## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, COMMONWEALTH OF
MASSACHUSETTS, STATE OF NEW YORK, STATE
OF ARIZONA, STATE OF CALIFORNIA, STATE OF
COLORADO, STATE OF CONNECTICUT, STATE OF
DELAWARE, THE DISTRICT OF COLUMBIA,
STATE OF HAWAI'I, STATE OF ILLINOIS, LAURA
KELLY, *in her official capacity as Governor of the State
of Kansas*, OFFICE OF THE GOVERNOR EX REL.
ANDY BESHEAR*, in his official capacity as Governor
of the* COMMONWEALTH OF KENTUCKY*,* STATE
OF MAINE, STATE OF MARYLAND, ATTORNEY
GENERAL DANA NESSEL FOR THE PEOPLE OF
MICHIGAN, STATE OF MINNESOTA, STATE OF
NEVADA, STATE OF NEW MEXICO, STATE OF
OREGON, JOSH SHAPIRO, *in his official capacity as
Governor of the Commonwealth of Pennsylvania*, STATE
OF RHODE ISLAND, STATE OF VERMONT, STATE
OF WISCONSIN,

        Plaintiffs,

    v.

U.S. OFFICE OF MANAGEMENT AND BUDGET;
RUSSELL VOUGHT, *in his official capacity as Director
of the Office of Management & Budget*; U.S.
DEPARTMENT OF AGRICULTURE; BROOKE L.
ROLLINS, *in her official capacity as Secretary of
Agriculture*; U.S. DEPARTMENT OF COMMERCE;
HOWARD LUTNICK, *in his official capacity as
Secretary of Commerce*; U.S. DEPARTMENT OF
DEFENSE; PETE HEGSETH, *in his official capacity as
the Secretary of Defense*; U.S. DEPARTMENT OF
HOMELAND SECURITY; KRISTI NOEM, *in her
official capacity as Secretary of Homeland Security*; U.S.
DEPARTMENT OF THE INTERIOR; DOUG
BURGUM, *in his official capacity as Secretary of
Interior*; U.S. DEPARTMENT OF JUSTICE; PAMELA
JO BONDI, *in her official capacity as Attorney General
of the U.S.*; U.S. DEPARTMENT OF LABOR; LORI
CHAVEZ-DeREMER, *in her official capacity as
Secretary of Labor*; U.S. DEPARTMENT OF STATE;

C.A. No. 1:25-cv-11816-IT

MARCO RUBIO, *in his official capacity as Secretary of State,* U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, *in his official capacity as Administrator of the Environmental Protection Agency*; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; DAVID RICHARDSON, *in his official capacity as the Senior Official Performing the Duties of the Administrator*; NATIONAL ENDOWMENT FOR THE HUMANITIES; MICHAEL MCDONALD, *in his official capacity as Acting Chairman of the National Endowment for the Humanities*; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, *in his official capacity as the Acting Director of the National Science Foundation*;

Defendants.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the State of New Jersey, the Commonwealth of Massachusetts, the State of New York, the State of Arizona, the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Illinois, Laura Kelly, in her official capacity as Governor of the State of Kansas, Office of the Governor *ex rel.* Andy Beshear, in his official capacity as Governor of Kentucky, the State of Hawai'i, the State of Illinois, the State of Maine, the State of Maryland, Attorney General Dana Nessel for the People of Michigan, the State of Minnesota, the State of Nevada, the State of New Mexico, the State of Oregon, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, the State of Rhode Island, the State of Vermont, and the State of Wisconsin allege as follows:

## INTRODUCTION

1. The Trump Administration has mounted an unprecedented and unlawful campaign to terminate billions of dollars in critical federal funding appropriated by Congress. Since January 20, at the direction of President Trump and the Department of Government Efficiency (DOGE),

federal agencies have stripped away thousands of grants they had previously awarded to Plaintiffs—for projects and programs that those same federal agencies had reviewed, approved, and supported only months before.

2.  Federal agencies have engaged in this nationwide slash-and-burn campaign by unlawfully invoking a single subclause buried in federal regulations promulgated by the Office of Management of Budget (OMB). This clause, referred to here as "the Clause,"[1] provides that federal agencies may terminate grants "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award *no longer effectuates* the program goals or *agency priorities*." 2 C.F.R. § 200.340(a)(4) (emphasis added). That Clause has been incorporated verbatim into regulations promulgated by each of the Agency Defendants.[2]

3.  The Trump Administration has claimed that five words in this Clause—"no longer effectuates . . . agency priorities"—provide federal agencies with virtually unfettered authority to withhold federal funding any time they no longer wish to support the programs for which Congress has appropriated funding. And it has made a concerted decision, reflected in its uniform practice across a wide range of federal agencies, to invoke the Clause as grounds for terminating billions of dollars of federal funding to Plaintiffs. Indeed, each Agency Defendant has invoked these five words since January 20 to terminate federal grants to States.

4.  The results have been devastating. With the stroke of a pen, federal agencies have deprived States of critical funding they rely on to combat violent crime and protect public safety, equip law enforcement, educate students, safeguard public health, protect clean drinking water, conduct life-saving medical and scientific research, address food insecurity experienced by

---

[1]  Plaintiffs refer to both 2 C.F.R. § 200.340(a)(4) (2024) and its predecessor, 2 C.F.R. § 200.340(a)(2) (2021), as the "Clause."

[2]  For purposes of this complaint, "Agency Defendants" refers to all Defendants except OMB.

students in school, ensure access to unemployment benefits for workers who lose their jobs, and much more. Federal agencies have done all of this without any advance notice, without any explanation to the State recipients, and in direct contravention of the will of Congress. The State recipients' sole offense has been that they used the grant funding precisely how they had promised in the grant applications—and as they were instructed by the agencies at the time of the grant award.

5.      The Trump Administration's decision to invoke this Clause as its purported basis for slashing billions of dollars of critical funding is a dramatic departure from past practice and OMB's own interpretation of the Clause. OMB first promulgated the Clause in 2020. 2 C.F.R. § 200.340(a)(2) (2021). At that time, it made clear that the Clause granted federal agencies only limited authority to terminate grants. OMB explained that the Clause permitted federal agencies to terminate grants where, for instance, "additional evidence reveals that a specific award objective is ineffective at achieving program goals," or where "additional evidence . . . cause[s] the Federal awarding agency to significantly question the feasibility of the intended objective of the award." 85 Fed. Reg. 49,507-08 (Aug. 13, 2020). At the same time, OMB clarified in its final guidance that, under the Clause as written, agencies "are not able to terminate grants arbitrarily." *Id.* at 49,509-10. OMB reiterated that purpose of the Clause in 2024, when it was revised to provide that an award could be terminated "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2024). OMB never suggested, in either the 2020 or 2024 rulemaking, that a grant could be terminated even though the grant was continuing to serve the very goals for which the monies had initially been awarded, merely because the agency's priorities shifted midway during the use of the grant—let alone with no advance notice.

4

6.     Consistent with OMB's guidance, Plaintiffs accepted federal grants with no notice or indication whatsoever that the federal government could change its priorities and terminate grants on a whim. Indeed, Plaintiffs are not aware of a single instance prior to January 2025 in which a federal agency relied on the Clause to terminate a grant on the grounds that agency priorities had changed after the award of the grant.

7.     In the first few weeks of the Trump Administration, however, federal agencies abruptly shifted course. In February 2025, President Trump formally directed agencies—and the DOGE employees assigned to these agencies—to terminate grants en masse. He issued an Executive Order directing each agency head—"in consultation with the agency's DOGE Team Lead"—to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify . . . such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." Exec. Order No. 14,222 §§ 1, 3(b), 90 Fed. Reg. 11,095 (Feb. 26, 2025). The President has since reinforced that directive through other Executive Orders requiring Agency Defendants to terminate grants based on this Administration's asserted priorities. *See infra* ¶¶ 82-91.

8.     In effectuating this directive, Agency Defendants now assert—for the first time— that the Clause means something completely new: That the Clause permits agencies to terminate grant awards when the agency simply changes its mind. As demonstrated by Defendants' decision to invoke the Clause as grounds for terminating thousands of grants to Plaintiffs, Defendants have asserted that the Clause provides them with a blank check to terminate awarded grants to Plaintiffs based on newly identified agency priorities—even when those priorities conflict with the priorities identified by Congress or by the agency at the time of the grant award. Indeed, invoking the Clause,

5

Defendants have in recent months terminated entire programs even where Congress has expressly directed that funds be spent on them.

9.    Defendants' decision to invoke the Clause to terminate grants based on changed agency priorities is unlawful several times over. The rulemaking history of the Clause makes plain that OMB intended for the Clause to permit terminations in only limited circumstances and provides no support for a broad power to terminate grants on a whim based on newly identified agency priorities. And the text of the Clause makes no reference to terminations based on changes in agency preferences that occur after a grant is awarded. Moreover, Defendants' limitless assertion of authority to terminate grants based on newly identified agency priorities is inconsistent with the separation of powers. The Constitution "grants the power of the purse to Congress, not the President." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). But under Defendants' capacious application of the Clause, Defendants have terminated entire programs by substituting their priorities for those identified by Congress, even when Congress has directed funds to be spent on those very programs. Defendants' decision to invoke the Clause to terminate grants based on changed agency priorities is also in tension with the Spending Clause because Defendants have failed to provide States with clear and unambiguous notice of the conditions that apply to their grants. *See* U.S. Constitution, Art. I, § 8, cl. 1. Under the Spending Clause, no statute could authorize the imposition of grant conditions that allow agencies to terminate grants on a whim based on an agency's own shifting priorities. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

10.    In invoking the Clause to terminate a wide range of grants, Defendants have caused and will continue to cause immediate and significant harm to Plaintiffs. Not only have federal agencies already collectively terminated billions of dollars in grants to Plaintiffs, but grant

terminations invoking the Clause remain ongoing. Defendants continue to implement the President's Executive Orders directing them to withhold federal funding through grant terminations—and with each passing week, Plaintiffs continue to receive additional termination notices. Plaintiffs have numerous existing grant agreements with Agency Defendants. Based on their decision to invoke the Clause to effectuate the President's directive to withhold federal funding through grant terminations means that these grants are subject to immediate termination if at any point Defendants change their priorities on a whim.

11.     Plaintiffs also collectively receive billions of dollars in federal funding each year from Defendants, and they will be applying for future grants in the days, weeks, and months to come. Because these grants will be subject to the same Clause, and because the decision to invoke this Clause to terminate grants based on changed agency priorities remains in effect, Plaintiffs seek a declaration as to the legal meaning of the Clause. Indeed, the need for clarity is especially pronounced for Plaintiffs because the Constitution mandates clear notice of the terms on which States accept federal funding. *See Murphy*, 548 U.S. at 296.

12.     Given Defendants' continuing grant terminations based on changed agency priorities and the ongoing harms incurred by Plaintiffs due to Defendants' interpretation of the Clause, Plaintiffs have a strong interest in obtaining a legal declaration of their rights under the Clause and Agency Defendants' regulations incorporating the Clause verbatim. In requesting these declaratory legal findings, Plaintiffs do not seek an order enjoining any particular grant termination. Instead, Plaintiffs seek a declaration that the Clause and Agency Defendants' regulations incorporating the Clause do not independently authorize the terminations of awards based on a failure to effectuate agency priorities identified after the grant was awarded. In the alternative, Plaintiffs seek an order vacating and setting aside Defendants' decision to invoke the

Clause as grounds for terminating grants based on a change in agency priorities, a permanent injunction barring Defendants from implementing or giving effect to that decision, and an order vacating and setting aside of the Clause itself as arbitrary and capricious under the Administrative Procedure Act.

## JURISDICTION AND VENUE

13.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

14.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the U.S. District of Massachusetts.

## PARTIES

### A. Plaintiffs

15.    Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

16.    Plaintiff Commonwealth of Massachusetts is a sovereign commonwealth in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the chief legal officer of Massachusetts.

17.     Plaintiff State of New York, represented by and through its Attorney General Letitia James, is a sovereign state of the United States. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

18.     Plaintiff State of Arizona is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

19.     Plaintiff State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

20.     Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by Attorney General Phil Weiser, who is the chief law enforcement officer of Colorado.

21.     Plaintiff State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by Attorney General William Tong, who is the chief law enforcement officer of Connecticut.

22.     Plaintiff State of Delaware is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathy Jennings, who is the chief law enforcement officer of Delaware.

23.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits

initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

24.     Plaintiff State of Hawai'i is a sovereign state in the United States of America. Hawai'i is represented by and through Attorney General Anne E. Lopez, is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne E. Lopez, who is the chief law enforcement officer of Hawai'i.

25.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests.

26.     Plaintiff Laura Kelly brings this suit in her official capacity as Governor of the State of Kansas. The Kansas Constitution vests "[t]he supreme executive power" in the Governor, "who shall be responsible for the enforcement of the laws of" Kansas. Kan. Const. art. I, § 3. The Governor oversees all executive agencies in Kansas and has the power to bring a suit and be sued in her official capacity in fulfilling her constitutional duty.

27.     Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as the Governor of the Commonwealth of Kentucky.  The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky. Const. § 81.  In fulfilling his constitutional duties, the Governor has authority to bring this action.

28.     Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by Attorney General Aaron Frey who is the chief law enforcement officer of Maine.

29.     The State of Maryland is a sovereign state in the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

30.     The People of the State of Michigan are represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

31.     Plaintiff State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

32.     Plaintiff State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

33.     Plaintiff State of Nevada is a sovereign state of the United States of America. Nevada is represented by Attorney General Aaron Ford who is the chief law enforcement officer of Nevada.

34.     Plaintiff State of Oregon is a sovereign state in the United States of America. The State of Oregon is represented by Attorney General Dan Rayfield, who is the chief legal officer of the State of Oregon.

35.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art.

IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

36.    Plaintiff State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

37.    Plaintiff State of Vermont is a sovereign state in the United States of America. Vermont is represented by Attorney General Charity Clark, who is authorized to initiate litigation on Vermont's behalf.

38.    Plaintiff State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul who is the chief law enforcement officer of Wisconsin.

**B. Defendants**

39.    Defendant the United States Office of Management and Budget (OMB) is a cabinet agency within the executive branch of the United States government. The Office of Management and Budget is responsible for oversight of federal agencies' performance and the administration of the federal budget. 31 U.S.C. § 501.

40.    Defendant Russell Vought is the Director of OMB, and that agency's highest ranking official. 31 U.S.C. § 502. He is responsible for overseeing OMB, providing direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements, and ensuring that its directions are implemented by all federal agencies that provide relevant funding and support. He is sued in his official capacity.

41.    Defendant the United States Department of Agriculture is a cabinet agency within the executive branch of the United States government. 7 U.S.C. § 2201.

42.     Defendant Brooke L. Rollins is the Secretary of Agriculture, and that agency's highest ranking official. 7 U.S.C. § 2202. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

43.     Defendant the United States Department of Commerce is a cabinet agency within the executive branch of the United States government. 15 U.S.C. § 1501.

44.     Defendant Howard Lutnick is the Secretary of Commerce, and that agency's highest ranking official. 15 U.S.C. § 1501. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

45.     Defendant the United States Department of Defense is a cabinet agency within the executive branch of the United States government. 10 U.S.C. § 111.

46.     Defendant Pete Hegseth is the Secretary of Defense, and that agency's highest ranking official. 10 U.S.C. § 113. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

47.     Defendant the United States Department of Homeland Security is a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 111.

48.     Defendant Kristi Noem is the Secretary of Homeland Security, and that agency's highest ranking official. 6 U.S.C. § 112. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

49.     Defendant the United States Department of the Interior is a cabinet agency within the executive branch of the United States government. 43 U.S.C. § 1451.

50.     Defendant Doug Burgum is the Secretary of the Interior, and that agency's highest ranking official. 43 U.S.C. § 1451. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

51.     Defendant the United States Department of Justice is an independent agency within the executive branch of the United States government. 28 U.S.C. § 501.

52.     Defendant Pamela Jo Bondi is the Attorney General for the United States Department of Justice, and that agency's highest ranking official. 28 U.S.C. § 503. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

53.     Defendant the United States Department of Labor is a cabinet agency within the executive branch of the United States government. 29 U.S.C. § 551.

54.     Defendant Lori Chavez-DeRemer is the Secretary of Labor, and that agency's highest ranking official. 29 U.S.C. § 551. She is charged with the supervision and management of all decisions and actions of that agency. She is sued in her official capacity.

55.     Defendant the United States Department of State is a cabinet agency within the executive branch of the United States government. 22 U.S.C. § 2651.

56.     Defendant Marco Rubio is the Secretary of State, and that agency's highest ranking official. 22 U.S.C. §§ 2651, 2561a. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

57.     Defendant the United States Environmental Protection Agency is an independent agency within the executive branch of the United States government. 42 U.S.C. § 4321.

58.     Defendant Lee Zeldin is the Administrator of the United States Environmental Protection Agency, and that agency's highest ranking official. 42 U.S.C. § 4321. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity.

59.    Defendant the United States Federal Emergency Management Agency is part of the United States Department of Homeland Security, a cabinet agency within the executive branch of the United States government. 6 U.S.C. § 313.

60.    David Richardson is the Acting Administrator of the United States Federal Emergency Management Agency, and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. He is sued in his official capacity. 6 U.S.C. §§ 313, 314.

61.    Defendant the National Endowment for the Humanities is an independent agency of the United States Government. 20 U.S.C. § 956. It is responsible for processing and overseeing humanities-related grants to individuals and organizations across the country.

62.    Defendant Michael McDonald is the Acting Chairman of the National Endowment for the Humanities and that agency's highest ranking official. He is sued in his official capacity.

63.    Defendant the National Science Foundation is an independent agency of the federal government that supports fundamental research and education in all the non-medical fields of science and engineering. 42 U.S.C. § 1861.

64.    Defendant the Brian Stone is the Acting Director of the National Science Foundation, and that agency's highest ranking official. He is sued in his official capacity.

## ALLEGATIONS

**I.    The Clause and Regulations Governing Grant Terminations.**

65.    OMB is a component of the Executive Office of the President and is responsible for leading the development of government-wide policy regarding Federal financial grants management. *See, e.g.*, 31 U.S.C. §§ 501, 502, 503(b)(2)(C) (requiring Deputy Director of Management to "establish general management policies for executive agencies" involving "grant, cooperative agreement, and assistance management").

15

66.     In discharging that responsibility, OMB periodically promulgates "guidance" governing Federal grants. Each of the Agency Defendants have incorporated this "guidance" into their own regulations.

67.     For years, OMB regulations have made clear that federal agencies can terminate grants unilaterally only in a narrow set of circumstances. These regulations never contemplated that agencies would have broad authority to terminate existing awards on a whim, without advance notice or consideration of reliance interests, based on shifting agency priorities.

**A.  2013 OMB Uniform Guidance Governing Federal Awards.**

68.     In 2013, OMB promulgated its Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards, commonly known as the Uniform Guidance. *See* 78 Fed. Reg. 78,590 (Dec. 26, 2013). This rulemaking was intended to "streamline" OMB guidance for federal grantmaking. *Id.*

69.     The Uniform Guidance states that it "is guidance, not regulation." 2 C.F.R. § 1.105(b). But it also requires that "Federal agencies making Federal awards to non-Federal entities . . . implement" substantive portions of the Uniform Guidance "in codified regulations unless different provisions are required by Federal statute or are approved by OMB." 2 C.F.R. § 200.106 (requiring that awardees implement "the language in subparts C through F" of the Uniform Guidance, which includes award requirements, cost principles, and audit requirements); *see also* 2 C.F.R. § 200.107 (explaining that "OMB will review Federal agency regulations and implementation" of the Guidance, and that "[a]ny exceptions will be subject to approval by OMB and only with adequate justification from the Federal agency").

70.     In 2014, all Federal award-making agencies issued a joint interim final rule codifying the Uniform Guidance into regulation. Federal Awarding Agency Regulatory

16

Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75,871 (Dec. 19, 2014); *see id.* at 75,872 (noting the "rule is necessary in order to incorporate into regulation and thus bring into effect the Uniform Guidance as required by OMB"). In so doing, the Federal award-making agencies gave "regulatory effect" to the portions of the Uniform Guidance that the agency chose to adopt. 2 C.F.R. § 1.105(c).

71.    The Uniform Guidance permits grant award termination only under enumerated circumstances. *See* 2 C.F.R. §§ 200.339 to 200.343 (collectively addressing "Remedies for Noncompliance"). Specifically, the Uniform Guidance provides that when a grant recipient fails to comply with the terms and conditions of an award or federal law, the federal agency "may implement specific conditions," 2 C.F.R. § 200.339, such as "[r]equiring additional project monitoring," requiring the recipient obtain technical or management assistance, and "[e]stablishing additional prior approvals," 2 C.F.R. § 200.208(c). If the agency subsequently "determines that noncompliance cannot be remedied by imposing specific conditions," the agency may then take additional corrective actions, including, among other things, suspending or terminating the award "in part or in its entirety." 2 C.F.R. § 200.339(c).

72.    The Uniform Guidance also sets additional parameters around grant terminations.

73.    From 2014 to 2020, the Uniform Guidance's Remedies for Noncompliance permitted termination of a federal grant award only (1) if the recipient failed to comply with the terms and conditions of the award; (2) for cause; and (3) with the consent of the recipient. 2 C.F.R. § 200.339(a)(1)-(3) (2014). Termination of the grant award was also permitted when initiated by the recipient upon written notice to the awarding agency. *Id.* § 200.339(a)(4).

**B. 2020 Revision to the OMB Uniform Guidance and Addition of the Clause.**

74.    In 2020, OMB revised the Uniform Guidance's Remedies for Noncompliance. *Guidance for Grants & Agreements*, 85 Fed. Reg. 49,506-507 (Aug. 13, 2020) (2020 Final Rule). The 2020 Final Rule revised the allowable reasons for award termination in several ways.

75.    First, the 2020 Final Rule eliminated the provision permitting termination of an award "for cause." OMB explained in the 2020 Final Rule's preamble that this provision was "not substantially different from the provision allowing Federal awarding agencies to terminate Federal awards when the recipient fails to comply with the terms and conditions." 85 Fed. Reg. 49,508; *see* 2 C.F.R. § 200.339(a)(1) (2021) (permitting termination "if a non-Federal entity fails to comply with the terms and conditions of a Federal award").

76.    Second, the 2020 Final Rule added the Clause, permitting termination of an award "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2021). The addition of the Clause contemplates that agencies may terminate grants for failing to meet *established* agency priorities—not terminations based on *new or changed* priorities.

77.    The preamble to the 2020 Final Rule specifically addressed how to construe this language. Responding to concerns "that the proposed language will provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause," OMB emphasized that "as written agencies are not able to terminate grants arbitrarily." 85 Fed. Reg. 49,509. Rather, OMB clarified that "[t]he intent of this change is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals." *Id.* at 49,508. According to OMB, this provision would authorize termination in limited circumstances—where, for example, "additional evidence reveals that a specific award objective is ineffective at achieving program

18

goals" or "cause[s] the Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id*. at 49,507-08.

78.     In the rulemaking history of the 2020 Final Rule, OMB never once indicated that the words "agency priorities" would confer broad authority on federal agencies to terminate grants based on new or changed agency priorities. Instead, to the extent OMB discussed the Clause at all during the rulemaking process, it focused on the "program goals" aspect of the Clause, connecting the Clause with provisions elsewhere in the 2020 Final Rule that mandated that agencies expressly "establish[] program goals" at the time they publicized the availability of the grant award. 85 Fed. Reg. 3,769 (noting that the termination provision was "[r]elated" to other aspects of the regulations designed to "strengthen program planning"); *see* 2 C.F.R. § 200.202 (requiring agencies to identify "clear goals and objectives" before announcing a Notice of Funding Opportunity).

### C.  2024 Revision to the Uniform Guidance and the Clause.

79.     In 2023, OMB issued a Notice of Proposed Rulemaking to revise the Uniform Guidance. Guidance for Grants & Agreements, Proposed Rule, 88 Fed. Reg. 69,690 (Oct. 5, 2023) (2023 NPRM).

80.     Following notice and comment, OMB issued its final Guidance for Federal Financial Assistance in April 2024. *See* 89 Fed. Reg. 30,046 (Apr. 22, 2024) (2024 Final Rule).

81.     The preamble to the 2024 Final Rule noted that OMB had proposed revising the Clause to "remove unnecessary language because section 200.340 still allowed agencies to terminate a Federal award according to the terms and conditions of the award. So an agency could specify the conditions upon which an award could be terminated in the terms and conditions of the award, including, for example, when an award no longer effectuates the program goals or agency priorities." *Id.* at 30,089. OMB noted that some commenters supported the removal of the Clause

because doing so "would eliminate a vague standard for award termination and serve OMB's goal of clarifying a section that could be interpreted in a variety of different ways." *Id.*

82.     The 2024 Final Rule revised the Clause to permit termination "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* at 30,169 (codified at 2 C.F.R. § 200.340(a)(4)).

83.     The 2024 Final Rule also expressly clarified that a federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b).

84.     In the 2024 Final Rule, OMB explained that this revision continued to permit termination of an award "pursuant to the terms and conditions of the Federal award," and that "this may include a term and condition allowing termination . . . , to the extent authorized by the law, if an award no longer effectuates the program goals or agency priorities." 89 Fed. Reg. 30,089. OMB concluded that "the final version of the guidance provides greater clarity on the policy for termination of awards by the Federal agency or pass-through entity by underscoring the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id*.

85.     Under both the 2020 and 2024 versions of the Clause, Plaintiffs are not aware of a single instance prior to January 20, 2025, in which the Clause was invoked to terminate an award to Plaintiffs on the grounds that the award does not effectuate new "agency priorities" identified after the time of the award.

II.    **The Trump Administration's Directives to Federal Agencies to Terminate Previously Awarded Federal Grant Funding.**

86.    Notwithstanding the circumscribed scope of authority given to Executive Branch agencies to terminate awarded federal funding, President Trump announced shortly after the 2024 election that he would be ordering a full-scale effort to "dismantle Government Bureaucracy" and "cut wasteful expenditures." President Trump indicated in November 2024 that he planned to establish a "Department of Government Efficiency" to work with Executive Branch agencies to carry out this dismantling effort.

87.    On January 20, 2025, President Trump issued an Executive Order creating the United States Department of Government Efficiency (DOGE). *See* Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025) (Establishing and Implementing the President's Department of Government Efficiency). By the terms of the Executive Order, a team of individuals affiliated with DOGE would embed in every federal agency.

88.    In the weeks and months after his inauguration, President Trump issued a series of executive orders unambiguously directing federal agencies—in consultation with DOGE—to terminate existing federal grants or contracts to a wide variety of federal funding recipients, including Plaintiffs.

89.    Most notably, on February 26, the President issued an Executive Order announcing that his Administration was "commenc[ing] a transformation in Federal spending on contracts, grants, and loans." Exec. Order No. 14,222 § 1, 90 Fed. Reg. 11,095 (Feb. 26, 2025) (Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative). The Executive Order required each agency head—"in consultation with the agency's DOGE Team Lead"—to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and

grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." *Id.* § 3(b). The Order directed agencies to "prioritize the review of funds disbursed under covered contracts and grants to educational institutions and foreign entities for waste, fraud, and abuse." *Id.*

90.     That Order was consistent with a number of other executive orders identifying new policy positions for the Administration and directing the termination of grants in accordance with those newly announced policy priorities.

91.     By way of illustration, on January 20, 2025, the President issued an Executive Order entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "DEI EO"). Exec. No. 14,151, 90 Fed. Reg. 8,339 (Jan. 20, 2025). Relevant here, the Executive Order mandates the termination of various offices, positions, programs and practices within the federal government, including in relation to its grants or contracts, that implicate what the Executive Order describes as "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)." *Id.* § 1. And the Executive Order also requires agencies to provide the Director of OMB a list of all "Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." *Id.* § 2(b)(ii)(C).

92.     On January 20, 2025, the President issued an Executive Order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender EO"). Exec. No. 14,168, 90 Fed. Reg. 8,615 (Jan. 20, 2025). Relevant here, this Executive Order directs that agencies (a) "shall take all necessary steps, as permitted by law, to end the Federal funding of" what the Executive Order calls "gender ideology," as defined

elsewhere in the EO, and (b) "shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id*. § 3(g).

93.    On March 20, the President issued an Executive Order on "Improving Education Outcomes by Empowering Parents, States, and Communities" (the "Education Outcomes EO"). Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025). Relevant here, this Order seeks to "ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance" with the "requirement that any program or activity receiving Federal assistance terminate illegal discrimination obscured under the label 'diversity, equity, and inclusion' or similar terms and programs promoting gender ideology." *Id*. at §§ 2(a)-(b).

94.    On April 28, the President issued an Executive Order on "Protecting American Communities from Criminal Aliens." Exec. Order No. 14,287, 90 Fed. Reg. 18,761 (Apr. 28, 2025). The Order directs the Attorney General, in coordination with the Secretary of Homeland Security, to "publish a list of States and local jurisdictions that obstruct the enforcement of Federal immigration laws (sanctuary jurisdictions)." *Id*. at § 2. After designating "sanctuary jurisdictions," this Order directs the head of each executive department or agency, in coordination with the Director of the Office of Management and Budget, to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate." *Id*. at § 3.

95.    Other Executive Orders also direct federal officers or agencies to review or terminate grant awards. *See, e.g.*, "Reinstating Common Sense School Discipline Policies" (the "School Discipline EO," Exec. Order No. 14,280, 90 Fed. Reg. 17,533 (Apr. 28, 2025) (Reinstating Common Sense School Discipline Policies); Exec. Order No. 24,282, 90 Fed. Reg. 17,541 (Apr. 28, 2025) (Transparency Regarding Foreign Influence at American Universities)

**III.    Defendants Have Invoked the Clause to Terminate Billions of Dollars of Funding to Plaintiffs, and Billions More in Funding Is At Risk.**

96.    Defendants have implemented the President's directives by making the decision to interpret and apply the Clause as the legal basis for gutting billions of dollars of grants already previously awarded to Plaintiffs.

97.    As part of the Administration's slash-and-burn campaign to indiscriminately cut federal grants, Defendants have terminated thousands of grant awards made to Plaintiffs, pulling the rug out from under the States, and taking away critical federal funding on which States and their residents rely for essential programs.

98.    Defendants have made the decision to invoke the Clause as grounds for terminating grants where the Administration no longer wishes to support the programs funded by those grants.

99.    Each Defendant has carried out that decision in a uniform fashion and across thousands of grants: they have invoked the "agency priorities" language in the Clause as grounds to terminate Plaintiffs' grants that the Administration no longer wishes to fund.[3]

100.    In doing so, the Agency Defendants have terminated grants without justification, without notice, and without reference to the grantee's performance. Terminations have come during the period of performance, without prior opportunity for the grantee to obtain information about the "agency priorities" that were the purported basis for the termination.

101.    Defendants have also invoked the Clause to terminate entire programs based on changing agency priorities even where Congress has directed funds to be spent on those programs.

---

[3] *See* Carolyn Y. Johnson & Joel Achenbach, *These 5 words have killed millions in grants and advanced Trump's agenda*, The Washington Post (Mar. 27, 2025), https://tinyurl.com/nhadpdzx.

102.    Indeed, Defendants have invoked the Clause to terminate awards even where Congress has appropriated money for an identified objective, and Defendants have chosen to substitute their own "agency priorities" for the objectives identified by Congress.

103.    None of these actions can be supported by the Clause itself, which OMB has stressed does not provide an agency with authority to arbitrarily terminate a grant award, or by the Agency Defendants' regulations incorporating the Clause. And yet Defendants have continued to invoke the Clause as grounds to terminate grants based on new, previously unspecified agency priorities—and they have done so without regard to grantees' reliance interests in the continued receipt of federal funds.

104.    Defendants' invocation of the Clause as grounds for grant terminations based on changed agency priorities is causing, and will continue to cause, significant and immediate harm to Plaintiffs. Plaintiffs operate programs and provide services to their residents in reliance on the federal funding they are awarded by Defendants. Defendants, however, have repeatedly ignored Plaintiffs' reliance interests and invoked the Clause to terminate billions of dollars in already-awarded funding to Plaintiffs.

105.    What follows below is a non-exhaustive accounting of awards to Plaintiffs that each Defendant has recently terminated under the Clause. Unless otherwise noted, each award was terminated by Defendants on the grounds that the award no longer effectuates "agency priorities" not identified at the time the award was made to Plaintiffs.

**A.  Department of Agriculture**

106.    The U.S. Department of Agriculture (USDA) oversees federally funded programs related to agriculture and, through its subagencies, distributes Congressionally appropriated grant

funding. To govern its grantmaking process, USDA adopted OMB's Uniform Guidance, including § 200.340, in 2014. *See* 2 C.F.R. § 400.1.

107.    Prior to 2025, Plaintiffs are not aware of any grant that was terminated by USDA or its subagencies pursuant to the Clause.

108.    In or around March 2025, USDA's Agricultural Marketing Service (AMS), a USDA subagency, terminated cooperative agreements with Plaintiffs through the Local Food Purchase Assistance Cooperative Agreement Program (LFPA Program). The LFPA Program uses "non-competitive cooperative agreements to provide funding for state, tribal and territorial governments to purchase foods produced within the state or within 400 miles of the delivery destination to help support local, and regional producers" to "improve food and agricultural supply chain resiliency."[4]

109.    Each of Plaintiffs' LFPA Program grants effectuated the priorities identified by Congress, which authorized funding for USDA to "purchase food and agricultural commodities"; "to purchase and distribute agricultural commodities (including fresh produce, dairy, seafood, eggs, and meat) to individuals in need, including through delivery to nonprofit organizations and through restaurants and other food related entities, as determined by the Secretary, that may receive, store, process, and distribute food items;" and to "make loans and grants and provide other assistance to maintain and improve food and agricultural supply chain resiliency." American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 1001, 135 Stat. 10 (2021).

110.    Nevertheless, in March 2025, Plaintiffs received identical termination notifications that cited the Clause and stated that the "agreement no longer effectuates agency priorities and . . . termination of the award is appropriate."

---

[4]    USDA, Local Food Purchase Assistance Cooperative Agreement Program, https://tinyurl.com/f453x9y8 (last visited June 23, 2025).

111.    In New Jersey, AMS terminated the Local Food Purchase Assistance (LFPA) 2025 Cooperative Agreement with the New Jersey Department of Agriculture. Through that cooperative agreement, New Jersey had planned to purchase and distribute locally grown, produced, and processed agricultural products from underserved producers to serve at food banks. AMS also terminated the Local Food for Schools and Child Care Cooperative Agreement (LFSCC), which was intended to increase purchasing of local, domestic, and unprocessed or minimally processed agricultural products for distribution to schools and childcare institutions participating in the National School Lunch Program and/or the Child and Adult Care Food Program.

112.    In New York, AMS terminated the LFPA 2025 Cooperative Agreement between AMS and New York Food for New York Families. Through that cooperative agreement, New York intended to create a more resilient statewide food system that supports local farms and provides high-quality, nutritious food to communities facing food insecurity.

113.    In Massachusetts, AMS terminated the LFPA 2025 Cooperative Agreement with the Massachusetts Department of Agricultural Resources on March 7, 2025. Through that program, Massachusetts operated "31 projects, with over $11 million in funding going straight towards the purchase of local foods from just under 500 unique farmers and producers across the state and region. LFPA also supported local food distribution to upwards of 700 sites, "serving vital communities across the Commonwealth" and "[a]warded organizations were able to make hundreds of new connections with farmers, working together to provide local healthy foods on a widespread scale." The termination letter cited the Clause and stated that "AMS has determined this agreement no longer effectuates agency priorities and that termination of the award is appropriate."

27

114.    In Maryland, AMS terminated the LFPA 2025 Cooperative Agreement with the Maryland Department of Agriculture. Through that cooperative agreement, Maryland intended to purchase local produce or minimally processed domestic foods for distribution to underserved communities.

115.    In Illinois, AMS terminated the LFPA 2025 Cooperative Agreement with the Illinois Department of Agriculture. This program is intended to increase local food consumption and help build and expand economic opportunity for local producers. Illinois intended to use funds under the agreement to maintain and improve food and agricultural supply chain resiliency by purchasing locally grown food to distribute to feeding programs and organizations such as food banks.

116.    In Wisconsin, AMS terminated a $5.4 million LFPA grant awarded to the Wisconsin Department of Agriculture, Trade, and Consumer Protection, which aimed to maintain and improve food and agricultural supply chain resiliency through the procurement of local, domestic, and unprocessed or minimally processed agricultural commodities. In Wisconsin, most of the funding was used to pay farmers to grow food to be distributed to food banks. On May 7, 2025, the state agency received notice that the grant was terminated "in accordance with 2 CFR § 200.340(a)(4)." Similarly, on April 18, 2025, USDA terminated a $600,000 award to the University of Wisconsin – Madison for the Equity in Conservation Outreach grant, which funds community-led conservation projects, similarly stating that the award "no longer effectuates Department priorities," citing the Clause.

117.    In Connecticut, AMS terminated the LFPA 2025 Cooperative Agreement with the Connecticut Department of Agriculture. Through that cooperative agreement, Connecticut had planned to serve farmers and communities facing food insecurity by supporting the purchase of

product from local producers and the distribution of that product to underserved communities through a network of organizations.

118.    In Kansas, on May 7, 2025, AMS terminated a $2,643,574 award issued to the Kansas Department of Agriculture (KDA) as part of LFPA program, citing the Clause. The goal of the grant is to "support, maintain, and improve food and agricultural supply chain resiliency through the procurement of local, domestic, and unprocessed or minimally processed agricultural commodities." This program purchases and distributes Kansas grown and processed foods to underserved communities and families across Kansas. Kansas food banks use these funds to purchase fresh, local foods directly from famers and producers and then distribute the food through their networks. This program will not continue in Kansas without additional federal funding.

119.    New Mexico State University (NMSU), a public university in New Mexico, was awarded approximately $980,000 through two grants pursuant to the USDA's Natural Resource Career Development Program (NRCDP) for Hispanic Students. The grants funded programs, services, and staff positions to administer these, which were designed to provide Hispanic college students with work experience, mentorship, and training to embark on careers with the USDA. The period of performance for these grants was August 30, 2023 through December 31, 2025, and September 24, 2024 through December 31, 2029. However, NMSU was informed on April 18, 2025 that both grants were being cancelled because of the Secretary of Agriculture's determination that they did not meet the agency's priority in ensuring that the Department's awards "do not support programs or organizations that promote or take part in diversity, equity, and inclusion (DEI) initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic."

120.    Plaintiffs also receive currently active grants from USDA that are at risk of termination based on Defendants' decision to construe the Clause as authorizing federal granting agencies like USDA to terminate grants based on changed agency priorities.

121.    For example, Wisconsin receives many grants from USDA that remain active as of the date of filing. The Madison and Milwaukee campuses of the Universities of Wisconsin alone have over $300 million in ongoing USDA awards. And the Wisconsin Department of Health Services is administering over $100 million in USDA awards for the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), Supplemental Nutrition Assistance Program (SNAP), and Emergency Food Assistance Program grants, which together provide critical nutritional support to hundreds of thousands of Wisconsinites. Other current awards include a $4.6 million Urban and Community Forestry grant to the Wisconsin Department of Natural Resources, a $1 million Conservation Engineering Assistance grant to the Wisconsin Department of Agriculture, Trade, and Consumer Protection, and a $4.3 million Fresh Fruits and Vegetables Program grant to the Wisconsin Department of Public Instruction.

122.    New Jersey also receives numerous grants from USDA that remain active as of the date of filing. This includes a $3,284,631 grant, administered by the Natural Resources Conservation Service, for Blue Acres Ida Buyouts in Cranford, that is being used to demolish six residences located within a floodplain and subject to frequent flooding, to eliminate risk and restore ecologic function to the area. A second grant, $981,244 for Consolidated Forestry Programs, administered by the United States Forest Service, is being used to encourage, promote, and support the local stewardship and effective management of trees and forest ecosystems in New Jersey's communities through technical assistance and financial assistance.

123.    Massachusetts similarly has received around $30 million of discretionary grants through USDA's Forestry Service, including to fund wildfire prevention, over the course of the last five years.

124.    In addition to currently active grants, Plaintiffs have also applied to several future grants from the USDA that are at risk of future termination based on Defendants' decision to construe the Clause as authorizing grant terminations based on new agency priorities not identified at the time of the award.

125.    For example, New Jersey's Department of Environmental Protection (NJDEP) applied for the USDA Wildfire Risk Reduction grant on January 15, 2025. And Rowan University, a public research university in New Jersey, has also applied for a grant to curb pathogenic avian influenza (Bird Flu) that is administered by USDA Animal and Plant Health Inspection Service.

126.    The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harms to Plaintiffs.

127.    For example, in New Jersey, the 2025 LFPA program was terminated before the new funds could be used, but farmers had relied upon the previous funding with the expectation that it would be renewed when they decided to make multi-year investments in the production of the specific crops being sought by food banks and schools, as opposed to other crops which may have been more useful and profitable at the time. The outlay of capital and individual work-effort included obtaining seeds and fertilizers, as well as paying for upfront expenses and longer-term investments in labor and equipment. Due to logistics and economics, such sources and methods cannot be efficiently substituted on a year-by-year basis, and any such new ventures will now be disincentivized due to uncertainty.

128.    In Connecticut, the termination of its LFPA grant impacts many stakeholders including agricultural producers, non-profits, and individuals facing food insecurity. Many of the producers are small businesses with diversified fruit and vegetable operations as well as operations producing dairy, eggs, maple syrup, and meat to a smaller extent. The funding would have supported continuation and expansion of a program which purchases healthy, local food from 131 agricultural producers and supplies that food to Connecticut individuals facing food insecurity through a network of non-profit organizations which operate at 561 distribution centers.

129.    Moreover, AMS's termination of New Jersey's Local Food for Schools and Child Care Cooperative Agreement (LFSCC) has harmed local farmers and schools who relied on prior funding to provide nutritional food for all students across New Jersey. While LFPA aims to address food insecurity, LFSCC's principal aim is to provide healthy produce and protein options to students of all socioeconomic levels in New Jersey schools. Without federal funding, it will be significantly harder for schools to provide nutritional food for their students, and some schools will be forced to completely end these programs because of high food costs.

130.    If Plaintiffs' active grants with USDA were to be terminated based on Defendants' invocation of the Clause, further harm would ensue.

131.    For example, if New Jersey's Blue Acres Ida Buyouts grant is terminated, five families within the State would need to relocate from homes prone to chronic riverine flooding. If USDA terminates New Jersey's grant for Consolidated Forestry Programs, the loss of funding would significantly hinder the NJDEP's ability to support projects that promote sustainable forest management, reduce wildfire risk, and strengthen community resilience.

132.    Plaintiffs also face harm if their pending or future grant applications are awarded and then subsequently terminated based on Defendants' invocation of the Clause.

133.    For example, If New Jersey is awarded the USDA Wildfire Risk Reduction grant and it is later terminated, NJDEP's capacity to obtain the equipment, services, and supplies needed for implementing prescribed fire treatments and mechanical mitigation efforts would be severely limited. Additionally, the loss of funding would eliminate the NJDEP's ability to offer sub-grants to local Firewise Communities. These sub-grants support the implementation of Firewise principles, wildfire prevention efforts, and educational events, critical initiatives that help protect lives, property, and natural resources by fostering fire-adapted, resilient communities in harmony with their surrounding environment.

134.    If Rowan were to receive the Bird Flu grant and it was subsequently terminated, Rowan University would be severely limited in its ability to protect the poultry industry and consumers. More specifically, Rowan University researchers working on this project intended to study Bird Flu transmission would have to cease, or significantly decrease, their lab and field work. As a result, New Jerseyans may be at greater risk of being exposed to Bird Flu, poultry businesses would face greater financial and safety vulnerabilities, and egg prices would be likely to increase due to outbreaks.

**B. Department of Commerce**

135.    The Department of Commerce (Commerce) provides financial assistance, as authorized by specific statutes, through its bureaus, including the Minority Business Development Agency (MBDA), the National Institution of Standards and Technology (NIST), and the National Oceanic and Atmospheric Administration (NOAA).

136.    Commerce adopted OMB's Uniform Guidance, including § 200.340, in 2014 without any revisions. *See* 2 C.F.R. § 1327.101. Prior to April 2025, Plaintiffs are not aware of any grant terminated by Commerce pursuant to the Clause.

137.    Plaintiffs have received termination notices for grants administered by several of Commerce's bureaus, including NOAA and MBDA.

138.    In Maine, for example, NOAA terminated a $9,000,000 grant for Transformational Habitat Restoration and Connectivity in Downeast Maine. On April 9, 2025, NOAA notified Maine that the grant was being terminated pursuant to the Clause based on NOAA's determination that the grant's "activities are no longer aligned with effectuating these undertakings, nor relevant to the current focus of the Administration's objectives. Specifically, NOAA has concluded that the initial planning and design for this project is an overuse of taxpayer dollars, and that the stated goal and description of the program—restoration of salt marsh and related effects—fall outside of the current direction NOAA is taking regarding habitat restoration at this time."

139.    In Arizona, Commerce terminated an MBDA Capital Readiness Program grant to the Arizona Hispanic Chamber of Commerce (AZHCC), which is the operator of the Arizona MBDA Business Center. The initial Notice of Grant Termination the MBDA sent to AZHCC on April 17, 2025, stated that the "MBDA has determined that your grant 'is unfortunately no longer consistent with the agency's priorities and no longer serves the interest of the United States and the MBDA Program.'" NOAA subsequently sent a separate letter concerning the same grant on April 28, 2025. This letter specifically quoted the Clause and noted that Commerce determined that project activities under the particular grant "no longer effectuate[s] [the MBDA's] undertakings nor advance[s] the Administration's objectives."

140.    The MBDA also terminated another grant that it had issued to the Arizona MBDA Business Center in a letter it sent to the business center on April 17, 2025. Like the letter sent to the AZHCC on the same date, this termination letter stated that the "MBDA has determined that

your grant is unfortunately no longer consistent with the agency's priorities and no longer serves the interest of the United States and the MBDA Program."

141.    Plaintiffs also currently receive grants from Commerce that are at risk of termination under Defendants' decision to construe the Clause as independently authorizing grant terminations based on changed agency priorities.

142.    New Jersey receives numerous NOAA-administered grants that remain active as of the date of filing. This includes a $3,067,000 grant for sustainable coastal community planning, as well as planning for energy facilities and development. Another grant for $563,169 pays the salaries of trained conservation Police Officers who patrol New Jersey and its waters using the latest law enforcement technology to enforce laws and regulations that protect New Jersey wildlife.

143.    Wisconsin has many grants from Commerce that remain active as of the date of filing. The University of Wisconsin - Madison alone has over $105 million in ongoing Commerce awards. And the Wisconsin Public Service Commission has an ongoing award of over $1 billion from Commerce through the Broadband Equity, Access and Deployment program, which is being used to support the deployment of high-speed internet access to households and businesses in Wisconsin that currently lack it.

144.    In addition to currently active grants, Plaintiffs have also applied to a number of future grants from Commerce that are at risk of future termination based on Commerce's decision to construe the Clause as independently authorizing grant terminations based on new agency priorities that were not identified at the time of the grant.

145.    For example, NJDEP has applied for at least one grant administered by NOAA. The Transformational Habitat Restoration and Coastal Resilience grant, expected to begin in June 2026, is intended to be used for a new tidal wetland at Liberty State Park. Stockton University, a

public university in New Jersey, has applied for a NOAA Science Collaborative grant, anticipated to start in October 2025, which is intended to fund a collaborative project with both Rutgers University and Rowan University.

146.    The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harms to Plaintiffs. If active grants were to be terminated based on Defendants' invocation of the Clause, further harm would ensue.

147.    For example, if New Jersey's NOAA-administered grant of $3,067,000 for sustainable coastal community planning were terminated, NJDEP would not be able to retain the staff funded by this grant who assess the condition of the coastal zone through various data collection methods, and who provide permits and initiate projects to bolster coastal resilience.

148.    Likewise, if Commerce terminates New Jersey's active grant for trained conservation Police Officers to enforce adherence to fishing quotas and approved catch methods and gear, deterrence would be weakened and violations are more likely to occur, threatening the sustainability of fisheries.

149.    Plaintiffs also face harm if their pending or future grant applications are awarded and then subsequently terminated based on Defendants' invocation of the Clause.

150.    For example, without the wetland development that the pending NOAA grant would fund in New Jersey, the surrounding urban areas will continue to lack this buffer and be more vulnerable to increasingly common coastal flooding.  Additionally, target fisheries and ecosystems cannot thrive without the planned salt marsh.

151.    As noted, Stockton applied to a NOAA Science Collaborative grant, anticipated to start in October 2025. Funding from this grant would not only support the employment of student workers at these universities but would also contribute to the national effort to make the nation's

coastal communities more resilient to environmental harms. If this grant were terminated, it would result in the loss of the employed student workers' opportunity to gain practical experience in this field and harm the project's contributions to the resilience of the nation's coastal communities.

## C. Department of Defense

152.    The Department of Defense (Defense) is authorized to make grant awards and enter into cooperative agreements and contracts to "perform research and development projects." 10 U.S.C. §§ 4001(a), (b).

153.    Defense adopted OMB's Uniform Guidance, including § 200.340, in 2014. *See* 2 C.F.R. § 1104.1. In March 2025, Defense also updated its Research & Development General Terms and Conditions to permit unilateral termination of an award "[t]o the extent authorized by law, if any award no longer effectuates the program goals or agency priorities."[5]

154.    Prior to January 2025, Plaintiffs are not aware of any grant terminated by DHS pursuant to the Clause or DHS's parallel regulations implementing the Clause.

155.    In Wisconsin, the Department of Defense on March 14, 2025, terminated a $2.1 million Minerva Research Initiative grant award to the University of Wisconsin – Madison, explaining that the award was "terminate[d] . . . in accordance with 2 C.F.R. 200.340(a)(4)." The University had been spending the award to help the Department of Defense use artificial intelligence and machine learning to better evaluate risks and opportunities in the science research projects that Defense funds.

156.    In Rhode Island, the University of Rhode Island was a subawardee of a grant from the Department of Defense to the Research Foundation of the State University of New York. On

---

[5] Dep't of Def., *Research & Development General Terms and Conditions* 53 (Mar. 2025), https://tinyurl.com/bdf9r7a4.

April 3, 2025, the Department of the Navy terminated the primary award because "it no longer effectuates the program goals or agency priorities."

157.    Plaintiffs have many grants from Defense that remain active as of the date of filing and are at risk of termination in light of Defendants' decision to construe the Clause as independently authorizing the termination of grants based on changed agency priorities.

158.    Wisconsin, for example, has many grants from the Department of Defense that remain active as of the date of filing. The University of Wisconsin – Madison alone has over $200 million in ongoing Department of Defense awards. And the Wisconsin Department of Natural Resources has a nearly $200,000 Army Installation Restoration award from the Department of Defense to assist with environmental cleanup at Defense sites across Wisconsin, including the Badger Army Ammunition Plant and Fort McCoy.

159.    Kansas also has active grants from the Department of Defense. The Kansas Department of Health and Environment was awarded $1,926,840.00 for the grant period beginning on July 1, 2024, by the Army Corps of Engineers, a subagency within the Department of Defense. Under the award, the Kansas Department of Health and Environment provides expedited review and other related services to execute the Defense Environmental Restoration Program at identified Defense installations, Base Realignment and Closure properties, National Guard properties, and Formerly Used Defense Sites properties. Termination of the funding award would result in the Kansas Department of Health and Environment being unable to facilitate remediation of the properties.

160.    The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harms to Plaintiffs. If active grants were to be terminated

based on Defendants' invocation of the Clause and their parallel regulations, further harm would ensue.

### D. Department of Homeland Security

161.    The Department of Homeland Security (DHS) provides grants to state, local, tribal, and territorial jurisdictions "that can be used for training, exercises, planning, personnel, and equipment to prepare for many threats and hazards."[6] DHS's grantmaking authority includes grants for pre- and post-emergency or disaster-related projects through the Federal Emergency Management Agency (FEMA).

162.    DHS adopted OMB's Uniform Guidance, including § 200.340, in 2014. *See* 2 C.F.R. § 3002.10. Prior to January 2025, Plaintiffs are not aware of any grant terminated by DHS pursuant to the Clause or DHS's parallel regulations implementing the Clause.

163.    Nonetheless, since the beginning of the Trump Administration, Plaintiffs have received termination notices that have invoked the Clause for grants administered by DHS.

164.    In Illinois, for example, FEMA terminated two Shelter and Services Program Grant Awards totaling $28,998,504 that had been awarded to the Illinois Department of Human Services. The grants were intended to fund costs that Illinois state and local government incurred in providing basic necessities like shelter, food, and medical care to migrants who DHS has released from its custody into the United States to relieve overcrowding at federal facilities. The termination letter cited the Clause and asserted that the grants "provide[] support for illegal aliens and [are] not consistent with DHS's current priorities."

165.    In Oregon, FEMA terminated a $2,863,337 Shelter and Services Program Grant Award to the Oregon Department of Human Services. The grant was intended to provide financial

---

[6] Dep't of Homeland Sec., *DHS Grants*, https://tinyurl.com/46k6yh8t (last updated Dec. 17, 2024).

assistance for sheltering and related activities provided by non-federal entities to support noncitizen migrants after their release by DHS. These services include, but are not limited to, shelter, food, transportation, acute medical care, personal hygiene supplies, and labor necessary to manage cases to provide these services. The termination letter cited the Clause and asserted that the grant "provides support for illegal aliens and is not consistent with DHS's current priorities."

166.    Plaintiffs also currently receive grants from DHS that are at risk of termination in light of Defendants' decision to construe the Clause as independently authorizing the termination of grants based on changed agency priorities.

167.    New Jersey currently has at least two Building Resilient Infrastructure and Communities (BRIC) grants from FEMA, totaling $58,517,000 in award money. The FEMA BRIC grant program is authorized by the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5133(e), to support pre-disaster mitigation work. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 608 (Mar. 23, 2024); Hazard Mitigation Assistance: Building Resilient Infrastructure and Communities, 87 Fed. Reg. 10805 (Feb. 25, 2022). New Jersey's BRIC grants are being used, among other things, to fund construction of a flood barrier to reduce risk of a 100-year flooding event from coastal flooding along the Hudson River.[7] Interruption of federal BRIC funding threatens the completion of this project, leaving water-edge communities at increased risk due to inadequate flood protection.

---

[7] On April 4, 2025, FEMA announced it was ending the BRIC program and canceling all BRIC applications from Fiscal Years 2020-2023, stating that if grant funds had not been distributed to states, tribes, territories and local communities, funds would be immediately returned either to the Disaster Relief Fund or the U.S. Treasury. Press Release, FEMA, *FEMA Ends Wasteful, Politicized Grant Program, Returning Agency to Core Mission of Helping Americans Recovering from Natural Disasters* (Apr. 4, 2025), https://tinyurl.com/3nta87te. As of the date of filing, New Jersey's two awarded BRIC grants have not been terminated.

40

168.    In Maryland, the Maryland Department of Emergency Management (MDEM) receives numerous FEMA-administered grants that remain active as of the date of filing. This includes a $5,896,691 grant for FY24 under the Emergency Management Performance Grant (EMPG) program. This grant funds key MDEM operations personnel as well as the State Emergency Operations Center itself, ensuring MDEM remains fully operational and responsive in times of crisis. Other key grants include $6,367,357 for FY24 under the State Homeland Security Program, which funds key personnel who focus on terrorism and targeted violence prevention, and $4,246,275 in FY22 Flood Mitigation Assistance funds, which are used to help local governments invest in flood mitigation projects and specifically targets repetitive loss properties insured by the National Flood Insurance Program.

169.    In Kansas, the Kansas Department of Agriculture (KDA) was awarded a total of $243,000.00 for The National Dam Safety Program State Assistance Grant award for FY 24, by FEMA. This grant is specifically used to support inspection services and staff training and travel, as well as equipment needed to implement KDA's dam safety program, and funds part of one agency staff person's salary. Termination of this award would result in the state being unable to efficiently regulate dams as necessary for the safety of the public and as statutorily required by Kansas law. A dam failure could have catastrophic consequences to life and property. The KDA was also awarded a $4,276,978.00 grant for the Cooperating Technical Partners grant for FY24, by FEMA. This grant is used to support outreach and education regarding flood prevention and mitigation and to provide technical assistance to local jurisdictions, including floodplain mapping. Termination of the funding award would result in the KDA being unable to effectively educate the citizens of Kansas about the risks of flooding. Kansas citizens would also be at greater risk in the

event of a flood event because this grant provides funds for real-time technical assistance to mitigate flood risks for communities.

170.    In addition to currently active grants, Plaintiffs have also applied to or will be applying to several future grants from DHS that, if awarded, would be at risk of future termination based on Defendants' decision to construe the Clause as independently authorizing the termination of grants based on changed agency priorities.

171.    The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harms to Plaintiffs. For example, with respect to Oregon's terminated grant, DHS failed to process submitted reimbursements. Oregon has also provided public benefits to asylum seekers that have been released by DHS without reimbursement specified in the grant. And, as noted, because these future grants are at risk of termination on a whim by DHS, Plaintiffs are not able to reliably plan budgets and determine what services they can provide to their residents.

### E.  Department of the Interior

172.    The Department of the Interior ("DOI") adopted § 200.340 in 2019 without any revisions. *See* 2 C.F.R. § 1402.100. To Plaintiffs' knowledge, prior to 2025, DOI had not previously relied on the Clause to terminate grant awards to Plaintiffs.

173.    The California Department of Fish and Wildlife received a $195,977 Cooperative Endangered Species Conservation Fund Traditional Conservation Grant (commonly referred to as "Traditional Section 6 grants") from DOI's Fish and Wildlife Service. The grant was awarded to fund the informed management and recovery of northern spotted owls through the study of the movement and dispersal of barred owls. The northern spotted owl is listed as threatened pursuant to the federal Endangered Species Act and the California Endangered Species Act, and invasive

barred owls have been identified as a key threat to the continued survival of the northern spotted owl.  On May 13, 2025, DOI cited 2 C.F.R. § 200.340 and the terms and conditions of the award to terminate the award because it "no longer effectuates the priorities of the U.S. Fish and Wildlife Service[.]"

174.    In Connecticut, the State Department of Energy and Environmental Protection received a $830,450 grant award through the Highlands Conservation Act Grant Program, which supports conservation of open space in under-resourced communities in the Highlands region of Connecticut. On May 22, 2025, DOI terminated the grant on the grounds that it no longer effectuates agency priorities, citing the Clause.

175.    In Nevada, on April 18, 2025, DOI cited to the Clause to terminate a $611,434.42 award to Nevada's Department of Conservation and Natural Resources. The project was titled "Addressing data deficiencies and preserving genetic diversity for imperiled rare plants in Nevada through monitoring and seed collection," and had a goal of expanding capacity for rare plant surveys and seed collection in Nevada. The award terms and conditions did not specify that the grant could be terminated pursuant to the Clause. In citing the Clause, DOI terminated the grant based on new agency priorities not contemplated at the time of the grant.

176.    In Pennsylvania, on May 22, 2025, DOI cited the Clause to terminate a $830,862 award to Pennsylvania's Department of Conservation and Natural Resources, which would have been used by the City of Easton, PA to fund the acquisition of five land parcels to connect nearby trails and parks. DOI terminated the grant because, it claimed, the award "no longer effectuates" agency priorities.

177.    Plaintiffs also currently receive grants from DOI that are at risk of termination in light of Defendants' decision to construe the Clause as independently authorizing the termination of grants based on changed agency priorities.

178.    The California Department of Fish and Wildlife has sixteen current Traditional Section 6 grants awarded by Defendants, totaling over $4,000,000, that are at risk of termination pursuant to the Clause.  These include, but are not limited to, awards for the conservation of numerous species listed as threatened or endangered under the federal Endangered Species Act. Termination of these grants would cause the cancellation of existing agreements with partners to conduct essential work and significantly limit California's ability to effectively monitor, study, and conserve these species.

179.    The Kansas Department of Health and Environment was awarded $2,829,000 for the grant period beginning on July 1, 2025, by the U.S. Department of the Interior.  Under the award, the KDHE conducts reclamation activities of abandoned coal mines in Kansas, including land clearing, backfilling and grading, erosion and site drainage control, and revegetation. Termination of the funding award would result in the Kansas Department of Health and Environment being unable to conduct reclamation activities of abandoned mines in Southeast Kansas.

180.    And, in Colorado, the Colorado Department of Agriculture has active grants from DOI that are at risk of termination pursuant to the clause.

181.    In addition to the currently active grants, Plaintiffs have also applied to or will be applying to several future grants from DOI that, if awarded, would be at risk of future termination based on Defendants' decision to construe the Clause as independently authorizing the termination of grants based on changed agency priorities. In New Jersey, for example, the Department of

Environmental Protection intends to apply to a Notice of Funding Opportunity posted by the National Park Service, Historic Preservation Fund – Annual State Historic Preservation Office Grants on July 1, 2025 for a $1,212,233 grant to support the identification, evaluation, and protection of historic properties and other responsibilities outlined in the National Historic Preservation Act.

182.   And, in California, the California Department of Fish and Wildlife has several pending grant applications with Defendants that, if awarded, will be at risk of termination pursuant to the Clause, including, but not limited to a Traditional Section 6 grant for $456,097 that the Department applied for on May 24, 2024. These funds, if awarded, would be used to mitigate lead poisoning, the primary source of mortality in California condors – which are listed as endangered under both the federal Endangered Species Act and the California Endangered Species Act – through a comprehensive approach involving community outreach, scientific studies to elucidate exposure pathways, and increased non-lead ammunition availability. This application remains pending.

183.   The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harms to Plaintiffs. In California, for example, the termination of the Spotted Owl Traditional Section 6 grant award required California to cancel an agreement with the University of Maryland to estimate the spatial origins of invading barred owls and their dispersal distances, thus hindering the State's understanding of barred owl invasions and ecology in California. Until the invasion patterns of barred owls are better understood, the northern spotted owl population is expected to continue to decline due to insufficient information to effectively mitigate the impacts of barred owls. And, as noted, because these future grants are at

risk of termination on a whim by DOI, Plaintiffs are not able to reliably plan budgets and determine what services they can provide to their residents.

### F. Department of Justice

184.    The Department of Justice adopted § 200.340 in 2014 without any revisions. *See* 2 C.F.R. § 2800.101. To Plaintiffs' knowledge, prior to 2025, the Department of Justice had not previously relied on the Clause to terminate grant awards to Plaintiffs.

185.    In April 2025, the Department of Justice's Office of Justice Programs (OJP) abruptly terminated numerous grants awarded to Plaintiffs in support of essential law enforcement functions. OJP implemented these terminations through a form email that stated, without explanation, that the awards "no longer effectuate[] the program goals or agency priorities" and cited the Clause. The email further noted that OJP had "*changed its priorities* with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government" (emphasis added).

186.    OJP terminated five awards received by the New Jersey Department of Law and Public Safety (NJ DLPS), which total more than $13,093,314 in grant funds. Each of these grant awards included a term stating that The Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted and supplemented by DOJ in 2 C.F.R. Part 2800 (together, the "Part 200 Uniform Requirements"), apply to this award. The awards terminated pursuant to the Clause included two awards under the Matthew Shepard & James Byrd Hate Crimes Program to combat violent crime and hate crimes. NJ DLPS used the funding from this grant to purchase Automated License Plate Readers to assist law enforcement in investigating

and prosecuting bias crimes and to establish the Community Peacemakers Collaborative to combat the rise in bias and hate crimes across New Jersey and expand public awareness of the resources available to victims of hate crimes. *See* 34 U.S.C. § 30503(b)(1) (authorizing the Attorney General to "award grants to State, local, and tribal law enforcement agencies for extraordinary expenses associated with the investigation and prosecution of hate crimes"). New Jersey's program effectuated the priorities identified by Congress in its appropriation for this grant program, which authorized funding for "grants to State, local, and Tribal law enforcement agencies to conduct educational outreach and training on hate crimes and to investigate and prosecute hate crimes." Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25, 149 (Mar. 9, 2024); *see also* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328,136 Stat. 4459, 4537 (Dec. 29, 2022).

187.    In 2023, the Minnesota Department of Education was awarded a $1,999,963 grant to help schools across Minnesota create safer learning environments, including by providing violence prevention training for school administrators and staff. The grant was authorized by the STOP School Violence Act of 2018. *See* 34 U.S.C. § 10551(a)(2) (authorizing the Director of the Bureau of Justice Assistance to make grants "for the purposes" described in the statute). On April 22, 2025, DOJ invoked the Clause as a basis for terminating the grant award.

188.    Plaintiffs also currently receive grants from DOJ that are at risk of termination based on Defendants' decision to construe the Clause as authorizing federal granting agencies like DOJ to terminate grants based on changed agency priorities.

189.    For example, New Jersey currently has at least two National Sexual Assault Kit Initiative (SAKI) grants which total $4,500,000 in award money. The SAKI grants fund New Jersey's efforts to develop and launch a statewide Sexual Assault Kit (SAK) tracking system, which requires all law enforcement agencies and forensic nurse examiner programs across the

State to enter and track every Sexual Assault Forensic Evidence (SAFE) kit currently in their possession and all future kits turned over to them. The tracking system provides every victim of sexual assault within New Jersey the ability to track the progress of their kit and case. Importantly, the new tracking system the SAKI grants fund allows monitoring of kits from collection through processing to aid in better identification of delays in submission or analysis, as well as to improve collaboration with other tracking systems including CODIS and VICAP. The SAKI grants are also being used to expand long-term storage capacity for SAFE kits.

190.    In Kansas, the Kansas Department of Health and Environment (KDHE) was awarded $6,000,000.00 for the grant period beginning on October 1, 2022, by DOJ.  Under the award, the KDHE administers the All Hands on DECK (Drug Endangered Child in Kansas) project, which seeks to prevent and mitigate adverse childhood experiences, specifically for drug endangered children. Termination of the funding award would result in the KDHE being unable to administer the program.

191.    The risk that current active awards and future awards will be terminated pursuant to the Clause will impose severe harms on the States. For example, if New Jersey's currently active SAKI grants were terminated as part of Defendants' implementation of the President's directive to withhold federal funding through grant terminations, that would severely undermine the State's efforts to test sexual assault kits, affecting New Jersey's ability to investigate sexual assault, sex trafficking, and domestic violence cases and disrupting a tracking system that the State has spent two years building.

192.    In addition to currently active grants, Plaintiffs have also applied to a number of future grants from DOJ that would be at risk of termination after they are awarded based on DOJ's understanding of the Clause.

### G. Department of Labor

193.    The Department of Labor (DOL) adopted OMB's Uniform Guidance, including

§ 200.340, in 2021 without revision. *See* 2 C.F.R. § 2900.4. Prior to May 2025, Plaintiffs are not

aware of any grant terminated by DOL pursuant to the Clause. In or around May 2025, however,

DOL began terminating grants made to State unemployment insurance commissions for

modernization efforts under the American Rescue Plan Act (ARPA).[8]

194.    The New Jersey Department of Labor and Workforce Development received three

DOL grants for modernization of its unemployment insurance systems: (1) a FY2023 ARPA

Unemployment Insurance Integrity Grant for $2,609,000; (2) a FY2023 ARPA IT Modernization

Grant for $11,250,000; and (3) an ARPA Unemployment Insurance Equity Grant for $6,840,000.

On May 22, 2025, New Jersey received identical letters citing the Clause and terminating the three

ARPA grants because they "no longer effectuate[] the U.S. Department of Labor's (Department)

priorities for its grant funding."

195.    The New York Department of Labor received three DOL grants for modernization

of its unemployment insurance systems: (1) a FY2023 ARPA Unemployment Insurance Integrity

Grant for $3,479,750; (2) a FY2023 ARPA IT Modernization Grant for $11,250,000, and (3) an

ARPA Unemployment Insurance Equity Grant for $9,120,000. On May 22, 2025, New York

received identical letters citing the Clause and terminating the three ARPA grants because they "no

longer effectuate[] the U.S. Department of Labor's (Department) priorities for its grant funding."

196.    Arizona's Department of Economic Security received three DOL ARPA grants, all

of which were terminated on May 22, 2025. The termination letters stated that the grants were

---

[8] Emily Peck, *White House cuts aid for state unemployment systems*, Axios (May 28, 2025),
https://tinyurl.com/4u94jrm9.

"being terminated because [they] 'no longer effectuate[] the U.S. Department of Labor's (Department) priorities for its grant funding.'"

197.    The Maryland Department of Labor received four DOL grants to improve and modernize its unemployment insurance systems: (1) a FY2023 ARPA Unemployment Insurance Tiger Team Grant for $4,473,550; (2) a FY2023 ARPA IT Modernization Grant for $11,250,000; (3) an ARPA Unemployment Insurance Equity Grant for $6,840,000; and (4) a FY2023 ARPA Integrity Grant for $2,609,000. On May 22, 2025, Maryland received identical letters citing the Clause and terminating each of the above listed ARPA grants because they "no longer effectuate[] the U.S. Department of Labor's (Department) priorities for its grant funding."

198.    The Illinois Department of Employment Security received multiple DOL grants for modernization of its unemployment insurance systems totaling $28,856,550. On May 22 and 23, 2025, Illinois received identical letters citing the Clause and terminating the ARPA grants because they "no longer effectuate[] the U.S. Department of Labor's (Department) priorities for its grant funding."

199.    The Rhode Island Department of Labor and Training received four DOL grants for modernization of its unemployment insurance systems: (1) an ARPA Unemployment Insurance Equity Grant for $2,282,164; (2) an ARPA Unemployment Insurance Claimant Experience Grant for $155,134; (3) an ARPA Integrity Grant for $869,000; and (4) an Unemployment Insurance Tiger Team Grant for $1,491,750.00. On May 23, 2025, Rhode Island received letters citing the Clause and terminating the three ARPA grants because they "no longer effectuate[] the U.S. Department of Labor's (Department) priorities for its grant funding."

200.    The Delaware Department of Labor Division of Unemployment Insurance received four DOL grants for upgrades to aspects of its unemployment insurance system and program

integrity: (1) an ARPA Unemployment Insurance Integrity Grant for approximately $869,000; (2) an ARPA Fraud Detection and Prevention Grant for approximately $1,230,000; (3) an ARPA Grant for Support, Following a Consultative Assessment for Fraud Detection and Prevention, Promoting Equitable Access, and Ensuring the Timely Payment of Benefits, including Backlog Reduction, for all Unemployment Compensation (UC) Programs for approximately $1,7600,000; and (4) an ARPA Grant for Promoting Equitable Access to Unemployment Compensation (UC) Programs for approximately $2,280,000. On May 22, 2025, Delaware received identical letters citing the Clause and terminating the four ARPA grants because they "no longer effectuate[] the U.S. Department of Labor's (Department) priorities for its grant funding."

201.    In Wisconsin, DOL terminated multiple grant awards to the Wisconsin Department of Workforce Development totaling around $32 million on the basis that they "[n]o longer effectuate[ ] the U.S. Department of Labor's . . . priorities for its grant funding." These awards were being used to support unemployment insurance modernization projects to ensure effective and efficient payment of unemployment insurance benefits and to reduce fraud and overpayments.

202.    The Oregon Employment Department received four grants issued under ARPA, totaling $12,282,000, for purposes such as modernizing unemployment insurance systems and preventing fraud.  On May 22, 2025, Oregon received letters citing the Clause and terminating all four grants because they "no longer effectuate[] the U.S. Department of Labor's priorities for its grant funding."

203.    The California Employment Development Department received three DOL grants to improve and modernize its unemployment insurance systems: (1) an ARPA Unemployment Insurance Integrity Grant for $3,479,750; (2) an ARPA Unemployment Insurance Tiger Teams Grant for $5,965,300; and (3) an ARPA Unemployment Insurance Equity Grant for $9,120,000.

On May 22, 2025, California received letters citing the Clause and terminating the three ARPA grants because they "no longer effectuate[] the U.S. Department of Labor's (Department) priorities for its grant funding."

204.    The Pennsylvania Department of Labor and Industry received several DOL grants for modernization and optimization of its unemployment insurance systems. Those included an ARPA Integrity Grant for $2,606,000.00 and an Unemployment Insurance Tiger Team Grant for $2,994,000.00. On May 22, 2025, the Pennsylvania Department of Labor and Industry received letters citing the Clause and terminating the three ARPA grants because they "no longer effectuate[] the U.S. Department of Labor's (Department) priorities for its grant funding."

205.    The Kentucky Education and Labor Cabinet received several DOL grants under ARPA, including a (1) $4,562,000 Unemployment Insurance Equity Grant, (2) $1,739,000 Unemployment Insurance Integrity Grant, (3) $1,790,805 Unemployment Insurance Tiger Teams grant, and (4) $11,250,000 IT Modernization Grant. On May 22, 2025, the Kentucky Education and Labor Cabinet received letters citing the Clause and terminating the four ARPA grants because they "no longer effectuate[] the U.S. Department of Labor's (Department) priorities for its grant funding."

206.    Plaintiffs also receive active grants from DOL that are at risk of termination based on Defendants' decision to construe the Clause as authorizing federal granting agencies like DOL to terminate grants based on changed agency priorities.

207.    For example, New Jersey receives numerous grants from DOL that remain active as of the date of filing. This includes an OSHA Consultation Grant for $1,898,700, and a PEOSH grant for $2,234,000. Both grants are authorized by the Occupational Safety and Health Act of 1970. *See* 29 U.S.C. § 670(d) (directing the Secretary to "establish and support cooperative

agreements with the States under which employers subject to this chapter may consult with State personnel with respect to . . . voluntary efforts that employers may undertake to establish and maintain safe and healthful employment."); *see also* 29 U.S.C. § 672(g) (authorizing the secretary to "make grants to the States to assist them in administering and enforcing programs for occupational safety and health."). These awards are used to fund on-site safety and health consultation services to private and public employers in order to identify potential hazards and improve safety in their workplaces, and to provide protection for New Jersey public sector workers through enforcement of occupational safety and health standards.

208.    Wisconsin also has many grants from DOL that remain active as of the date of filing. The University of Wisconsin – Madison alone has over $2 million in ongoing Department of Labor awards. And the Wisconsin Department of Workforce Development has multiple ongoing awards, including over $11 million for the Wagner-Peyser Employment Service program, which provides recruitment assistance to businesses and career services to over 20,000 job seekers each year, and almost $27 million for Workforce Innovation and Opportunity Act programs, which provide employment and training services to thousands of unemployed and underemployed adults each year, including those facing difficulty transferring specialized skills to other occupations or industries, or a decline in market demand for certain skills.

209.    The Kentucky Education and Labor Cabinet also receives many grants from DOL that remain active as of the date of Filing. These grants include (1) a $2,148,222.00 Reemployment Services and Eligibility Assessment Grant, (2) a $5,000,000.00 Quality Jobs, Equity, Strategy and Training (QUEST) Disaster Recovery Dislocated Worker Grant, (3) a $1,000,000 Disaster Recovery National Dislocated Worker Grant, and (4) a $741,890.00 State Apprenticeship Expansion Formula grant. From 2020 to 2025, the Kentucky Education and Labor Cabinet

received grants numerous grants from the U.S. Department of Labor and is likely to apply for grants from U.S. Department of Labor in the future to sustain these important programs.

210.    In addition to currently active grants, Plaintiffs have also applied to a number of future grants from DOL that are at risk of future termination based on DOL's decision to construe the Clause as independently authorizing grant terminations based on new agency priorities that were not identified at the time of the grant.

211.    The College of New Jersey (TCNJ), a public university, has submitted a preliminary proposal (through a pass-through entity) for a Workforce Pathway for Youth grant funded by DOL with an anticipated start date of September 1, 2025. The New Jersey Department of Labor and Workforce Development will apply for an OSHA Consultation Grant and a PEOSH grant funded by DOL with an anticipated start date of October 1, 2025.

212.    The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harms to Plaintiffs. For instance, the decision to terminate grants awarded to state unemployment insurance commissions have hindered Plaintiffs' efforts toward fraud prevention and data analytics, and they have harmed debt collection work by reducing available staff. In New Jersey, the ARPA grants were intended to improve the system used to make unemployment insurance claims and move it to a cloud-based system, and to hire investigatory staff to identify fraud in the unemployment insurance program. With the termination of these grants, Plaintiffs will be unable to make critical security updates, system improvements, and program expansions.

213.    If Plaintiffs' currently active grants were terminated based on Defendants' decision to construe the Clause as authorizing grant terminations based on changed agency priorities, Plaintiffs would suffer significant harm. For example, in New Jersey, the state's free consultation

programs for private and public employers would be placed in jeopardy. There is no guarantee that New Jersey would be able to obtain other funding to sustain these programs. Without this grant funding, New Jersey would have to reduce, if not eliminate entirely, the consultation program for employers, risking the safety of their workers. Likewise, if TCNJ is awarded the Workforce Pathway for Youth grant and that award is later terminated, that termination would significantly impede New Jersey's efforts to establish and expand programs to prepare high school students for the workforce and higher education.

## H. Department of State

214.    The Department of State (State) adopted OMB's Uniform Guidance, including § 200.340, in 2014 without any revisions. *See* 2 C.F.R. § 600.101(a). To Plaintiffs' knowledge, until 2025, State had not previously relied on the Clause to terminate any grant awards to Plaintiffs.

215.    In Wisconsin, State terminated a $60,300 University Partnership Program award to the University of Wisconsin – La Crosse on February 28, 2025, explaining that the award "no longer effectuates agency priorities." The award had been used to fund a partnership program between the University of Wisconsin - La Crosse and the University of Belgrade for field, laboratory, and research training at an archaeological site in Serbia.

216.    Plaintiffs also receive currently active grants from State that are at risk of termination based on Defendants' decision to construe the Clause as authorizing federal granting agencies like State to terminate grants based on changed agency priorities.

217.    For example, Wisconsin has direct grant awards and pass-through awards from the State Department that remain active as of the date of filing. The University of Wisconsin – Madison has about $450,000 in obligated funds where the Department is the funding agency.

218.    The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harms to Plaintiffs. If active grants were to be terminated based in Defendants' invocation of the Clause, further harm would ensue.

## I. Environmental Protection Agency

219.    The Environmental Protection Agency (EPA) adopted OMB's Uniform Guidance, including § 200.340, in 2014 without any revisions. *See* 2 C.F.R. § 1500.2. To Plaintiffs' knowledge, until 2025, the EPA had not previously relied on the Clause to terminate any grant awards to Plaintiffs.

220.    Beginning in February 2025, at the direction of DOGE, EPA began terminating large swaths of grant awards for purported "failure to effectuate agency priorities."[9]

221.    For example, in New Jersey, the EPA terminated a grant awarded to Montclair State University under the People, Prosperity and the Planet (P3) Student Design Competition program (P3) on April 25, 2025. Montclair received a $25,000 P3 award to fund a research project to support the development and demonstration of innovative and cost-effective solutions for novel technologies for removing "forever chemicals," also known as PFAS, from drinking water. The termination notice received by Montclair stated that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States" and, therefore, "is inconsistent with, and no longer effectuates, Agency priorities."

---

[9] EPA, Press Release, *EPA Administrator Lee Zeldin Cancels 20 Grants in 2nd Round of Cuts with DOGE, Saving Americans More than $60M* (Feb. 25, 2025), https://tinyurl.com/2j4cpw92.

222.    In Massachusetts, EPA terminated an Assistance Agreement awarded to the Massachusetts Department of Public Health on March 31, 2025. Originally issued in 2024, the grant funded programs aimed at achieving "measurable and meaningful improvements in asthma outcomes through the reduction of home environmental asthma triggers in Springfield, Holyoke, and Chicopee, MA, where old housing stock and low-income households are prevalent." The project was awarded $1,000,000 over a budget period from July 1, 2024 – June 30, 2027. The termination letter cited the Clause and terminated the grant "effective immediately on the grounds that the award no longer effectuates the program goals or agency priorities, and "[t]he objectives of the award are no longer consistent with EPA funding priorities." The termination further stated that the grant "provides funding for programs that promote initiatives that conflict with the Agency's policy of prioritizing merit, fairness, and excellence in performing our statutory functions; that are not free from fraud, abuse, waste, or duplication; or that otherwise fail to serve the best interests of the United States."

223.    In Arizona, the EPA terminated an Assistance Agreement it awarded to the Arizona Board of Regents, University of Arizona, on May 1, 2025. Originally issued in 2022, the grant's next installment (totaling $8,100,000) was intended to support surveys, studies, investigations, training, and special purpose activities focused on environmental justice. The termination letter cited the Clause and terminated the grant "effective immediately on the grounds that the remaining portion of the federal award will not accomplish the EPA funding priorities for achieving program goals." The termination letter further stated that "[t]he objectives of the award are no longer consistent with EPA funding priorities."

224.    In Nevada, EPA terminated several grants that funded projects of the Desert Research Institute (DRI*), Nevada's non-profit environmental research institution under the Nevada

System of Higher Education. With over 600 scientists, engineers, students, and staff across campuses in Reno and Las Vegas, DRI scientists continuously produce information and solutions for the complex, intertwined systems of the environment and human health as related to air, water, fire, earth, and people. DRI works with communities across the state—and the world—to address the most pressing scientific questions, while building bridges between scientists and policymakers to enact positive change. The terminated grants include (1) a $499,191 award for the Special Purpose Activities Related to Environmental Justice program, which focuses on addressing environmental and public health issues in underserved communities; (2) a $544,763 award for the Development, Implementation and Evaluation of Stakeholder-Driven Wildfire Smoke Monitoring and Messaging in Rural Nevada project, the goal of which was to address air quality risks caused by wildfire smoke; and (3) a $644,021 award for a project applying an integrative approach for estimating children's soil and dust ingestion rates, the goal of which was to assess children's chemical exposure and associated health risks. Each of these awards was terminated for alleged failure to effectuate agency priorities.

225.    In Kansas, EPA terminated a $1,000,000 award to the Kansas Department of Health and Environment, which funded food equity and environmental sustainability in Southeast Kansas. The EPA cited the Clause in an accompanying termination letter to the KDHE, which also indicated that the termination was based on new agency priorities not contemplated at the time of the grant.  The termination of this grant resulted in the KDHE terminating sub-recipient agreements with the Healthy Bourbon County Action Team and the Kansas University Medical Center.  The activities contemplated by the cancelled project fell within three primary categories: (1) health promotion and education; (2) community-driven strategies to address environmental justice and food equity; and (3) communications and evaluation.  With the funding from this grant, a mobile

laboratory was empowered to deploy 25 times across three Southeast Kansas school districts to develop and implement experiments tailored to grade level. Additionally, local health equity action teams were to prioritize placemaking interventions to address environmental changes to adopt in community settings to expand food access, including building main street edible gardens, raised-bed garden kits, or rainwater collection.

226.    Plaintiffs also have currently active grants from the EPA that are at risk of termination based on Defendants' decision to construe the Clause as authorizing federal granting agencies like EPA to terminate grants based on changed agency priorities.

227.    New Jersey, for example, currently has at least three active grants with the Environmental Protection Agency, totaling $455,047,720 in award money. This includes a Climate Pollution Reduction Grant, in the amount of $ 248,937,720, awarded through the Greenhouse Gas Air Pollution Reduction Implementation Grant program, *see* 42 U.S.C. § 7437, which is intended to fund projects to reduce harmful emissions along I-95, one of the nation's busiest freight corridors, and will benefit all residents and visitors to the States of Connecticut, Delaware, Maryland, New Jersey, and New York.

228.    New Jersey also received two Lead Service Line Replacement awards, for a total of $206,110,000, as part of the Drinking Water State Revolving Loan (DWSRF) program. *See* Infrastructure Investment & Jobs Act, Pub. L. 117-58, 135 Stat. 429, 1400 (2021). New Jersey is using these funds to reduce lead in drinking water by funding projects emphasizing the identification and removal of lead service lines.

229.    Kansas, through the Kansas Department of Health and Environment, was awarded a total of $284,000.00 for the grant period beginning on October 1, 2020, by the EPA. Under the award, the KDHE administers Kansas' voluntary lead testing program at no cost to participating

schools and child care facilities. Termination of the funding award would result in the KDHE being unable to provide no cost lead testing in schools and child care facilities.

230.    The Kansas Department of Health and Environment was also awarded $27,768,000.00 for the grant period beginning on August 1, 2025, by the EPA. Under the award, the KDHE provides low interest rate financing to eligible public water systems for the costs associated with the planning, design, and construction of eligible drinking water improvement projects. Termination of the funding award would result in the KDHE being unable to provide the services.

231.    In addition to currently active grants, Plaintiffs have also applied for a number of future grants from the EPA that, if awarded, would be subject to the Clause and would be at risk of termination based on EPA's decision to construe the Clause as authorizing termination of grants based on new agency priorities that were not identified at the time of the award.

232.    EPA has now included in its grant terms and conditions the authority to terminate a grant award "for failure to effectuate program goals and agency priorities" in accordance with the Clause. On April 3, 2025, the EPA published revised "General Terms and Conditions," which "[a]dded a new termination provision if the award no longer effectuates the program goals or agency priorities."[10] The EPA Terms and Conditions adopt the Clause's language and state that the provision "applies to all new awards and funding agreements (incremental and supplemental) made on or after April 3, 2025.[11]

233.    New Jersey, for example, has recently applied for: (1) a Clean Water Act Quality 604b grant that provides funding for water quality management planning activities; (2) four

---

[10] EPA, Grant General Terms & Conditions, at 1, (Apr. 3, 2025), https://tinyurl.com/msx2pajt.
[11] *Id.*

DWSRF grants that will help provide safe drinking water; (3) three Clean Water State Revolving Fund grants for water quality infrastructure projects; and (4) two Brownfields grants to assist with the safe clean-up and redevelopment of brownfield sites. Most of these grants are anticipated to begin on July 1, 2025.

234.    Kansas has also recently applied for grants from the EPA, including: (1) a Water Infrastructure Improvements for the Nation Act grant in the amount of $1,292,000 and (2) a Clean Water Act 319 Non-point source management program grant in the amount of $9,668,805. These applications remain pending as of the date of filing.

235.    The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harms to Plaintiffs. If active grants were terminated based on Defendants' invocation of the Clause, further harm would ensue.

236.    For example, termination of New Jersey's Lead Service Line Replacement funds would strand communities and water systems that have already embarked on replacement projects with the expectation and commitment that federal funds would be available to reimburse them upon final project completion. Termination would have the greatest impact on low-income communities that would struggle to complete their lead service line replacement projects without the $164,000 in principal forgiveness made available through the FY23 and FY24 grants.

237.    Termination of New Jersey's Climate Pollution Reduction Grant would disrupt the progress New Jersey and partner states are making toward 2030 and 2050 greenhouse gas emissions reduction goals. The transportation sector is a major source of greenhouse gas (GHG) emissions, and enabling freight truck charging along the heavily used northeast corridor will allow for truck fleet conversion from GHG-emitting fossil-fuel powered to zero-emission electric powered. The collateral air quality improvement benefits from NOx, VOC, and other particulate

reductions, through reducing fossil-fuel combustion, would also be lost by the communities adjacent to the corridor.

**J.   National Endowment for the Humanities**

238.    The National Endowment for the Humanities (NEH) was established by Congress to support and provide funding for research, education, and promotion of the humanities. *See* 20 U.S.C. § 956. To that end, Congress established priorities for NEH grantmaking, including that NEH shall "give particular regard to scholars, and educational and cultural institutions, that have traditionally been underrepresented" in federal grant funding. *Id.* § 956(c).

239.    In 2014, NEH adopted OMB's Uniform Guidance, including § 200.340, without any revisions. *See* 2 C.F.R. § 3374.1. Prior to April 2025, Plaintiffs are not aware of any grant terminated by NEH pursuant to the Clause. However, in or around April 2025, NEH began terminating grant awards to organizations across the country based on a purported changed in its priorities.[12] Grants awarded to Plaintiffs (and their institutions) were among those terminated or canceled.

240.    In New Jersey, NEH terminated a grant for $3,530,606 to the New Jersey Council for the Humanities (NJCH), which was used to support NJCH's operations, including by making subawards to recipients from New Jersey's NEH formula funds and sponsoring public programming throughout the State. On April 2, 2025, NJCH was notified that its operating grant was terminated because it "no longer effectuates the agency's needs and priorities." NEH did not identify as a basis for the termination of the grant any "agency priorities" that were in effect at the time of the grant award.

---

[12] NEH, Press Release, *An Update on NEH Funding Priorities and the Agency's Recent Implementation of Trump Administration Executive Orders* (Apr. 15, 2025), https://tinyurl.com/3y8vhcjk.

241.    New Jersey's public institutions also received NEH grant awards that were terminated because they allegedly failed to "effectuate the agency's needs and priorities." These terminations included four grants previously awarded to Montclair State University, collectively totaling over $746,926 in awarded funding to support, among other things, programs related to AI and humanities education for faculty and students.

242.    Plaintiffs receive currently active grants from NEH that are subject to the Clause and would be at risk of termination based on Defendants' decision to construe the Clause as authorizing federal granting agencies like NEH to terminate grants based on changed agency priorities. Plaintiffs have also applied to future grants from NEH that would be subject to the Clause and are at risk of termination based on NEH's application of the Clause.

243.    For example, in New Jersey, Rowan University has applied for two Collaborative Research Grants, set to begin on October 1, 2025, and a Humanities Research Centers on Artificial Intelligence Grant, also set to begin on October 1, 2025. TCNJ has applied for a Promotion of the Humanities Teaching and Learning Resources and Curriculum Development grant, expected to begin this year.

244.    The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harm to Plaintiffs.

245.    For example, in New Jersey, Montclair State University's four terminated NEH grants were being used to fund research projects covering a range of topics, including digital conservation of historical monuments in Sicily, understanding Asian American immigration patterns in San Francisco, the rise of AI art, and the history of racial and ethnic groups in the United States. These grant-funded research projects not only sought to create valuable scholarship but were also intended to create important learning and development opportunities for students.

Without this federal funding, Montclair State University has had to shut down these research projects.

246.    Likewise, NJCH's terminated grant was intended to expand access to the humanities across New Jersey, with a focus on citizen journalism via a partnership with New Jersey's community colleges. NJCH's community-college based work was designed with the idea that New Jersey community colleges reach all corners of the State, including its most rural (which are often least well served by humanities organizations), helping increase access with greater geographic dispersal of federal funds, as well as reach a broader set of audiences for the humanities in New Jersey's rural south and northwestern corners.

247.    If Plaintiffs' active grants with NEH were terminated based on Defendants' invocation of the Clause, further harm would ensue.

### K. National Science Foundation

248.    The National Science Foundation (NSF) is charged with "provid[ing] Federal support for basic scientific and engineering research, and to be a primary contributor to mathematics, science, and engineering education at academic institutions in the United States." 42 U.S.C. § 1862k(a)(6)(A). To that end, NSF "make[s] contracts or other arrangements (including grants, loans, and other forms of assistance) to support such scientific, engineering, and educational activities." *Id.* § 1862(a)(1). Since its creation, NSF has funded important research projects at universities across the country.

249.    NSF adopted OMB's Uniform Guidance, including § 200.340, in 2014 without any revisions. *See* 2 C.F.R. § 2500.100.

250.    To Plaintiffs knowledge, NSF had not relied on the Clause to terminate any grant awards until April 2025.

251.    In April 2025, however, NSF began terminating research grants on a large scale as "not in alignment with agency priorities," without any attempt to identify why the grants did not align with the agency priorities that were identified at the time of the grant award.[13]

252.    In New Jersey, for example, NSF terminated a $2,000,000 grant awarded to Montclair State University for a project seeking to "provide a greater understanding of the impact of family support on outcomes for STEM majors, particularly from underrepresented groups."[14] At the time the grant was awarded, NSF had concluded that the award "reflects NSF's statutory mission and has been deemed worthy of support through evaluation using the Foundation's intellectual merit and broader impacts review criteria."[15]

253.    And, on May 2, 2025, Kean University received a notice that its $1,999,935 grant for its CREST Project (CREST-DPSI (C): Advancing Research and Computer Science Doctoral Education), which intended to increase participation in STEM PhD programs through the establishment of a new doctoral program in Computer Science, was being terminated because it was purportedly "not in alignment with current NSF priorities." On May 9, 2025, Kean University was notified that its $800,000 award for a project to expand the pipeline of talent entering into computing careers—otherwise known as the Implementation and Evaluation Project: Blending Socioeconomic-Inclusive Design into Undergraduate Computing Curricula to Build a Larger Computing Workforce (IEP Project)—was also terminated as "not in alignment with current NSF priorities."

---

[13] The termination of NSF grants awarded to certain of Plaintiffs is currently being litigated in the Southern District of New York. See New York v. Nat'l Science Found., 25-4452 (S.D.N.Y. May 28, 2025).
[14] U.S. Nat'l Sci. Found., *Award Abstract # 1953631*, https://tinyurl.com/55kp9xpc (last visited June 23, 2025).
[15] *Id.*

254.    Maryland public universities receive numerous grants from NSF, many of which have been terminated citing the Clause, or otherwise due to unenumerated changes in agency goals and priorities. This includes a $5,794,026 award to the University of Maryland Baltimore County to improve recruitment and promotion of underrepresented tenure-track faculty in science, technology, engineering, and mathematics (STEM) fields, terminated on May 2, 2025 for not being "in alignment with current NSF priorities,"[16] and an $813,628 award to the University of Maryland College Park to fund research leveraging artificial intelligence to improve reliability and equity in geoscience weather models.[17]

255.    In Rhode Island, NSF terminated a $1,488,962 grant awarded to the University of Rhode Island for Broadening Participation Among Science Communication Practitioners: Science Communication and Representation Fellowship in a communication stating the grant was "not in alignment with current NSF priorities."

256.    In New York, NSF terminated a $1,000,000 grant awarded to the State University of New York (SUNY) at Albany for a project titled "ADVANCE Adaptation: Project SAGES: Striving to Achieve Gender Equity in STEM." On May 2, 2025, SUNY received a notice that this grant was being terminated because it was purportedly "not in alignment with current NSF priorities."

---

[16] The grant abstract on NSF's website still reads: "This award reflects NSF's statutory mission and has been deemed worthy of support through evaluation using the Foundation's intellectual merit and broader impacts review criteria." *See* U.S. Nat'l Sci. Found., *Award Abstract # 2217329*, https://tinyurl.com/5dmykjrx (last visited June 23, 2025).

[17] The grant abstract on NSF's website still reads: "This award reflects NSF's statutory mission and has been deemed worthy of support through evaluation using the Foundation's intellectual merit and broader impacts review criteria." *See* U.S. Nat'l Sci. Found., *Award Abstract # 2425735*, https://tinyurl.com/5377vfap (last visited June 23, 2025).

257.    In New Mexico, NSF terminated a $369,800 grant awarded to New Mexico State University (NMSU) for its Research Oriented Learning Experiences Program, which encouraged and supported Latina/o college students in STEM fields, particularly Electrical and Computer Engineering. The program created opportunities for collaboration between undergraduate students and graduate students and faculty on research projects to enhance students research abilities and experience by covering salaries, participant support, supplies, tuition, and health insurance costs. On April 25, 2025, the NSF cancelled the funding "on the basis that [it] no longer effectuate[s] the program goals or agency priorities." Citing the same reasons, on May 2, 2025, NSF terminated a separate $500,000 grant to NMSU that was supposed to continue through July 31, 2026 and supported Hispanic students entering STEM fields.

258.    Plaintiffs also receive currently active grants from NSF that are at risk of termination based on Defendants' decision to construe the Clause as authorizing federal granting agencies like NSF to terminate grants based on changed agency priorities.

259.    For example, New Jersey receives numerous grants from NSF that remain active as of the date of filing. This includes, by way of illustration, a $501,629 research grant for BRC-BIO: A Biogeochemical Study of Bog Iron in the New Jersey Pine Barrens, and a $219,632 research grant for RUI: Primary and Secondary Coordination Sphere Effects in Ruthenium-Catalyzed Base-Free Hydrogen Transfer Reactions awarded to Stockton University. A third grant, $2,533,968 for Collaborative Research: PRIMER – A Model to Strengthen the Research Enterprise at Predominantly Undergraduate Institutions, was recently awarded to TCNJ. All three grants are authorized by the National Science Foundation Act of 1950. *See* 42 U.S.C. § 1862(a)(2) ("The Foundation is authorized and directed … to award … scholarships and graduate fellowships for study and research in the sciences").

260.    The City University of New York receives multiple grants from the Robert Noyce Teacher Scholarship Program that remain active as of the date of filing. This includes an approximately $1.2 million grant to prepare highly qualified STEM teachers to support effective learning in remote, in-person, and hybrid learning environments. These grants are authorized by National Science Foundation Act of 1950, 42 U.S.C. § 1862n-1.

261.    In addition to currently active grants, Plaintiffs have also applied for a number of future grants from NSF that if awarded, would be subject to the Clause and would be at risk of termination based on Defendants' decision to construe the Clause as authorizing federal granting agencies like NSF to terminate grants based on changed agency priorities.

262.    At the time of filing, for example, Kean University in New Jersey has applied for ten NSF grants. The New Jersey Institute of Technology has applied for 43 NSF grants since January 16, 2025 totaling $22,624,839, including the "S-STEM: Making Impactful Careers in Engineering Technology Accessible to Academically Talented Low-Income Students" grant.

263.    The grant terminations that have already occurred based on Defendants' invocation of the Clause have caused significant harms to Plaintiffs.

264.    As a result of these terminations, institutions in Plaintiffs have already stopped work on projects focused on STEM education and training in engineering, mathematics, environmental sciences, geosciences, computer sciences, atmospheric sciences, cryospheric sciences, and aquatic sciences. Data collection and analysis efforts have been impeded, which will affect the timely publication and dissemination of research findings on critical topics. The loss of these projects constrains innovation and slows down the development of future proposals that could advance national STEM priorities and benefit Plaintiffs. Postdoctoral scholars, project managers, undergraduate students, faculty and staff have lost or will lose their jobs, and those who

depart take their training and expertise with them, requiring new investment in recruitment and training. The loss of such personnel in STEM fields will have compounding effects, with fewer teachers and mentors to recruit and retain future talent.

265.    In New Jersey, Kean's CREST Project grant was intended to promote increased participation in STEM PhDs by underrepresented minority students through the establishment of a new doctoral program in Computer Science, focusing on critical areas such as artificial intelligence (AI), data science, and cybersecurity. NSF's termination of Kean's CREST Project jeopardizes the start of the first class of the doctoral program in school year 2025-2026 and the four faculty members who would have supported the program through student recruitment and curriculum development. The termination of Kean's IEP Project affects tuition and stipends for two masters graduate student researchers and stipends for faculty to attend workshops to learn how to design inclusive software. As a result of the termination of Kean's CREST and IEP grants, the future workforce of the United States and the State of New Jersey will be affected.

266.    Relatedly, in New Jersey, if the two active NSF grants awarded to Stockton University, the BRC-BIO grant and the RUI grant, were terminated, this would result in the loss of staff whose salary is fully funded by the grant, including full-time technicians and student workers. This would harm Stockton, a small regional state institution, because it would limit its ability to compete with other institutions in offering its students cutting edge research opportunities and the student workers would suffer a loss of practical training and experience, thereby diminishing their post-graduation opportunities.

IV.    **Defendants' Reliance on the Clause to Terminate Federal Funding Based on Changed Agency Priorities Has Caused Severe Harm to Plaintiffs.**

267.    Defendants' decision to invoke the Clause as grounds to terminate billions of dollars of grants to Plaintiffs based on shifting agency priorities has caused, and will continue to cause, significant, immediate, and irreparable harm to Plaintiffs.

268.    As set forth in the preceding paragraphs, Defendants have stripped away thousands of federal grants that they had previously awarded to Plaintiffs. They have done so without any advance notice to Plaintiffs, and without accounting for the significant reliance interests of Plaintiffs in the funding that has already been promised to them.

269.    The consequences of this indiscriminate campaign to terminate billions of dollars in federal grant awards to Plaintiffs have already been catastrophic.

270.    Defendants' funding terminations based on the Clause have caused Plaintiffs' law enforcement agencies to lose critical resources they need to protect public safety and prevent violent crime. They have caused research universities to lose funding that supports critical scientific research and lifesaving medical breakthroughs. They have eviscerated programs that address food insecurity for students. They have made it harder to ensure that everyone has access to safe, clean drinking water free from dangerous chemicals. They have undermined the States' efforts to make it easier for Americans to access unemployment benefits when they suddenly lose their jobs. They have damaged the States' ability to research and respond to extreme heat and the dangers posed by wildfires in our communities.

271.    For the federal grants that have already been terminated, Plaintiffs have had to cease operating many programs and projects. Because Plaintiffs did not anticipate having these grants terminated midway through award performance periods, the grant terminations have significantly disrupted Plaintiffs' operations and budgets.

272.    Moreover, Plaintiffs presently have many federal grants with these same Defendants that are active, and Plaintiffs have already applied for or plan to apply for many more.

273.    Federal funding accounts for a significant portion of Plaintiffs' budgets, and Plaintiffs rely on this federal funding to provide critical services to their residents. Because of Defendants' decision to invoke the Clause and Agency Defendants' regulations implementing the Clause to terminate grants, however, Plaintiffs now lack clarity on the circumstances in which their existing and future grants may be terminated.

274.    Defendants' decision to construe the Clause as permitting the termination of awards to Plaintiffs based on shifting agency priorities runs counter to OMB's own interpretation of the Clause and the narrow circumstances in which grants may be terminated pursuant to the Clause. *See supra* ¶¶ 61-81.

275.    Because of Defendants' decision to construe the Clause as independently authorizing terminations of grants based on shifting agency priorities, Plaintiffs' grants may now be terminated on a whim based on new "agency priorities" not identified at the time of the award. That has created significant uncertainty for Plaintiffs, casting doubt on the stability of the federal funding on which Plaintiffs rely to provide programs to their residents and making it substantially more difficult for Plaintiffs to plan their budgets and operations.

276.    Indeed, Defendants' broad application of the Clause to terminate Plaintiffs' grants means that States cannot be certain that, if they are awarded any of the grants for which they have applications pending, they will be able to rely on that funding for the duration of the grant.

277.    Plaintiffs therefore require a declaration on the meaning of the Clause and Agency Defendants' parallel regulations incorporating the Clause, as this Clause continues to govern existing funding Plaintiffs have been awarded and the future awards they are seeking.

# CAUSES OF ACTION

## COUNT I

### Declaratory Judgment
### 5 U.S.C. § 703; 28 U.S.C. § 2201

278.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

279.    Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

280.    The OMB regulations containing the Clause and the Agency Defendants' parallel regulations that incorporate the Clause are "final agency action" under the APA. 5 U.S.C. § 551(13).

281.    An actual and substantial controversy exists between Plaintiffs and Defendants about whether the Clause and the Agency Defendants' parallel regulations incorporating the Clause permit Defendants to terminate grants on the grounds that Defendants have identified new "agency priorities" after the award of the grant.

282.    This action is presently justiciable. As explained above, Defendants have asserted that the Clause permits them to terminate awarded grants on the grounds that the Department identified new "agency priorities" after the award of the grant. Defendants have already relied on that interpretation of the Clause to terminate existing grant awards to Plaintiffs, collectively resulting in the loss of billions of dollars in federal funding to the Plaintiffs. Plaintiffs currently have other grants awarded by the same Defendants that have terminated existing grants to Plaintiffs based on changed "agency priorities." These grants are all subject to immediate termination under the Defendants' interpretation of the Clause. In addition, Plaintiffs obtain billions of dollars in grants from Defendants each year, all of which will be subject to the same Clause in the OMB regulations and the Agency Defendants' parallel regulations and therefore subject to termination if

Defendants decide on a whim to change their priorities. Indeed, Plaintiffs are facing multiple deadlines, during the pendency of this suit, to apply for or to accept federal grants that will be subject to the OMB regulations and the Agency Defendants' parallel regulations.

283.    Moreover, as explained above, several of President Trump's executive orders expressly direct Defendants to terminate federal grants consistent with applicable law. These directives include, but are not limited to, President Trump's February 26 Executive Order requiring all agency heads to "review existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate . . . such covered contracts to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration." Exec. Order No. 14,222 § 3(b), 90 Fed. Reg. 11,095 (Feb. 26, 2025) (Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative); *see supra* ¶¶ 82-91.

284.    In light of Defendants' present and ongoing reliance on the Clause, including through Agency Defendants' implementing regulations, Plaintiffs seek prompt declaratory relief to clarify the rights and obligations of the parties.

285.    Declaratory relief is warranted in light of the strong interest Plaintiffs have in obtaining clarity regarding their rights and obligations under current and future grants. Federal funding accounts for a significant portion of Plaintiffs' budgets, and Plaintiffs rely on this federal funding to provide critical services to their residents. Plaintiffs therefore have powerful reliance interests in the continuation of this funding—and in knowing the law governing the grants they would otherwise be accepting during the pendency of this litigation. Plaintiffs should not have to guess at whether Defendants can cut off their federal funding by identifying new agency priorities not known to Plaintiffs at the time of the grant.

286.    *First*, the Clause and the Agency Defendants' parallel regulations cannot be invoked to terminate an award if the award terms and conditions themselves do not "clearly and unambiguously specify" that the grant can be terminated when it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(b). This limitation is clear from the plain text of the regulations.

287.    *Second*, the Clause and the Agency Defendants' parallel regulations cannot be used to terminate an award where Congress has directed funds to be spent on particular grant programs or where Congress has appropriated money for an identified objective and the agency substitutes its own "agency priorities" for the objective identified by Congress.

288.    This limitation draws support from separation-of-powers principles. The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). It follows that, "[a]bsent congressional authorization, the [Executive] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* at 1235.

289.    Defendants' expansive interpretation of the Clause and the Agency Defendants' parallel regulations incorporating the Clause would violate the separation of powers by effectively creating a backdoor to unlawful impoundment. Where Congress has appropriated funds and directed that they be spent on particular grant programs, terminating those grants based on changed agency priorities has the effect of unlawfully impounding and refusing to spend Congressionally appropriated funds. *See In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (explaining that the Executive "does not have unilateral authority to refuse to spend [congressionally appropriated] funds"). By the same token, where Congress has appropriated funds and directed that they be spent on a particular objective, yet the agency terminates grants because

it has substituted new priorities for the objective Congress set out by statute, that too has the effect of unlawfully impounding Congressionally appropriated funds for the objectives Congress itself identified.

290.    *Third*, the Clause and the Agency Defendants' parallel regulations authorizes a grant to be terminated only if the grant no longer effectuates "agency priorities" that were identified at the time of the federal award. The Clause does not independently permit or authorize such terminations based on changed agency priorities identified after the time of the federal award.

291.    This limitation draws support from the text of the Clause. The Clause authorizes the termination of an award only where the "*award* no longer effectuates the program goals or agency priorities." That language offers no indication that it confers unfettered authority on federal agencies to change their priorities on a whim and terminate grants based on those newfound priorities. If an agency could terminate any award simply because it has changed its mind, that would render wholly superfluous the many other carefully crafted regulatory provisions that address agency termination authority. *See, e.g.*, 2 C.F.R. §§ 200.340(a)(1)-(3), 200.340(b). It is not sensible to interpret a single subclause of a provision in OMB guidance to grant such sweeping authority. *See Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 203 (5th Cir. 2019) ("[W]e presume that [agencies], no less than Congress, do not hide elephants in mouseholes." (citation omitted)).

292.    This limitation also draws support from OMB's own interpretation of the Clause. The rulemaking history of the 2020 version makes clear that the Clause allows Defendants to terminate awards in limited circumstances—for example, where "additional evidence reveals that a specific award objective is ineffective at achieving program goals," 85 Fed. Reg. 49,507, or where "additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award," *Id.* at 49,507-08. OMB expressly disagreed with

commenters who suggested that the language of the Clause would "provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause." *Id.* at 49,509.

293.   Moreover, this limitation draws support from statutes requiring agencies to notify and consult Congress when setting priorities, which make clear that "agency priorities" must be set through a reticulated process that provides notice to Congress and the public. *See* 31 U.S.C. § 1120(a)(3) (mandating that OMB consult with Congress "[w]hen developing or making adjustments to Federal Government priority goals"); 5 U.S.C. § 306(b) (allowing agencies to adjust goals and objectives "to reflect significant changes in the environment in which the agency is operating, with appropriate notification of Congress").

294.   This limitation also draws support from Spending Clause principles. The Spending Clause requires States to have fair notice of the conditions that apply to the disbursement of funds they receive. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17-18 (1981); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012). The funding conditions must be set out "unambiguously" in the relevant statute. *Arlington*, 548 U.S. at 296 (quoting *Pennhurst*, 451 U.S. at 17). And the federal statute must be viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds." *Id.* But no statute authorizes Defendants to terminate grant awards based on newly identified "program goals or agency priorities" unknown to Plaintiffs at the time of the award. If there were such a statute, it would violate the Spending Clause because it would not set forth unambiguously the terms upon which grants may be terminated.

295.   Declaratory relief setting out these limitations on the Clause and the Agency Defendants' parallel regulations will clarify the rights and obligations of the parties and is therefore appropriate under 28 U.S.C. § 2201 to resolve this controversy.

## COUNT II

**Administrative Procedure Act**
**5 U.S.C. § 706(2) - Agency Action Contrary to Law**

296.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

297.    A court can "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2).

298.    Upon information and belief, Defendants have made a decision, as a matter of final agency policy, that the Clause and Agency Defendants' parallel regulations afford them independent authority to terminate grants based on new "agency priorities" identified after the grants have been awarded.

299.    That decision, whether written or unwritten, is final agency action because it reflects the "consummation" of the Defendants' decisionmaking process and because it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). The final nature of the decision is evidenced by the fact that it has been applied to thousands of grants, collectively involving billions of dollars of Federal funding. *See Biden v. Texas*, 597 U.S. 785, 808-09 (2022) (agency action final where it sets an agency's legal interpretations, policies, or priorities in a way that binds agency staff); *Texas v. EEOC,* 933 F.3d 433, 442 (5th Cir. 2019) ("[A]ctions that retract an agency's discretion to adopt a different view of the law are binding.").

300.    Defendants' decision is contrary to the meaning of the Clause. The Clause and the Agency Defendants' parallel regulations authorize grant terminations only if the grant no longer effectuates "agency priorities" identified at the time of the federal award, and the Clause does not

77

independently permit or authorize grant terminations based on changed agency priorities identified after the time of the federal award.

301.    That conclusion draws support from the text of the Clause. The Clause authorizes the termination of an award only where the "*award* no longer effectuates the program goals or agency priorities." That language offers no indication that it confers unfettered authority on federal agencies to change their priorities on a whim and terminate grants based on those newfound priorities. If, as Defendants suggest, an agency could terminate any award simply because it has changed its mind, that would render wholly superfluous the many other carefully crafted regulatory provisions that address agency termination authority. *See, e.g.*, 2 C.F.R. § 200.340(a)(1)-(3); § 200.340(b). It is not sensible to interpret a single subclause of a provision in OMB guidance to grant such sweeping authority. *See Ryder*, 945 F.3d at 203 ("[W]e presume that [agencies], no less than Congress, do not hide elephants in mouseholes." (citation omitted)).

302.    This conclusion also draws support from OMB's own interpretation of the Clause. The rulemaking history of the 2020 version makes clear that the Clause allows Defendants to terminate awards in limited circumstances—for example, where "additional evidence reveals that a specific award objective is ineffective at achieving program goals," 85 Fed. Reg. 49,507, or where "additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award," 85 Fed. Reg. 49,507-08. OMB expressly disagreed with commenters who suggested that the language of the Clause would "provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause." *Id.* at 49,509.

303.    The only reasonable interpretation of the Clause and Agency Defendants' parallel regulations is that termination is permitted only where the award no longer effectuates the program goals and agency priorities that were identified when the award was made.

304.     Defendants' decision that the Clause grants them authority to terminate grants based on new "agency priorities" identified after the grants have been awarded is inconsistent with the Clause's language, structure, and purpose. It is therefore contrary to law under the APA.

305.     Accordingly, if the Court does not afford relief to Plaintiffs as set forth in Count I, then Plaintiffs are entitled to an order vacating and setting aside Defendants' decision that the Clause and Agency Defendants' parallel regulations affords federal awarding agencies independent authority to terminate grants based on new "agency priorities" identified after the grants have been awarded, as well as an injunction enjoining any action taken to implement that decision.

## COUNT III

### Administrative Procedure Act
### 5 U.S.C. § 706(2) - Arbitrary and Capricious Agency Action

306.     Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

307.     Defendants include "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

308.     The OMB regulations containing the Clause and the Agency Defendants' parallel regulations that incorporate the Clause are "final agency action" under the APA. 5 U.S.C. § 551(13).

309.     The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

310.     An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between

the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

311.    That "reasoned explanation requirement of administrative law is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

312.    An agency action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" before it. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal..*, 591 U.S. 1, 25 (2020) (quoting *State Farm*, 463 U.S. at 43).

313.    Importantly, even where an agency relies on the work of another agency, there is still arbitrary-and-capricious review. In those circumstances, "the critical question is whether the action agency's *reliance* was arbitrary and capricious." *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1093 (D.C. Cir. 2021).

314.    Since January 2025, Defendants have invoked the Clause and the Agency Defendants' parallel regulations to terminate grants based on new "program goals or agency priorities" not identified by Congress or by the agency at the time of the grant award. If the Clause and the Agency Defendants' parallel regulations permit Defendants to terminate awards on the grounds of changed "agency priorities," there is no reasoned basis for those regulations, and thus they violate the APA.

315.    During the 2020 rulemaking that led to the adoption of the Clause and in the 2024 rulemaking that led to the codification of the Clause in its present form, OMB never once provided an explanation for an expansive assertion of authority to terminate grants based on the phrase

"agency priorities." In fact, OMB made clear during the 2020 rulemaking that the Clause permits terminations of awards only in limited circumstances, such as where "additional evidence reveals that a specific award objective is ineffective at achieving program goals," 85 Fed. Reg. 49,507, or where "additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award," 85 Fed. Reg. 49,507-08.

316.    OMB also expressly noted that "as written agencies are not able to terminate grants arbitrarily." *Id.* at 49,509.

317.    In adopting the Clause in the OMB regulations and the Agency Defendants' parallel regulations, Defendants failed to provide a reasoned basis for an expansive assertion of termination authority based on "agency priorities."

318.    In adopting the Clause in the OMB regulations and the Agency Defendants' parallel regulations, which Defendants now assert grant them an expansive termination authority based on "agency priorities," Defendants also failed to account for several other important aspects of the problem before them, including, at a minimum, (i) Plaintiffs' reliance interests in awarded grants; (ii) the need for grantees to have clear, unambiguous notice of the circumstances in which their already-awarded funding may be terminated; (iii) whether any statutes or regulations permit Defendants to terminate grants without advance warning based on a change in agency priorities; (iv) whether any statutes or regulations permit Defendants to terminate grant programs even where Congress has directed them to fund those programs or to fund specific grants; and (v) whether grantees should be given notice of any new agency priorities and an opportunity to modify their grant proposals prior to termination.

319.    Accordingly, if the Court disagrees with Plaintiffs' interpretation (as set forth in Count I) of the language of the Clause and the Agency Defendants' parallel regulations, then

Plaintiffs are entitled to an order and judgment holding unlawful and setting aside he Clause and the Agency Defendants' parallel regulations, as well as an order enjoining any action taken to enforce or implement these provisions. Plaintiffs are also entitled to a permanent injunction preventing Defendants from terminating grants pursuant to the Clause and Agency Defendants' parallel regulations based on new "agency priorities" not identified by Congress or by the agency at the time of the grant award.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray that this Court:

i. Declare pursuant to 28 U.S.C. § 2201 that 2 C.F.R. § 200.340(a)(4) (2024), 2 C.F.R. § 200.340(a)(2) (2021), and Agency Defendants' parallel regulations:

    a. Do not permit or authorize the termination of awarded grants on the basis that the grant "no longer effectuates the program goals or agency priorities" if the award terms and conditions do not "clearly and unambiguously specify" that the award can be terminated when it "no longer effectuates the program goals or agency priorities";

    b. Do not permit or authorize the termination of awarded grants where Congress has directed funds to be spent on particular grants, or where Congress has appropriated money for identified objectives and the agency seeks to substitute its own "agency priorities" for the objectives identified by Congress; and

    c. Do not permit or authorize the termination of awarded grants based on new agency priorities identified after the time of the federal award.

ii. Alternatively, if the Court does not grant Plaintiffs relief on Count I:

a. Set aside and permanently enjoin Defendants from carrying out Defendants' decision that the Clause affords federal awarding agencies independent authority to terminate grants based on new "agency priorities" identified after the grants have been awarded, 5 U.S.C. § 706(2);

b. Issue a judicial declaration that 2 C.F.R. § 200.340(a)(4) (2024), 2 C.F.R. § 200.340(a)(2) (2021), and Agency Defendants' parallel regulations are unlawful because they violate the Administrative Procedure Act;

c. Set aside 2 C.F.R. § 200.340(a)(4) (2024), 2 C.F.R. § 200.340(a)(2) (2021), and Agency Defendants' parallel regulations under the Administrative Procedure Act, 5 U.S.C. § 706;

d. Permanently enjoin Defendants from enforcing 2 C.F.R. § 200.340(a)(4) (2024), 2 C.F.R. § 200.340(a)(2) (2021), and Agency Defendants' parallel regulations;

e. Permanently enjoin Defendants from incorporating the language of 2 C.F.R. § 200.340(a)(4) (2024), 2 C.F.R. § 200.340(a)(2) (2021), and Agency Defendants' parallel regulations into any future terms and conditions for grants to Plaintiffs.

iii.   Award the Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

iv.   Grant other such relief as this Court may deem proper.

Respectfully submitted,

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY


*/s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum*
  *Solicitor General*
Sundeep Iyer*
  *Chief Counsel*
Stephen Ehrlich*
  *Deputy Solicitor General*
Amanda I. Morejón
Jessica L. Palmer*
Meghan K. Musso*
Sarah Nealon*
Lauren E. Van Driesen*
  *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Jeremy.Feigenbaum@njoag.gov
Amanda.Morejon@law.njoag.gov

*Counsel for the State of New Jersey*


**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS


By:  */s/ Vanessa A. Arslanian*
Katherine B. Dirks (BBO No. 673674)
  *Chief State Trial Counsel*
James A. Sweeney (BBO No. 543636)
  *State Trial Counsel*
Anna J. Lumelsky (BBO No. 677708)
  *Deputy State Solicitor*
Yael Shavit (BBO No. 695333)
  *Chief, Consumer Protection Division*
Vanessa A. Arslanian (BBO No. 688099)
Chris Pappavaselio (BBO No. 713519)
Jak Kundl (BBO No. 713951)
  *Assistant Attorneys General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
vanessa.arslanian@mass.gov

*Counsel for the Commonwealth of Massachusetts*


**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK


By: */s/ Rabia Muqaddam*
Rabia Muqaddam†
  *Special Counsel for Federal Initiatives*
Jessica Ranucci†
  *Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8883
Rabia.muqaddam@ag.ny.gov
Jessica.Ranucci@ag.ny.gov


*Counsel for the State of New York*


**KRISTIN K. MAYES**
  ATTORNEY GENERAL OF ARIZONA


By: */s/ Hayleigh S. Crawford*
Hayleigh S. Crawford†
  *Deputy Solicitor General*
Syreeta A. Tyrell†
  *Senior Litigation Counsel*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov
*Counsel for the State of Arizona*


**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA


By: */s/ Shiwon Choe*


**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO


By: */s/ David Moskowitz*

Anya M. Binsacca
  *Supervising Deputy Attorney General*
Shiwon Choe[†]
Zelda Vassar[†]
Harald H. Kirn[†]
  *Deputy Attorneys General*
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-4400
Anya.Binsacca@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Zelda.Vassar@doj.ca.gov
Harald.Kirn@doj.ca.gov

*Counsel for the State of California*

David Moskowitz[†]
  *Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

*Counsel for the State of Colorado*


**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Michael K. Skold*
Michael K. Skold[†]
  *Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

By: */s/ Ian R. Liston*
Ian R. Liston[†]
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*


**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala[†]
  *Assistant Attorney General*
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAI'I

By: */s/ Kaliko'onālani D. Fernandes*
David D. Day[†]
  *Special Assistant to the Attorney General*
Kaliko'onālani D. Fernandes[†]
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead†
  *Public Interest Counsel*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

*Counsel for the State of Illinois*

**LAURA KELLY**
  IN HER OFFICIAL CAPACITY AS GOVERNOR OF
    THE STATE OF KANSAS

By: */s/ Justin Whitten*
Justin Whitten*
  *General Counsel*
Ashley Stites-Hubbard*
  *Deputy Chief Counsel*
Office of the Kansas Governor
300 SW 10th Ave, Room 541-E
Topeka, KS 66612
(785) 296-3930
Justin.h.whitten@ks.gov
Ashley.stiteshubbard@ks.gov

*Counsel for Governor Laura Kelly*

**OFFICE OF THE GOVERNOR** *ex rel.*
**ANDY BESHEAR**
  IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
    THE COMMONWEALTH OF KENTUCKY

By:  */s/ S. Travis Mayo*
S. Travis Mayo*
  *General Counsel*
Taylor Payne*
  *Chief Deputy General Counsel*
Laura C. Tipton*
  *Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

By: */s/ Jason Anton*
Jason Anton†
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
jason.anton@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

By: */s/ Steven J. Goldstein*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*

Steven J. Goldstein†
  *Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6414
Sgoldstein@oag.state.md.us

*Counsel for the State of Maryland*


Neil Giovanatti†
  *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorney for the People of the State of Michigan*


**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

By: */s/ Katherine J. Bies*
Katherine J. Bies†
  *Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Counsel for the State of Minnesota*


**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Amy Senier*
Amy Senier
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
asenier@nmdoj.gov

*Counsel for the State of New Mexico*


**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern†
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*


**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

By: */s/ Brian Simmonds Marshall*
Coby Howell†
Brian Simmonds Marshall*
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov

*Counsel for the State of Oregon*


**JOSH SHAPIRO**
  IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA


**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

Jennifer Selber
*General Counsel*

By:  */s/ Jacob B. Boyer*
Jacob B. Boyer[†]
  *Deputy General Counsel*
Michael J. Fisher[†]
  *Executive Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

By: */s/ Leonard Giarrano IV*
Leonard Giarrano IV[†]
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2062
lgiarrano@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose[†]
  *Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Colin T. Roth*
Colin T. Roth[†]
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us

*Counsel for the State of Wisconsin*

*\*Pro hac vice application forthcoming*
[†] *Admitted pro hac vice*