**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*,<br><br>    Defendants. | Civil Action No. 25-11816-IT |

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ON COUNT I – DECLARATORY JUDGMENT**

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

    I.   The Clause and Regulations Governing Grant Terminations ............................................. 3

        A.  2013 OMB Rulemaking ................................................................................. 3

        B.  OMB's 2020 Rulemaking and Adoption of the Clause............................................ 5

        C.  OMB's 2024 Rulemaking............................................................................... 6

    II.  The Trump Administration Directs Federal Agencies to Abruptly Terminate Previously Awarded Grants Based on New Priorities ......................................................... 8

    III.  Agency Defendants Invoke the Clause to Terminate Billions in Funding to Plaintiffs, With Billions More at Risk ......................................................................... 9

ARGUMENT ................................................................................................................... 12

    I.   A Declaratory Judgment on Count I Is Appropriate. ......................................................... 12

    II.  Agency Defendants Cannot Contravene Three Key Limits on the Clause...................... 16

        A.  The Clause Cannot Be Used to Terminate Grant Awards Based on New "Agency Priorities" Identified After the Award of the Grants. ................................. 16

        B.  The Clause Cannot Be Used to Disregard Congressional Directives by Withholding Duly Appropriated Funds. ..................................................... 21

        C.  The Clause Cannot Be Used to Terminate Grant Awards Where It Is Not Clearly and Unambiguously Specified in the Award Terms and Conditions.......................... 24

CONCLUSION ................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*,
    770 F. Supp. 3d 121 (D.D.C. 2025) ................................................................. 23

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) ................................................................................... 20

*Ass'n of Am. Univs. v. Dep't of Def.*,
    Civ. No. 25-11740, 2025 WL 2022628 (D. Mass. July 18, 2025) ....................... 15

*Ass'n of Am. Univs. v. Nat'l Sci. Found.*,
    Civ. No. 25-11231, 2025 WL 1725857 (D. Mass. June 20, 2025) ....................... 15

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
    838 F.3d 42 (1st Cir. 2016) ........................................................................... 12

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
    508 U.S. 83 (1993) ....................................................................................... 13

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ................................................................... 15, 22

*Climate United Fund v. Citibank, N.A.*,
    Civ. No. 25-698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ............................ 24

*Cochise Consultancy, Inc. v. Hunt*,
    587 U.S. 262 (2019) ..................................................................................... 17

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
    Civ. No. 25-00121, 2025 WL 1426226 (D.R.I. May 16, 2025) ....................... 23, 24

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ..................................................................................... 13

*Downing v. Keurig Green Mountain, Inc.*,
    Civ. No. 20-11673, 2021 WL 2403811 (D. Mass. June 11, 2021) ....................... 13

*Fischer v. United States*,
    603 U.S. 480 (2024) ..................................................................................... 19

*Gale v. First Franklin Loan Servs.*,
    701 F.3d 1240 (9th Cir. 2012) ........................................................................ 17

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) .................................................................................... 23

*In re Body Sci. LLC Pat. Litig.*,
  167 F. Supp. 3d 152 (D. Mass. 2016) ......................................................................... 18

*Katz v. Pershing, LLC*,
  672 F.3d 64 (1st Cir. 2012) ........................................................................................ 13

*Kentucky v. Yellen*,
  67 F.4th 322 (6th Cir. 2023) ....................................................................................... 21

*Massachusetts Fair Hous. Ctr. v. United States Dep't of Hous. & Urban Dev.*,
  496 F.Supp.3d 600 (D. Mass. 2020) ..................................................................... 15, 16

*Massachusetts v. United States Dep't of Health & Hum. Servs.*,
  923 F.3d 209 (1st Cir. 2019) ................................................................................ 13, 15

*Metro. Transp. Auth. v. Duffy*,
  Civ. No. 25-1413, 2025 WL 1513369 (S.D.N.Y. May 28, 2025) ................................... 24

*Mooney v. Domino's Pizza, Inc.*,
  Civ. No. 14-13723, 2016 WL 4576996 (D. Mass. Sept. 1, 2016) .................................. 17

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ..................................................................................................... 13

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  763 F. Supp. 3d 36 (D.D.C. 2025) ............................................................................... 23

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) .............................................................................................. 20, 25

*New Hampshire Lottery Comm'n v. Rosen*,
  986 F.3d 38 (1st Cir. 2021) ................................................................................... 15, 16

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021) .................................................................................................... 17

*Noel Canning v. NLRB*,
  705 F.3d 490 (D.C. Cir. 2013) .................................................................................... 17

*Off. of Pers. Mgmt. v. Richmond*,
  496 U.S. 414 (1990) .................................................................................................... 22

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ................................................................................................ 20, 25

*Penobscot Nation v. Frey*,
    3 F.4th 484 (1st Cir. 2021) ............................................................................ 20

*PHC, Inc. v. Pioneer Healthcare, Inc.*,
    75 F.3d 75 (1st Cir. 1996) ............................................................................. 13

*Pub. Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024) ........................................................................... 13

*Rhode Island v. Trump*,
    Civ. No. 25-128, 2025 WL 1303868 (D.R.I. May 6, 2025) ..................... 23

*Rumsfeld v. Padilla*,
    542 U.S. 426 (2004) (similar) ...................................................................... 17

*Ryder v. Union Pac. R.R. Co.*,
    945 F.3d 194 (5th Cir. 2019) ........................................................................ 20

*State Nat'l Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015) ........................................................................ 15

*State of R.I. v. Narragansett Indian Tribe*,
    19 F.3d 685 (1st Cir. 1994) ........................................................................... 15

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) .................................................................... 22

*United States v. Hughes*,
    211 F.3d 676, 691 (1st Cir. 2000) ............................................................... 17

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ......................................................................................... 22

*W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*,
    59 F.4th 1124 (11th Cir. 2023) .................................................................... 22

*Washington v. U.S. Dep't of Transportation*,
    Civ. No. 25-00848, 2025 WL 1742893 (W.D. Wash. June 24, 2025) ...... 23

*Widakuswara v. Lake*,
    Civ. No. 25-1015, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ................ 24

**Statutes**

2 U.S.C. § 683 ........................................................................................................... 23

2 U.S.C. § 684 ........................................................................................................... 23

5 U.S.C. § 306(b) ...................................................................................................... 20

5 U.S.C. § 702 ........................................................................................................... 13

5 U.S.C. § 703 ...................................................................................................... 13, 16

5 U.S.C. § 706(2) ...................................................................................................... 12

28 U.S.C. § 2201(a) ............................................................................................. 13, 16

31 U.S.C. § 1120(a)(3) .............................................................................................. 20

31 U.S.C. § 1122 ....................................................................................................... 20

**Treatises**

Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2759 (4th ed. 2025) ......................... 13

**Regulations**

2 C.F.R. § 200.210(d) .................................................................................................. 4

2 C.F.R. § 200.340(a)(1) ............................................................................................ 19

2 C.F.R. § 200.340(a)(2) (2021) ............................................................................... 1, 6

2 C.F.R. § 200.340(a)(4) (2024) .......................................................... 1, 6, 7, 17, 18, 24

2 C.F.R. § 200.340(a)(3) ............................................................................................ 19

2 C.F.R. § 200.340(b) ........................................................................................... 19, 24

**Constitutional Provisions**

U.S. Const., art. I, § 1 ............................................................................................... 22

U.S. Const., art. I, § 8, cl. 1 ...................................................................................... 22

U.S. Const., art. I, § 9 ............................................................................................... 22

## Other Authorities

Cost Efficiency Initiative, Exec. Order No. 14,222, 90 Fed. Reg. 11,095-96 (Jan. 20, 2025) ....... 3

Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the
  Federal Government, Exec. Order No. 14,168, 90 Fed. Reg. 8,615-16 (Jan. 20, 2025)............ 9

Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No.
  14,151, 90 Fed. Reg. 8,339 (Jan. 20, 2025) ............................................................................... 8

Establishing and Implementing the President's "Department of Government Efficiency," Exec.
  Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025) .............................................................. 8

Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's
  Uniform Administrative Requirements, Cost Principles, and Audit Requirements for
  Federal Awards, 79 Fed. Reg. 75,871 (Dec. 19, 2014) .............................................................. 5

Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046 (Apr. 22, 2024) .......... 4, 6, 7, 25

Guidance for Grants and Agreements, 85 Fed. Reg. 49,506 (Aug. 13, 2020).... 5, 6, 17, 18, 19, 25

Implementing the President's "Department of Government Efficiency" Cost Efficiency
  Initiative, Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) ...................... 3, 9, 14

Improving Education Outcomes by Empowering Parents, States, and Communities, Exec.
  Order No. 14,242, 90 Fed. Reg. 13,679-80 (Mar. 20, 2025)...................................................... 9

Protecting American Communities from Criminal Aliens, Exec. Order No. 14,287, 90 Fed.
  Reg. 18,761-62 (Apr. 28, 2025) ................................................................................................. 9

Reinstating Commonsense School Discipline Policies, Exec. Order No. 14,280, 90 Fed. Reg.
  17,533 (Apr. 28, 2025) ............................................................................................................... 9

Transparency Regarding Foreign Influence at American Universities, Exec. Order No.
  14,282, 90 Fed. Reg. 17,541 (Apr. 28, 2025)............................................................................ 9

Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal
  Awards, 78 Fed. Reg. 78,590 (Dec. 26, 2013).................................................................. 3, 4, 5

## INTRODUCTION

The Trump Administration has mounted an unprecedented and unlawful campaign to terminate billions of dollars in critical federal funding appropriated by Congress. At the President's direction, federal agencies have canceled thousands of grants that they previously had awarded to Plaintiffs—23 States and the District of Columbia—for projects and programs that those same agencies had reviewed, approved, and supported only months prior. With the stroke of a pen, federal agencies have deprived States of funding they rely on and had already been using to combat violent crime and protect public safety, equip law enforcement, educate students, safeguard public health, protect clean drinking water, conduct life-saving medical and scientific research, address food insecurity, ensure access to unemployment benefits, and much more.

Federal agencies have based this unprecedented campaign on a single subclause buried in federal regulations promulgated by the Office of Management and Budget (OMB) and incorporated verbatim into regulations promulgated by Agency Defendants.[1] This provision, referred to here as the "Clause," states that agencies may terminate grants if an award "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2024); 2 C.F.R. § 200.340(a)(2) (2021). Defendants have claimed that those words provide them with virtually unfettered authority to terminate federal funding. Indeed, each Agency Defendant has invoked the Clause since January 20 to terminate grants to Plaintiffs because the grants purportedly do not advance this Administration's new priorities. Defendants have done so without advance notice, without explanation, and often in direct contravention of the will of Congress.

Defendants' invocation of the Clause to terminate billions of dollars in federal funding violates the law in at least three ways. *First*, the Clause cannot be used to terminate existing grants

---

[1] "Agency Defendants" refers to all Defendants except OMB.

based on new agency priorities identified *after* the time of the federal award. The Clause's text and rulemaking history make plain that it permits termination in only limited circumstances, specifically where the grant can no longer feasibly achieve its *original* objectives. The Clause does not confer upon federal agencies a broad power to terminate grants on a whim based on newly identified agency priorities. To conclude otherwise would not only render other provisions of the same regulation superfluous—which require agencies to put the public and grantees on notice of their goals and priorities—but would run counter to constitutional principles requiring States to have clear notice of the conditions on any funding they accept. *Second*, the Clause cannot be used to withhold duly appropriated funds by identifying "agency priorities" that disregard or are otherwise incompatible with Congress's directives. Congress—not the Executive Branch—has the power of the purse. Federal agencies cannot simply refuse to spend appropriated funds in defiance of statutory mandates enacted by Congress. *Third*, the Clause cannot be used to terminate existing grants if the award terms and conditions do not clearly and unambiguously specify that the award can be terminated when it "no longer effectuates the program goals or agency priorities." That is abundantly clear from the plain text of the Clause itself, an adjacent clause of the same regulation, over a decade of rulemaking history, and recent case law.

Plaintiffs request a declaratory judgment to clarify these limits on the Clause. Plaintiffs collectively have billions of dollars in grants already awarded by Defendants and receive billions of dollars in federal funding from Defendants each year. These grants are at imminent risk of termination. Indeed, the President has expressly directed all federal agencies to "review all existing covered contracts and grants and," where consistent with applicable law, "terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the [new] policies of [the

Trump] Administration." *See* Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative, Exec. Order No. 14,222, 90 Fed. Reg. 11,095-96 (Feb. 26, 2025). And federal agencies have already invoked the Clause—and newly discovered agency priorities—to terminate thousands of grants awarded to Plaintiffs worth billions of dollars. Moreover, Plaintiffs will be applying for future grants in the days, weeks, and months ahead, and they regularly receive billions of dollars in federal funding each year. These grants could also be abruptly terminated under Defendants' view of the Clause, depriving Plaintiffs of fair notice of the conditions that apply to their grants and undermining the stability of their budgets.

In light of the ongoing harms stemming from Defendants' continuing invocation of the Clause, Plaintiffs have a strong interest in obtaining a legal declaration of the meaning and limitations of the Clause. While Defendants may change their priorities (consistent with applicable law) and take those new priorities into account when awarding *new* grants, their invocation of those new priorities to terminate *existing* grants is unlawful. The Court should therefore enter judgment for Plaintiffs on Count I and issue a declaratory judgment to clarify the circumstances under which the Clause does not permit or authorize Agency Defendants to terminate federal awards mid-grant.

## BACKGROUND

### I.    The Clause and Regulations Governing Grant Terminations

#### A.    2013 OMB Rulemaking

In 2013, OMB engaged in notice-and-comment rulemaking to "streamline" federal grantmaking and to "strengthen" oversight. *See* Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78,590 (Dec. 26, 2013). The rule OMB issued, which OMB described as "Guidance," sought to advance these twin goals by "provid[ing] a governmentwide framework for grants management" and "set[ting] standard requirements for

financial management of Federal awards across the entire Federal government." *Id.*

   As part of that framework, before grant applications are solicited, federal agencies must provide public notices containing "sufficient information to help an applicant make an informed decision about whether to submit an application" for federal funding, including fully describing the program to be funded and the agency's "priorities" in making selections. *Id.* at 78,621-22 (setting forth 2 C.F.R. §§ 200.202, 200.203); *see also id.* at 78,673 (requiring "full program description of the funding opportunity"). More specifically, all Notices of Funding Opportunities ("NOFOs") are required to include the same or similar information so that "[p]otential applicants ... [are] able to find similar information across all Federal NOFOs." Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046, 30,204 (Apr. 22, 2024) (App'x I to Part 200—Full Text of Notice of Funding Opportunity). This required information includes a "program description" that "must include ... [t]he general purpose of the funding and what it is expected to achieve for the public good"; "[t]he Federal agency's funding priorities or focus areas, if any"; and the "outcomes the Federal agency expects recipients to achieve." *Id.* And once selections are made, federal agencies "must include" in each award all the general terms and conditions as well as any agency- or program-specific terms and conditions. 78 Fed. Reg. at 78,623-24 (2 C.F.R. §§ 200.210(b), (c)). The award must also clearly specify the "expected performance" of the grantee as well as "the outcomes intended to be achieved by the program." *Id.* at 78,624 (2 C.F.R. § 200.210(d)).

   OMB's 2013 Guidance delineates the circumstances under which an award may be terminated by an agency. *See id.* at 78,637-39 (2 C.F.R. §§ 200.338-342) (addressing "Remedies for Noncompliance"). Indeed, the 2013 Guidance states that federal agencies can terminate an award mid-grant in only three enumerated circumstances: (1) "fail[ure] to comply with the terms and conditions of a Federal award," (2) "for cause," or (3) with the "consent" of the grantee. *Id.* at

78,638 (2 C.F.R. §§ 200.339(a)(1)-(3)). And even if a grantee is noncompliant, the federal agency

is required to first determine if "imposing additional conditions" could remedy the failure before

taking action to terminate an award. *Id.* at 78,637-38 (2 C.F.R. § 200.338). The 2013 Guidance

was codified in 2014 by all federal award-making agencies, thereby giving regulatory effect to the

portions of the Guidance that each agency chose to adopt.[2]

### B.    OMB's 2020 Rulemaking and Adoption of the Clause

In 2020, OMB revised its Guidance to improve grant "performance to achieve program

results." Guidance for Grants and Agreements, 85 Fed. Reg. 49,506, 49,507 (Aug. 13, 2020). The

2020 revisions require federal agencies to engage in more meticulous program planning and design

from the outset, including "set[ting] priorities" and "identif[ying] targets of opportunity" for fund-

ing. *Id.* at 49,507 (2 C.F.R. § 200.202). Critically, federal agencies must design programs and

establish the "goals" and "objectives" for grants "*before* the applications are solicited." *Id.* (em-

phasis added). And agencies are required to disclose all performance requirements to awardees in

both "the solicitation and in the award." *Id.* Indeed, federal agencies are required to clearly inform

grantees "of the termination provisions" in a "clear and unambiguous" manner in the award itself.

*Id.* at 49,542 (2 C.F.R. § 200.211(c)(v)); *see also id.* at 49,507 ("Federal awarding agencies must

clearly and unambiguously articulate the conditions under which a Federal award may be termi-

nated in their applicable regulations and in the terms and conditions of Federal awards.").

Although federal agencies can still terminate an award for failure "to comply with the terms

---

[2] *See* Federal Awarding Agency Regulatory Implementation of Office of Management and
Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for
Federal Awards, 79 Fed. Reg. 75,871 (Dec. 19, 2014). Federal agencies were required to imple-
ment substantive portions of the Guidance "in codified regulations unless different provisions
[we]re required by Federal statute or [we]re approved by OMB." *Id.* at 78,620 (2 C.F.R.
§ 200.106); *see also id.* (2 C.F.R. § 200.107).

and conditions" of the award (after following the proper steps) or where the agencies obtain grant-

ees' consent, OMB's 2020 revisions removed the "for cause" termination provision, explaining

that the provision was "not substantially different than the provision allowing Federal awarding

agencies to terminate Federal awards when the recipient fails to comply with the terms and condi-

tions." *Id.* at 49,508. And OMB inserted the Clause,[3] which allows an agency to terminate an award

if an award "no longer effectuates the program goals or Federal awarding agency priorities." *Id.* at

49,507-08 (describing revision to 2 C.F.R. § 200.340(a)(2)).

OMB explained that "the intent" in adding the Clause was "to ensure that Federal awarding

agencies prioritize ongoing support to Federal awards that meet program goals." *Id.* at 49,507. For

example, the Clause permits termination where post-award "evidence reveals that a specific award

objective is ineffective at achieving program goals" or where "additional evidence" causes the

agency "to significantly question the feasibility of the intended objective of the award." *Id.* at

49,507-08. OMB did not suggest, however, that the Clause enables agencies to terminate awards

mid-grant due to new agency priorities not contemplated at the time of the grant. To the contrary,

in response to comments "express[ing] a concern that [the Clause] will provide Federal agencies

too much leverage to arbitrarily terminate awards without sufficient cause," OMB firmly stated

that the Clause does *not* empower agencies "to terminate grants arbitrarily." *Id.* at 49,509.

## C.    OMB's 2024 Rulemaking

OMB again revised the Guidance in 2024 to incorporate new policies and to "reduce

agency and recipient burden." 89 Fed. Reg. 30,046. As part of these revisions, OMB underscored

---

[3] The Clause has been incorporated verbatim into regulations promulgated by each Agency De-
fendant. *See* 2 C.F.R. subpart B. Plaintiffs collectively use "the Clause" to reference 2 C.F.R.
§ 200.340(a)(4) (2024), 2 C.F.R. § 200.340(a)(2) (2021), and the agency regulations adopting
those provisions.

that federal agencies must ensure grantees are made aware of a grant program's specific objectives (as well as the "agency's funding priorities") *before* the award is granted. *See, e.g.*, *id.* at 30,149 (2 C.F.R. § 200.204(8)) (requiring notices of funding opportunities to include "[a] brief description that is written in plain language and summarizes the goals and objectives of the program"); *id.* at 30,150 (2 C.F.R. § 200.211) ("The Federal award must include ... performance goals ... [and] how performance will be assessed."); *id.* at 30,204 (App'x I to Part 200 (b)(3)(i)(B)-(C), *Full Text of Notice of Funding Opportunity*, requiring agency to include a "program description," with "funding priorities" and "program goals and objectives").

OMB also revised its Guidance on grant terminations to "provide[] greater clarity on the policy for termination of awards by the Federal agency." *Id.* at 30,089. The Clause itself was moved to subsection (a)(4), which now provides that federal agencies may terminate grants "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Although OMB initially proposed removing the Clause altogether as "unnecessary"—because an agency could only "terminate a Federal award according to the terms and conditions of the award"—it ultimately chose to retain the Clause and clarify that an award may be terminated solely "pursuant to the terms and conditions of the Federal award." 89 Fed. Reg. at 30,089. This means that if a federal agency wants to terminate an award because it "no longer effectuates the program goals or agency priorities," that can be done only if "the language [wa]s included in the terms and condition of the award." *Id.* at 30,089 (2 C.F.R. § 200.340(a)(4) (2024)). And OMB revised the regulation to ensure that federal agencies were clear on this point: the Clause can be used only if a grant award's terms and conditions "clearly and unambiguously specify" that it is one of the enumerated bases for termination. *Id.* In promulgating the 2024 Guidance, OMB made clear that

"[t]he prior version of section 200.340(b) and the proposed version both directed Federal agencies ... to clearly and unambiguously specify all termination provisions in the terms and conditions of the award." *Id.* OMB nonetheless explained that it was revising the wording of the Clause to "underscore[e] the need for agencies ... to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id.*

## II.    The Trump Administration Directs Federal Agencies to Abruptly Terminate Previously Awarded Grants Based on New Priorities

On January 20, 2025, the day President Trump was inaugurated, he issued an Executive Order creating the United States Department of Government Efficiency (DOGE). *See* Establishing and Implementing the President's "Department of Government Efficiency," Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025). The DOGE order required each federal agency to establish "a DOGE Team of at least four employees" and to provide them with "full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* at 8,441-42.

In the days and weeks that followed, the President issued a series of Executive Orders directing federal agencies to review and abruptly terminate existing grant funding to a range of recipients, including Plaintiffs, based on the Executive Branch's policy preferences. For example, alongside the first DOGE order, the President issued an Executive Order that directed each agency to terminate all "'equity-related' grants or contracts" and "all DEI or DEIA performance requirements for employees, contractors, or grantees," as well as to furnish a list to OMB of all "Federal grantees who received Federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No. 14,151, 90 Fed. Reg. 8,339 (Jan. 20, 2025). A separate Executive Order directed the cessation of all "Federal funds ... used to promote gender ideology," requiring "[e]ach agency [to] assess grant conditions and grantee preferences

and ensure grant funds do not promote gender ideology." Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14,168, 90 Fed. Reg. 8,615-16 (Jan. 20, 2025).

On February 26, 2025, the President issued Executive Order 14,222, which purported to "commence[] a transformation in Federal spending on contracts, grants, and loans." *See* Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative, Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025). The order directs "[e]ach [a]gency [h]ead, in consultation with the agency's DOGE Team Lead, [to] review all existing covered contracts and grants and," where consistent with applicable law, "terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the [new] policies of [the Trump] Administration." *Id.* at 11,095-96. The Order also instructs agencies to "prioritize the review of funds disbursed under covered contracts and grants to educational institutions." *Id.* at 11,096.

Since then, the President has continued to direct the termination of existing grant awards that do not square with the Administration's new policy preferences. *See, e.g.*, Improving Education Outcomes by Empowering Parents, States, and Communities, Exec. Order No. 14,242, 90 Fed. Reg. 13,679-80 (Mar. 20, 2025); Protecting American Communities from Criminal Aliens, Exec. Order No. 14,287, 90 Fed. Reg. 18,761-62 (Apr. 28, 2025); Reinstating Commonsense School Discipline Policies, Exec. Order No. 14,280, 90 Fed. Reg. 17,533 (Apr. 28, 2025); Transparency Regarding Foreign Influence at American Universities, Exec. Order No. 14,282, 90 Fed. Reg. 17,541 (Apr. 28, 2025).

III.    **Agency Defendants Invoke the Clause to Terminate Billions in Funding to Plaintiffs, With Billions More at Risk**

To carry out the President's directives, Agency Defendants have used the Clause as the

9

legal basis to eliminate billions of dollars in grants already awarded and in use by Plaintiffs. Plaintiffs have received boiler-plate letter after boiler-plate letter from each Agency Defendant citing the Clause and saying that their grants "no longer effectuate[] agency priorities" and, as a result, termination is "appropriate." *See, e.g.*, Goetz Decl. (CA), Doc. No. 66-2 at 3; Daniels Decl. (RI), Doc. No. 66-48 at 4. Many of these notifications explicitly state that the objectives of the grant conflict with new agency priorities. *See, e.g.*, Scheminske Decl. (CO) Ex. A, Doc. No. 66-7 at 6-7; Koppell Decl. (NJ) Ex. A, Doc. No. 66-37 at 7-8. Not one of these communications cites program goals or agency priorities identified at the time the grant was awarded. The letters largely characterize the decisions as "final agency action[s]" that are "not subject to administrative appeal." *See, e.g.*, Walton Decl. (HI), Doc. No. 66-13 at 9; Link Decl. (KY), Doc. No. 66-25 at 7; Melvin Decl. (NY), Doc. No. 66-44 at 11.

Agency Defendants have invoked the Clause to terminate awards even where the Clause was not "clearly and unambiguously specif[ied]" in the terms and conditions of the actual, operative awards. *See, e.g.*, Womack Decl. (CA), Doc. No. 66-4 at 2-3; Dimitruk Decl. (VT), Doc. No. 66-50 at 3. Agency Defendants have also terminated awards where Congress specifically appropriated the monies for the particular grant programs or directed that the federal monies be spent on the particular objectives of the grant. *See, e.g.*, McGillivray Dec. (WI), Doc. No. 66-52 at 3-5.

By deploying the Clause to sweep away billions in federal funding mid-grant, Agency Defendants have upended vital programs and services that the Plaintiffs and their residents rely on. Defendant U.S. Department of Justice, for example, abruptly terminated grants supporting essential law enforcement functions and providing law enforcement with the equipment they need to combat violent crime. *See, e.g.*, Ottobre Decl. (NJ), Doc. No. 66-39 at 3; Patchak Decl. (WI), Doc. No. 66-54 at 2-3. Grants terminated by Defendant U.S. Department of Agriculture supported State

efforts to purchase locally grown food for food banks. *See, e.g.*, Sanders Decl. (IL), Doc. No. 66-19 at 3-6; Gorzkowicz Decl. (MA), Doc. No. 66-28 at 3-4. Defendant U.S. Department of Labor terminated grants aimed at protecting the integrity of unemployment benefits through fraud detection and prevention, programs which had similarly been authorized under the American Rescue Plan Act. *See, e.g.*, Gorzkowicz Decl. (MA), Doc. No. 66-28 at 4; Monson Decl. (PA), Doc. No. 66-46 at 3-4. Defendant U.S. Department of Justice terminated grants to help prevent school violence. *See, e.g.*, Minge Decl. (MN), Doc. No. 66-32 at 3-4. And the list goes on. In total, these grant terminations have resulted in billions of dollars lost for critical programs, with tangible harms to the States and millions of their residents. *See, e.g.*, Samuel Decl. (NV), Doc. No. 66-33 at 3; Wengryn Decl. (NJ), Doc. No. 66-40 at 3-4; Bowen Decl. (MD), Doc. No. 66-55 at 6-7.

Agency Defendants have also thrown into doubt the future of existing grant awards that have not yet been terminated. Plaintiffs have billions of dollars' worth of active grants that are now at risk of termination due to Defendants' interpretation of the Clause. *See generally* Womack Decl. (CA), Doc. No. 66-4 at 4; Berger Decl. (IL), Doc. No. 66-14 at 3-4; McGillivray Decl. (WI), Doc. No. 66-52 at 5. Should Agency Defendants continue to terminate these grants using the Clause, critical programs will have to cease operations. *See, e.g.*, Thomas Decl. (CA), Doc. No. 66-3 at 3; Stevens Decl. (DC), Doc. No. 66-10 at 3. Thousands of local farmers and producers could be left without technical support and resources. *See, e.g.*, Wengyrn Decl. (NJ), Doc. No. 66-40 at 3-4. Funding for drinking water inspections could dry up. *See, e.g.*, Casler Decl. (OR), Doc. No. 66-45 at 3-4. And pivotal research on strokes, HIV, cardiovascular disease, and early cancer detection hangs in the balance. *See, e.g.*, Monson Decl (PA), Doc. No. 66-46 at 3-4.

Plaintiffs have applied for, and plan to apply for, billions of dollars in new federal grant funding from Agency Defendants. Hundreds of these applications are currently pending for funds

11

that would help address the vital needs of Plaintiffs' residents, such as providing humanitarian aid and benefit payments for those who are unemployed because of the devastating January wildfires in Los Angeles County, California. Womack Decl. (CA), Doc. No. 66-4 at 4-5. Based on the billions of dollars in funding that Plaintiffs have received over the past several years, *e.g.*, Melhoff Decl. (NM), Doc. No. 66-41 at 3-4; Monson Decl. (PA), Doc. No. 66-46 at 6-8; Daniels Decl. (RI), Doc. No. 66-48 at 13-15, they reasonably anticipate that many of these applications will result in grant awards. If the Clause could be used to summarily terminate these awards at any point, Plaintiffs will face continued uncertainty about the actual monies available to be used to help their residents—including whether to apply for and accept grant awards that, under Agency Defendants' interpretation, could vanish at any moment, based on future and as-of-then still unidentified evolving agency priorities.

## ARGUMENT

Plaintiffs are entitled to summary judgment on Count I, which seeks a declaratory judgment that the Clause cannot be used to terminate existing grants (1) based on new agency priorities identified after the time of the federal award; (2) where any Defendant invokes the Clause to withhold duly appropriated funds by identifying "agency priorities" that disregard or are otherwise incompatible with Congress's directives; or (3) if the award terms and conditions do not clearly and unambiguously specify that the award can be terminated when it "no longer effectuates the program goals or agency priorities." *See* First Am. Compl., Doc. No. 64 at 65-70 (¶¶ 252-69). [4]

### I.    A Declaratory Judgment on Count I Is Appropriate.

Under the Administrative Procedure Act (APA) and Declaratory Judgment Act, a federal

---

[4] Here, "a motion for summary judgment is simply a vehicle to tee up a case for judicial review." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). The court asks

court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see* 5 U.S.C. §§ 702-03. The aim of a declaratory judgment is to "resolv[e] potential disputes" anticipated by the party seeking relief "in light of the other side's conduct." *PHC, Inc. v. Pioneer Healthcare, Inc.*, 75 F.3d 75, 79 (1st Cir. 1996) (citing *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 94-97 (1993)). Here, Plaintiffs have standing to seek, and this case is ripe for adjudication of, such a declaratory judgment, which will not only "serve a useful purpose in clarifying and settling the legal relations in issue" but will also "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2759 (4th ed. 2025).

To start, there is at least a "substantial risk of [Plaintiffs suffering] future [Clause-based grant terminations] that [are] traceable to the Government defendants," which warrants "forward-looking relief." *Murthy v. Missouri*, 603 U.S. 43, 69 (2024); *see also Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 50 (1st Cir. 2024) ("An 'injury is imminent if it is certainly impending <u>or</u> if there is a substantial risk that harm will occur.'"). As substantiated by Plaintiffs' 55 declarations, Agency Defendants have already used the Clause—and newly discovered agency priorities—to terminate hundreds of grants awarded to Plaintiffs that are collectively worth billions of dollars. That is a quintessential economic injury. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) ("los[ing] out on federal funds ... is a sufficiently concrete and imminent injury to satisfy Article III"); *Massachusetts v. United States Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019) ("In this circuit, it is a bedrock proposition that a relatively small economic loss— even an identifiable trifle—is enough to confer standing." (cleaned up) (quoting *Katz v. Pershing*,

---

whether the challenged regulatory action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to [a] constitutional right"; "in excess of statutory ... authority"; or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A)-(D).

*LLC*, 672 F.3d 64, 76 (1st Cir. 2012))); *see also Downing v. Keurig Green Mountain, Inc.*, Civ.

No. 20-11673, 2021 WL 2403811, at *3 (D. Mass. June 11, 2021) (Talwani, J.) ("[A]n actual

economic loss ... is a 'prototypical concrete harm.'" (citation omitted)). The terminated grants were

critical sources of funding for States to, for example, combat violent crime, protect public safety,

remove "forever chemicals" from drinking water, protect unemployment benefits systems from

fraud, distribute locally grown produce to schools and underserved communities, and more.[5]

Those Clause-based terminations are exceedingly likely to continue.[6] The President has

ordered each agency head to "review all existing covered contracts and grants and, where appro-

priate and consistent with applicable law, terminate or modify" such "contracts and grants to re-

duce overall Federal spending or reallocate spending to promote efficiency and advance the poli-

cies of [this] Administration." Exec. Order No. 14,222 § 3(b), 90 Fed. Reg. 11,095-96 (Feb. 26,

2025); *see also* First Am. Compl., Doc. No. 64 at 22-23 (¶¶ 91-94). And as Plaintiffs' declarations

make clear, Plaintiffs have active grants with the same Agency Defendants that have (improperly)

used the Clause to terminate grants. *See supra* at 9-11. On top of that, Plaintiffs have applied, and

plan to apply, for more grants with those same Agency Defendants, which have historically

awarded billions of dollars to Plaintiffs each year. *See supra* at 11-12. Between the Executive

Orders directing grant terminations, the previous Clause-based grant terminations by Agency De-

fendants, and the current and future grants with the same Agency Defendants, there is at least a

substantial risk that Defendants will terminate more in critical federal funding under the Clause—

---

[5] *See, e.g.*, Ottobre Decl. (NJ), Doc. No. 66-39 at 3; Walton Decl. (HI), Doc. No. 66-13 at 3; Koppell Decl. (NJ), Doc. No. 66-37 at 3-4; Womack Decl. (CA), Doc. No. 66-4 at 3-4; Sanders Decl. (IL), Doc. No. 66-19 at 3; Flood Decl. (MI), Doc. No. 66-30 at 3.

[6] Agency Defendants have continued to invoke the Clause to terminate grant awards to Plaintiffs since the filing of the Complaint in this case. *See, e.g.*, Walsh Decl. (IL), Doc. No. 66-22 at 4; Flood Decl. (MI), Doc. No. 66-30 at 3; Pace Decl. (HI), Doc. No. 66-12 at 3; Campagna Decl. (RI), Doc. No. 66-47 at 3-4; Logan-Greene Decl. (NY), Doc. No. 66-43 at 3.

an impending fiscal injury that entitles Plaintiffs to forward-looking relief.[7]

The Court can thus decide this case now. Plaintiffs bring this challenge to an agency action on "purely legal claims," so the challenge "is 'presumptively reviewable,' *i.e.*, ripe." *Massachusetts Fair Hous. Ctr. v. United States Dep't of Hous. & Urban Dev.*, 496 F.Supp.3d 600, 608-09 (D. Mass. 2020) (cleaned up); *see State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53-54 (D.C. Cir. 2015) (Kavanaugh, J.) (collecting Supreme Court precedent holding that "affected parties could challenge agency regulations in pre-enforcement suits"). In fact, reviewing and determining the scope of a statute or regulation is a standard function of a declaratory judgment. *See, e.g.*, *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 54 (1st Cir. 2021) (affirming declaratory judgment where "merits of th[e] controversy ... turn[ed] entirely on a question of statutory interpretation"); *State of R.I. v. Narragansett Indian Tribe*, 19 F.3d 685, 694 (1st Cir. 1994) (declaratory judgment appropriate where the case presented "purely legal" issue involving statutory interpretation and was "of critical importance"). Put simply, this "challenge is sufficiently 'fit' for judicial resolution" and, given impending injuries that Plaintiffs confront from more Clause-based grant terminations, Plaintiffs "face immediate hardship if the court were to withhold review." *Massachusetts Fair Hous. Ctr.*, 496 F. Supp. 3d at 609. A forward-looking declaratory judgment is therefore appropriate to delineate, as here, the obligations of governmental actors who are expected to

---

[7] *See, e.g.*, *Massachusetts*, 923 F.3d at 222 (holding that Massachusetts had standing to challenge federal regulations "based on an imminent fiscal injury"); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, Civ. No. 25-11231, 2025 WL 1725857, at *7 (D. Mass. June 20, 2025) (Talwani, J.) ("sufficiently imminent" injury where plaintiffs challenged federal policy notice that, if implemented, would apply "to future grants ... not yet awarded"); *Ass'n of Am. Univs. v. Dep't of Def.*, Civ. No. 25-11740, 2025 WL 2022628, at *11 (D. Mass. July 18, 2025) (Article III standing where plaintiffs could lose funding and their "programs ... [would] face significant disruption" from changes to grant conditions); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) ("concrete" and "imminent" injury from threat to withhold all federal grants from so-called "sanctuary" cities and counties, even though the federal government argued that "the Executive Order may not be enforced").

adhere to the law. *See, e.g.*, *New Hampshire Lottery Comm'n*, 986 F.3d at 53. That is why the APA itself expressly contemplates declaratory relief. *See* 5 U.S.C. § 703.

Ultimately, Plaintiffs should not have to guess whether Defendants, at any time following the award of a federal grant, can suddenly use the Clause to cut off the federal funding for no reason other than that the grant purportedly does not effectuate new "agency priorities." So declaratory relief setting out the scope of the Clause and the limitations on its use by Defendants will clarify the rights and obligations of the parties. *See* 28 U.S.C. § 2201.

## II.    Agency Defendants Cannot Contravene Three Key Limits on the Clause.

The Court should enter judgment for Plaintiffs on Count I and issue a declaratory judgment clarifying three key limits on the Clause: the Clause cannot be used to terminate existing grants (1) based on new agency priorities identified after the time of the federal award; (2) where Defendants withhold duly appropriated funding based on agency priorities that disregard congressional directives; or (3) if the award terms and conditions do not themselves clearly and unambiguously specify that the award can be terminated when it "no longer effectuates the program goals or agency priorities."

### A.    The Clause Cannot Be Used to Terminate Grant Awards Based on New "Agency Priorities" Identified After the Award of the Grants.

The Clause's express language, its rulemaking history, corollary statutory and regulatory directives, and constitutional principles confirm that Agency Defendants cannot terminate grant awards based on new "agency priorities" not identified at the time of the award. But that is precisely what Agency Defendants have done. *See supra* at 8-9. What the Clause actually permits is terminating existing grants in the limited circumstance where the grant no longer effectuates agency priorities identified when the award was first made. That is, where "additional evidence

reveals that a specific award objective is ineffective at achieving program goals" or where "additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award." 85 Fed. Reg. at 49,507-08. And while agencies may, consistent with applicable law, properly change their priorities *going forward* and use those new priorities to determine whether to award *new* grants, allowing agencies to terminate *existing* grants based on new "priorities" identified *after* the grant award would improperly permit federal funding to be pulled back at any moment based on an agency's whim.

Start with the Clause's text. The Clause discusses terminating an existing grant if it "no longer effectuates *the* program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). "In construing a statute" or regulation, "the definite article 'the' particularizes the subject which it precedes and is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" *Gale v. First Franklin Loan Servs.*, 701 F.3d 1240, 1246 (9th Cir. 2012); *see also Mooney v. Domino's Pizza, Inc.*, Civ. No. 14-13723, 2016 WL 4576996, at *4 (D. Mass. Sept. 1, 2016) (Talwani, J.) ("The definite article 'the' is a word of limitation that indicates a reference to a specific object." (citation omitted)). In other words, using the definite article "the" followed by nouns indicates that each noun's identity is discrete and certain. *See, e.g.*, *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021) (observing that the statute "seems to speak of the charging document as a discrete thing, using a definite article with a singular noun ('the notice')."); *Cochise Consultancy, Inc. v. Hunt*, 587 U.S. 262, 272 (2019) (similar); *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (similar); *see also Noel Canning v. NLRB*, 705 F.3d 490, 500 (D.C. Cir. 2013) (in discussing "the," noting that, "[u]nlike 'a' or 'an,' that definite article suggests specificity."), *aff'd*, 573 U.S. 513 (2014); *United States v. Hughes*, 211 F.3d 676, 691 (1st Cir. 2000) ("[U]se of the definite article 'the' to indicate a narrower class of 'victims' makes sense."); *In re Body Sci. LLC Pat. Litig.*, 167

F. Supp. 3d 152, 164 (D. Mass. 2016) ("All three dependent claims use the definite article 'the,' indicating that they are referring to the evaluator station introduced in claim 1, instead of introducing a new evaluator station."). So "*the* program goals" or "agency priorities" means not just "any" program goals or agency priorities that federal agencies later identify whenever they wish, but the specific program goals and agency priorities in place at the time of the initial award.

The Clause also makes clear that it can only be used to terminate an award that "*no longer effectuates* the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added). Especially when paired with the definite article "the," the Clause's text references circumstances where an award previously effectuated agency priorities set at the time of award but may "no longer" do so. The agency priorities thus *must have existed previously*—at the time of the award—when the agency assessed the match between the award and its priorities. It makes little sense to apply the "no longer effectuates" language to *new* priorities that did not exist at the time of the grant award; a grant would never (except by happenstance) have effectuated program goals or agency priorities that did not exist when the grant was awarded. Just as a social-media post announcing that a company is "no longer" hiring a paralegal makes clear they are referring to a *previous* hiring opportunity, so too a Clause that asks whether a grant "no longer" effectuates the agency priorities must refer to the priorities that were *already* established.

The Clause's rulemaking history confirms this reading. OMB explained that it intended the Clause "to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals." 85 Fed. Reg. at 49,507. OMB then identified two scenarios where an award would no longer do so: where "additional evidence reveals that a specific award objective is ineffective at achieving program goals" or where "additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id.* at

49,507-08. Much like the phrase "no longer effectuates," the term "additional evidence" implies that the agency's original goals and priorities have held steady—all that has changed is that new evidence indicates the award does not serve those original goals and priorities.

For example, the EPA could use the Clause to terminate an existing grant to clean up groundwater pollution with a particular technology if a new study reveals that this technology does not in fact help clean up groundwater. In that scenario, "additional evidence" shows that the project (using the technology to clean up groundwater) is ineffective or no longer feasible to accomplish the original agency priority (cleaning up groundwater). But nothing indicates that EPA could stop funding the cleanup project midway because it has lost interest in water quality. To the contrary, OMB reassured commenters that the Clause would *not* allow agencies "to terminate grants arbitrarily," and OMB disagreed with those who feared that the "language [could] provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause." *Id.* at 49,509.

Allowing terminations based on mid-award priority shifts would render superfluous the many other provisions circumscribing when agencies can terminate existing grants. *See, e.g.*, 2 C.F.R. §§ 200.340(a)(1)-(3) (federal award may be terminated if "recipient ... fails to comply with the terms and conditions"; upon "the consent of the recipient"; or "[b]y the recipient ... upon sending ... a written notification of the reasons"); *id.* § 200.340(b) (requiring the federal agency to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award"). In other words, there would be no need for agencies to invoke the narrow circumstances of those parallel provisions if they could simply invoke whatever priorities they wish, new or old, and terminate grants on that basis. *See, e.g.*, *Fischer v. United States*, 603 U.S. 480, 498 (2024) ("Although the Government's all-encompassing interpretation may be literally permissible, it defies the most plausible understanding ... and it renders an unnerving amount of [ ] text

mere surplusage."). Allowing agencies to terminate existing grants based on newly identified pri-

orities would also run counter to other carefully reticulated requirements that direct agencies to

clearly define their program goals and funding priorities at the outset of the grant, to provide public

notice of these goals and priorities, and to measure progress against those defined goals.[8] *See* 31

U.S.C. § 1122. And it would be extraordinary for such all-encompassing grant-termination power

to be buried in a subclause of the Federal Register: although federal agencies "could theoretically

issue such a rule, we presume that they, no less than Congress, do not 'hide elephants in mouse-

holes.'" *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 203 (5th Cir. 2019); *accord Penobscot Nation*

*v. Frey*, 3 F.4th 484, 506 (1st Cir. 2021).

    This conclusion is reinforced by constitutional principles. Under the Spending Clause,

Congress can "grant federal funds to the States" and impose conditions on those grants to "ensure

that the funds are used by the States to 'provide for the ... general Welfare' in the manner Congress

intended." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012) (quoting U.S. Const.,

art. I, § 8, cl. 1). But Congress "must do so unambiguously[,]" enabling "the States to exercise

their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch.*

*& Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,

548 U.S. 291, 296 (2006). It thus exceeds constitutional bounds to surprise "States with post ac-

ceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. "This threshold requirement—

that Congress speak clearly as to a condition it imposes—at least provides assurance that, before

---

[8] Indeed, Congress has made clear that agency priorities cannot be changed on a whim: by statute, agencies may only change their priorities through a reticulated process that provides adequate notice to Congress. *See, e.g.*, 31 U.S.C. § 1120(a)(3) (mandating that OMB consult with Congress "[w]hen developing or making adjustments to Federal Government priority goals"); 5 U.S.C. § 306(b) (allowing agencies to adjust goals and objectives "to reflect significant changes in the environment in which the agency is operating, with appropriate notification of Congress").

a state gives up some of its power in exchange for federal grant money, the state's eyes are wide open: it knows what the consequences are." *Kentucky v. Yellen*, 67 F.4th 322, 324 (6th Cir. 2023). Here, Plaintiffs are unaware of any federal statute that authorizes Defendants to terminate grants based on newly identified program goals or agency priorities unknown to Plaintiffs at the time of the award—and Defendants have not cited any such statute in terminating grants to Plaintiffs. If there were such a statute, it would violate the Spending Clause because it would not set forth unambiguously the terms upon which grants may be terminated, making it impossible for States to evaluate the risks and obligations of accepting the funds.

For these reasons, the Court should declare that the Clause permits termination of existing grants only in the limited circumstance where the grant no longer effectuates program goals and agency priorities identified at the time of the award.

**B.    The Clause Cannot Be Used to Disregard Congressional Directives by Withholding Duly Appropriated Funds.**

Plaintiffs are entitled to a declaratory judgment that the agencies cannot invoke the Clause to withhold duly appropriated funds by identifying "agency priorities" that disregard or are otherwise incompatible with Congress's directives. In at least certain Clause-based terminations, Plaintiffs are not aware of Defendants having redirected the affected funds anywhere. Without such redirection, Clause-based terminations constitute a refusal to spend congressionally appropriated funds in contravention of statutory mandates. These actions are clearly not "authorized by law" within the meaning of the Clause because they unconstitutionally contravene congressional directives.

"The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const., art. I, § 1 (Vesting Clause); *id.* art. I, § 8, cl. 1 (Spending Clause); *id.* art. I, § 9, cl. 7

(Appropriations Clause); *see also U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) ("The power over the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'"). And "[t]he Constitution does not confer upon [the Executive] any power to enact laws or to suspend or repeal such as the Congress enacts." *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915). So once Congress exercises its exclusive power by enacting appropriations statutes, "public funds [must] be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990); *see also W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023). Put simply, "[a]bsent congressional authorization, the Administration may not withhold properly appropriated funds in order to effectuate its own policy goals." *San Francisco*, 897 F.3d at 1235.

These well-settled principles refute Defendants' interpretation of the Clause. Defendants cannot rely on the vague moniker of new "agency priorities" to disregard Congress's directives by withholding duly appropriated funds. Just as a federal agency cannot decide to employ funding assigned to repair Navy ships to instead fund leeches to improve groundwater quality, so too a federal agency cannot decide to simply stop spending Congress's water-quality appropriations just because that agency no longer believes Congress was correct in the priorities it chose for its funds.

To conclude otherwise would violate not only constitutional principles, but also Congress's comprehensive statutory regime under the Congressional Budget and Impoundment Control Act of 1974, which restricts the Executive Branch's authority to "impound" (that is, decline to spend) federal funds. *See* 2 U.S.C. § 683. Instead, the President may only "propose[]" a rescission to Congress, a proposal deemed rejected if Congress does not pass a rescission bill within 45 days.

*Id.*; *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) ("[E]ven the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill."). Even if the President wants to "defer" (that is, delay) the expenditure of funds, the Impoundment Control Act allows the President to do so only on limited grounds, *see* 2 U.S.C. § 684(b), and it mandates that the President send a "special message" to Congress for the proposed deferral, *id.* § 684(a).

Yet Defendants' expansive interpretation of the Clause allows agencies to disregard congressional directives, effectively creating a backdoor to unlawful impoundment. *See, e.g.*, *Rhode Island v. Trump*, Civ. No. 25-128, 2025 WL 1303868, at *15 (D.R.I. May 6, 2025). In such circumstances, courts have unsurprisingly restricted the Executive Branch from terminating federal funding authorized by Congress. *See, e.g.*, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 56 (D.D.C. 2025) (temporary injunction where OMB "ordered a nationwide freeze on preexisting financial commitments" because it "r[a]n roughshod over a 'bulwark of the Constitution' by interfering with Congress's appropriation of federal funds"); *Aids Vaccine Advoc. Coal. v. United States Dep't of State*, 770 F. Supp. 3d 121, 145 (D.D.C. 2025) (preliminary injunction because "if the authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds 'simply because of policy objections'" (quoting *In re Aiken Cnty.*, 725 F.3d at 259)).[9] Both the Constitution and federal statutes are clear: federal agencies cannot use the Clause to withhold duly appropriated funds by identifying "agency priorities" that disregard or are otherwise incompatible with Congress's directives.

---

[9] *See also Washington v. U.S. Dep't of Transportation*, Civ. No. 25-00848, 2025 WL 1742893, at *2 (W.D. Wash. June 24, 2025); *Colorado v. U.S. Dep't of Health & Hum. Servs.*, Civ. No. 25-00121, 2025 WL 1426226, at *19 (D.R.I. May 16, 2025); *Widakuswara v. Lake*, Civ. No. 25-1015, 2025 WL 1166400, at *15 (D.D.C. Apr. 22, 2025).

### C.    The Clause Cannot Be Used to Terminate Grant Awards Where It Is Not Clearly and Unambiguously Specified in the Award Terms and Conditions.

Finally, the plain text of OMB's regulation makes clear that Agency Defendants cannot use the Clause to terminate a federal grant award where "the terms and conditions of the Federal award" do not "clearly and unambiguously specify" that the grant can be terminated when it no longer effectuates the program goals or agency priorities. 2 C.F.R. § 200.340(b); *see* 2 C.F.R. § 200.340(a)(4) (termination under the Clause only permitted "pursuant to the terms and conditions of the Federal award"). That is why courts have read this regulatory language, "both in isolation and in context," to mean that the Clause can be invoked only if it "is actually included as a term and condition of the federal award." *Metro. Transp. Auth. v. Duffy*, Civ. No. 25-1413, 2025 WL 1513369, at *28 (S.D.N.Y. May 28, 2025); *Climate United Fund v. Citibank, N.A.*, Civ. No. 25-698, 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025) ("Defendants[] ... can only terminate a federal award on this basis pursuant to the terms and conditions of the federal award."). Put differently, agencies must "state upfront in an award that [they] may [try to] terminate the award based on" the Clause "if [they] wish[] to have the ability to exercise that termination in the absence of consent." *Duffy*, 2025 WL 1513369, at *28. To hold otherwise—allowing the Clause to be invoked even when it is not specified in that award's terms and conditions—"would undermine the security of all federal awards" and be "at odds with the plain meaning of [the] text." *Id.*

This conclusion is confirmed by OMB's own rulemaking, which is unequivocal that "Federal awarding agencies *must* clearly and unambiguously articulate the conditions under which a Federal award may be terminated in their applicable regulations *and in the terms and conditions of Federal awards*." 85 Fed. Reg. at 49,507 (emphases added); *accord* 89 Fed. Reg. at 30,089 ("*Provided that the language is included in the terms and condition of the award*, the revised termination provision at section 200.340 continues to allow Federal agencies and pass-through

24

entities with authority to terminate an award in the circumstances described in paragraph (a)(2) in the prior version of the guidance." (emphasis added)).

And this limit on the Clause is once again reinforced by constitutional principles. States must be allowed to accept grants "knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17. But without the Clause being clearly and unambiguously specified in the award terms and conditions, a "State could hardly anticipate that" the Clause would be used to terminate that grant. *NFIB*, 567 U.S. at 584. In that scenario, Agency Defendants are improperly surprising States with "post acceptance or 'retroactive' conditions"—something even Congress itself could not do. *Pennhurst*, 451 U.S. at 25.

Notably, Agency Defendants know how to clearly and unambiguously specify the Clause's applicability when they want to do so. First Am. Compl., Doc. No. 64 at 60 (¶ 232). And Agency Defendants continue to terminate grants even where the Clause is not specified in the awards' terms and conditions. *See, e.g.*, Cameron Decl. (DE), Doc. No. 66-11 at 3-4; Link Decl. (KY), Doc. No. 66-25 at 3-4. The Court should declare that the Clause cannot be a basis for termination unless it has been clearly and unambiguously incorporated into a grant's terms and conditions.

## CONCLUSION

For the foregoing reasons, summary judgment should enter in the Plaintiffs' favor on Count I, and the Court should order declaratory judgment in the form proposed as Exhibit A to Plaintiffs' Motion for Summary Judgment.

Dated: August 4, 2025                          Respectfully submitted,

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum*
  *Solicitor General*
Sundeep Iyer*
  *Chief Counsel*
Stephen Ehrlich*
  *Deputy Solicitor General*
Bassam Gergi*
Amanda I. Morejón
Jessica L. Palmer*
Meghan K. Musso*
Sarah Nealon*
Lauren E. Van Driesen*
  *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Jeremy.Feigenbaum@njoag.gov
Amanda.Morejon@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

By: */s/ Rabia Muqaddam*
Rabia Muqaddam[†]
  *Special Counsel for Federal Initiatives*
Jessica Ranucci[†]
  *Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8883
Rabia.muqaddam@ag.ny.gov
Jessica.Ranucci@ag.ny.gov

*Counsel for the State of New York*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

By:  */s/ Katherine B. Dirks*
Katherine B. Dirks (BBO No. 673674)
  *Chief State Trial Counsel*
James A. Sweeney (BBO No. 543636)
  *State Trial Counsel*
Anna J. Lumelsky (BBO No. 677708)
  *Deputy State Solicitor*
Yael Shavit (BBO No. 695333)
  *Chief, Consumer Protection Division*
Vanessa A. Arslanian (BBO No. 688099)
Chris Pappavaselio (BBO No. 713519)
Jak Kundl (BBO No. 713951)
  *Assistant Attorneys General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2107
katherine.dirks@mass.gov
vanessa.arslanian@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KRISTIN K. MAYES**
  ATTORNEY GENERAL OF ARIZONA

By: */s/ Hayleigh S. Crawford*
Hayleigh S. Crawford[†]
  *Deputy Solicitor General*
Syreeta A. Tyrell[†]
  *Senior Litigation Counsel*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Shiwon Choe*
Anya M. Binsacca
  *Supervising Deputy Attorney General*
Shiwon Choe[†]
Zelda Vassar[†]
Harald H. Kirn[†]
  *Deputy Attorneys General*
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-4400
Anya.Binsacca@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Zelda.Vassar@doj.ca.gov
Harald.Kirn@doj.ca.gov

*Counsel for the State of California*


**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Michael K. Skold*
Michael K. Skold[†]
  *Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Counsel for the State of Connecticut*


**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO

By: */s/ David Moskowitz*
David Moskowitz[†]
  *Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

*Counsel for the State of Colorado*


**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

By: */s/ Ian R. Liston*
Ian R. Liston[†]
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

27

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala[†]
  *Assistant Attorney General*
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*


**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead[†]
  *Public Interest Counsel*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

*Counsel for the State of Illinois*


**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day[†]
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes[†]
  *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*


**LAURA KELLY**
IN HER OFFICIAL CAPACITY AS GOVERNOR OF
THE STATE OF KANSAS

By: */s/ Justin Whitten*
Justin Whitten*
  *General Counsel*
Ashley Stites-Hubbard*
  *Deputy Chief Counsel*
Office of the Kansas Governor
300 SW 10th Ave, Room 541-E
Topeka, KS 66612
(785) 296-3930
Justin.h.whitten@ks.gov
Ashley.stiteshubbard@ks.gov

*Counsel for Governor Laura Kelly*

**OFFICE OF THE GOVERNOR** *ex rel.* **ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY

By:  */s/ S. Travis Mayo*
S. Travis Mayo*
   *General Counsel*
Taylor Payne*
   *Chief Deputy General Counsel*
Laura C. Tipton*
   *Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*


**ANTHONY G. BROWN**
   ATTORNEY GENERAL OF MARYLAND

By: */s/ Steven J. Goldstein*
Steven J. Goldstein[†]
   *Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6414
Sgoldstein@oag.state.md.us

*Counsel for the State of Maryland*


**AARON M. FREY**
   ATTORNEY GENERAL OF MAINE

By: */s/ Jason Anton*
Jason Anton[†]
   *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
jason.anton@maine.gov

*Counsel for the State of Maine*


**DANA NESSEL**
   ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti[†]
   *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorney for the People of the State of Michigan*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

By: */s/ Katherine J. Bies*
Katherine J. Bies[†]
  *Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Counsel for the State of Minnesota*


**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern[†]
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*


**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Amy Senier*
Amy Senier
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508
(505) 490-4060
asenier@nmdoj.gov

*Counsel for the State of New Mexico*


**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

By: */s/ Brian Simmonds Marshall*
Coby Howell[†]
Brian Simmonds Marshall*
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov

*Counsel for the State of Oregon*

30

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

Jennifer Selber
*General Counsel*

By:  */s/ Jacob B. Boyer*
Jacob B. Boyer[†]
 *Deputy General Counsel*
Michael J. Fisher[†]
 *Executive Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
 ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Leonard Giarrano IV*
Leonard Giarrano IV[†]
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2062
lgiarrano@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose[†]
 *Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Colin T. Roth*
Colin T. Roth[†]
 *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us

*Counsel for the State of Wisconsin*

\*Pro hac vice application forthcoming
† Admitted pro hac vice

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

<u>/s/ *Katherine B. Dirks*</u>
Katherine B. Dirks

Dated: August 4, 2025

32