**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF NEW JERSEY, *et al.*,

     Plaintiffs,

            *v.*                          Case No. 1:25-cv-11816-IT

U.S. OFFICE OF MANAGEMENT
AND BUDGET, *et al.*,

     Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

STEPHEN M. PEZZI
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov
Florida Bar No. 1041279

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................4

I.      REGULATORY BACKGROUND ......................................................................4

II.     LITIGATION BACKGROUND ..........................................................................7

ARGUMENT ......................................................................................................................8

I.      PLAINTIFFS LACK ARTICLE III STANDING ................................................10

        a.      Plaintiffs' cognizable injuries were caused by decisions that they do not (and could not) challenge in this suit, and that are not redressable here ..............................10

        b.      Plaintiffs' allegations of possible future injury relating to possible future terminations of possible future grants are too speculative to support standing .........13

        c.      Plaintiffs seek an impermissible advisory opinion, not a permissible declaratory judgment. ...............................................................................................................17

II.     PLAINTIFFS DO NOT CHALLENGE ANY FINAL AGENCY ACTION IN COUNTS I AND II. .............................................................................................20

III.    ALL PLAINTIFFS FORFEITED (AND SOME PLAINTIFFS WAIVED) THEIR CLAIMS IN COUNT III BY FAILING TO RAISE THEIR OBJECTIONS DURING THE RULEMAKING. ........................................................................23

IV.     PLAINTIFFS' CLAIMS LACK MERIT. ...........................................................26

        a.      Plaintiffs are correct that the government must comply with valid federal statutes, but that is no basis for relief here. ......................................................26

        b.      Plaintiffs are also correct that the government must comply with its own regulations, but that is also no basis for relief here. ......................................28

        c.      The plain text of 2 C.F.R. § 200.340(a)(4) allows for termination of a grant based on new agency priorities. ..................................................................30

CONCLUSION ..................................................................................................................37

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ............................................................................................ 15, 16

*ACLU of Mass. v. U.S. Conf. of Catholic Bishops*,
  705 F.3d 44 (1st Cir. 2013) ....................................................................................... 19

*Adams v. U.S. EPA*,
  38 F.3d 43 (1st Cir. 1994) ........................................................................................ 24

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005) .................................................................................. 25

*Am. Pub. Health Ass'n v. NIH*,
  145 F.4th 39 (1st Cir. 2025) ..................................................................................... 11

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin. & Dep't of Labor*,
  738 F.3d 387 (D.C. Cir. 2013) .................................................................................. 22

*Appalachian Power Co. v. EPA*,
  251 F.3d 1026 (D.C. Cir. 2001) ............................................................................. 2, 25

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ................................................................................................ 36

*ASARCO, Inc. v. Kadish*,
  490 U.S. 605 (1989) ................................................................................................ 14

*At&t v. EEOC*,
  270 F.3d 973 (D.C. Cir. 2001) .................................................................................. 22

*Atl. Richfield Co. v. Christian*,
  590 U.S. 1 (2020) ................................................................................................... 35

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................*passim*

*Berkshire Env't Action Team, Inc. v. Tenn. Gas Pipeline Co.*,
  851 F.3d 105 (1st Cir. 2017) ..................................................................................... 22

*Buck v. Am. Airlines, Inc.*,
  476 F.3d 29 (1st Cir. 2007) ....................................................................................... 19

*California v. Texas*,
  593 U.S. 659 (2021) ........................................................................................ 12, 18, 19

*Chi. Women in Trades v. Trump*,
  778 F. Supp. 3d 959 (N.D. Ill. 2025) ........................................................................ 27

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................... 13, 14, 15

*Climate United Fund v. Citibank, N.A.*,
    778 F. Supp. 3d 90 (D.D.C. 2025) ..................................................... 29

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ........................................................................... 14

*Davila v. Corporacion De P.R. Para La. Difusion Publica*,
    498 F.3d 9 (1st Cir. 2007) ................................................................. 25

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025) ........................................................... 11, 17, 29

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ........................................................................... 33

*Golden v. Zwickler*,
    394 U.S. 103 (1969) ........................................................................... 17

*Harper v. Werfel*,
    118 F.4th 100 (1st Cir. 2024) ................................................ *passim*

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................................. 5

*Henson v. Santander Consumer USA Inc.*,
    582 U.S. 79 (2017) ............................................................................. 31

*Holistic Candlers & Consumers Ass'n v. FDA* ,
    664 F.3d 940 (D.C. Cir. 2012) .......................................................... 22

*Ka Lok Lau v. Holder*,
    880 F. Supp. 2d 276 (D. Mass. 2012) .............................................. 18

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................... 4, 5, 27

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................... 10, 13

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................................... 17

*Marx v. Gen. Revenue Corp.*,
    568 U.S. 371 (2013) ........................................................................... 34

*Mass. Delivery Ass'n v. Coakley*,
    769 F.3d 11 (1st Cir. 2014) ............................................................... 17

*Massachusetts v. United States*,
    522 F.3d 115 (1st Cir. 2008) ................................................................................. 24, 26

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ................................................................................................. 18

*M.G. ex rel. Garcia v. Armijo*,
    117 F.4th 1230 (10th Cir. 2024) ............................................................................. 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................... 4, 33, 35

*Muirhead v. Mecham*,
    427 F.3d 14 (1st Cir. 2005) ..................................................................................... 19

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ................................................................................................. 36

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ................................................................................................... 13

*Nat'l Mining Ass'n v. Dep't of Labor*,
    292 F.3d 849 (D.C. Cir. 2002) ............................................................................... 25

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ............................................................................... 22

*Nat'l Park Hosp. Ass'n v. DOI*,
    538 U.S. 803 (2003) ........................................................................................... 15, 16

*NIH v. Am. Pub. Health Ass'n*,,
    600 U.S. ---, 2025 WL 2415669 (U.S. Aug. 21, 2025) ................................... *passim*

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ................................................................................................. 16

*Osediacz v. City of Cranston*,
    414 F.3d 136 (1st Cir. 2005) ................................................................................... 17

*Pennhurst State Sch. & Hosp. v. Halderman* ,
    451 U.S. 1 (1981) ............................................................................................... 36, 37

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................................................................... 25

*Posada v. Cultural Care, Inc.*,
    554 F. Supp. 3d 309 (D. Mass. 2021) .................................................................... 23

*Puerto Rico v. United States*,
    490 F.3d 50 (1st Cir. 2007) ..................................................................................... 23

*Reddy v. Foster,*
  845 F.3d 493 (1st Cir. 2017) ................................................................................ 15

*Reno v. Catholic Soc. Servs.,*
  509 U.S. 43 (1993) .................................................................................... 15, 16

*Rotinsulu v. Mukasey,*
  515 F.3d 68 (1st Cir. 2008) ................................................................................ 28

*Rudisill v. McDonough,*
  601 U.S. 294 (2024) .......................................................................................... 31

*Ryder v. Union Pac. R.R.,*
  945 F.3d 194 (5th Cir. 2019) ............................................................................ 35

*Sig Sauer, Inc. v. Brandon,*
  826 F.3d 598 (1st Cir. 2016) ............................................................................ 21

*Sisseton-Wahpeton Oyate of the Lake Traverse Rsrv. v. U.S. Corps of Eng'rs,*
  888 F.3d 906 (8th Cir. 2018) ............................................................................ 22

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) .................................................................................... 12, 17

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) .................................................................................... 9, 15

*Sw. Airlines Co. v. Saxon,*
  596 U.S. 450 (2022) .......................................................................................... 32

*Tex. v. United States,*
  523 U.S. 296 (1998) .......................................................................................... 15

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ................................................................................... *passim*

*Trump v. Am. Fed'n of Gov't Emps.,*
  145 S. Ct. 2635 (2025) ...................................................................................... 28

*Trump v. CASA, Inc.,*
  145 S. Ct. 2540 (2025) ........................................................................................ 9

*Tyngsboro Sports II Solar, L.L.C. v. Nat'l Grid USA Serv. Co.,*
  88 F.4th 58 (1st Cir. 2023) ................................................................................ 19

*United States v. L.A. Tucker Truck Lines, Inc.,*
  344 U.S. 33 (1952) ............................................................................................ 24

*United States v. Texas,*
  599 U.S. 670 (2023) ............................................................................................ 1

*United States v. Wilson,*
   503 U.S. 329 (1992) ................................................................................ 32

*Whitman v. Am. Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001) ................................................................................ 33

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ................................................................................ 13

**United States Constitution**

U.S. Const. art. III .................................................................................. 9, 17

**Statutes**

5 U.S.C. § 306 ......................................................................................... 35

5 U.S.C. § 553 ......................................................................................... 23

5 U.S.C. § 704 ...................................................................................... 2, 20

5 U.S.C. § 706 ......................................................................................... 26

28 U.S.C. § 1491 ................................................................................. 11, 27

28 U.S.C. § 2201 ................................................................................... 7, 19

31 U.S.C. § 1120 ..................................................................................... 35

**Rules**

Fed. R. Civ. P. 12 ............................................................................. 9, 23, 37

Fed. R. Civ. P. 15 ....................................................................................... 7

Fed. R. Civ. P. 65 ..................................................................................... 28

**Guidance and Regulations**

2 C.F.R. pt. 200 ..................................................................................... 5, 24

2 C.F.R. pt. 215 ......................................................................................... 5

2 C.F.R. § 200.100 ..................................................................................... 7

2 C.F.R. § 200.101 ................................................................................ 18, 27

2 C.F.R. § 200.106 ..................................................................................... 7

2 C.F.R. § 200.110 ..................................................................................... 7

2 C.F.R. § 200.339 ..................................................................................... 5

2 C.F.R. § 200.340 ............................................................................... *passim*

2 C.F.R. § 200.340 (2020) ......................................................................... 29

2 C.F.R. § 200.340 (2021) ........................................................................... 5

OMB, *Uniform Admin. Requirements for Grants & Agreements with Insts. of Higher Educ., Hospitals, & Other Non-Profit Orgs.,* 69 Fed. Reg. 26,281 (May 11, 2004) ....................................... 5

OMB, Supp. Final Rule: *Appraisals for Higher-Priced Mortgage Loans,*,
   78 Fed. Reg. 78,520-01 (Dec. 26, 2013) ......................................................... 5

OMB, Final Rule: *Guidance for Grants & Agreements*,
   85 Fed. Reg. 49,506 (Aug. 13, 2020) ............................................................ 5

OMB, Notice of Proposed Rulemaking: *Guidance for Grants & Agreements*,
   88 Fed. Reg. 69,390 (Oct. 5, 2023) ........................................................ 6, 23

OMB, Notice: *Request for Information*,
   88 Fed. Reg. 8480 (Feb. 9, 2023) .................................................................. 5

OMB, Final Rule: *Guidance for Federal Financial Assistance*,
   89 Fed. Reg. 30,046 (Apr. 22, 2024) ............................................................ 6

**Other Authorities**

A. Scalia & B. Garner, Reading Law (2012)..................................................................... 32

Judge Harry T. Edwards et al., Federal Standards of Review (2d ed. 2013) ................... 22

OMB, *Guidance for Grants and Agreements* (Oct. 5, 2023),
   https://www.regulations.gov/document/OMB-2023-0017-0001/comment ...................... 23

Arizona Comment (Dec. 1, 2023),
   https://www.regulations.gov/comment/OMB-2023-0017-0525 ................................24

Illinois Comment (Mar. 25, 2020),
   https://www.regulations.gov/comment/OMB-2019-0005-0192 ...............................24

Massachusetts Comment (Dec. 1, 2023),
   https://www.regulations.gov/comment/OMB-2023-0017-0224 ...............................24

Michigan Comment (Nov. 30, 2023),
   https://www.regulations.gov/comment/OMB-2023-0017-0182 ...............................24

Minnesota Comment (Mar. 4, 2020),
   https://www.regulations.gov/comment/OMB-2019-0005-0167 ...............................24

## INTRODUCTION

"[T]he States have brought an extraordinarily unusual lawsuit." *United States v. Texas*, 599 U.S. 670, 686 (2023). Rather than challenging the termination of any particular grant by any particular agency, instead, twenty-two Plaintiffs sue twenty-six Defendants, challenging what they describe as a "nationwide slash-and-burn campaign" by the "Trump Administration" in general, raising blanket, undifferentiated objections to the termination of "thousands of grants" at once—but without seeking relief that would actually restore a single grant. Am. Compl. ¶¶ 1-2, ECF No. 64. Instead, they purport to challenge the Executive Branch's alleged "interpretation" of guidance that was issued by the Office of Management and Budget (OMB) during the Biden Administration. That mismatch between the allegedly unlawful agency "decision" on one hand, and the amorphous relief requested in this suit, on the other, creates a set of jurisdiction and justiciability defects that doom this lawsuit at the threshold.

First, Plaintiffs lack Article III standing. To be clear, some of Plaintiffs' grants have already been terminated, and Defendants do not dispute that those grant terminations give rise to a concrete and particularized Article III injury—that is, to challenge those grant terminations. But Plaintiffs eschew any challenge to any particular grant terminations in this suit—presumably in an effort to get around the problem that the Supreme Court has twice emphasized in recent months that challenges to grant terminations must be brought exclusively in the Court of Federal Claims, under the Tucker Act. *See NIH v. Am. Pub. Health Ass'n*, 600 U.S. ---, 2025 WL 2415669 (U.S. Aug. 21, 2025) (citing *Dep't of Education v. California*, 145 S. Ct. 966 (2025)).

Instead, Plaintiffs here try to challenge the government's *interpretation* of grant-termination guidance issued by the Office of Management and Budget (OMB), and corresponding agency regulations implementing that guidance. But in trying to plead around their Tucker Act problem, Plaintiffs have pleaded themselves into another one: the causation and redressability requirements of Article III standing. In short, Plaintiffs' injuries are all caused by actual grant terminations—not by the regulations (nor any interpretation of those regulations) that Plaintiffs challenge in this suit. Nor would winning this suit redress any concrete harm—after all, in this suit, Plaintiffs do not seek (and could not seek) the restoration of a single dollar of lost grant funding.

Plaintiffs also try various forward-looking theories of injury, alleging that they "face harm if their pending or future grant applications are awarded and then subsequently terminated." Am. Compl. ¶ 132. But fears of possible future termination of possible future grants—grants that Plaintiffs have not even been awarded, may never be awarded, and that in some instances they have not yet even applied for—are far too speculative to support Article III standing. For similar reasons, any challenge to the possible future termination of possible future grants is not ripe. Instead, Plaintiffs can sue, in the Court of Federal Claims, if and when they suffer an actual injury from the termination of an actual grant. But in this suit, despite their scattershot allegations, Plaintiffs ultimately seek nothing more than an advisory opinion about the meaning of federal regulations, in the abstract. That is impermissible under both Article III and the Declaratory Judgment Act (DJA).

Second, with respect to Counts I and II, Plaintiffs do not challenge any "final agency action" within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 704. Counts I and II do not challenge any federal regulation, nor the termination of any grant. And even accepting (as Plaintiffs speculate "upon information and belief," Am. Compl. ¶ 298) that Defendants "have made a decision" to interpret regulations in a way that Plaintiffs disagree with, that interpretation, standing alone, neither "mark[s] the 'consummation' of the agency's decisionmaking process," nor is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Again, although actual grant terminations satisfy that requirement, Plaintiffs challenge none here.

Third, in Count III—in which Plaintiffs challenge 2 C.F.R. § 200.340(a)(4), though only in the alternative—Plaintiffs face yet another hurdle. "It is black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue." *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001). But here, many of the Plaintiff States didn't comment at all, and none raised any of the objections that form the basis of this suit. Having remained silent (or even supportive) during the rulemaking, Plaintiffs cannot now bring suit, for example, on the theory that "OMB never once provided an explanation" in response to comments they never submitted. Am. Compl. ¶ 315.

Fourth, turning to the merits of Plaintiffs' interpretation of OMB's regulations, the unusual and problematic nature of this lawsuit is laid bare even further. Plaintiffs raise three objections to the government's interpretation of 2 C.F.R. § 200.340(a)(4), arguing that Defendants cannot invoke it to terminate a grant (1) "where Congress has directed funds to be spent on particular grant programs," Am. Compl. ¶ 287; (2) where the grant contract's "terms and conditions" do not "clearly and unambiguously specify" that termination due to changed agency priorities is permissible, *id.* ¶ 286 (quoting 2 C.F.R. § 200.340(b)); and (3) where the "changed agency priorities" at issue were "identified after the time of the federal award," *id.* ¶ 290.

On the first two issues, there is not even any disagreement for the Court to resolve, at least at the level of generality at which Plaintiffs bring this facial challenge. Defendants *agree* that that they cannot terminate grants when doing so would be inconsistent with a federal statute, or when doing so would violate agency regulations (such as 2 C.F.R. § 200.340(b) or its agency-specific equivalents). If the parties disagree about whether and when those conditions are satisfied, in the context of specific grant terminations governed by specific grant contracts—as they have in the past, and as they may again in the future—the Court of Federal Claims is open for business. Indeed, even setting aside justiciability concerns, that is the only practical way to adjudicate those claims. After all, the legality of any particular grant termination will turn on the specific terms of a specific grant contract, whatever federal statutes govern the agency programs at issue, and myriad other grant-specific, agency-specific, and case-specific considerations that can be decided by a court only at a more granular level.

Finally, the parties *do* disagree about one of the three legal questions that Plaintiffs try to raise in this suit: that is, about whether or not the reference to "agency priorities" in 2 C.F.R. § 200.340(a)(4) excludes *new* agency priorities. If the Court reaches it, that question is easy. There is simply nothing in the text of the regulation that limits the "agency priorities" in 2 C.F.R. § 200.340(a)(4) to old "agency priorities." And Plaintiffs' atextual and counterintuitive interpretation is also inconsistent with the immediately preceding sub-section, which *is* focused on the state of the world at the time "the Federal award was made." 2 C.F.R. § 200.340(a)(3). Plaintiffs' interpretation is also hard to square with OMB's core mission, as understood by every modern President: to "serve the President of the United States

in implementing his vision across the Executive Branch."  Because there is nothing either unusual or improper about an agency changing priorities, it is hard to imagine *why* OMB would have drafted its guidance in the way that Plaintiffs now claim to read it—which would effectively lock new agency leadership into the "agency priorities" of their predecessors, at least when it comes to federal grants.

Ultimately, it is no secret what is going on here: Plaintiffs have sincere policy objections to the substance of the new "agency priorities" that took hold at many agencies after the most recent election. That is their right.  But "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part) (cited favorably in *Biden v. Texas*, 597 U.S. 785, 812 (2022)).  The remedy for Plaintiffs' concerns is the next election—or, at most, a lawsuit challenging actual grant terminations that they believe to be unlawful—not a tortured rewrite of a regulation that has been on the books across multiple Administrations.

Plaintiffs' amended complaint should thus be dismissed, in its entirety, for lack of subject-matter jurisdiction (under Federal Rule of Civil Procedure 12(b)(1)) or for failure to state a claim upon which relief can be granted (under Federal Rule of Civil Procedure 12(b)(6)).  Plaintiffs' motion for summary judgment should then be denied as moot.

## BACKGROUND

### I.    Regulatory Background

Many federal statutes provide discretionary authority to Executive Branch agencies to allocate grant funding to private entities, as well as to State or Local governments.  The text of those statutes vary greatly across the U.S. Code but, as a general matter, "[t]he allocation of funds from a lump-sum appropriation" is a paradigmatic example of a decision that is "traditionally regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  "After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.*  Agencies thus routinely make discretionary decisions about how "'resources are best spent'" and "whether a

4

particular program 'best fits the agency's overall policies.'"  *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).  While Congress sometimes sets broad, outer guardrails about "permissible statutory objectives," courts generally have "no leave to intrude" on these highly discretionary agency decisions, so long as agencies stay within those broad limits.  *Id.*

Consistent with what has long been understood as a discretionary authority of the Executive Branch, the Office of Management and Budget (OMB) has assisted every modern President in ensuring that the President's priorities are appropriately accounted for in agency grant-making decisions, consistent with applicable law.  In service of that goal, in 1976, OMB first issued its "Uniform Administrative Requirements for Grants and Other Agreements with Institutions of Higher Education, Hospitals and Other Non-Profit Organizations," which was repeatedly revised in the following decades.  *See, e.g.*, OMB Circular A-110 (1993).  The uniform guidance in that circular was relocated to 2 C.F.R. part 215 in 2004.  *See* OMB, *Uniform Admin. Requirements for Grants and Agreements with Insts. of Higher Educ., Hospitals, and Other Non-Profit Orgs.*, 69 Fed. Reg. 26,281 (May 11, 2004).  In 2013, the guidance was amended again, and moved to 2 C.F.R. part 200, with the termination provision codified at § 200.339.  *See* 78 Fed. Reg. 78,589 (Dec. 26, 2013).  In 2014 and again in 2016, the regulations were further amended; though subparagraph (a) of 2 C.F.R. § 200.339 (which later became 2 C.F.R. § 200.340) remained unchanged.

As relevant here, on January 22, 2020, OMB proposed changes to the termination provisions of the uniform guidance and, for the first time, proposed that a grant could be terminated "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2021).  After notice and comment, that iteration of the uniform guidance was finalized on August 13, 2020, during the final year of the first Trump Administration.  *See* OMB, Final Rule: *Guidance for Grants & Agreements*, 85 Fed. Reg. 49,506 (Aug. 13, 2020).

On February 9, 2023, OMB published a Notice of Request for Information, soliciting feedback from all interested stakeholders on possible changes to OMB's grant-making guidance.  *See* OMB, Notice: *Request for Information*, 88 Fed. Reg. 8,480 (Feb. 9, 2023).  OMB published its latest proposed guidance on October 5, 2023, and again solicited further comments on that proposed text.  *See* OMB,

Notice of Proposed Rulemaking: *Guidance for Grants & Agreements*, 88 Fed. Reg. 69,390 (Oct. 5, 2023). The final rule at issue here was published on April 22, 2024, during the final year of the Biden Administration. *See* OMB, Final Rule: *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046 (April 22, 2024). As a result, currently, 2 C.F.R. § 200.340(a) and (b) read as follows, in their entirety:

**§ 200.340 Termination.**

(a)    The Federal award may be terminated in part or its entirety as follows:

(1)    By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2)    By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

(3)    By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4)    By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

(b)    The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.

2 C.F.R. § 200.340(a), (b). During the notice-and-comment process that led to this language being finalized, several of the Plaintiff States commented on the proposed guidance generally, but none raised any of the issues that are now the subject of this suit.

OMB's grant-making guidance strives to "establish[] uniform administrative requirements, cost principles, and audit requirements for" *all* "[f]ederal awards," which means that, as a general matter, "[f]ederal agencies must not impose additional requirements" except when "specifically required by Federal statute, regulation, or Executive order." 2 C.F.R. § 200.100(a)(1).  OMB's uniform guidance has thus been incorporated, in substantial part, into agencies' own grant-making regulations. *See* Am. Compl. ¶ 2 ("That Clause has been incorporated verbatim into regulations promulgated by each of the Agency Defendants."); *see also* 2 C.F.R. § 200.106 ("Federal agencies making Federal awards to non-Federal entities must implement the language in subparts C through F of this part in codified regulations unless different provisions are required by Federal statute or are approved by OMB."); *id.* § 200.110(a) ("The standards set forth in this part affecting the administration of Federal awards by Federal agencies become effective once implemented by Federal agencies.").

## II.    Litigation Background

Plaintiffs filed their original complaint on June 24, 2025, ECF No. 1, and an amended complaint (with Defendants' consent, *see* Fed. R. Civ. P. 15(a)(2)) on July 31, 2025, ECF No. 64.  The amended complaint was filed on behalf of twenty-three different Plaintiffs (twenty states, and three state governors) and names twenty-six different Defendants: OMB, virtually every grant-making agency in the Executive Branch, and each of their leaders in their official capacities.

Plaintiffs' amended complaint brings three causes of action: (1) one under the Declaratory Judgment Act (DJA), 28 U.S.C. § 2201, *see* Am. Compl. ¶¶ 279-95; (2) an APA claim for agency action "contrary to law," alleging that the government's purported interpretation of 2 C.F.R. § 200.340(a)(4) is "contrary to the meaning" of that regulation, *see id.* ¶¶ 297-305; and (3) a claim that challenges (only in the alternative) 2 C.F.R. § 200.340(a)(4) itself as "arbitrary and capricious" under the APA.

Although the amended complaint makes repeated references to "thousands of grants" that Plaintiffs suggest have been terminated unlawfully since January of 2025, *see* Am. Compl. ¶¶ 2, 8, 97, 99, 268, 299, it does not appear to challenge (nor seek any relief restoring) any of those grants.  Instead, Plaintiffs allege more generally that, "[u]pon information and belief, Defendants have made a decision . . . that" 2 C.F.R. § 200.340(a)(4) "afford[s] them independent authority to terminate grants based on

new 'agency priorities' identified after the grants have been awarded." Am. Compl. ¶ 298. That alleged "decision" is the primary target of Plaintiffs' suit (and in particular, Counts I and II), on the theory that this "decision is contrary to the meaning of" 2 C.F.R. § 200.340(a)(4)—regulatory text that Plaintiffs refer to in their filings as "the Clause."

In Count III, Plaintiffs also challenge—though only in the alternative—2 C.F.R. § 200.340(a)(4) itself, on the grounds that it is arbitrary and capricious under the APA. Count III is pleaded in expressly conditional terms, in which Plaintiffs allege that "[*i*]*f* the Clause and the Agency Defendants' parallel regulations permit Defendants to terminate awards on the grounds of changed 'agency priorities,' there is no reasoned basis for those regulations, and thus they violate the APA." Am. Compl. ¶ 314.

As for their requested relief, Plaintiffs primarily request a series of declaratory judgments. *See* Am. Compl., Prayer for Relief ¶ (i). And Count I itself is labeled only as a "Declaratory Judgment" cause of action. *See id.* at 72. Then, only "if the Court does not grant Plaintiffs relief on Count I," Plaintiffs also seek injunctive relief that would "enjoin Defendants from carrying out Defendants' decision that the Clause affords federal awarding agencies independent authority to terminate grants based on new 'agency priorities' identified after the grants have been awarded," as well as a "set aside" under the APA (and further duplicative injunctions) that would operate directly against 2 C.F.R. § 200.340(a)(4) and "Agency Defendants' parallel regulations." Am. Compl., Prayer for Relief ¶ (ii).

Plaintiffs moved for summary judgment on August 4, 2025, ECF Nos. 65-67—but solely on Count I, their "Declaratory Judgment" cause of action. Pursuant to a schedule agreed upon by the parties and approved by the Court, ECF No. 61, Defendants now simultaneously oppose Plaintiffs' summary-judgment motion and move to dismiss the Amended Complaint in its entirety.

## ARGUMENT

This suit seeks to enlist this Court into high-level supervision of the Executive Branch's reading of its own regulations, which Plaintiffs fear has resulted in the termination (or may result in the future termination) of "thousands of grants," Am. Compl. ¶ 2—but without challenging a single grant termination directly. The problem for Plaintiffs is that "federal courts do not exercise general

oversight of the Executive Branch; they resolve cases and controversies." *Trump v. Casa, Inc.*, 145 S. Ct. 2540, 2562 (2025). Plaintiffs are thus free to challenge individual grant terminations that they believe to be unlawful, as long as they do so in compliance with other jurisdictional limits, such as the Tucker Act. *NIH*, 2025 WL 2415669. This suit, however, seeks "to challenge the[se] regulations in the absence of a live dispute over a concrete application of those regulations." *Summers v. Earth Island Inst.*, 555 U.S. 488, 490 (2009). That is inconsistent with Article III of the Constitution, as well as the Declaratory Judgment Act. So, whether as a matter of standing, ripeness, final agency action, or all of the above, this suit should be dismissed in its entirety.

On the merits, things get even stranger, as the government *agrees* with two of Plaintiffs' three legal theories—which is itself a powerful indicator of a structural problem with the bones of this suit. Plaintiffs are of course correct that the termination of a grant—like any other agency action—must comply with all applicable federal statutes and regulations. Indeed, the challenged regulation says so. *See* 2 C.F.R. § 200.340(a)(4) ("to the extent authorized by law"). So that is no basis for relief here, at the high level of generality at which Plaintiffs have brought this suit. In any event, as for the authority to terminate a grant that "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4), there is no hint in the text, structure, or purpose of the regulation that the only "agency priorities" that count are old "agency priorities." So, if the Court does reach the merits of that abstract legal question, Plaintiffs' atextual interpretation should be rejected.[1]

---

[1] This motion to dismiss, if granted, would resolve this case in its entirety—either as a matter of subject-matter jurisdiction under Rule 12(b)(1), for failure to state a claim under Rule 12(b)(6), or some combination thereof. Should the Court deny this motion, however, Defendants intend to move for summary judgment on any surviving claims. With respect to Plaintiffs' arbitrary-and-capricious claim (Count III), any summary-judgment briefing might require the preparation of an administrative record. Currently, however, all parties agree that no administrative record is necessary for the Court to resolve the pending motions. *See* Joint Mot. for Scheduling Order ¶ 3, ECF No. 61 ("The parties further agree that Defendants need not produce an administrative record, at least at this time. Should some record become necessary, the parties will confer on that subject at that time.").

## I.    PLAINTIFFS LACK ARTICLE III STANDING.[2]

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Although at least some of the Plaintiff States have likely suffered at least some Article III injury in connection with at least some grant terminations, those grant terminations are not the target of this sprawling and scattershot lawsuit, filed against nearly the entire Executive Branch all at once.  Nor would vacating the regulation itself (much less the government's alleged "interpretation" of the regulation) remedy that injury.  *See NIH*, 2025 WL 2415669, at *2 (Barrett, J., concurring) ("Vacating the guidance does not reinstate terminated grants.").  As a result, there is a fundamental mismatch between Plaintiffs' allegations of harm and the broad relief they are requesting in this suit.  That mismatch creates an Article III standing defect that warrants dismissal.

### a.    Plaintiffs' cognizable injuries were caused by decisions that they do not (and could not) challenge in this suit, and that are not redressable here.

Defendants do not dispute that some Plaintiffs have identified at least some Article III injuries—in particular, with respect to the termination, by specific Defendants, of certain specific grants, to certain specific Plaintiff States.  As one example, Plaintiff Wisconsin alleges that Defendant the Department of State "terminated a $60,300 University Partnership Program award to the University of Wisconsin – La Crosse on February 28, 2025," which previously "had been used to fund a partnership program between the University of Wisconsin - La Crosse and the University of Belgrade for field, laboratory, and research training at an archaeological site in Serbia."  Am. Compl. ¶ 215.  But although injury-in-fact is the first requirement for standing, it is not the last.  And none of Plaintiffs' theories of harm about past grant terminations satisfies the separate requirements of causation and

---

[2] Three of the Plaintiffs are state officials, rather than States.  To the extent that those state officials lack the authority under state law to bring this suit, they should also be dismissed for that additional reason.  *See generally* Br. of the State of Kan. as Amicus Curiae, ECF No. 78.  The Court need not reach that question, however, if it dismisses on other grounds.

redressability. That is because this suit studiously avoids any challenge to the actual grant terminations that caused Plaintiffs' injuries. That mismatch creates a causation problem. Nor would those injuries be redressed by the advisory opinion that Plaintiffs seek, about the meaning of Executive Branch regulations, in the abstract—a redressability problem.

To be clear, this was not some failure of pleading—it is the direct consequence of sophisticated counsel's attempt at *artful* pleading, and their careful efforts to sidestep now-well-settled limitations on federal-district-court review of contract claims against the federal government, which must typically be brought in the Court of Federal Claims. *See NIH*, 2025 WL 2415669, at *1 (citing *California*, 145 S. Ct. at 968); 28 U.S.C. 1491(a)(1) (providing for jurisdiction in the Court of Federal Claims, under the Tucker Act, for "any express or implied contract with the United States"). But in trying to plead around the Tucker Act, Plaintiffs walk right into other more familiar limitations on federal jurisdiction.

**1. Causation.** To return to the example of the State Department's relationship with the University of Wisconsin: Plaintiff Wisconsin's alleged injury is based on losing roughly $60,000 in taxpayer funds to support student archeology in Serbia. But the *cause* of that injury was a decision by the State Department to terminate that specific grant—a decision that is *not* challenged in this suit. Nor could it have been. That is because, if Plaintiffs had challenged the termination of that grant, it would be obvious that this Court lacks subject-matter jurisdiction, under the Tucker Act.

The Supreme Court put that question firmly to rest just last month. In *American Public Health Association v. National Institutes of Health*, the First Circuit had allowed a lawsuit to proceed in district court that challenged "a new policy that prohibits NIH from funding scientific research grants in certain categories," as well as certain "grant terminations made pursuant to the Challenged Directives." 145 F.4th 39, 43, 50 (1st Cir. 2025). The plaintiffs in that case (which included many of the Plaintiffs here) "argued that the Challenged Directives are unlawful agency-wide policies . . . and that the terminations flowed directly from those unlawful policies." *Id.* at 51.

With respect to the challenge to grant terminations, the Supreme Court disagreed with the First Circuit, and granted a stay. The Court emphasized its earlier reasoning in *Department of Education v. California*, 145 S. Ct. 966 (2025), that the "Administrative Procedure Act's 'limited waiver of

[sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH*, 2025 WL 2415669, at *1 (quoting *California*, 145 S. Ct. at 968).

Here, in trying to plead around their Tucker Act problem—that is, by avoiding any challenge to actual grant terminations—Plaintiffs have pleaded themselves into a standing problem. Because all of Plaintiffs' Article III injuries were caused by the termination of their grants—not caused by any OMB regulations, nor any interpretation of those regulations—they cannot satisfy the causation requirement of Article III standing.

**2. Redressability.** Plaintiffs face an even more straightforward redressability problem. "To determine whether an injury is redressable, a court will consider the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 593 U.S. 659, 671 (2021). Here, the injury suffered is the termination of particular grants—but none of "the judicial relief requested" by Plaintiffs would (or could) remedy that injury. *Id.*

Most obviously, with respect to their claims for declaratory relief (and their motion for summary judgment on Count I), obtaining "a judicial statement that the provision they attacked is" unlawful gets them nothing, standing alone. *Id.* And even the more ambitious forms of relief that Plaintiffs request (though only in the alternative) in their complaint—*e.g.*, to "enjoin Defendants from carrying out Defendants' decision that the Clause affords federal awarding agencies independent authority to terminate grants based on new 'agency priorities' identified after the grants have been awarded," Am. Compl., Prayer for Relief ¶ (ii)(a)—would not restore a single dollar of lost funding, nor prevent the future termination of any particular grant. Winning this lawsuit, in other words, will make no difference to the Serbian archeology program at the University of Wisconsin—at most, it would provide the sort of "psychic satisfaction" that "is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998); *see NIH*, 2025 WL 2415669, at *2 (Barrett, J., concurring) ("Vacating the guidance does not reinstate terminated grants."). The result is that none of Plaintiffs' alleged injuries "would likely be redressed by" the "judicial relief" that they seek in this suit. *TransUnion*, 594 U.S. at 423.

**b. Plaintiffs' allegations of possible future injury relating to possible future terminations of possible future grants are too speculative to support standing.**

**1.** In addition to their allegations of injuries relating to *past* grant terminations—theories of standing that ultimately fail on causation and redressability grounds, as explained above, *see supra* at 10-12—Plaintiffs also include extensive allegations about their fears of possible *future* injuries, relating to possible future terminations, of possible future grants. But those allegations do not even get off the ground—they are far too speculative to provide the basis for any Article III injury.

To support Article III standing, "an injury must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (quoting *Lujan*, 504 U.S. at 565 n.2). To that end, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)); *see also, e.g.*, *Murthy v. Missouri*, 603 U.S. 43, 69 (2024) ("To obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them.").

Plaintiffs' forward-looking allegations about the risk of future injuries fail this test. For example, Plaintiffs repeatedly allege that they "will be applying for future grants in the days, weeks, and months to come" and that, "if awarded," those grants "would be at risk of termination" in the future. Am. Compl. ¶¶ 11, 231.[3] That sort of conjecture—about the possible future termination of

---

[3] *See also, e.g.*, Am. Compl. ¶ 124 ("Plaintiffs have also applied to several future grants from the USDA that are at risk of future termination"); *id.* ¶ 132 ("Plaintiffs also face harm if their pending or future grant applications are awarded and then subsequently terminated"); *id.* ¶ 144 ("Plaintiffs have also applied to a number of future grants from Commerce that are at risk of future termination"); *id.* ¶ 170 ("Plaintiffs have also applied to or will be applying to several future grants from DHS that, if awarded, would be at risk of future termination"); *id.* ¶ 181 ("Plaintiffs have also applied to or will be applying to several future grants from DOI that, if awarded, would be at risk of future termination" *id.* ¶ 191 ("The risk that current active awards and future awards will be terminated pursuant to the Clause will impose severe harms on the States"); *id.* ¶ 192 ("Plaintiffs have also applied to a number of future grants from DOJ that would be at risk of termination after they are awarded"); *id.* ¶ 210

possible future grants that Plaintiffs might possibly be awarded in the future, possibly because of OMB guidance or some agency's interpretation of it—is too speculative to support standing.

While operating within the wide boundaries set by 2 C.F.R. § 200.340—and by dozens of potentially relevant agency regulations and appropriations statutes that may affect individual grant-termination decisions at individual agencies—government officials will be making "policy judgment[s] committed to the[ir] broad and legitimate discretion." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (citation omitted). "[C]ourts cannot presume either to control or to predict" the future exercise of that discretion. *Id.*; *see also, e.g., NIH*, 2025 WL 2415669, at *5 (Kavanaugh, J., concurring) (agreeing with the government that grant terminations are "highly discretionary decisions over how to allocate limited agency resources"). In other words, when it comes to making grant-termination decisions on an agency-by-agency, grant-by-grant basis, "[t]hese policy decisions might be made in different ways by the governing officials, depending on their perceptions of wise . . . policy and myriad other circumstances." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 614-15 (1989).

Perhaps agencies will award, and then terminate, the future grants that Plaintiffs are concerned about—though at least in the absence of another change in administration, it is hardly obvious why an agency would take that seemingly inefficient approach. Alternatively, perhaps the grants that Plaintiffs have in mind won't be awarded at all—meaning that 2 C.F.R. § 200.340(a)(4) wouldn't be relevant. Or perhaps those grants will be awarded but then retained. Or perhaps future grant terminations *will* be justified on the ground that a particular grant "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). But perhaps not. Either way, the Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 413, but Plaintiffs would have this

---

("Plaintiffs have also applied to a number of future grants from DOL that are at risk of future termination"); *id.* ¶ 242 ("Plaintiffs have also applied to future grants from NEH that would be subject to the Clause and are at risk of termination"); *id.* ¶ 261 ("Plaintiffs have also applied for a number of future grants from NSF that if awarded, would be subject to the Clause and would be at risk of termination"); *id.* ¶ 273 ("Plaintiffs now lack clarity on the circumstances in which their existing and future grants may be terminated").

Court do exactly that. *Cf. id.* at 412 ("[B]ecause § 1881a at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural.").

Ultimately, if and when Plaintiffs face actual or imminent harm from the actual termination of an actual grant—rather than the hypothetical future termination of a hypothetical future grant—they can sue to challenge the termination of that grant, in an appropriate forum. But in general, they do not "have standing to challenge the[se] regulations in the absence of a live dispute over a concrete application of those regulations." *Summers*, 555 U.S. at 490.

**2.** Similar concerns are equally fatal to Plaintiffs' allegations of future injury under the rubric of ripeness. "[T]he justiciability doctrines of standing and ripeness" are "interrelated; each is rooted in Article III." *Reddy v. Foster*, 845 F.3d 493, 499 (1st Cir. 2017). "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). The "ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up). The key considerations are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 301 (quoting *Abbott Labs.*, 387 U.S. at 149).

In the context of challenges to federal regulations, the Supreme Court has been especially vigilant about these principles, which is why "a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

15

For example, in *Ohio Forestry Association v. Sierra Club*, the Supreme Court held that a challenge to a forest plan for a particular National Forest was not ripe. 523 U.S. 726, 732-37 (1998). The Court noted that the forest plan standing alone caused no hardship: by itself, it "does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut." *Id.* at 733. And the plaintiff would "have ample opportunity later to bring its legal challenge" to the plan in the context of a specific logging project, "at a time when harm is more imminent and more certain." *Id.* at 734. Likewise, in *National Park Hospitality Association*, the Supreme Court held that a challenge to a National Park Service regulation about concession contracts was not ripe, because "judicial resolution" of the issue "should await a concrete dispute about a particular concession contract." 538 U.S. at 812; *see also Reno*, 509 U.S. at 43 (challenge to immigration regulation not ripe until applied to plaintiffs).

So too here. Plaintiffs can directly challenge any allegedly unlawful grant termination that causes them concrete harm, if and when such a termination actually happens. That is not just a hypothetical: many such cases have been decided in the past few months, or are currently pending, on exactly that sort of theory. *See, e.g.*, *California v. Dep't of Educ.*, No. 1:25-cv-10548 (D. Mass.). Sometimes the government may win those cases; sometimes the government may lose. But those varied outcomes, in cases against various agency defendants, with varying statutory constraints on their authority, and with varying factual records, confirm that it is both impractical and unnecessary to litigate all of these issues now, in this abstract context, with twenty-two plaintiffs suing twenty-six defendants at once, complaining of a wide variety of past and potential future violations of the law by "[t]he Trump Administration" in general—relating to literally "thousands of grants," Am. Compl. ¶ 1, all of which are governed by different terms and conditions. Instead, these claims must wait "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm" them. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

As for "the hardship to the parties of withholding court consideration," *Abbott Labs.*, 387 U.S. at 149, notably, Plaintiffs have not filed any motion for time-sensitive injunctive relief. For good reason—some of the grant terminations they reference in their filings took place over six months ago,

*see, e.g.*, Am. Compl. ¶ 215 (discussing a grant terminated in February of 2025), while others have not yet occurred (and may never occur). Of course, if Plaintiffs need relief with respect to any particular grant, they remain free to pursue that relief in the Court of Federal Claims. *California*, 145 S. Ct. at 969 ("[I]f respondents ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum."). And on the other side of the ledger, "[t]he plaintiffs do not state that they will repay grant money if the Government ultimately prevails," *NIH*, 2025 WL 2415669, at *1.

Of course, Plaintiffs might think it more efficient to challenge this overall regulatory framework all at once, rather than challenging concrete applications of that framework. But Article III has no convenience exception. *See Steel Co.*, 523 U.S. at 94-95. And although a "case-by-case approach . . . is understandably frustrating" to Plaintiffs, it "is the traditional, and remains the normal, mode of operation[s] of the courts." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

### c.    Plaintiffs seek an impermissible advisory opinion, not a permissible declaratory judgment.

**1.**    "The federal courts established pursuant to Article III of the Constitution do not render advisory opinions." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969). That is *why* "standing to sue is an indispensable component of federal court jurisdiction." *Osediacz v. City of Cranston*, 414 F.3d 136, 139 (1st Cir. 2005). In short, "[u]nder Article III, federal courts do not adjudicate hypothetical or abstract disputes," nor do they "possess a roving commission to publicly opine on every legal question." *TransUnion*, 594 U.S. at 423. As a result, "[t]he divide between a valid declaratory judgment and an invalid advisory opinion can be narrow." *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 16 (1st Cir. 2014).

This suit falls on the wrong side of that line, as it seeks to pull this Court into an "abstract dispute" over the meaning of federal law. *TransUnion*, 594 U.S. at 423. Again, the caption is telling: twenty-two different Plaintiffs sue twenty-six different Defendants. But ultimately, the number of parties is not the problem, it is the target of the suit: what Plaintiffs characterize as a "nationwide slash-and-burn campaign" by "[t]he Trump Administration" *in general*, resulting in the termination of "a wide range of grants"—not any specific decision by any particular agency defendant, and not with

respect to any particular grant (or even group of grants).  Am. Compl. ¶ 1, 2, 10.  And as for relief, Plaintiffs largely "seek a declaration as to the legal meaning" of government regulations.  *Id.* ¶ 11.

But "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." *California*, 593 U.S. at 672.  "At a minimum, this means that the dispute must 'be real and substantial' and 'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). Ultimately, "the key difference between an advisory opinion and declaratory judgment is that declaratory judgment is by definition a determination in an actual controversy." *Ka Lok Lau v. Holder*, 880 F. Supp. 2d 276, 281 (D. Mass. 2012).

Plaintiffs cannot satisfy those requirements here.  For starters, on two of the three issues on which Plaintiffs ask this Court to opine, at least at the level of generality at which they seek relief, the government *agrees* with Plaintiffs—*i.e.*, that the government cannot terminate grants that are required by federal statutes, *see infra* at 26-28, nor may it terminate grants in a manner that violates government regulations, *see infra* at 28-29.  Indeed, the regulations say so explicitly.  *See* 2 C.F.R. § 200.340(a)(4) ("to the extent authorized by law"); *id.* § 200.101(d) ("Federal statutes or regulations govern in any circumstances where they conflict with the provisions of this part.").  And although there may be "an actual controversy" with respect to some *particular* grant terminations—many of which are simultaneously being litigated in other suits around the country, *see, e.g.*, *Washington v. Dep't of Com.*, No. 25-cv-1507 (W.D. Wash.) (alleging that the Department of Commerce, relying on 2 C.F.R. § 200.340, unlawfully terminated two climate-related grants)—Plaintiffs do not challenge any such grant terminations here.  So, at the level of generality at which Plaintiffs have chosen to frame this suit, there is no "actual controversy" at all—indeed, the parties seem to agree on most of the relevant legal issues, *see infra* at 26-29.  And even with respect to the one abstract legal question on which the parties do disagree, *see infra* at 30-37, the "actual controversy" raising that issue would arise, if at all, in the context of a specific decision by a specific agency to terminate a specific grant.  Plaintiffs thus seek nothing

more than "an opinion advising what the law would be upon a hypothetical state of facts." *California*, 593 U.S. at 672.

In response, Plaintiffs will likely emphasize that some of the defendant agencies have *already* terminated many grants to many of the Plaintiff States. And they have. But that cannot solve Plaintiffs' jurisdictional problem: "[w]ith limited exceptions, not present here, issuance of a declaratory judgment deeming past conduct illegal is also not permissible as it would be merely advisory." *ACLU of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 (1st Cir. 2013). Declaring that some set of past grant terminations were unlawful would not reanimate those grants. *See supra* at 12.

**2.** Were there any doubt that the purpose of this suit is for Plaintiffs to obtain an advisory opinion about what federal law means in the abstract, it was put to rest by Plaintiffs' summary-judgment motion. In that motion, Plaintiffs made a curious procedural choice. Although Plaintiffs' own filings acknowledge that their claims raise purely legal (rather than factual) issues, *see* Pls.' Br. at 15, they nonetheless chose to move for summary judgment solely on Count I, which purports to be a "Cause of Action" titled "Declaratory Judgment." Am. Compl. ¶ 278.

But even if Plaintiffs could establish subject-matter jurisdiction, the Court still could not grant relief solely on Count I, because "[t]he DJA does not by itself create a federal cause of action." *Tyngsboro Sports II Solar, LLC v. Nat'l Grid USA Serv. Co., Inc.*, 88 F.4th 58, 64 (1st Cir. 2023). In other words, "[a]lthough the plaintiffs style 'declaratory judgment' as a cause of action, the provision that they cite, 28 U.S.C. § 2201(a), creates a remedy, not a cause of action." *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007). By itself, the DJA "neither provides nor denies a jurisdictional basis for actions under federal law, but merely defines the scope of available declaratory relief." *Muirhead v. Mecham*, 427 F.3d 14, 17 n.1 (1st Cir. 2005); *see also California*, 593 U.S. at 671-73 (jurisdictional problem created by standalone request for declaratory relief).

In other words, had Plaintiffs established a violation of the APA in either Count II or Count III—their substantive APA claims—then one of the possible forms of *relief* to which they might have been entitled is a declaratory judgment. But, having declined to seek summary judgment on Counts II and III, Plaintiffs cannot now seek relief on Count I by itself. That would be like seeking

summary judgment solely on a claim for "money damages," or a plaintiff's claim for "injunction"—those are *remedies*, not causes of action. A request for relief on Count I, by itself, is incoherent. Plaintiffs' summary-judgment motion can be denied, in its entirety, on that basis alone.

## II. PLAINTIFFS DO NOT CHALLENGE ANY FINAL AGENCY ACTION IN COUNTS I AND II.

"The APA provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.'" *Harper*, 118 F.4th at 116 (quoting 5 U.S.C. § 704). "To be considered 'final,' the agency action must satisfy two conditions." *Id.* "First, it 'must mark the 'consummation' of the agency's decisionmaking process." *Id.* (quoting *Bennett*, 520 U.S. at 178). "Second, 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Id.* (quoting *Bennett*, 520 U.S. at 178).

In their complaint, Plaintiffs explicitly identify the agency actions that they believe qualify as "final agency action" under the APA. So, for example, in connection with Count III, Plaintiffs allege that "[t]he OMB regulations containing the Clause and the Agency Defendants' parallel regulations that incorporate the Clause are 'final agency action' under the APA." Am. Compl. ¶ 308. Defendants do not dispute for purposes of this motion that those regulations are final agency action—after all, they shape the contours of the legal and contractual relationship between grantor and grantee.

In Counts I and II, however, Plaintiffs do not challenge "[t]he OMB regulations containing the Clause," nor "the Agency Defendants' parallel regulations that incorporate the Clause." *Id.* Instead, Plaintiffs allege that "[u]pon information and belief, Defendants have made a decision, as a matter of final agency policy, that the Clause and Agency Defendants' parallel regulations afford them independent authority to terminate grants based on new 'agency priorities' identified after the grants have been awarded." *Id.* ¶ 298. Plaintiffs thus assert that "*that* decision, whether written or unwritten, is final agency action." *Id.* ¶ 299 (citing *Bennett*, 520 U.S. at 178) (emphasis added). The core of Plaintiffs' suit is thus based on the theory that this alleged "decision" is unlawful because it is "*contrary* to the meaning of the Clause." *Id.* ¶ 300 (emphasis added)—Plaintiffs do not challenge "the Clause" itself (except in Count III, and only in the alternative). But even if such an interpretive "decision" has

actually been made—something about which Plaintiffs only speculate "[u]pon information and belief," *id.* ¶ 298—that "decision" would not be final agency action under the APA.

First, any such decision would not "mark the 'consummation' of the agency's decisionmaking process." *Harper*, 118 F.4th at 116 (quoting *Bennett*, 520 U.S. at 178). Far from it—it would mark the very *beginning* of that process. Even if some or all Defendants, at some point, "decided" that they had the "authority to terminate grants based on new 'agency priorities' identified after the grants have been awarded," Am. Compl. ¶ 298, that "decision," standing alone, would result in the termination of no grant. Instead, countless agency officials would still need to consider, among many other things: (1) current agency priorities; (2) whether those priorities are compatible with any particular grant; (3) whether the agency wishes to terminate the grant at issue, (4) the text of the grant contract, and (5) whether some other legal constraint—such as the relevant appropriations statute, or some other provision of federal law, *see infra* at 26-29—prevents termination of the grant, notwithstanding the change in agency priorities. The fact that "there are" many "further steps" in each agency's "administrative process" before terminating a grant demonstrates that the alleged "decision" that Plaintiffs challenge in Counts I and II is not final agency action. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016).

Those "further steps" are not just a formality. *Id.* Consider, for example, the many thousands of grants subject to the same regulations that have *not* been terminated. In thousands of instances, presumably some version of the process above took place, and resulted in a decision *not* to terminate a grant. That alone shows that the "'consummation' of the agency's decisionmaking process," *Harper*, 118 F.4th at 116 (quoting *Bennett*, 520 U.S. at 178), is far downstream of the alleged "decision" that Plaintiffs challenge in Counts I and II—as sometimes grants are terminated, and sometimes grants are retained, even if subject to the same regulations, interpreted the same way, by the same officials.

Second, any such "decision" would *not* "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Bennett*, 520 U.S. at 178). Again, assume Plaintiffs are correct in their speculation that, "[u]pon information and belief, Defendants have made a decision" that they have the "authority to terminate grants based on new

'agency priorities' identified after the grants have been awarded." Am. Compl. ¶ 298. Any such decision "determined" no "rights or obligations," and zero "legal consequences" flowed from it. *Harper*, 118 F.4th at 116 (quoting *Bennett*, 520 U.S. at 178). What *does* have "legal consequences" is a specific agency official's eventual action follow through on the termination of some specific grant. *That* decision changes the "rights and obligations" of the grantor and grantee, under the terms of their contract. *Id.* (That is why Plaintiffs would generally not have to challenge that sort of decision "[u]pon information and belief," Am. Compl. ¶ 298—because they would know, upon receipt of a termination letter, that a grant had been terminated.) But someone in OMB merely reading the Code of Federal Regulations—thus setting the stage for possible future grant terminations by other agency officials—does not have any legal consequences, standing alone. And it certainly does not "*conclusively* determin[e] the rights and obligations of the parties with respect to the matters at issue," as is required to demonstrate final agency action. *Berkshire Env't Action Team, Inc. v. Tennessee Gas Pipeline Co., LLC*, 851 F.3d 105, 111 (1st Cir. 2017) (emphasis added).

Put another way, an agency does not determine legal rights or obligations "merely by expressing its view of the law." *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. Army Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001)); *see also Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 946 (D.C. Cir. 2012) (no final agency action where an "agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party"). That is why courts routinely hold that challenges to agency legal interpretations are not final agency action—even where (unlike here) those interpretations are memorialized in formal written guidance. *See, e.g.*, *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 248 (D.C. Cir. 2014) (guidance document not final agency action even where labeled as "Final Guidance" because it merely "advise[d] [agency] staff" about how to oversee permit applications under the Clean Water Act); *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("[I]nterpretative rules or statements of policy generally do not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which [they are] addressed.'") (quoting Judge Harry T. Edwards et al., Federal Standards of Review 157 (2d ed. 2013)).

In sum, APA plaintiffs routinely challenge federal regulations, for which there is little doubt that the final-agency-action test is satisfied. But at least in Counts I and II, Plaintiffs do not challenge any regulation—they instead argue that some nebulous, undefined "decision" itself is "*contrary to* the meaning of" federal regulations. Am. Compl. ¶ 300 (emphasis added). Any such "decision" is not final agency action within the meaning of the APA. So Counts I and II should be dismissed.[4]

## III.  ALL PLAINTIFFS FORFEITED (AND SOME PLAINTIFFS WAIVED) THEIR CLAIMS IN COUNT III BY FAILING TO RAISE THEIR OBJECTIONS DURING THE RULEMAKING.

Count III challenges regulatory text that went through a full notice-and-comment process in 2023, *see* 88 Fed. Reg. at 69,390, and which was finalized in its current form in early 2024, in the final year of the Biden Administration. *See* 89 Fed. Reg. at 30,046. All interested parties thus had a recent opportunity to comment on OMB's proposed regulatory text, through the notice-and-comment procedures established in the APA. *See* 5 U.S.C. § 553.

Despite that opportunity, about half of the Plaintiff States sat on the sidelines: Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Nevada, New Jersey, New Mexico, and Pennsylvania did not comment at all. Some of the Plaintiff States (or their agencies or officials), however, did submit comments: Arizona, California, Colorado, Kansas, Kentucky, Maine, Massachusetts, Michigan, Minnesota, New York, Oregon, Rhode Island, and Vermont.[5] None of those comments, however, raised any of the issues that are now the subject of Plaintiffs' lawsuit. And many were broadly *supportive* of OMB's proposed language. For example, a state agency in Arizona said that "[t]he updates, in general, provide added clarity that will be helpful to recipients in

---

[4] The First Circuit has suggested that "[t]he issue of whether there was final agency action implicates the jurisdiction of the federal courts." *Puerto Rico v. United States*, 490 F.3d 50, 70 (1st Cir. 2007). But whether the final-agency-action requirement is jurisdictional (and thus warrants dismissal under Rule 12(b)(1)) or is more appropriately understood as an element of an APA claim (and thus warrants dismissal under Rule 12(b)(6)), dismissal is warranted here.

[5] All of the comments are available here: https://www.regulations.gov/document/OMB-2023-0017-0001/comment. The Court may take judicial notice of these comments. *See, e.g.*, *Morales Posada v. Cultural Care, Inc.*, 554 F. Supp. 3d 309, 314 n.2 (D. Mass. 2021) ("Courts can take judicial notice of information from an official government website that is not subject to reasonable dispute.").

administering federal awards and subawards."[6]  A state agency in Massachusetts wrote "to express our support for the proposed amendments to 2 C.F.R. Part 200, Uniform Guidance, proposed by the Office of Management and Budget (OMB)."[7]  A Michigan agency wrote simply to "to thank" OMB "for the opportunity to provide comments regarding proposed changes," and explained that it had "reviewed the proposed changes and have no additional comments."[8]

As a general matter, "[i]n reviewing agency action," a court "will not consider issues which a petitioner failed to present during the administrative process in accordance with the relevant procedural requirements."  *Adams v. EPA*, 38 F.3d 43, 50 (1st Cir. 1994); *see United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").  Because they failed to raise the issues about which they now object, Plaintiffs here do not satisfy this "basic prerequisite" for "judicial review of an agency action."  *Massachusetts v. United States*, 522 F.3d 115, 132 (1st Cir. 2008).[9]

------

[6]    Arizona    Comment    (Dec.    1,    2023),    *available    at* https://www.regulations.gov/comment/OMB-2023-0017-0525.

[7]    Massachusetts    Comment    (Dec.    1,    2023),    *available    at* https://www.regulations.gov/comment/OMB-2023-0017-0224

[8]    Michigan    Comment    (Nov.    30,    2023),    *available    at* https://www.regulations.gov/comment/OMB-2023-0017-0182.

[9] For the most part, the same is also true of the 2020 rulemaking, which is not before this Court.  In that prior rulemaking, however, there was at least some participation on this subject: the Minnesota Department of Natural Resources and the Illinois Department of Commerce and Economic Opportunity each submitted comments raising questions (and expressing some concern) about the breadth of agency termination authority.  *See* Minnesota Comment (Mar. 4, 2020), *available at* https://www.regulations.gov/comment/OMB-2019-0005-0167 ("The potential for grants to be defunded in the middle would be hugely problematic . . . ."); Illinois Comment (Mar. 25, 2020), *available at* https://www.regulations.gov/comment/OMB-2019-0005-0192 ("Who determines if the award is no longer meeting the program goals or agency priorities?  It concerns us that if there is a change in management for an agency and the new management wants to go in a different direction with the goals, it would allow them to terminate awards . . . .").  Of course, commenting on a different, previous rule cannot satisfy Plaintiffs' burden to comment on the one that is before the Court.  So to the extent those comments from prior rulemakings are relevant to this suit at all, it is only because they

In the context of notice-and-comment rulemaking, First Circuit precedent on the APA's issue-exhaustion requirement is sparse. But the D.C. Circuit routinely rejects APA claims challenging agency regulations where, as here, the plaintiff failed to raise their concerns via comments to the agency during rulemaking. In short, "[i]t is black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue." *Appalachian Power Co. v. EPA*, 251 F.3d, 1026, 1036 (D.C. Cir. 2001); *see also, e.g.*, *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148-50 (D.C. Cir. 2005) ("Because UMA did not raise these contentions during the rulemaking . . . the FMCSA did not act arbitrarily or capriciously in failing to consider these claims."); *Nat'l Min. Ass'n v. Dep't of Labor*, 292 F.3d 849, 874 (D.C. Cir. 2002) ("Like the District Court, though, we decline to consider this claim, because NMA failed to raise it during the notice-and-comment period.").

This case shows why that principle is important. For example, Plaintiffs now allege that during the rulemaking process, "OMB never once provided an explanation for an expansive assertion of authority to terminate grants based on the phrase 'agency priorities.'" Am. Compl. ¶ 315. But if the Plaintiff States had raised those concerns at the appropriate time, OMB might have provided the exact sort of explanation that Plaintiffs now claim was missing. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to significant comments received during the period for public comment."). Instead, the Plaintiffs were either silent or supportive.

As a result, because none of the Plaintiff States raised any of their concerns with the challenged regulations during the comment period, they have forfeited all of their claims (and their requests for relief) that challenge the regulation itself. And for the Plaintiffs that did comment, but only on other issues—and especially those that offered their explicit *support* for OMB's proposed regulatory text— the problem goes one level deeper. Those Plaintiffs not only forfeited their claims but affirmatively waived them. *See Davila v. Corporacion De P.R. Para La Difusion Publica*, 498 F.3d 9, 15 n.2 (1st Cir. 2007). But, whether by waiver or forfeiture, all Plaintiffs here fail this "basic prerequisite" for "judicial

---

undermine Plaintiffs' repeated assertions that nobody ever anticipated that OMB's guidance would "allow terminations based on mid-award priority shifts." Pls.' Br. at 19.

review of an agency action." *Massachusetts*, 522 F.3d at 132. Accordingly, Count III (and any request for relief that would operate against the regulations themselves) thus fail for that additional reason.

## IV.    PLAINTIFFS' CLAIMS LACK MERIT.

For the reasons above, this Court can and should dispose of this lawsuit, in its entirety, without addressing any of Plaintiffs' legal theories on the merits. If the Court does reach the merits, however, none of Plaintiffs' interpretive objections provides a basis for any relief in this suit. In some instances, that is because Plaintiffs are wrong about the law—in particular, Plaintiffs are mistaken to say that 2 C.F.R. § 200.340(a)(4) does not "authorize the termination of awarded grants based on new agency priorities." Am. Compl., Prayer for Relief ¶ (i)(c). In other instances, however, that is because Plaintiffs are *right* about the law, and wrong only that there is some dispute between the parties—in particular, Defendants fully agree that the government must comply with federal statutes and regulations in terminating grants. So none of Plaintiffs' claims states a claim upon which relief can be granted—at least, not in this scattershot suit, pleaded at a hopelessly high level of generality, against virtually the entire Executive Branch all at once.

### a.    Plaintiffs are correct that the government must comply with valid federal statutes, but that is no basis for relief here.

One of Plaintiffs' theories, on the merits, is that the regulations at issue "cannot be used to terminate an award where Congress has directed funds to be spent on particular grant programs or where Congress has appropriated money for an identified objective and the agency substitutes its own 'agency priorities' for the objective identified by Congress." Am. Compl. ¶ 287. On that theory, Plaintiffs' summary-judgment motion seeks a corresponding "declaratory judgment that the agencies cannot invoke the Clause to withhold duly appropriated funds by identifying 'agency priorities' that disregard or are otherwise incompatible with Congress's directives." Pls.' Br. at 21. In other words, Plaintiffs argue that, in terminating grants, the government must comply with federal statutes.

Plaintiffs are correct, as far as that goes. A federal statute trumps an agency regulation. *Cf.* 5 U.S.C. § 706(2)(C) (authorizing a court to set aside final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). Defendants do not claim the power

to terminate grants in violation of federal statutes—and certainly not by relying on a regulation that applies only "to the extent authorized by law." 2 C.F.R. § 200.340(a)(4); *see also id.* § 200.101(d) ("Federal statutes or regulations govern in any circumstances where they conflict with the provisions of this part."). In short, there is no dispute to resolve on this point, and no relief to order—if a statute prohibits termination of a grant, 2 C.F.R. § 200.340(a)(4) does not (and could not) change that.

To be sure, sometimes a grantor and a grantee will *disagree* about the meaning of a federal appropriations or grant-related statute—after all, those statutes are often drafted in open-ended terms that provide significant discretion to the Executive Branch. *See NIH*, 2025 WL 2415669, at *5 (Kavanaugh, J., concurring) (agreeing with the government that grant terminations are "highly discretionary decisions over how to allocate limited agency resources"); *Vigil*, 508 U.S. at 192 (similar).[10] And sometimes that disagreement will result in litigation. *See, e.g., California v. U.S. Dep't of Educ.*, No. 1:25-cv-10548 (D. Mass.). But those disputes do not suggest that the Executive Branch is claiming the power to ignore federal statutes in the abstract—only that courts will sometimes have to referee contract disputes (or statutory interpretation disputes) between contracting parties, as courts have been doing for hundreds of years.

So if any of the Plaintiffs believe that any of the Defendants have terminated some grant in violation of some specific statutory text that requires that grant to continue, Plaintiffs can sue in the Court of Federal Claims. *See NIH*, 2025 WL 2415669; 28 U.S.C. § 1491(a)(1). And if the court agrees with Plaintiffs about the meaning of that statute, they will *win* that suit. *Cf., e.g., Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 992 (N.D. Ill. 2025) (holding that "the WANTO Act requires DOL to issue equity-related grants"). But that agreement between the parties is no basis for relief in this

---

[10] For one common example in which this sort of dispute may arise: even if Congress identifies a general purpose for certain funding, terminating a grant to a particular grantee and then reallocating those funds to another grantee will often be fully compliant with the statute (depending, as always, on whatever the relevant statute actually says). For a less common example: some federal statutes are unconstitutional, which raises different questions about the Executive Branch's legal obligations. *See, e.g., Race- and Sex-Based Presumptions in USDOT Disadvantaged Business Enterprise Program* (June 25, 2025), https://www.justice.gov/oip/media/1404871/dl?inline. Of course, none of these nuances are before this Court in this case, given the abstract nature of Plaintiffs' facial challenge.

sprawling, Executive-Branch-wide lawsuit. *See Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) (Sotomayor, J., concurring) (voting with majority to stay injunction against an "Executive Order" that "directs agencies to plan reorganizations and reductions in force 'consistent with applicable law,'" noting that "[t]he plans themselves are not before this Court, at this stage, and we thus have no occasion to consider whether they can and will be carried out consistent with the constraints of law").

Plaintiffs' requests for relief are foreclosed by these same principles. For purposes of the DJA, there is no "actual controversy" between the parties on this point. *See supra* at 17-19. And had Plaintiffs sought an injunction requiring defendants to comply with federal statutes when terminating grants—and at least so far, they have not—it would have been improper: "[i]njunctions simply requiring defendants to obey the law are too vague." *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1249 (10th Cir. 2024); *see also* Fed. R. Civ. P. 65(d)(1) ("Every order granting an injunction . . . must . . . state its terms specifically; and . . . describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.").

### b. Plaintiffs are also correct that the government must comply with its own regulations, but that is also no basis for relief here.

Plaintiffs next allege that the regulations at issue "cannot be invoked to terminate an award if the award terms and conditions themselves do not 'clearly and unambiguously specify' that the grant can be terminated when it 'no longer effectuates the program goals or agency priorities.'" Am. Compl. ¶ 286 (quoting 2 C.F.R. § 200.340(a)(4), (b)). Plaintiffs' summary-judgment motion likewise asks the Court to "declare that the Clause cannot be a basis for termination unless it has been clearly and unambiguously incorporated into a grant's terms and conditions." Pls.' Br. at 25. In other words, Plaintiffs argue that, in terminating grants under the authority set forth in 2 C.F.R. § 200.340(a)(4), the government must also comply with its other regulations—in particular, with 2 C.F.R. § 200.340(b).

Once again, Plaintiffs are correct—at least at an unhelpfully high level of generality. As a general matter, "[a]n agency has an obligation to abide by its own regulations" as long as those regulations remain on the books. *Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954)). And 2 C.F.R. § 200.340(b) provides that

an agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."[11]

Of course, much like Plaintiffs' argument about compliance with federal statutes, the devil will be in the details. And again, sometimes a grantor and a grantee will disagree about the "terms and conditions of the Federal award," and whether the relevant "termination provisions" are sufficiently "clear[] and unambiguous[]" to satisfy 2 C.F.R. § 200.340(b) or other government regulations. The Court of Federal Claims is open for business to resolve those disputes on a grant-by-grant, contract-by-contract basis. Indeed, that is the only *possible* way to resolve these sorts of questions—by reference to the actual text of an actual grant contract. *See, e.g.*, *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 114 (D.D.C. 2025) (enjoining termination of a grant on the theory that "the Terms and Conditions governing the grant award expressly limit EPA to three possible grounds for termination"), *vacated by* No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) (vacating the injunction because these "claims can be heard only in the Court of Federal Claims"). Disputes with the United States over the text of a grant contract are squarely committed to the Court of Federal Claims, under the Tucker Act. *See NIH*, 2025 WL 2415669; *California*, 145 S. Ct. at 966. There is thus no legal basis, no practical need, and no feasible mechanism for this Court to provide relief in this lawsuit at such a high level of generality, across dozens of agencies, relating to "thousands of grants," Am. Compl. ¶ 1, all of which are subject to different terms and conditions, all at once—and certainly not based on (another, abstractly defined) legal principle on which all parties agree, in the absence of any concrete application.

---

[11] Importantly, this was not the case under previous versions of this regulation, which instead referred to a similar concept in explicitly precatory terms. *See* 2 C.F.R. § 200.340(b) (2020) ("A Federal awarding agency *should* clearly and unambiguously specify termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section.") (emphasis added). Accordingly, many older grants—including many of the grants referenced in Plaintiffs' complaint—would not be subject to this requirement. That Plaintiffs overlook this nuance further underscores the problematic nature of the broad, across-the-board relief that they seek.

###### c.      The plain text of 2 C.F.R. § 200.340(a)(4) allows for termination of a grant based on new agency priorities.

Finally, Plaintiffs argue that 2 C.F.R. § 200.340(a)(4) should be interpreted to prohibit "the termination of awarded grants based on new agency priorities identified after the time of the federal award." Am. Compl., Prayer for Relief ¶ (i)(c).  Before Defendants explain why Plaintiffs are mistaken about that, one point bears emphasis: that the first real disagreement between the parties about the law comes on page 30 of this brief suggests that something is very wrong with the basic structure of this suit.  In any event, although the Court should not reach this question for all the reasons above, Plaintiffs' interpretation is foreclosed by the text, structure, and purpose of 2 C.F.R. § 200.340(a).

**1.**  First, the text.  Under 2 C.F.R. § 200.340(a)(4), a "Federal award may be terminated in part or its entirety . . . [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

At the time the original award is made by an agency, it should always be the case that, in the agency's judgment, making the award "effectuates the program goals or agency priorities."  *Id.*  Otherwise, the agency would not have made the award in the first place.  But as 2 C.F.R. § 200.340(a)(4) contemplates explicitly, sometimes things change.  Maybe "the program goals" change.  Maybe "agency priorities" change.  Or maybe nothing changed at the program or the agency, but the grantee is no longer the best available choice—imagine, for example, a grant to a nonprofit whose CEO turns out to be a foreign spy, or is credibly accused of fraud.  In situations like this (or countless others), an agency might reasonably conclude that "an award no longer effectuates the program goals or agency priorities."  *Id.*  The regulations explicitly contemplate that an agency may exercise that sort of discretion, as a responsible steward of the public fisc.

Plaintiffs' view is that the only "agency priorities" that matter for purposes of this analysis are the "agency priorities" that were in place at "the time of the federal award."  Am. Compl., Prayer for Relief ¶ (i)(c).  But that limitation is entirely atextual—there is nothing in the text that takes such a restrictive view of the relevant "agency priorities."  In plain English, if "an award no longer effectuates

. . . agency priorities," that just means there is now a disconnect between the award and the priorities. But that disconnect can arise from changes on either end—either something happened to the award (*e.g.*, the grantee is no longer the best choice), or something happened at the agency (*e.g.*, the priorities changed), or both.  Either way, the award "no longer effectuates . . . agency priorities" within the meaning of 2 C.F.R. § 200.340(a)(4).  Plaintiffs identify nothing in the text of the regulation that narrows the relevant "agency priorities" so sharply.

**2.** Plaintiffs' interpretation is also inconsistent with the overall structure of 2 C.F.R. § 200.340. In particular, Plaintiffs ignore the immediately preceding sub-section, which generally allows the "recipient" of the grant to terminate it in part, after providing notice.  *See id.* § 200.340(a)(3).  Then, in the case of a partial termination by the grantee, when it comes to the leftover portion of the grant, the agency may then "terminate the Federal award in its entirety"—but only if the agency "determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made."  *Id.*  That is a backward-looking inquiry, stated in the past tense, about the state of the world at the time "the Federal award *was made.*"  *Id.* (emphasis added).

Why is this relevant?  Because Plaintiffs' interpretation of 2 C.F.R. § 200.340(a)(4) requires implicitly reading into the regulation language that the drafters omitted—in particular, language restricting any consideration of the agency's priorities to those in effect at the time "the Federal award was made."  2 C.F.R. § 200.340(a)(3).  So it is telling that the immediately preceding sub-section uses exactly that sort of language, and explicitly calls for the very sort of backward-looking, past-tense analysis that Plaintiffs insist is (silently) required by § 200.340(a)(4).  But § 200.340(a)(4) contains no similar language.  To the contrary, it is stated in the present tense—calling for a here-and-now analysis of whether the award *currently* "effectuates the program goals or agency priorities," in the present. 2 C.F.R. § 200.340(a)(4).

"[W]e generally 'presume differences in language like this convey differences in meaning.'" *Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017)).  And so, whether interpreting statutes, regulations, or contracts, "where [a] document has used one term in one place, and a materially different term in another, the presumption

is that the different term denotes a different idea." *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (quoting A. Scalia & B. Garner, Reading Law 170 (2012)). And just as "Congress' use of a verb tense is significant in construing statutes," *United States v. Wilson*, 503 U.S. 329, 333 (1992), OMB's use of the past tense in (a)(3) and the present tense in (a)(4) is significant, in construing 2 C.F.R. § 200.340. So, not only is there nothing in the plain text of sub-section (a)(4) that would restrict an agency's focus to its old priorities (to the exclusion of its new priorities), but the presence of exactly that sort of language in sub-section (a)(3) makes it impossible to imagine that OMB intended for the same kind of limitation to apply in sub-section (a)(4), without saying so.

**3.** Finally, even if Plaintiffs could overcome the text and structure of 2 C.F.R. § 200.340(a), their interpretation also has the problem of being highly counterintuitive, and impossible to square with the purpose of the regulation, considered in the overall context of OMB's core mission.

This regulatory text—drafted by OMB—explicitly references "agency priorities," in a sentence about changes over time. 2 C.F.R. § 200.340(a)(4). That is unsurprising, because one thing that OMB is quite familiar with is the possibility of significant changes to "agency priorities" over time— including, but not limited to, after a change in Presidential administration.

During the Obama Administration, the White House website stated that "[t]he core mission of OMB is to serve the President of the United States in implementing his vision across the Executive Branch." THE WHITE HOUSE, *The Mission and Structure of the Office of Management and Budget*, *available at* https://obamawhitehouse.archives.gov/omb/organization_mission/. It emphasized that OMB "reports directly to the President and helps a wide range of executive departments and agencies across the Federal Government to implement the commitments and priorities of the President." *Id.* Next, during the first Trump Administration—when the language about "agency priorities" first appeared in the Code of Federal Regulations—the White House's website similarly emphasized that OMB "serves the President of the United States in overseeing the implementation of his vision across the Executive Branch." THE WHITE HOUSE, *Office of Management and Budget*, *available at* https://trumpwhitehouse.archives.gov/omb/. Finally, during the Biden Administration—when 2 C.F.R. 200.340(a)(4) was finalized in its current form—the website retained essentially the same

language, declaring that OMB "serves the President of the United States in overseeing the implementation of his or her vision across the Executive Branch." THE WHITE HOUSE, Office of Management and Budget, *available at* https://bidenwhitehouse.archives.gov/omb/.

And so, because every modern President has relied on OMB to "help[] a wide range of executive departments and agencies across the Federal Government to implement the commitments and priorities of the President," *see supra*, it is hard to see why OMB would draft a regulation (1) about changed circumstances, (2) explicitly referencing "agency priorities," but (3) that also (silently) *prohibited* consideration of *new* "agency priorities." 2 C.F.R. 200.340(a)(4). After all, there is nothing unusual or improper about an agency changing priorities—even dramatically—in response to new direction from politically accountable leadership. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."); *State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.") (cited favorably in *Biden*, 597 U.S. at 812). In large part, that is what elections are for. Given that backdrop, and OMB's core mission, it is hard to imagine that in explicitly referencing "agency priorities" in 2 C.F.R. § 200.340(a)(4), OMB intended to foreclose consideration of *new* agency priorities—all without saying so expressly.

**4.** Plaintiffs' arguments to the contrary lack merit. First, Plaintiffs emphasize that the regulatory text describes the relevant "program goals or agency priorities" as "*the* program goals or agency priorities," using the definite article "the." Pls.' Br. at 17. Plaintiffs then cite eight cases for the general proposition that the use of the word "the" can be significant. *See id.* But Plaintiffs never explain *why* that usage is significant in any way that matters here. Nothing about the word "the" tells the reader whether "the . . . agency priorities" at issue are "the" current priorities or "the" old priorities. The word "the" simply doesn't answer (or even address) that question.

Second, Plaintiffs parse the phrase "no longer effectuates," suggesting that it "references circumstances where an award previously effectuated agency priorities," but no longer does so.  *Id.* at 18.  Sure—but that is equally true under Defendants' interpretation.  On Defendants' interpretation, an award "no longer effectuates" agency priorities, at least sometimes, because those priorities changed.  So the phrase "no longer effectuates" is likewise little help to the Court in answering the question at issue here.

Nor is Plaintiffs' hypothetical about a company "'no longer' hiring a paralegal."  *Id.* at 18.  Plaintiffs may be right that "a social-media post announcing that a company is 'no longer' hiring a paralegal makes clear they are referring to a previous hiring opportunity."  *Id.*  But a statement that a grant "no longer effectuates . . . agency priorities" could similarly mean that the grant used to effectuate agency priorities, in the past, but no longer does so—because the agency priorities (and nothing else) changed.  Plaintiffs offer nothing more than *ipse dixit* to the contrary, asserting that "a Clause that asks whether a grant 'no longer' effectuates the agency priorities must refer to the priorities that were *already* established."  *Id.*  But why is that?  Plaintiffs offer only italics—not an explanation.

Third, Plaintiffs argue that "[a]llowing terminations based on mid-award priority shifts would render superfluous the many other provisions circumscribing when agencies can terminate existing grants."  *Id.* at 19.  Not at all.  Unlike in sub-section (a)(4), termination under sub-sections (a)(1) and (a)(2) can be accomplished even when the grant *continues* to "effectuate[] the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4).  For example, assume that "agency priorities" are likely to remain relatively stable between now and January 2029.  On that assumption, without the authority in 2 C.F.R. § 200.340(a)(1), an agency could not terminate a grant even if the grantee "fails to comply with the terms and conditions of the Federal award."  That would be untenable.  And 2 C.F.R. § 200.340(a)(3) is even more obviously not surplusage, because it allows—unlike any other sub-section—for termination initiated by the grantee.

Of course, even if Plaintiffs had shown that the government's interpretation led to some overlap, "[t]he canon against surplusage is not an absolute rule," *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013), and cannot overcome the plain text of the guidance.  That is especially so where, as

here, 2 C.F.R. § 200.340(a)(4) reads as something like a menu of available pathways to the termination of a grant.  In other words, even if it were correct that one ground for termination was broad enough to overlap with (or even fully encompass) another, that would be neither surprising nor problematic— that would just mean that agencies have a choice to rely on a narrow basis for termination or a broad basis for termination.

Contrary to Plaintiffs' assertion, *see* Pls.' Br. at 20, the government's interpretation is not an example of an agency "hid[ing] elephants in mouseholes." *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 203 (5th Cir. 2019) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).  In fact, 2 C.F.R. 200.340(a)(4) is, "at the risk of the tired metaphor spinning out of control, less a mousehole and more a watering hole—exactly the sort of place we would expect to find this elephant." *Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 22 (2020).  After all, 2 C.F.R. § 200.340 is titled "Termination," and 2 C.F.R. § 200.340(a) explicitly lists the circumstances in which a "Federal award may be terminated in part or its entirety."  No reasonable reader of OMB's guidance about grant terminations should be surprised to see that grant-making agencies have discretionary authority to terminate discretionary grants.  To return to the elephant metaphor one last time: this is more like finding an elephant "hiding" in the elephant habitat at the zoo—under a sign that says "Elephants."

Fourth, Plaintiffs argue (though only in a footnote) that "agency priorities cannot be changed on a whim."  Pls.' Br. at 20 n.8 (citing 31 U.S.C. § 1120(a)(3) and 5 U.S.C. § 306(b), both of which require certain notifications to Congress)).  But they do not argue that any agency has violated those notification requirements, nor explain why it would be relevant to this lawsuit if they did.  In any event, to the extent those statutes are relevant here at all, they tend to undermine Plaintiffs' position—by showing that Congress (unsurprisingly) is aware of the reality that agencies often "evaluate priorities in light of the philosophy of the administration," including after a "change in administration brought about by the people casting their votes." *State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring in part and dissenting in part).  That makes it even less likely that OMB intended its own regulations to be interpreted in the restrictive and counterintuitive fashion that Plaintiffs advance.

This also raises a severe administrability problem that casts further doubt on Plaintiffs' interpretation: how, exactly, should a court identify the date on which a certain agency priority came into being?  Agencies typically do not (and are not required to) exhaustively or precisely catalog and document all changes to its "program goals or agency priorities."  2 C.F.R. § 200.340(a)(4).  Instead, goals and priorities often change slowly and incrementally, over time—not in discretely identifiable moments, or from one day to the next.  But Plaintiffs' interpretation would seemingly require courts to take on the task of identifying the date on which a new agency priority sprang into existence, to decide whether it was before or after a grant was made.  In practice, that sort of inquiry would be impossible—is it inauguration day?  The day of some press release?  The day new leadership was nominated?  Confirmed?  The government's interpretation requires no bizarre project of that sort.

Fifth, although Plaintiffs do not bring any constitutional claims in this case, they do make passing reference to the *Pennhurst* principle: that "when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'"  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).  That principle does not apply here, because Plaintiffs do not make any allegations about any "conditions" imposed upon them in exchange for accepting federal funds.  *Compare, e.g.*, *Pennhurst*, 451 U.S. at 12-13 ("Each State shall also 'as a condition' of receiving assistance 'provide the Secretary satisfactory assurances that each program which receives funds from the State's allotment has in effect for each developmentally disabled person who receives services from or under the program a habilitation plan.'").  That is not surprising, as those conditions (if they exist) would be found in hundreds of potentially relevant statutes or appropriations bills, scattered across the U.S. Code—not in OMB's grant-termination guidance.  Moreover, the regulations that Plaintiffs challenge here are not at all specific to States, so federalism principles are irrelevant to the vast majority of its applications—this is not a regulation *of* the States at all.  *Cf. Murphy v. NCAA*, 584 U.S. 453, 475-76 (2018) ("The anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage.").

In any event, even if it applied here, there is no *Pennhurst* problem with 2 C.F.R. § 200.340.  As Plaintiffs themselves emphasize, the regulations provide that "[t]he Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  2 C.F.R. § 200.340(b).  Compliance with that requirement thus also satisfies any applicable *Pennhurst* obligation.  No State can reasonably claim to be surprised that a federal agency availed itself of authority that appears expressly in the Code of Federal Regulations.  "[I]f a State is unaware of the conditions" imposed on their grants, *Pennhurst*, 451 U.S. at 17, that can be explained only by their failure to read the regulations, the grant documents, or both.

## CONCLUSION

For these reasons, the Court should dismiss this suit, in its entirety, either for lack of subject-matter jurisdiction (under Rule 12(b)(1)) or for failure to state a claim upon which relief can be granted (under Rule 12(b)(6)).  Plaintiffs' motion for summary judgment should then be denied as moot.

Date: September 11, 2025          Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov
Florida Bar No. 1041279

*Counsel for Defendants*