**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| STATE OF NEW JERSEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 25-11816-IT |
| v. | ) | |
| | ) | |
| U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF OF 13 MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT[1]**

Joshua D. Schnell*
Samuel Van Kopp*
Cordatis LLP
1011 Arlington Boulevard
Suite 375
Arlington, VA 22209
(202) 342-2550
jschnell@cordatislaw.com
svankopp@cordatislaw.com

Krista Oehlke (BBO# 707566)
Perry Law
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 213-3070
koehlke@danyaperrylaw.com

*Admitted *Pro Hac Vice*

Dated: September 18, 2025                    *Counsel for Amici Curiae 13 Members of Congress*

---

[1] The Court granted *Amici* leave to file this brief on September 15, 2025 (ECF 93).

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTERESTS OF *AMICI CURIAE* ........................................................................ 1

INTRODUCTION .............................................................................................. 2

ARGUMENT ..................................................................................................... 3

I.    The Constitution requires federal agencies to follow statutory mandates and
congressional policy directives ..................................................................... 3

II.    Federal agencies cannot use 2 C.F.R. § 200.340(a)(4) to avoid statutory
mandates and congressional policy directives ............................................... 4

III.    The Constitution gives Congress the exclusive authority to appropriate funds.............. 6

IV.    Federal agencies cannot use 2 C.F.R. § 200.340(a)(4) to withhold
appropriated funds ....................................................................................... 7

V.    Defendants' unlawful use of 2 C.F.R. § 200.340(a)(4) is harming the States................. 8

    A.    USDA's unlawful use of 2 C.F.R. § 200.340(a)(4) is inflicting
severe harm on farmers, ranchers, agricultural producers, and
food insecure individuals ..................................................................... 9

    B.    USDA's termination of the Local Food Purchase Assistance
Cooperative Agreement Program shows the harm caused by USDA's
unlawful use of 2 C.F.R. § 200.340(a)(4) ............................................. 12

CONCLUSION.................................................................................................. 17

i

## TABLE OF AUTHORITIES

**CASES**                                                                                               **PAGE**

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937) ...................................................... 6

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................................................... 7

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) ............................................................................................................. 6

*Dep't of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) ................................................... 6, 7

*Fed. Election Comm'n v. Cruz,* 596 U.S. 289 (2022) ............................................................... 4

*Fed. Election Comm'n v. Dem. Sen. Campaign Comm.*, 454 U.S. 27 (1981) ........................... 5

*FMC v. Seatrain Lines, Inc.,* 411 U.S. 726 (1973) .................................................................. 5

*Hart's Case*, 16 Ct. Cl. 459 (1880), *aff'd*, 118 U.S. 62 (1886) .............................................. 7

*In re Aiken Cnty.,* 725 F.3d 255 (D.C. Cir. 2013) ............................................................ 3, 5, 8

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ..................................................................................... 8

*Mistretta v. United States*, 488 U.S. 361 (1989) ..................................................................... 4

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
   595 U.S. 109 (2022) ............................................................................................................. 4

*Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) ................................... 4

*NLRB v. Brown*, 380 U.S. 278 (1965) ..................................................................................... 5

*Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414 (1990).................................................. 6

*SEC v. Sloan*, 436 U.S. 103 (1978) ......................................................................................... 5

*Volkswagenwerk v. FMC*, 390 U.S. 261 (1968) ...................................................................... 5

*Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
   501 U.S. 252 (1991)............................................................................................................. 4

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................................. 4

## STATUTES AND REGULATIONS

2 C.F.R. § 200.340(a)(4) ............................................................ 2, 4, 5, 7, 8, 9, 10, 12, 16

2 U.S.C. § 683(b) ............................................................................................... 8

16 U.S.C. § 3871d(a) .......................................................................................... 9

31 U.S.C. § 1341(a)(1)(A)-(B) ............................................................................ 7

31 U.S.C. § 1512 ................................................................................................ 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| STATE OF NEW JERSEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 25-11816-IT |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. OFFICE OF MANAGEMENT | ) | |
| AND BUDGET, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF OF 13 MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF
PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT[1]**

**INTEREST OF *AMICI CURIAE***

*Amici curiae* are thirteen Members of Congress—six Senators and seven Members of the House of Representatives. As Members of Congress, *Amici* have a strong interest in protecting Congress's exclusive authority over legislation and appropriations. As Members with constituents who benefit from U.S. Department of Agriculture (USDA) programs, *Amici* support USDA programs that alleviate food insecurity and support small farmers and rural communities. *Amici* have an interest in this litigation because plaintiffs are challenging, among other things, defendants' termination of USDA programs benefiting the states and districts they represent.

The thirteen *Amici curiae* Members are as follows:

U.S. Senator John Fetterman                 U.S. Representative Chrissy Houlahan

U.S. Senator Amy Klobuchar                 U.S. Representative Angie Craig

---

[1] The Court granted *Amici* leave to file this brief on September 15, 2025 (ECF 93). No counsel for any party authored this brief in whole or in part, and no party or their counsel funded this brief.

U.S. Representative Mary Gay Scanlon

U.S. Representative Chris Deluzio

U.S. Representative Dwight Evans

U.S. Senator Adam Schiff

U.S. Representative Madeleine Dean

U.S. Senator Chris Van Hollen

U.S. Senator Ben Ray Luján

U.S. Senator Cory Booker

U.S. Senator Peter Welch

## INTRODUCTION

Under the United States Constitution, Congress has the exclusive authority to legislate and appropriate. In this capacity, Congress has passed laws and appropriated funds for critical financial assistance programs that are implemented by virtually every federal agency. These programs fund research, schools, hospitals, healthcare, national security, rural communities, food banks, and many other congressionally mandated programs. Shortly after President Trump took office, however, federal agencies began arbitrarily terminating billions of dollars from these programs. To effectuate the terminations, the agencies relied on 2 C.F.R. § 200.340(a)(4), which is a subsection of a regulation buried deep in the Code of Federal Regulations. Under this subsection, federal agencies (many of whom are defendants in this case) argue that they can unilaterally terminate *any* federal financial assistance agreement based on purported "changes in program goals or agency priorities." But federal agencies cannot use regulations to infringe on Congress's authority to legislate and appropriate. The Court should therefore rule that defendants cannot use section 200.340(a)(4) to avoid statutory mandates, congressional policy directives, and appropriations laws.

## ARGUMENT[2]

### I.    The Constitution requires federal agencies to follow statutory mandates and congressional policy directives

"Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cnty.,* 725 F.3d 255, 259 (D.C. Cir. 2013). In the D.C. Circuit's *Aiken* decision, Supreme Court Justice Brett Kavanaugh (then serving as a circuit court judge) explained that it is a "settled, bedrock principle[] of constitutional law" that neither the President nor his "subordinate executive agencies" may "decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.*; *see also* U.S. Const. art. I, §§ 1, 9, cl. 7; U.S. Const. art. II, § 3. And this is no small matter. In reaching his *Aiken* holding, Justice Kavanaugh concluded that our constitutional system of government could fail if courts do not enforce the bedrock principle that the President cannot disregard statutory mandates and congressional policy directives:

> This case has serious implications for our constitutional structure. It is no overstatement to say that our constitutional system of separation of powers would be significantly altered if we were to allow executive and independent agencies to disregard federal law in the manner asserted in this case by the Nuclear Regulatory Commission. Our decision today rests on the constitutional authority of Congress, and the respect that the Executive and the Judiciary properly owe to Congress in the circumstances here.

*Id.* at 266-67. "[A]bsent a lack of funds or a claim of unconstitutionality that has not been rejected by final Court order, the Executive must abide by statutory mandates and prohibitions." *Id.* at 259.

---

[2] *Amici* support plaintiffs' other arguments regarding defendants' unlawful conduct, but this brief only addresses defendants' violations of statutory mandates, congressional policy directives, and appropriations laws.

Just as importantly, "agencies are creatures of statute" and "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). An agency therefore "'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Cruz,* 596 U.S. 289, 301 (2022) (citations omitted). This rule "recognize[s] Madison's teaching that the greatest security against tyranny—the accumulation of excessive authority in a single Branch—lies not in a hermetic division among the Branches, but in a carefully crafted system of checked and balanced power within each Branch." *Mistretta v. United States*, 488 U.S. 361, 381 (1989).[3] The Constitution's exclusive grant of legislative authority to Congress prohibits federal agencies from ignoring statutory mandates and congressional policy directives.

Further, the Constitution's "Take Care" Clause requires that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. This "constitutional duty" to faithfully execute the law "does not permit the President to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974). Instead, when the President acts, his power "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).

## II.    Federal agencies cannot use 2 C.F.R. § 200.340(a)(4) to avoid statutory mandates and congressional policy directives

The Court should grant plaintiffs' motion for partial summary judgment by ruling that defendants cannot use 2 C.F.R. § 200.340(a)(4) to terminate grants in violation of statutory mandates

---

[3] *See also Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 273 (1991) ("Time and again we have reaffirmed the importance in our constitutional scheme of the separation of governmental powers into the three coordinate branches.") (cleaned up).

and congressional policy directives.[4] Under section 200.340(a)(4), defendants can terminate a grant "pursuant to the terms and conditions of the Federal award, *including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.*" (emphasis added). Nothing in this regulatory provision authorizes federal agencies to terminate grants that are otherwise required by statutory mandates or congressional policy directives.

To the contrary, defendants' section 200.340(a)(4) terminations are unlawful if they conflict with statutory mandates or congressional policy directives. This conclusion is consistent with longstanding Supreme Court precedent, which holds that courts "must reject administrative constructions of [a] statute, whether reached by adjudication or by rule-making, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Fed. Election Comm'n v. Dem. Sen. Campaign Comm.*, 454 U.S. 27, 32, (1981) (citing *SEC v. Sloan*, 436 U.S. 103, 118 (1978); *FMC v. Seatrain Lines, Inc.,* 411 U.S. 726, 745–746 (1973); *Volkswagenwerk v. FMC*, 390 U.S. 261, 272 (1968); *NLRB v. Brown*, 380 U.S. 278, 291 (1965)). In other words, "[r]eviewing courts are not obliged to stand aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB*, 380 U.S. at 291; *see In re Aiken Cnty.,* 725 F.3d at 259 (ruling agencies cannot "decline to follow a statutory mandate or prohibition simply because of policy objections."). This Court should therefore rule that defendants cannot use section 200.340(a)(4) in violation of statutory mandates and congressional policy directives.

---

[4] For simplicity, this brief uses "grants" as a catch-all term that encompasses grants, cooperative agreements, and the other types of federal financial assistance agreements at issue in this case.

### III.    The Constitution gives Congress the exclusive authority to appropriate funds

The Constitution's Appropriations Clause gives Congress the exclusive authority to appropriate funds for use by the Executive Branch: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. "Textually, the command is unmistakable—'no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'" *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425, (2024) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). The Appropriations Clause therefore gives Congress "exclusive power over the federal purse." *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (citation omitted); *see Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) ("Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute.").

Congress's "power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." THE FEDERALIST NO. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961). Put differently, "the Appropriations Clause is [] a bulwark of the Constitution's separation of powers among the three branches of the National Government." *FLRA*, 665 F.3d at 1347. And as then-Judge Kavanaugh concluded in the *FLRA* case, the Appropriations Clause "is particularly important as a restraint on Executive Branch officers: If not for the Appropriations Clause, 'the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure.'" *Id.* (quoting 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1342, at 213–14 (1833)). When "the

decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring).

To protect its power over the purse, Congress has enacted several "statutes [that] reinforce Congress's control over appropriated funds." *FLRA*, 665 F.3d at 1347. For example, the Purpose Statute "provides that appropriated funds may be applied only 'to the objects for which the appropriations were made.'" *Id.* (quoting 31 U.S.C. § 1301(a)). Similarly, the Anti-Deficiency Act "makes it unlawful for government officials to 'make or authorize an expenditure or obligation exceeding an amount available in an appropriation' or to involve the Federal Government 'in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.'" *Id.* (quoting 31 U.S.C. § 1341(a)(1)(A)-(B)). And the Impoundment Control Act of 1974 (2 U.S.C. §§ 682-688) prohibits the President from refusing to spend appropriated funds.

## IV. Federal agencies cannot use 2 C.F.R. § 200.340(a)(4) to withhold appropriated funds

The Court should grant plaintiffs' motion for partial summary judgment by ruling that defendants cannot use 2 C.F.R. § 200.340(a)(4) to avoid spending appropriated funds. It is axiomatic that the President cannot withhold appropriated funds based on priorities and policies that conflict with appropriations laws. *See, e.g., Hart's Case*, 16 Ct. Cl. 459, 484 (1880), *aff'd*, 118 U.S. 62 (1886) ("The absolute control of the moneys of the United States is in Congress, and Congress is responsible for its exercise of this great power only to the people."). Congress has codified this bedrock principle of constitutional law in at least two statutes. First, 31 U.S.C. § 1512 prohibits the President and other federal officials from refusing to spend appropriated funds *unless* Congress has approved the rescission of those funds. Second, the Impoundment Control Act provides that

the President can only impound—i.e., refuse to spend—appropriated funds *if* Congress agrees to

rescind those funds within 45-days of a rescission request:

> Any amount of budget authority proposed to be rescinded or that is to be
> reserved as set forth in such special message shall be made available for ob-
> ligation unless, within the prescribed 45-day period, the Congress has com-
> pleted action on a rescission bill rescinding all or part of the amount proposed
> to be rescinded or that is to be reserved. Funds made available for obligation
> under this procedure may not be proposed for rescission again.

2 U.S.C. § 683(b). Absent such a congressionally approved rescission, "the President and federal

agencies may not ignore statutory mandates or prohibitions merely because of policy disagree-

ment[s] with Congress." *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (citing *Lincoln v.

Vigil*, 508 U.S. 182, 193 (1993)). Put simply, "*even the President* does not have unilateral authority

to refuse to spend [appropriated] funds." *Id.* at n.1 (emphasis added).[5] The Court should therefore

rule that defendants cannot use section 200.340(a)(4) to terminate grants if doing so would violate

appropriations laws.

## V.    Defendants' unlawful use of 2 C.F.R. § 200.340(a)(4) is harming the States

If this Court allows federal agencies to use section 200.340(a)(4) to terminate grants in

violation of statutory mandates, congressional policy directives, and appropriations laws, the plain-

tiff States (and all other American citizens) will face a hard truth: the federal government is no

longer a reliable partner. To illustrate the destructive harm caused by the Administration's arbitrary

revocation of federal funds based on undefined and amorphous changes in "program goals and

---

[5] *See also* Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal
Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), *reprinted in Ex-
ecutive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of
Powers of the S. Comm. on the Judiciary*, 92d Cong. 279, 282 (1971) ("With respect to the sug-
gestion that the President has a constitutional power to decline to spend appropriated funds, we
must conclude that existence of such a broad power is supported by neither reason nor precedent.").

agency priorities," the remainder of this brief explains how USDA's unlawful use of section 200.340(a)(4) is harming American farmers, rural communities, and food insecure individuals throughout the Commonwealth of Pennsylvania and the rest of the country.

### A.  USDA's unlawful use of 2 C.F.R. § 200.340(a)(4) is inflicting severe harm on farmers, ranchers, agricultural producers, and food insecure individuals

Unfortunately, USDA has not publicly released its list of programs that purportedly no longer effectuate program goals or agency priorities. Nor, to the knowledge of *Amici*, has USDA provided this list to Congress. The precise scope of USDA's actions is therefore difficult to verify. Nevertheless, limited information provided to Congress indicates that USDA has terminated—or otherwise refused to fund—a number of congressionally mandated programs.

For example, the Regional Conservation Partnership Program (RCPP) is a mandatory Farm Bill Program administered by the Natural Resources Conservation Service. *See* Food Security Act of 1985, § 1271D(a), 16 U.S.C. § 3871d(a). In June 2025, USDA rescinded over $1 billion in RCPP funding for Fiscal Year (FY) 2025.[6] In its rescission letters, USDA encouraged organizations with rescinded FY 2025 awards to reapply for FY 2026 awards *when* USDA opened the FY 2026 application period. But weeks away from FY 2026, USDA has not opened the application period. Given the common knowledge within USDA and the conservation community that RCPP contracts can take more than a year to go from award to fully executed and signed agreement, USDA's conduct indicates that it is refusing to implement the RCPP in violation of statutory mandates, congressional policy directives, and appropriations laws. *See* 16 U.S.C. § 3871d(a).

Obfuscating an already murky decision-making process, USDA rescinded several RCPP awards that were funded with Farm Bill appropriations by conflating those funds with a different

---

[6] Chris Clayton, *USDA Cuts Hit RCPP Grant Projects*, DTN PROGRESSIVE FARMER, JULY 14, 2025, *available at* https://tinyurl.com/mrc4xt8e.

appropriation—the supplemental RCPP funding that Congress provided in the Inflation Reduction Act. USDA's lack of clarity blindsided more than 60 organizations dedicated to conservation stewardship. And hundreds—if not thousands—of farmers and communities set to benefit from the RCPP are now far less likely to participate in future regional conservation projects. The same is true about participants in the Food for Progress and McGovern-Dole International Food for Education and Child Nutrition Programs who have been similarly harmed by USDA's purported "changes in agency priorities" related to those international assistance programs.

Given USDA's lack of transparency, the intended (and unintended) consequences of its unlawful actions are difficult to quantify. This is because Congress has directed USDA to implement so many vital programs for States, local governments, research and educational institutions, farmers, ranchers, other agricultural producers, and food insecure individuals. Nevertheless, the following non-exhaustive summary of those served by USDA programs demonstrates the harm that *Amici's* constituents will suffer if the Court allows USDA (and the other defendants) to use section 200.340(a)(4) to violate statutory mandates, congressional policy directives, and appropriations laws:

- Over 3.4 million American farmers, ranchers, and stewards of 880 million acres of private farmland.[7]

- Approximately 18 million American households experiencing food insecurity, including the nearly 1 in 5 households with children who are food insecure.[8]

---

[7] *See* Nat'l Agric. Statistics Serv., U.S. Dep't of Agric., 2022 Census of Agriculture, Summary and State Data, 3 tbl. 1; 57 tbl. 52 (2024), *available at* https://tinyurl.com/37ecvsh5.

[8] Matthew P. Rabbitt et al., Econ. Res. Serv., U.S. Dep't of Agric., Household Food Security in the United States in 2023, 8-10 (2024), *available at* https://tinyurl.com/f4r4vy9t (*see* 10 fig. 2, stating that 17.9% of households with children experienced food insecurity in 2023).

- Nearly 30 million students in approximately 94,000 elementary and secondary schools nationwide benefiting from the National School Lunch Program and School Breakfast Program.[9]

- Approximately 9.6 million families, individuals, trusts, estates, and family partnerships who control around 110 million hectares of forestland.[10]

- Over 10,000 scientists, experts, and educators at American land-grant universities who leverage millions of dollars in research grants from the National Institutes of Food & Agriculture to keep America at the forefront of food and agriculture-related challenges.

- Millions of Americans who access information and training from land-grant universities through the Cooperative Extension System's offices in or near 3,000 counties.[11]

- Every rural community in need of support from USDA's more than 50 rural development programs for economic development, health care, broadband and telecommunications access, wastewater and water utilities infrastructure support, energy access, affordable housing, and community facilities development.[12]

Notwithstanding the above list, precisely accounting for the full scope of USDA's reach is nearly impossible, as participation in many programs fluctuates based on need—like nutrition assistance—or by choice—like conservation programs with voluntary enrollment. What *Amici* can say with certainty, however, is that USDA's congressionally mandated programs will fail if States and their residents can no longer depend on USDA as a reliable partner to support American

---

[9] KARA CLIFFORD BILLINGS, Cong. Res. Serv., R48515, SCHOOL LUNCH AND BREAKFAST PARTICIPATION: A SNAPSHOT OF RECENT TRENDS (2025), *available at* https://tinyurl.com/5t2xe4ph.

[10] Brett J. Butler et al., *Studies of Family Forest Owners in the USA: A Systematic Review of Literature from 2000 through 2019*, 22 SMALL-SCALE FORESTRY at 1 (2022), *available at* https://tinyurl.com/fz9e8hny.

[11] NAT'L INST. OF FOOD & AGRIC., U.S. DEP'T OF AGRIC., COOPERATIVE EXTENSION PROGRAM, Sep. 19, 2025, *available at* https://tinyurl.com/nyxn9djv.

[12] LISA S. BENSON ET AL., CONG. RES. SERV., RURAL DEFINITIONS USED FOR ELIGIBILITY REQUIREMENTS IN USDA RURAL DEVELOPMENT PROGRAMS (2023), *available at* https://tinyurl.com/33yn-wvnc.; KATIE JONES & MAGGIE MCCARTY, CONG. RES. SERV. R47044, USDA RURAL HOUSING PROGRAMS: AN OVERVIEW (2022), *available at* https://tinyurl.com/27wr3yx7.

agriculture, defeat food insecurity, and help rural communities prosper. *Amici* cannot stress this point enough: USDA's success depends on its partnerships with agricultural producers and rural communities. These partners *will not* participate in USDA programs if federal agencies can disregard statutory mandates, congressional policy directives, and appropriations laws after every presidential election.

### B. USDA's termination of the Local Food Purchase Assistance Cooperative Agreement Program shows the harm caused by USDA's unlawful use of 2 C.F.R. § 200.340(a)(4).

Under its Local Food Purchase Assistance Cooperative Agreement Program (LFPA), USDA provided Pennsylvania and other plaintiff States with funding to purchase and distribute local foods to underserved communities. *See* ECF 64, Am. Compl. ¶¶ 106-118. The general purposes of the LFPA Program were the bipartisan goals of defeating food insecurity and improving the resiliency of America's agricultural supply chains. *Id.* at ¶¶ 108-109. In early 2025, USDA informed Pennsylvania that it would be receiving an additional $13 million in LFPA funds. In March 2025, however, USDA terminated its LFPA agreements with Pennsylvania and other plaintiff States by relying on 2 C.F.R. § 200.340(a)(4) to assert that the LFPA "no longer effectuates agency priorities." *See id.* at ¶ 110. USDA's assertion is astounding: Congress created USDA to, among other things, defeat food insecurity and improve the resiliency of domestic agricultural supply chains.

Moreover, USDA's actions since March 2025 demonstrate that the LFPA Program remains consistent with USDA's priorities. For example, in May 2025, Secretary of Agriculture Rollins declared that "[t]he first policy pillar of the *Make Agriculture Great Again Agenda* focuses on the

prosperity of small family farms, which are the heart of our communities and our nation."[13] And a key part of USDA's plan to support small family farms is to "prioritize local farmers in institutional and public food procurement policies . . . with an emphasis on USDA nutrition programs." *Id.* at 8. Yet two months earlier, USDA terminated the LFPA Program because it purportedly no longer effectuates agency priorities. *See* Am. Compl. ¶ 110.

USDA's termination of the LFPA Program has left farmers like veteran Jason Frye (owner of Pleasant Lane Farms in Latrobe, Pennsylvania) without the reliable income farmers need to sustain multi-year relationships with local food banks.[14] According, to Mr. Frye, the LFPA Program benefited his veteran-owned farm in the following ways:

> Pleasant Lane started working with Westmoreland Food Bank in 2020 as part of the USDA food box program, and since 2021, we've continued our relationship using PASS and LFPA funding for bi-monthly shipments to the food bank. We've started to produce and offer a wider variety of products as the food bank helps balance our production needs with our other customers and helps us ensure we have enough work to employ two full-time cheesemakers and three part-time packaging employees.
>
> This relationship has helped create more predictable demand for our products," Jason continued. "Our work with the food bank has given us flexibility to shift production capacity exclusively to food bank products when demand may be temporarily low and we may have had excess milk. The sales to the food bank on PASS and LFPA have helped us avoid food waste, while allowing us to work with more local suppliers for the packaging and logistics requirements for our organization. *Id.*

The Westmoreland Food Bank in Delmont, Pennsylvania has similarly suffered because of USDA's termination of Pennsylvania's LFPA Program:

> Matty Tippit-Soto, Director of Warehouse Logistics for Westmoreland Food Bank, reflected, "The PASS and LFPA programs have had a huge impact on

---

[13] U.S. DEP'T OF AGRIC., FARMERS FIRST; SMALL FAMILY FARMS POLICY AGENDA 3 (2025), *available at* https://tinyurl.com/yc7nahcw.

[14] *Pleasant Lane Farms*, FEEDING PENNSYLVANIA, Feb. 24, 2025, https://tinyurl.com/5y93b78c.

> our ability to provide our neighbors with locally sourced, nutritious foods. When the opportunity to use these funding streams to partner with Pleasant Lane came about, we knew we couldn't pass it up. It's really a full circle moment to be able to support a local family and veteran owned business, increase the amount of food that the food bank has access to and is able to distribute, and provide our neighbors with quality local dairy products. *Id.*

These LFPA Program benefits—which help achieve USDA's mission of defeating food insecurity and improving agricultural supply chains—are no longer available to Mr. Frye, Pleasant Lane Farms, and the Westmoreland Food Bank.

The unnecessary harm caused by USDA's unlawful termination of the LFPA Program is happening throughout the country. *See, e.g.,* ECF 64, Am. Compl. ¶¶ 111-118, 127-129. For example, in 2024, California distributed more than $23 million in no longer available LFPA funds "to provide local healthy food and 18,647,546 meals to food-insecure Californians."[15] The impacts of these unlawful funding cuts are being unfairly absorbed by the very businesses USDA should be supporting. These businesses include Old Grove Orange—a California farm and food hub that relied on the LFPA Program to supply fresh produce to more than 45 school districts in the Greater Los Angeles basin:

> Old Grove Orange operates as both a family farm and a food hub that coordinates with 28 farming families across San Bernardino and Riverside counties. Together, they supply produce to more than 45 school districts in the Greater Los Angeles Basin. Since 2005, 100% of their produce has been sold directly to K-12 school districts.
>
> [The farmer and operator of Old Grove Orange] explained that this collaborative approach helps overcome barriers that would otherwise prevent small farms from accessing institutional markets.
>
> "The average farm in San Bernardino County makes less than $50,000. So 80% of farms in San Bernardino County make less than $50,000 a year in sales," she said. "And acreage wise, the vast majority are less than five acres."

---

[15] Kathryne McCann, *How federal funding cuts are hitting Redlands farms and families*, COMMUNITY FORWARD REDLANDS, Apr. 8, 2025, *available at* https://tinyurl.com/mr5hndmy.

> For these small producers, the federal programs provided crucial financial stability and market access. The cuts are especially devastating because farming requires long-term planning. *Id.*

Similarly, in the spring of 2025, Iowa lost roughly $11.3 million in federal funding to support local food purchases through USDA's LFPA and Local Food for Schools Programs.[16] Prior to these cuts, Iowa had used these programs to support approximately 300 farms who sent food to 135 Iowa school districts and 951 food distribution locations in 98 of the state's 99 counties.[17] The timing of USDA's terminations left Iowa farmers blindsided at the start of planting season:

> "Our farm has been supplying fresh, local meat through this program since it began," said Ryan Marquardt of Wild Rose Pastures in Van Meter. "We planned our 2025 production based on the promise of these programs continuing. Now, we have product in the pipeline with nowhere to sell it. LFPA allowed us to move remaining inventory efficiently, secure preorders for specialized products, and free up our limited time to focus on growing. With a couple thousand dollars in meat sales each year through LFPA, we've increased our gross farm sales by 50% over the last three years—money that goes right back into our local community.[18]

By increasing the production capacity of Iowa's local producers, these terminated USDA programs allowed organizations like Iowa Food Hub to partner with 140 producers and 40 schools to deliver local foods to families struggling to find enough to eat.[19] Iowa Food Hub had scaled up its infrastructure to meet the expected demand from these programs in the coming year, and its

---

[16] AGRIC. MARKETING SERV., U.S. DEP'T OF AGRIC., LFS, LFPA, AND LFPA PLUS AWARD TABLE (last updated December 9, 2024), *available at* https://tinyurl.com/2p9n332j.

[17] Chris Clayton, Pushback Over Cutting Local Food Grants, DTN PROGRESSIVE FARMER, Mar. 17, 2025, *available at* https://tinyurl.com/56k87yav.

[18] Press Release, Iowa Farmers Union, USDA Cancels Local Food Funding, Creating Uncertainty for Iowa Farmers and Food Hubs, Mar, 10. 2025, *available at* https://tinyurl.com/mpsd93vb.

[19] Cami Koons, *USDA cuts programs bringing local food into schools, food banks*, IOWA CAPITAL DISPATCH, Mar. 11, 2025, *available at* https://tinyurl.com/2kwcuv79.

general manager, Peter Kraus, noted the disconnect between the terminations and USDA's policy priorities:

> "If they're looking for waste, there isn't any here," Kraus said, noting that funding goes to schools and food banks, then right back into the community. "If they're looking for 'America First,' local food is what 'America First' could look like." *Id.*

Jordan Scheibel, the owner of Middle Way Farm in Grinnell, Iowa, further explained how the terminations frustrated USDA's ability to meet its mission:

> In many cases, it's not that Iowa's communities can't produce the food locally, it's that farmers cannot risk scaling up unless they know that what they grow can be sold. LFPA gives certainty to many growers. This funding being unceremoniously cut off hurts farmers, low-income households, and rural vitality with no discernible benefit. It's short-sighted and, in fact, wastes the effort and planning that has gone into the program up to this point. *Id.*

The harms caused by USDA's termination of the LFPA Program extend well beyond Iowa, California and Pennsylvania. For example, in early 2025, USDA promised Minnesota approximately $4.7 million in additional LFPA funds. Following the inauguration, however, USDA reneged on this promise. Like those in Iowa, California and Pennsylvania, Minnesota farmers and food banks are paying a steep price for USDA's unlawful actions.[20]

In sum, USDA's unlawful use of 2 C.F.R. § 200.340(a)(4) is inconsistent with the statutory mandates, congressional policy directives, and appropriations laws that require USDA to defeat food insecurity, support local farms, and increase the resiliency of agricultural supply chains. Making matters worse, USDA's unlawful conduct is harming farmers, food banks, and food insecure individuals across the country.

---

[20] Christopher Ingraham, *USDA cancels $18 million in funding for school meals and food banks in Minnesota*, MINNESOTA REFORMER, Mar. 11. 2025, *available at* https://tinyurl.com/y3uupj7k.

## CONCLUSION

As demonstrated in this brief, USDA and the other federal agency defendants cannot rely on 2 C.F.R. § 200.340(a)(4) to avoid statutory mandates, congressional policy directives, and appropriations laws. The Court should therefore grant plaintiffs' partial motion for summary judgment.

Respectfully submitted,

*/s/ Joshua D. Schnell*
Joshua D. Schnell*
Samuel Van Kopp*
Cordatis LLP
1011 Arlington Boulevard
Suite 375
Arlington, VA 22209
(202) 342-2550
jschnell@cordatislaw.com
svankopp@cordatislaw.com

*/s/ Krista Oehlke*
Krista Oehlke (BBO# 707566)
Perry Law
445 Park Avenue, 7th Floor
New York, NY 10022
Tel: (212) 213-3070
koehlke@danyaperrylaw.com

*Admitted *Pro Hac Vice*

Dated: September 18, 2025            *Counsel for Amici Curiae 13 Members of Congress*

17

## CERTIFICATE OF SERVICE

I certify that on this 18th day of September 2025, a copy of the foregoing *Amici Curiae* Brief was served on the parties' counsel via the Court's ECF filing system.

<u>/s/Joshua D. Schnell</u>
Joshua D. Schnell*
Cordatis LLP
1011 Arlington Boulevard
Suite 375
Arlington, VA 22209
(202) 342-2550
jschnell@cordatislaw.com

*Admitted *Pro Hac Vice*