## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, *et al.*,

       Plaintiffs,

   v.

U.S. OFFICE OF MANAGEMENT AND
BUDGET, *et al.*,

       Defendants.

Civil Action No. 25-11816-IT

---

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT ON COUNT I
## AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

    I.    Defendants' Threshold Objections Lack Merit. ................................................ 4

        A.    Plaintiffs Have Article III Standing. ........................................................ 6

        B.    Plaintiffs' Claims Are Ripe For Judicial Review. ................................... 10

        C.    Plaintiffs Challenge Final Agency Action Under The APA. .................... 12

            1.    Counts I And III Challenge Final Agency Action ........................... 13

            2.    Count II Challenges Final Agency ................................................. 14

        D.    Declaratory Relief Is Appropriate On Count I. ....................................... 17

    II.    Summary Judgment Should Be Granted On Count I. ...................................... 20

        A.    The Clause Cannot Be Used To Terminate Grants Based On New "Agency Priorities" Identified After The Time Of Award. ................................... 21

        B.    The Clause Cannot Be Used To Terminate Grant Awards Where It Is Not Clearly And Unambiguously Specified In The Award Terms And Conditions. .................. 29

    III.  Plaintiffs Did Not Waive Or Forfeit Their Claim In Count III. ...................... 31

CONCLUSION ................................................................................................................... 35

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.B.A. v. Dep't of Justice,*
   783 F. Supp. 3d 236 (D.D.C. 2025) ......................................................................27

*Abbott Laboratories v. Gardner,*
   387 U.S. 136 (1967)................................................................ 5, 10, 13, 17-18

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
   429 F.3d 1136 (D.C. Cir. 2005)......................................................................... 31

*Am. Bus Ass'n v. Slater,*
   231 F.3d 1 (D.C. Cir. 2000)...............................................................................22

*Am. Forest & Paper Ass'n v. EPA,*
   137 F.3d 291 (5th Cir. 1998) ................................................... 31, 34, 35

*Am. Fuel & Petrochemical Mfrs. v. EPA,*
   937 F.3d 559 (D.C. Cir. 2019)........................................................................ 34

*Arevalo v. Ashcroft,*
   344 F.3d 1 (1st Cir. 2003) ................................................................................23

*Ass'n of Am. Univs. v. Nat'l Sci. Found.,*
   ----F. Supp. 3d----, 2025 WL 1725857 (D. Mass. June 20, 2025) ............................................5

*Barrick Goldstrike Mines Inc. v. Browner,*
   215 F.3d 45 (D.C. Cir. 2000)............................................................................ 16

*Beecham v. United States,*
   511 U.S. 368 (1994) .........................................................................................24

*Bennett v. Spear,*
   520 U.S. 154 (1997)............................................................... 12, 13, 16

*Biden v. Texas,*
   597 U.S. 785 (2022).......................................................................................... 15

*Carr v. Saul,*
   593 U.S. 83 (2021)............................................................................................ 33

*Chamber of Com. of U.S. v. FEC,*
    69 F.3d 600 (D.C. Cir. 1995)..................................................................6, 11, 12

*Citizens Coal Council v. EPA,*
    447 F.3d 879 (6th Cir. 2006) ...........................................................................33

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...........................................................................................6, 9

*Comm. on the Judiciary, U.S. House of Representatives v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008) ..................................................................19

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024).............................................................................6, 20, 33

*Faith Int'l Adoptions v. Pompeo,*
    345 F. Supp. 3d 1314 (W.D. Wash. 2018) ..................................................16

*Faucher v. Fed. Election Comm'n,*
    743 F. Supp. 64 (D. Me. 1990) .......................................................................14

*Fed. Land Bank of Springfield v. Farm Credit Admin.,*
    676 F. Supp. 1239 (D. Mass. 1987) ..............................................................14

*First Nat. Bank of Chi. v. Comptroller of Currency of U.S.,*
    956 F.2d 1360 (7th Cir. 1992) .........................................................................16

*Fort Sumter Tours, Inc. v. Andrus,*
    564 F.2d 1119 (4th Cir. 1977) .........................................................................16

*Frese v. MacDonald,*
    425 F. Supp. 3d 64 (D.N.H. 2019)...................................................................9

*Freytag v. Comm'r,*
    501 U.S. 868 (1991) ..........................................................................................22

*Frozen Food Express v. United States,*
    351 U.S. 40 (1956) ...............................................................................................5

*Gardner v. Toilet Goods Ass'n,*
    387 U.S. 167 (1967).............................................................................................6

*Gulluni v. Levy,*
    85 F.4th 76 (1st Cir. 2023) ...............................................................................34

*Greenwich Terminals LLC v. United States Army Corp of Eng'rs*,
   Civ. No. 23-4283, 2024 WL 4595590 (E.D. Pa. Oct. 28, 2024) ............................................. 34

*Hisp. Affs. Project v. Acosta*,
   901 F.3d 378 (D.C. Cir. 2018) ............................................................................................... 14

*Indep. Bankers Ass'n of Am. v. Smith*,
   534 F.2d 921 (D.C. Cir. 1976) ............................................................................................... 18

*Kentucky v. Yellen*,
   67 F.4th 322 (6th Cir. 2023) .................................................................................................. 28

*Lab. Rels. Div. of Constr. Indus. of Mass.,*
   *Inc. v. Healey*, 844 F.3d 318 (1st Cir. 2016) ....................................................................... 10

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ............................................................................................................... 34

*Louisiana v. U.S. Env't Prot. Agency*,
   712 F. Supp. 3d 820 (W.D. La. 2024) .................................................................................... 14

*Massachusetts Fair Hous. Ctr. v. United States Dep't of Hous. & Urban Dev.*,
   496 F.Supp.3d 600 (D. Mass. 2020) ...................................................................................... 11

*Massachusetts v. Hayes*,
   691 F.2d 57 (1st Cir. 1982) .................................................................................................... 34

*Massachusetts v. United States Dep't of Health & Hum. Servs.*,
   923 F.3d 209 (1st Cir. 2019) .................................................................................................... 7

*Mass. Delivery Ass'n v. Coakley*,
   769 F.3d 11 (1st Cir. 2014) .................................................................................................... 17

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
   514 U.S. 52 (1995) ................................................................................................................. 23

*McInnis-Misenor v. Maine Med. Ctr.*,
   319 F.3d 63 (1st Cir. 2003) .................................................................................................... 10

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ............................................................................................................... 11

*Metro. Transp. Auth. v. Duffy*,
   784 F. Supp. 3d 624 (S.D.N.Y. 2025) ............................................................................... 28, 29

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........................................................................ 6, 7

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
763 F. Supp. 3d 36 (D.D.C. 2025) ................................................ 15

*Nat'l Park Hosp Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ............................................................. 9, 10, 12

*Nat. Res. Def. Council v. EPA*,
755 F.3d 1010 (D.C. Cir. 2014) .................................................... 34

*New Hampshire Lottery Comm'n v. Rosen*,
986 F.3d 38 (1st Cir. 2021) ................................. 6, 9, 12, 19-20

*New York v. Trump*,
133 F.4th 51 (1st Cir. 2025) .................................................... 13, 15

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ...................................................................... 23

*O'Connell v. Shalala*,
79 F.3d 170 (1st Cir. 1996) .......................................................... 21

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .............................................................. 12, 26, 20

*Penobscot Nation v. Frey*,
3 F.4th 484 (1st Cir. 2021) .......................................................... 21

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ........................................................................ 34

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ............................................................. 7

*Rhode Island v. Narrangansett Indian Tribe*,
19 F.3d 685 (1st Cir. 1994) ................................................ 9, 10, 11, 12

*Ryan, LLC v. Fed. Trade Comm'n*,
746 F. Supp. 3d 369 (N.D. Tex. 2024) .......................................... 6

*Ryder v. Union Pac. R. R. Co.*,
945 F.3d 194 (5th Cir. 2019) ................................................... 22, 29

*Sackett v. E.P.A.*,
  566 U.S. 120 (2012) ........................................................................... 5

*Sandoz Inc. v. Becerra*,
  57 F.4th 272 (D.C. Cir. 2023) ........................................................ 34

*Schoenthal v. Raoul*,
  150 F.4th 889, 901 (7th Cir. 2025) ............................................... 19

*Soni v. Bos. Med. Ctr. Corp.*,
  683 F. Supp. 2d 74 (D. Mass. 2009) ............................................. 27

*State v. Dawson*,
  119 P. 360 (Kan. 1911) ............................................................... 4, 5

*Stern v. U.S. Dist. Ct. for Dist. of Mass.*,
  214 F.3d 4 (1st Cir. 2000) ........................................................ 11, 12

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ........................................................................ 7

*Texas v. Cardona*,
  743 F. Supp. 3d 824 (N.D. Tex. 2024) ........................................ 5, 16

*Texas v. Equal Emp. Opportunity Comm'n*,
  933 F.3d 433 (5th Cir. 2019) ........................................................ 15

*Thakur v. Trump*,
  787 F. Supp. 3d 955 (N.D. Cal. 2025) .......................................... 27

*United States v. L. A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952) ......................................................................... 33

*United States v. Storer Broad. Co.*,
  351 U.S. 192 (1956) ......................................................................... 5

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016) ....................................................................... 13

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ....................................................................... 27

*Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Loc. No. 2322*,
  651 F.3d 176 (1st Cir. 2011) .................................................... 11, 12

*Vt. Pub. Int. Rsch. Grp. v. U.S. Fish & Wildlife Serv.*,
   247 F. Supp. 2d 495 (D. Vt. 2002) .................................................................. 32

*Washington v. Fed. Emergency Mgmt. Agency*,
   Civ. No. 25-12006, 2025 WL 2229394 (D. Mass. Aug. 5, 2025) ........................... 16

*Weichel v. Town of Braintree*,
   Civ. No. 20-11456, 2022 WL 17852109 (D. Mass. Dec. 22, 2022) ........................ 11

**Statutes**

5 U.S.C. § 306(b) ........................................................................................ 26

5 U.S.C. § 702 ............................................................................................ 32

5 U.S.C. § 703 ............................................................................................ 19

5 U.S.C. § 704 ............................................................................................ 12

28 U.S.C. § 2201(a) ..................................................................................... 17

31 U.S.C. § 1120(a)(3) ................................................................................. 26

Kan. Stat. Ann. § 75-108 .............................................................................. 4

**Regulations**

2 C.F.R. § 200.211(c)(1) .............................................................................. 30

2 C.F.R. § 200.340(a)(2) (2021) ................................................................. 1, 21

2 C.F.R. § 200.340(a)(3) ............................................................................ 1, 21

2 C.F.R. § 200.340(a)(4) (2024) ............................................................ 1, 21, 28

2 C.F.R. § 200.340(b) ............................................................................. 29, 30

**Constitutional Provisions**

Kan. Const. art. I, § 3 ................................................................................. 4, 5

**Other Authorities**

Breyer, Stephen & Stewart, Richard, *Administrative Law and Regulatory Policy*
   (2d ed. 1985) ............................................................................................... 6

Doernberg, Donald L., *The Trojan Horse: How the Declaratory Judgment Act Created A
   Cause of Action and Expanded Federal Jurisdiction While the Supreme Court Wasn't*

*Looking*, 36 UCLA L. Rev. 529, 583 (1989)..........................................................................19

Exec. Order No. 14,332 § 6(b), 90 Fed. Reg. 38,929, 38,933 (Aug. 7, 2025) ..............................8

Federal Emergency Management Agency, *The Department of Homeland Security (DHS)
NSGP Notice of Funding Opportunity (NOFO) Fiscal Year 2025 Nonprofit Security Grant
Program*, https://tinyurl.com/2sm4ew3z..................................................................................15

Funk, William, *Exhaustion of Administrative Remedies - New Dimensions Since Darby*,
18 Pace Env't. L. Rev. 1 (2000)................................................................................................32

H.R. Rep. No. 79-1980 (1946) ..................................................................................................4, 5

S. Rep. No. 79-752 (1945)............................................................................................................4

Scalia, A. & Garner, B., *Reading Law: The Interpretation of Legal Texts* 63 (2012)..................26

Sohoni, Mila, *The Past and Future of Universal Vacatur*, 133 Yale L.J. 2304 (2024) .............4-5

*The Mission and Structure of the Office of Management and Budget*, The White House:
President Barack Obama, https://obamawhitehouse.archives.gov/omb/organization_mis-
sion/ (last visited Oct. 16, 2025) ..............................................................................................28

# INTRODUCTION

The federal government asserts that a single subclause in a federal regulation grants federal agencies virtually unfettered authority to terminate grants on a whim. Indeed, the uncontroverted factual record demonstrates that Agency Defendants have invoked this Clause time and again to terminate billions of dollars in grants previously awarded to Plaintiffs[1]—23 States and the District of Columbia—that Plaintiffs rely on to combat violent crime, protect public safety, support natural disaster relief, ensure clean drinking water, and more. Agency Defendants have repeatedly invoked the Clause to terminate grants on the unsupportable ground that the grants purportedly do not advance new agency priorities identified after the time of the award. 2 C.F.R. § 200.340(a)(4) (2024); 2 C.F.R. § 200.340(a)(2) (2021). They have done so at the direction of the President, who has issued Executive Orders—including one after Plaintiffs filed their complaint—ordering federal agencies to terminate grants based on new priorities. Consistent with the President's directives, Clause-based terminations have continued even since this lawsuit was filed. And Plaintiffs have more than a thousand current grants—worth billions of dollars—that were previously awarded by Agency Defendants and are at risk of future Clause-based termination. As explained in their opening brief, Plaintiffs are therefore entitled to summary judgment on Count I: a declaratory judgment that clarifies the limits imposed by the Clause, including that the Clause cannot be used to terminate grants based on new agency priorities identified after the time of the award.

Defendants, for their part, do not dispute any of the 55 declarations or other evidence offered in support of Plaintiffs' motion for summary judgment on Count I, and they do not dispute that their interpretation would permit the federal government to terminate grants at will as long as they come up with purportedly new agency priorities. Instead, their brief raises numerous threshold

---

[1] All capitalized terms have the same meaning as in Plaintiffs' Motion. *See* Pls.' Br., Doc. No. 67.

objections to Plaintiffs' claims. But none of these arguments have any merit.

Notwithstanding Defendants' futile attempts to raise procedural roadblocks to judicial review, this case presents a textbook Administrative Procedure Act (APA) challenge ripe for adjudication. In Count I, Plaintiffs request a pre-enforcement declaratory judgment under the APA and the Declaratory Judgment Act. In light of Plaintiffs' grants that have already been subject to Clause-based terminations, the President's directive ordering federal agencies to continue these terminations, and the billions of dollars of *current* grants at risk of termination based on Defendants' invocation of the Clause, Plaintiffs plainly have Article III standing to seek pre-enforcement relief. The APA contemplates that parties can seek such relief in the form of a declaratory judgment regarding the Clause, which even Defendants concede is final agency action under the APA. And a declaratory judgment is appropriate here because it would resolve a concrete legal dispute about the meaning of a clause that has been used, and will likely be used in the future, to inflict billions in fiscal injuries on Plaintiffs and destabilize the budgets of nearly half the country's States.

Defendants' arguments on the merits of Count I fare no better. Defendants now concede that they "cannot terminate grants that are required by federal statutes" and may not "terminate grants in a manner that violates government regulations." Defs.' Br., Doc. No. 89 at 26. So the only remaining dispute is whether Defendants can use the Clause to terminate existing grants based on new agency priorities identified after the time of the federal award. The text, structure, and history of the Clause make plain that the answer is no. Defendants are relying on a single subclause buried in federal regulations to strip Plaintiffs of billions of dollars currently in use. But agencies are not presumed to hide elephants in mouseholes—and that is certainly true here, where Defendants suddenly purported to discover an unfettered grant of authority years after the Clause

was promulgated. Under these circumstances, Plaintiffs are entitled to a declaratory judgment making clear that the Clause cannot be used to terminate existing grants based on new agency priorities identified after the time of the federal award.

Finally, this Court should deny Defendants' motion to dismiss Counts II and III. On these claims, too, Defendants raise various threshold objections that falter out of the gate. Plaintiffs have plausibly alleged final agency action in Count II, which seeks vacatur of Defendants' decision "that the Clause and Agency Defendants' parallel regulations afford them independent authority to terminate grants based on new 'agency priorities' identified after the grants have been awarded." Am. Compl., Doc. No. 64 at 77 (¶¶ 298-99). And Plaintiffs have not waived or forfeited their objections in Count III, which alleges in the alternative that the Clause is arbitrary and capricious.

At bottom, Defendants assert that Plaintiffs' case is somehow "extraordinarily unusual," because it involves a large coalition of sovereign Plaintiffs and "twenty-six Defendants." Doc. No. 89 at 9. But if anything is "extraordinarily unusual" about this case, it is Agency Defendants' unprecedented invocation of the Clause—five years after it was first promulgated—to terminate billions of dollars of Plaintiffs' federal funding and to threaten billions more. While Defendants may change their priorities (consistent with applicable law) and take new priorities into account when awarding *new* grants, their invocation of those new priorities to terminate *existing* grants is unlawful. And Defendants' actions, unlawful as they are, plainly warrant this Court's review. Accordingly, this Court should grant Plaintiffs' motion for summary judgment on Count I and deny Defendants' motion to dismiss.

## **ARGUMENT**

Defendants devote most of their briefing to a series of threshold objections to Plaintiffs' claims. But each of these objections falls well short of the mark. Plaintiffs have Article III standing;

their claims are ripe; their claims seek relief with respect to final agency actions under the APA; and a declaratory judgment is warranted under Count I. Once those arguments fall away, the merits are straightforward. Plaintiffs are entitled to summary judgment on Count I because the Clause does not permit Agency Defendants to invoke the Clause to terminate existing grants based on new agency priorities identified after the time of the federal award. And with respect to Defendants' motion to dismiss, Defendants' lone remaining objection—that Plaintiffs somehow waived or forfeited their arbitrary-and-capricious claim in Count III—likewise lacks merit.

## I.    Defendants' Threshold Objections Lack Merit.

This case is straightforwardly justiciable. Plaintiffs[2] have brought claims under the APA and the Declaratory Judgment Act challenging Agency Defendants' use of their regulations to terminate grants going forward. That is a textbook pre-enforcement APA challenge—a challenge brought *before* Agency Defendants unlawfully invoke the Clause to terminate Plaintiffs' active grants—about the meaning of agency regulations. Despite Defendants' arguments, there is nothing "extraordinarily unusual" about that. *Contra* Doc. No. 89 at 9. Congress itself envisioned relief in such situations when it enacted the APA: the "[d]eclaratory judgment procedure" may operate "before statutory forms of review are available and may be utilized to determine the validity or application of any agency action." H.R. Rep. No. 79-1980 at 276 (1946); *accord* S. Rep. No. 79-752 at 212-13 (1945); *see* Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L.J.

---

[2] While offering no argument of their own, Defendants cite an amicus brief challenging the authority of one of the Plaintiffs, the Kansas Governor, to join this suit. Doc. No. 89 at 19 n.2. That issue need not detain this Court long. Constitutional, statutory, and historical authority empowers the Governor to bring suit and employ counsel to protect the State of Kansas' interests. *See* Kan. Const. art. I, § 3; Kan. Stat. Ann. § 75-108. The Kansas Constitution vests "[t]he supreme executive power" in the Governor, "who shall be responsible for the enforcement of the laws of" Kansas, Kan. Const. art. I, § 3; and allocates the Governor "such power as will secure efficient execution of the laws." *State v. Dawson*, 119 P. 360, 363 (Kan. 1911). The Kansas Governor is therefore a proper plaintiff here.

2304, 2352 (2024) (explaining that the APA's legislative history "shows that Congress expressly relied on DOJ's earlier assurances that the DJA was an existing mechanism for persons with Article III standing to obtain a judgment as to the validity of administrative rules"). In such a declaratory proceeding, "the court must determine the validity or application of a rule or order" and "render a judicial declaration of rights" that "bind[s] an agency." H.R. Rep. No. 79-1980 at 276.

Unsurprisingly, then, courts routinely review pre-enforcement challenges seeking declaratory judgments as to agency action. That was true in *Abbott Laboratories v. Gardner*, where the Supreme Court emphasized that if "the legal issue presented is fit for judicial resolution" and a regulation has a "sufficiently direct and immediate" impact, then "access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act *must be permitted*, absent a statutory bar or some other unusual circumstance." 387 U.S. 136, 152-53 (1967) (emphasis added). And that has been true in many other cases before and since.[3] It is well settled that "preenforcement

---

[3] *See, e.g., Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) (pre-enforcement declaratory review available under the APA to challenge agency compliance order); *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967) (allowing pre-enforcement challenge to regulations under the APA and Declaratory Judgment Act because it was "not a situation in which consideration of the underlying legal issues would … be facilitated if they were raised in the context of a specific attempt to enforce the regulations"); *United States v. Storer Broad. Co.*, 351 U.S. 192, 199 (1956) (allowing pre-enforcement challenge to regulations that "operate[d] to control the business affairs" of the plaintiff); *Frozen Food Express v. United States*, 351 U.S. 40, 43-44 (1956) (permitting pre-enforcement review where agency action had "immediate and practical impact"); *Chamber of Com. of U.S. v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995) ("[A]n agency rule, unlike a statute, is typically reviewable without waiting for enforcement."); *Ass'n of Am. Univs. v. Nat'l Sci. Found.*, ----F. Supp. 3d----, 2025 WL 1725857, at *7, 24 (D. Mass. June 20, 2025) (Talwani, J.) (granting pre-enforcement declaratory judgment under the APA challenging policy notice that would only apply "to future grants that NSF ha[d] not yet awarded" because "a declaratory judgment declares the rights and obligations of the parties and has 'the force and effect of a final judgment or decree'"); *Texas v. Cardona*, 743 F. Supp. 3d 824, 894 (N.D. Tex. 2024) (granting Texas pre-enforcement "declaratory relief" because it "successfully established that the Guidance Documents violate[d] the APA" and declaratory relief would "delineat[e] the rights and legal relations among" the parties); *Ryan, LLC v. Fed. Trade Comm'n*, 746 F. Supp. 3d 369, 382 (N.D. Tex. 2024) (granting pre-enforcement summary judgment on "claims under the APA and Declaratory Judgment Act").

review of agency rules" is "the norm, not the exception." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 840 (2024) (Kavanaugh, J., concurring) (quoting Stephen Breyer & Richard Stewart, *Administrative Law and Regulatory Policy* 1137 (2d ed. 1985)).

Just as in those prior cases, jurisdiction is proper here. Plaintiffs have brought a pre-enforcement APA challenge about the meaning of agency regulations that have been used, and will likely be used in the future, to inflict a quintessential Article III injury on Plaintiffs: the loss of monetary awards that Plaintiffs rely on. The President has issued Executive Orders directing Agency Defendants to terminate grants based on a change in priorities; in implementing that directive, Agency Defendants have already invoked the Clause as their purported basis for terminating hundreds of grants to Plaintiffs; and Plaintiffs have current (and will have future) grants with those *same* Agency Defendants, who have continued Clause-based terminations even after this lawsuit was filed. In these circumstances, Plaintiffs are plainly entitled to forward-looking relief, and all of the threshold arguments Defendants raise therefore lack merit.[4]

### A.    Plaintiffs Have Article III Standing.

Plaintiffs have Article III standing to seek forward-looking relief because they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)); *see* Doc. No. 67 at 20-22. The parties agree that Agency Defendants inflict an Article III injury on Plaintiffs

---

[4] For the reasons explained above and below, all of Plaintiffs' claims are justiciable. But Plaintiffs only seek summary judgment on Count I, which asks for a declaratory judgment settling the meaning of the Clause. Counts II and III are pled only in the alternative. So the Court need not determine the justiciability of Counts II and III if it issues a declaratory judgment on Count I. *See N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 62 (1st Cir. 2021) (finding it "unnecessary" to "hold unlawful and set aside an agency action" because "the remedy provided by the Declaratory Judgment Act [wa]s adequate under the circumstances" (citation modified)).

when their grants are terminated. Doc. No. 67 at 20; Doc. No. 89 at 18; *cf. Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209, 227 (1st Cir. 2019) (holding imminent fiscal injury to the Commonwealth was a concrete and particularized injury). And while Defendants spill much ink arguing that there is no causation or redressability for *past* grant terminations, Plaintiffs are not seeking relief for any of those. *Compare* Doc. No. 67 at 20-22, *with* Doc. No. 89 at 18-20. Instead, Plaintiffs have been clear from the beginning that they seek *forward*-looking relief to clarify their rights under the Clause for current and future grants that are subject to Agency Defendants' invocation of the Clause. *See* Doc No. 67 at 20-22; Doc. No. 64 at 73 (¶ 285) ("Declaratory relief is warranted in light of the strong interest Plaintiffs have in obtaining clarity regarding their rights and obligations under current and future grants."). On that front, Defendants do not (and could not) contest that Plaintiffs' harm from future grant terminations is traceable to Defendants and would be redressed by a favorable ruling. *See* Doc. No. 89 at 21-23. Nor do they dispute Plaintiffs' 55 declarations and detailed evidence showing that they face an imminent injury from Agency Defendants' future invocation of the Clause. *See id.* Defendants argue only that, as a legal matter, future terminations are too speculative. *See id.* They are wrong.

The evidence is overwhelming and undisputed that Plaintiffs face a "substantial risk" of economic injury from Defendants' invocation of the Clause. *See Murthy*, 603 U.S. at 58; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 50 (1st Cir. 2024) ("An 'injury is imminent if it is certainly impending *or* if there is a substantial risk that harm will occur.'" (citation omitted)). Agency Defendants have already used the Clause (and newly discovered agency priorities) to terminate hundreds of grants awarded to Plaintiffs that are collectively worth billions of dollars. *See* Doc. No. 67 at 20; Doc. No. 89 at 18 (agreeing that those terminations are Article III injuries). And those terminations are exceedingly

likely to continue.

Indeed, the President has directed Agency Defendants to "review all existing covered con-tracts and grants and, where appropriate and consistent with applicable law, terminate or modify" such "contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [this] Administration." Exec. Order No. 14,222 § 3(b), 90 Fed. Reg. 11,095, 11,096 (Feb. 26, 2025); *see also* Doc. No. 64 at 22 (¶¶ 91-94). And since the filing of this case, the President has doubled down: in August 2025, he issued another Executive Order requiring agencies to, among other things, ensure that "the terms and conditions of existing discretionary grants [] permit immediate termination for convenience, or clarify that such termi-nation is permitted, including if the award no longer advances agency priorities or the national interest." Exec. Order No. 14,332 § 6(b), 90 Fed. Reg. 38,929, 38,933 (Aug. 7, 2025).

While Defendants focus on "possible future termination[s] of possible future grants that Plaintiffs might possibly be awarded in the future" to argue that future terminations are too spec-ulative, Doc. No. 89 at 20-22, they conspicuously fail to mention that Plaintiffs have at least 1,180 *currently active* grants (totaling more than $5,391,125,688) with the Agency Defendants,[5] all of

---

[5] *See* de la Rubia Decl (AZ), Doc. No. 66-1 at 3; Thomas Decl. (CA), Doc. No. 66-3 at 3-4; Wom-ack Decl. (CA), Doc. No. 66-4 at 4; Greenberg Decl. (CO), Doc. No. 66-6 at 3-4; Scheminske Decl. (CO), Doc. No. 66-7 at 3; Dykes Decl. (CT), Doc. No. 66-8 at 4-12; Stevens Decl. (DC), Doc. No. 66-10 at 3; Walton Decl. (HI), Doc. No. 66-13 at 3-4; Berger Decl. (IL), Doc. No. 66-14 at 3-4; Cox Decl. (IL), Doc. No. 66-15 at 3; Poeschel Decl. (IL), Doc. No. 66-16 at 3; Richards Decl. (IL), Doc. No. 66-18 at 3-4; Sanders Decl. (IL), Doc. No. 66-19 at 3-6; Stevens Decl. (IL), Doc. No. 66-20 at 3; Vollmar Decl. (IL), Doc. No. 66-21 at 3; Biggs Decl. (KS), Doc. No. 66-23 at 3; Penrod Decl. (KS), Doc. No. 66-24 at 3-4; Link Decl. (KY), Doc. No. 66-25 at 4; Fortman Decl. (ME), Doc. No. 66-26 at 3; Barton Decl. (MA), Doc. 66-27 at 4-5; Gorzkowicz Decl. (MA), Doc. No. 66-28 at 4-5; Mackinnon Decl. (MA), Doc. No. 66-29 at 5; Flood Decl. (MI), Doc. No. 66-30 at 3-4; Kremer Decl. (MN), Doc. No. 66-31 at 3; Asaro-Angelo (NJ), Doc. No. 66-34 at 3; Berkowitz Decl. (NJ), Doc. No. 66-35 at 3-4; Kreipke Decl. (NJ), Doc. No. 66-38 at 3-7; Brooks Decl. (NY), Doc. No. 66-42 at 3; Melvin Decl. (NY), Doc. No. 66-44 at 3-4; Casler Decl. (OR), Doc. No. 66-45 at 3-4; Monson Decl. (PA), Doc. No. 66-46 at 4-5; Daniels Decl. (RI), Doc. No.

whom have incorporated the Clause into their regulations. Those are not grants that "Plaintiffs might possibly be awarded in the future"; they are *existing* grants that are at risk of termination right now. Far from being speculative, Agency Defendants have continued using the Clause to terminate these grants even after this case was filed. *See, e.g.*, Carlisle Decl. (MA) (Ex. 56), Doc. No. 97-1 at 3; Second Grejner-Brzezinska Decl. (WI) (Ex. 57), Doc. No. 97-2 at 2-3; Walsh Decl. (IL), Doc. No. 66-22 at 4; Flood Decl. (MI), Doc. No. 66-30 at 3; Pace Decl. (HI), Doc. No. 66-12 at 3; Campagna Decl. (RI), Doc. No. 66-47 at 3-4; Logan-Greene Decl. (NY), Doc. No. 66-43 at 3. Put simply, (1) Defendants have already terminated billions of dollars in grants to Plaintiffs under the Clause; (2) billions of dollars in Plaintiffs' active grants with Agency Defendants remain vulnerable to termination under the Clause; and (3) the President has repeatedly announced the federal government's intention to continue terminating grants under the Clause.[6] *See, e.g.*, *N.H. Lottery Comm'n*, 986 F.3d at 50 ("[H]istory of past enforcement against the same conduct supports a finding of injury in fact for pre-enforcement standing."); *Frese v. MacDonald*, 425 F. Supp. 3d 64, 76-77 (D.N.H. 2019) (same). In these circumstances, any suggestion that Plaintiffs will *not* experience more Clause-based grant terminations by Agency Defendants blinks reality. So Plaintiffs undoubtedly have Article III standing to seek forward-looking relief.

---

66-48 at 10-11; Dimitruk Decl. (VT), Doc. No. 66-50 at 3; Grejner-Brzezinska Decl. (WI), Doc. No. 66-51 at 6-7; McGillivray Decl. (WI), Doc. No. 66-52 at 5; Patchak Decl. (WI), Doc. No. 66-54 at 3.

[6] Defendants cite to *Clapper v. Amnesty International USA*, to argue that the Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." Doc. No. 89 at 22 (quoting 568 U.S. at 413-14). But the plaintiffs in *Clapper* had "no actual knowledge of the Government's … practices," presented only "guesswork" about what the government might do under the statute, and relied on "a highly attenuated chain of possibilities" to argue standing. 568 U.S. at 410-13. In stark contrast, Plaintiffs here have established that Agency Defendants previously used the Clause (on hundreds of occasions) to terminate Plaintiffs' grants, have continued to do so since the filing of this case, and are exceedingly likely to do so again. *See supra* at 7-9.

**B.      Plaintiffs' Claims Are Ripe For Judicial Review.**

For similar reasons, there is no ripeness problem here. Ripeness turns on a "dual inquiry: evaluation of 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (quoting *Abbott Lab'ys*, 387 U.S. at 149). To be sure, "[a]pplying this test in the declaratory judgment context often requires custom tailoring" because it "contemplate[s] an ex ante determination of rights." *Rhode Island v. Narrangansett Indian Tribe*, 19 F.3d 685, 692 (1st Cir. 1994) (citation omitted). But in a case seeking relief with respect to agency regulations, a case is "ordinarily considered" ripe when the "factual components [are] fleshed out, by some concrete action applying the regulation" in "a fashion that harms or threatens to harm" to the challenging party. *Nat'l Park Hosp Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

That describes this case perfectly. As discussed above, it is undisputed that Agency Defendants have already used the Clause—and invoked newly announced agency priorities—to terminate hundreds of Plaintiffs' grants, collectively worth billions of dollars. *See supra* at 7-9. Those are plainly "concrete action[s] applying the regulation" in "a fashion that harms" Plaintiffs. *Nat'l Park Hosp.*, 538 U.S. at 808. And more of that harm is certainly "threaten[ed]." *Id.* Agency Defendants have continued to use the Clause to terminate Plaintiffs' grants even after this case was filed, and Executive Orders direct agencies to continue such terminations apace. *See supra* at 9. Given that Plaintiffs have established through undisputed evidence that they have more than a thousand active grants (totaling more than $5 billion) with the Agency Defendants that are at risk of termination right now, there is quite obviously "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st

Cir. 2016) (quoting *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007)).

This case therefore "presents a discrete issue that will not create undue hardship for the parties or the court to address." *Weichel v. Town of Braintree*, Civ. No. 20-11456, 2022 WL 17852109, at *3-4 (D. Mass. Dec. 22, 2022) (Talwani, J.). Plaintiffs seek a declaration on well-defined, discrete legal issues regarding proper use of the Clause: Plaintiffs say the Clause cannot be used to terminate grants based on new "agency priorities" not identified at the time of the award; Defendants say the opposite. *Compare* Doc. No. 67 at 23-28, *with* Doc. No. 89 at 38-45. Either way, only "purely legal claims" are at issue, so the challenge "is presumptively reviewable, *i.e.*, ripe." *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 608-09 (D. Mass. 2020) (citation omitted). And Defendants do not rebut that presumption. Nor could they: the debate over the Clause's meaning "can be finally resolved by [a] declaratory judgment" because "its contours are sharply defined" and "additional facts will not affect its resolution." *Stern v. U.S. Dist. Ct. for Dist. of Mass.*, 214 F.3d 4, 10 (1st Cir. 2000). Again, such pre-enforcement challenges to agency regulations are commonplace. *See supra* at 4-6.

As for hardship to the parties, the First Circuit has made clear that the inquiry "should focus on the judgment's usefulness." *Narragansett Indian Tribe*, 19 F.3d at 693. "Rather than asking, negatively, whether denying relief would impose hardship," courts must determine "whether granting relief would serve a useful purpose" or "whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest." *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Loc. No. 2322*, 651 F.3d 176, 188 (1st Cir. 2011) (citation omitted). After all, the purpose of the Declaratory Judgment Act is "to clarify legal relationships so that plaintiffs (and possibly defendants) c[an] make responsible decisions about the future." *Narragansett Indian Tribe*, 19 F.3d at 693. Here, a declaratory judgment settling the meaning of the Clause would put

11

the "underlying controversy to rest," *Verizon New England*, 651 F.3d at 188, by resolving the circumstances under which the Clause permits grant termination. This would provide much-needed certainty to Plaintiffs, who rely on this critical grant funding and must be able to plan their budgets "cognizant of the consequences of their participation" in federal grant programs. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

Contrary to Defendants' suggestion, the Court should not require Plaintiffs to lose billions more in federal funding to contest Defendants' interpretation of the Clause. Doc. No. 89 at 24. Like many other pre-enforcement challenges to agency actions, this case "turn[s] entirely on a question of statutory [and regulatory] interpretation." *N.H. Lottery Comm'n*, 986 F.3d at 54; *see Narragansett Indian Tribe*, 19 F.3d at 694 (declaratory judgment appropriate where the case presented "purely legal" issue involving statutory interpretation and was "of critical importance"); *Chamber of Com. of U.S. v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995) (finding challenge to regulation ripe where "[t]he issue presented is a relatively pure legal one that subsequent enforcement proceedings will not elucidate"). And Plaintiffs do not have to "await the consummation of threatened injury to obtain preventive relief," where, as here, the injury is sufficiently imminent. *Narragansett Indian Tribe*, 19 F.3d at 693 (citation omitted); *see supra* at 7-10. That "would inflict significant institutional costs with little corresponding gain." *Stern*, 214 F.3d at 11.

This case is therefore ripe for review now. Agency Defendants' invocation of the Clause to terminate hundreds of Plaintiffs' grants—while more than a thousand grants, worth billions of dollars, remain active with the same Defendants—is more than sufficiently "concrete" to warrant "judicial resolution." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 812.

### C.    Plaintiffs Challenge Final Agency Action Under The APA.

Plaintiffs' APA challenges also satisfy the APA's final-agency-action requirement. The

APA's "generous review provisions," *Bennett v. Spear*, 520 U.S. 154, 163 (1997), authorize judicial review of any "final" agency action. 5 U.S.C. § 704. Only two conditions are required for finality: the challenged action "(1) marks the consummation of the agency's decisionmaking process and (2) is an action by which rights or obligations have been determined, or from which legal consequences will flow." *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (citations omitted); *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016) (noting the Court "ha[s] long taken" a "'pragmatic' approach" to "finality."). All three APA claims satisfy that test here.

### 1.    Counts I And III Challenge Final Agency Action.

In Count I and Count III, Plaintiffs allege that "[t]he OMB regulations containing the Clause and the Agency Defendants' parallel regulations that incorporate the Clause" are "'final agency action' under the APA." Doc. No. 64 at 72 (¶ 280), 79 (¶ 308). While those claims (and their requested relief) differ,[7] the final-agency-action analysis does not.[8]

There is no question that agency regulations consummate the agency's decisionmaking process, determine "rights or obligations," and have "legal consequences." *See Bennett*, 520 U.S. at 178. They are therefore quintessential final agency action. *See, e.g.*, *Abbott Lab'ys*, 387 U.S. at

---

[7] Count I seeks a declaration to "clarify the rights and obligations" that flow from the Clause, Doc. No. 64 at 73 (¶¶ 284-85), while Count III seeks, in the alternative, "an order … holding unlawful and setting aside the Clause and the Agency Defendants' parallel regulations, as well as an order enjoining any action taken to enforce or implement these provisions," Doc. No. 64 at 81 (¶ 319).

[8] Defendants strangely claim that, unlike Count III, Count I challenges Defendants' final policy that "the Clause and Agency Defendants' parallel regulations afford them independent authority to terminate grants based on new 'agency priorities' identified after the grants have been awarded." Doc. No. 89 at 20 (quoting Doc. No. 64 at 77 (¶ 298)). But that is Plaintiffs' Count II. *See* Doc. No. 64 at 77-79 (¶¶ 296-305). By contrast, as the Complaint makes clear, both Counts I and III seek relief targeted at agency regulations themselves. In fact, in conceding that Count III concerns agency regulations that are final agency actions, Defendants favorably quote the same paragraph that appears verbatim in *both* Counts I and III: "[t]he OMB regulations containing the Clause and the Agency Defendants' parallel regulations that incorporate the Clause are 'final agency action' under the APA." Doc. No. 64 at 72 (¶ 280), 79 (¶ 308); Doc. No. 89 at 28.

149 ("[T]he regulations in issue we find to be 'final agency action' within the meaning of … the

Administrative Procedure Act.").[9] And, again, pre-enforcement lawsuits that concern agency reg-

ulations are routine under the APA. *See supra* at 4-6.

Indeed, the issue is so open and shut that Defendants themselves concede the challenged

regulations are final. In Defendants' own words: "APA plaintiffs routinely challenge federal reg-

ulations, for which there is little doubt that the final-agency-action test is satisfied." Doc. No. 89

at 31. So, unsurprisingly, "Defendants do not dispute" that the challenged regulations "are final

agency action—after all, they shape the contours of the legal" relationship "between grantor and

grantee." *Id.* at 28. Plaintiffs agree. That ends this inquiry.

## 2.    Count II Challenges Final Agency Action.

Unlike Counts I and III, Count II challenges Defendants' "decision, as a matter of final

agency policy, that the Clause and Agency Defendants' parallel regulations afford them independ-

ent authority to terminate grants based on new 'agency priorities' identified after the grants have

been awarded." Doc. No. 64 at 77 (¶¶ 298-99). This is also final agency action under the APA.[10]

Agency Defendants' sudden termination of thousands of grants (collectively involving bil-

lions of dollars) under a subclause they never invoked for this purpose before January 2025 demon-

strates that they have unquestionably made a recent decision that the Clause permits termination

---

[9] *See also Louisiana v. U.S. Env't Prot. Agency*, 712 F. Supp. 3d 820, 850 (W.D. La. 2024) ("De-
fendants do not dispute that the promulgation of a federal regulation constitutes 'final agency ac-
tion.'"); *Faucher v. Fed. Election Comm'n*, 743 F. Supp. 64, 67 (D. Me. 1990) ("[T]he FEC's
promulgation of regulations is final agency action."), *aff'd*, 928 F.2d 468 (1st Cir. 1991); *Fed.
Land Bank of Springfield v. Farm Credit Admin.*, 676 F. Supp. 1239, 1246 (D. Mass. 1987) (same).

[10] At the very least, because Plaintiffs have more than plausibly alleged final agency action, Count
II should survive Defendants' motion to dismiss. Accordingly, any further questions about the
contours and scope of this agency action can be left to another day. *Cf. Hisp. Affs. Project v. Acosta*,
901 F.3d 378, 388 (D.C. Cir. 2018) (remanding for the district court to "exercise its discretion to
permit" discovery to "ascertain the contours of the precise policy at issue").

of grants based on newly announced agency priorities. Defendants vigorously defend the merits of their decision here, arguing that "even if such a[] … 'decision' has actually been made," the Court should find it lawful. Doc. No. 89 at 20-21, 30-37. But Defendants cannot have it both ways, and courts are "not required to exhibit a naiveté from which ordinary citizens are free." *New York v. Trump*, 133 F.4th at 69 (citation omitted); *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 115 (D.D.C. 2025) (rejecting the contention that "countless federal agencies ... suddenly began exercising their own discretion to suspend funding across the board at the exact same time" as a "remarkable" and "unfathomable" "coincidence")). The final nature of the decision is reinforced by the fact that Agency Defendants' thousands of grant terminations across various federal agencies are on the same grounds using functionally identical reasoning. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 808-09 (2022) (agency action final where it sets an agency's legal interpretations, policies, or priorities in a way that binds agency staff); *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 442 (5th Cir. 2019) ("[A]ctions that retract an agency's discretion to adopt a different view of the law are binding."). Indeed, some federal agencies have now expressly incorporated Defendants' interpretation of the Clause into new grant award terms and conditions, confirming that Defendants intend to continue to use that flawed interpretation to terminate more grants in the future. *See, e.g.*, Federal Emergency Management Agency, *The Department of Homeland Security (DHS) NSGP Notice of Funding Opportunity (NOFO) Fiscal Year 2025 Nonprofit Security Grant Program*, https://tinyurl.com/2sm4ew3z (interpreting the Clause to permit federal agency to terminate award when "DHS/FEMA, in its sole discretion, changes or re-evaluates the goals or priorities of the grant program and determines that the award will be ineffective at achieving the updated program goals or agency priorities").

Nothing more is needed to establish a "final" agency action. Courts have routinely found that when an agency takes a sufficiently firm position on its interpretation of the law that has consequences for a regulated party, even if no formal order issues, there is final agency action under the APA.[11] There is no reason Plaintiffs cannot challenge Defendants' unlawful policy now. While Defendants suggest that further agency steps must still occur, Doc. No. 89 at 29, this argument ignores the facts on the ground: Plaintiffs have suddenly experienced billions of dollars in grant terminations—all invoking the newly interpreted Clause—and are vulnerable to billions more. Even if Plaintiffs do not know precisely which terminations are coming next, those terminations are indeed coming. *See supra* at 7-10. Defendants' decision is thus necessarily one from which "rights" and "obligations have been determined" and "legal consequences will flow." *Bennett*, 520 U.S. at 178.

Plaintiffs have more than a thousand additional active grants, collectively worth billions of dollars, that are potentially subject to termination on the same grounds. Plaintiffs "need not assume such risks while waiting for [an agency] to drop the hammer in order to have their day in court."

---

[11] *See, e.g.*, *Washington v. Fed. Emergency Mgmt. Agency*, Civ. No. 25-12006, 2025 WL 2229394, at *5 (D. Mass. Aug. 5, 2025) ("[W]hile it may technically be correct to say that the Secretary of DHS has not formally issued any declaration of final agency action, the agency's actions … nonetheless signal that a final determination has been made from which concrete consequences have been felt[.]"); *see also Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("[W]e reject[] the proposition that if an agency labels its action an 'informal' guideline it may thereby escape judicial review under the APA." (citation omitted)); *First Nat. Bank of Chi. v. Comptroller of Currency of U.S.*, 956 F.2d 1360, 1364 (7th Cir. 1992) (letter from Comptroller interpreting banking regulations was final agency action regardless of how "formal" it appeared); *Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119, 1123 (4th Cir. 1977) (final agency action where the National Park Service's statutory "interpretation … and its legal relationship with the plaintiff ha[d] become fixed"); *Texas v. Cardona*, 743 F. Supp. 3d 824, 838, 842-47 (N.D. Tex. 2024) (guidance documents were final agency action because they impacted "Texas educational entities that accept federal dollars, including Texas schools in receipt of substantial funding"); *Faith Int'l Adoptions v. Pompeo*, 345 F. Supp. 3d 1314, 1324 (W.D. Wash. 2018) (emails clarifying Department of State's interpretation of regulations constituted final agency action).

*Hawkes*, 578 U.S. at 600 (citation omitted). Rather, the impact of Defendants' decision is "sufficiently direct and immediate as to render the issue[s] appropriate for judicial review at this stage." *Abbott Lab'ys*, 387 U.S. at 152.

### D.    Declaratory Relief Is Appropriate On Count I.

As discussed above, a declaratory judgment is warranted here. Courts routinely issue declaratory relief where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 16 (1st Cir. 2014) (quoting *MedImmune*, 549 U.S. at 127); *see also* 28 U.S.C. § 2201(a) (authorizing court to "declare the rights and other legal relations" where there is "a case of actual controversy within its jurisdiction"). That is true here. Plaintiffs therefore are not seeking an "advisory opinion" based on mere hypotheticals, as the federal government contends.

This case presents a substantial controversy of sufficient immediacy. Contrary to Defendants' assertion, Plaintiffs are not asking for an "opinion advising what the law would be upon a hypothetical state of facts.'" Doc. No. 89 at 26 (citation omitted). The "state of facts" is all too real: Plaintiffs have had billions in grants already terminated by Agency Defendants, and they have billions in *active* grants with the same Agency Defendants at risk of termination. *See supra* at 7-9. Agency Defendants have even used the Clause to terminate Plaintiffs' grants since the filing of this lawsuit. *See supra* at 8-9 That easily satisfies all Article III requirements and warrants declaratory relief. *See supra* at 6-12. Far from an abstract policy debate, this is a dispute over the legality of concrete agency actions, involving discrete legal issues, with catastrophic real-world consequences.

As to the adverse legal interests of the parties, Plaintiffs seek a declaratory judgment set-tling the meaning of the Clause: Plaintiffs say the Clause cannot be used to terminate grants based on new "agency priorities" not identified at the time of the award, while Defendants contend the opposite.[12] *Compare* Doc. No. 67 at 23-28, *with* Doc. No. 89 at 38-45. Nothing about that legal dispute hinges on the specifics of any grant agreement; it simply requires a legal analysis to deter-mine the meaning of the Clause. It is difficult to imagine a more concrete and crystalized legal dispute for declaratory-judgment purposes. Without clarity about the Clause's meaning, Agency Defendants will continue to unlawfully terminate billions of dollars in active grants, and Plaintiffs are left to guess when grants that help combat violent crime, provide natural disaster relief, and increase access to nutritional food for students, among other things, may be taken away based on new agency priorities pulled out of thin air. This uncertainty leaves Plaintiffs to wonder whether already-committed federal funds will continue to flow or be cut off without warning, jeopardizing long-term projects, staffing decisions, and budget allocations across critical sectors.

It could not matter less that "twenty-[four] different Plaintiffs sue[d] twenty-six different Defendants." Doc. No. 89 at 25. There is no numerosity exception to the Declaratory Judgment Act. And courts routinely issue declaratory judgements concerning agency actions that have a broad impact on numerous parties. *See supra* at 4-6. The Supreme Court has even recognized that a pre-enforcement APA suit involving many affected parties weighs in favor of declaratory relief because it may help "speed enforcement." *Abbott Lab'ys*, 387 U.S. at 154 ("[A] pre-enforcement challenge by nearly all prescription drug manufacturers is calculated to speed enforcement. If the Government prevails, a large part of the industry is bound by the decree; if the Government loses,

---

[12] The fact that Defendants have conceded several points in their brief, *see infra* at 29-30, is irrel-evant because the core controversy remains: whether Agency Defendants can terminate grants at will "based on new agency priorities" not identified at the time of an award.

it can more quickly revise its regulation."); *see Indep. Bankers Ass'n of Am. v. Smith*, 534 F.2d 921, 928 (D.C. Cir. 1976) (rejecting argument that plaintiffs must file piecemeal suits against each regulated entity). If anything, then, the number of sovereign Plaintiffs and federal Defendants underscores the significant legal stakes of this case and the importance of a clarifying declaration.

Defendants also misconstrue Plaintiffs' request for declaratory relief in Count I, asserting that Count I "purports to be a 'Cause of Action' titled 'Declaratory Judgment'" and that the Declaratory Judgment Act "does not by itself create a federal cause of action.'" Doc. No. 89 at 27 (citation omitted). But although other courts have held as much, the First Circuit has not.[13] And regardless, Count I is brought under *both* the APA and the Declaratory Judgment Act. That is why Count I not only cites the specific provision of the APA expressly contemplating declaratory relief, 5 U.S.C. § 703, but also includes APA-related allegations, like that the regulations at issue "are 'final agency action' under the APA." Doc. No. 64 at 72 (¶¶ 278-80). And everyone agrees that if "Plaintiffs establish[] a violation of the APA," then "one of the possible forms of *relief* to which they might [be] entitled is a declaratory judgment." Doc. No. 89 at 27; *see* 5 U.S.C. § 703 (declaratory relief expressly contemplated under the APA). While Defendants argue that applies only to the "substantive APA claims" in Counts II and III, Count I is also a "substantive APA claim" that entitles Plaintiffs to declaratory relief. *Compare* Doc. No. 89 at 27, *with* Doc. No. 64 at 72-76 (¶¶ 278-95). There is nothing unusual about a standalone claim for declaratory relief. *See, e.g.*, *Schoenthal v. Raoul*, 150 F.4th 889, 901 (7th Cir. 2025) ("Nearly a century of case law establishes

---

[13] *See N.H. Lottery Comm'n*, 986 F.3d at 62; *see also Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 80, 83-84 (D.D.C. 2008) ("[T]he wording of the statute does not indicate that any independent cause of action is required to invoke the DJA…. [T]he Court concludes that the Committee need not identify a cause of action apart from the DJA."); Donald L. Doernberg, *The Trojan Horse: How the Declaratory Judgment Act Created A Cause of Action and Expanded Federal Jurisdiction While the Supreme Court Wasn't Looking*, 36 UCLA L. Rev. 529, 583 (1989) ("Beyond question, the Act created a cause of action.").

that Plaintiffs can bring a standalone claim pursuant to the procedures in the Declaratory Judgment Act … when the claim satisfies Article III's case-or-controversy requirement."). And courts in this Circuit *favor* declaratory relief in APA cases involving questions of law. *See N.H. Lottery Comm'n*, 986 F.3d at 62. That is how Plaintiffs are proceeding here: they currently seek summary judgment solely on Count I, which alleges an APA violation meriting declaratory relief that sets out the Clause's limits. Doc. No. 64 at 72-76 (¶¶ 278-95).

In the end, this is a classic pre-enforcement APA case seeking a declaratory judgment on the meaning of an agency regulation. Such pre-enforcement challenges are so common that they are considered "the norm, not the exception." *Corner Post*, 603 U.S. at 840 (Kavanaugh, J., concurring) (citation omitted). Plaintiffs are well within that accepted use of declaratory relief, seeking to resolve a concrete legal dispute about the meaning of a subclause that has been used, and will likely be used in the future, to inflict billions in fiscal injuries on Plaintiffs. The Court should therefore decide this case now and issue a declaratory judgment on Count I.

## II.    Summary Judgment Should Be Granted On Count I.

In Count I, Plaintiffs sought a declaratory judgment clarifying three key limits on the Clause: the Clause cannot be used to terminate existing grants (1) based on new agency priorities identified after the time of the federal award; (2) where Defendants withhold duly appropriated funding based on agency priorities that disregard congressional directives; or (3) if the award terms and conditions do not themselves clearly and unambiguously specify that the award can be terminated when it "no longer effectuates the program goals or agency priorities." Doc. No. 67 at 23.

Defendants now acknowledge "that the government cannot terminate grants that are required by federal statutes" and may not "terminate grants in a manner that violates government regulations." Doc. No. 89 at 26. Those concessions narrow this dispute to one primary issue: whether it is unlawful for Agency Defendants to use the Clause to terminate existing grants based

on new agency priorities identified *after* the time of the federal award. The answer is yes.

> **A.** **The Clause Cannot Be Used To Terminate Grants Based On New "Agency Priorities" Identified After The Time Of Award.**

Defendants' interpretation of the Clause—which would permit agencies to terminate grants based on newly announced "priorities"—is contrary to the Clause's text, structure, and regulatory history. It also makes no sense in the broader context of federal grantmaking, which has long sought to ensure that grantees have confidence that they will receive the funds they have been promised. The past few months have demonstrated what OMB surely would have predicted: that a regime that permits the sudden no-fault cancellation of billions of dollars in grants would devastate Plaintiffs and other grantees, destabilizing the whole system. In the face of Defendants' sudden unprecedented invocation of an obscure regulatory provision—five years after it was introduced—to terminate billions of dollars in State grant funding, Defendants' assertion that no State "can reasonably claim to be surprised," Doc. No. 89 at 45, is simply absurd.

**<u>Text and Structure</u>**. The Clause states that agencies may terminate a grant if an award "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2024); 2 C.F.R. § 200.340(a)(2) (2021). The interaction between the terms "the" (in "the . . . agency priorities") and "no longer" (in "no longer effectuates") shows that the only priorities an agency may invoke to terminate a grant are priorities that existed at the time of the initial award. Defendants attempt to avoid this conclusion by considering each term in isolation, Doc. No. 89 at 41-42, but that approach is inconsistent with fundamental interpretive principles. Courts should not be "culling selected words from a statute's text and inspecting them in an antiseptic laboratory setting," but instead should give "due weight to design, structure, and purpose as well as to aggregate language." *See O'Connell v. Shalala*, 79 F.3d 170, 176 (1st Cir. 1996). Defendants' newly invented

approach to the Clause makes especially little sense where, as here, their interpretation would bestow unprecedented and nearly unlimited grant-termination authority, permitting agencies to simply manufacture new agency priorities and then cancel billions of dollars in preexisting grants. Courts presume that agencies, "no less than Congress, do not 'hide elephants in mouseholes.'" *Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 203 (5th Cir. 2019); *accord Penobscot Nation v. Frey*, 3 F.4th 484, 506 (1st Cir. 2021). That is a strong indication Defendants' capacious understanding of the text of the Clause should be rejected.

The terms "no longer" and "the" not only are governed by the design, structure, and purpose of the regulation, *see supra* at 21-22, but also work together to give the Clause its meaning. As Defendants concede, Doc. No. 89 at 42, the phrase "no longer effectuates" limits the Clause to awards that previously (at Time A) effectuated program goals or agency priorities, but now (at Time B) do not. The term "the" then specifies the yardstick against which the agency must measure: a *specific* set of program goals and agency priorities. *See Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4-5 (D.C. Cir. 2000) ("the definite article 'the' particularizes the subject which it precedes"); *Freytag v. Comm'r*, 501 U.S. 868, 901-02 (1991) (Scalia, J., concurring in part) (explaining, in interpreting "the Courts of Law" in the Appointments Clause, that "the definite article 'the' obviously narrows the class of eligible 'Courts of Law' to those courts of law envisioned by the Constitution").

The definite article, in other words, forecloses Defendants' suggestion that there can be many sets of goals and priorities between Time A and Time B. And the use of "no longer effectuates"—as opposed to simply "does not effectuate"—indicates a temporal change: that the award *once did* effectuate those goals but has ceased to do so. Consider the counterfactual: if the Clause permitted different goals and priorities at Times A and B, as Defendants argue, it would not be

possible to speak of "*the* program goals or agency priorities." So an agency may terminate an award under the Clause only if it conflicts with the agency's *original* priorities—the ones that existed at the time of the award. *Cf. Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 61 n.6 (1995) (emphasizing that the parties were bound by the terms applicable at the time the agreement was executed, not a rule enacted later). Because Defendants' interpretation requires disregarding the definite article "the," it cannot be correct. *See Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003) (describing "the venerable rule that statutes should be interpreted, whenever possible, to give every word and phrase some operative effect"); *cf. Niz-Chavez v. Garland*, 593 U.S. 155, 161-65 (2021) (emphasizing importance of indefinite article "a" in a statutory phrase).

Even the President has implicitly recognized the significance of the term "the" in the Clause. In a recent Executive Order, he directed OMB to "revise" the "Uniform Guidance" to "further clarify" that "termination for convenience" is permitted for discretionary grants, "including when the award no longer advances agency priorities." Exec. Order No. 14,332, 90 Fed. Reg. at 38,932. Tellingly, the order replaces "*the* agency priorities" in the Clause with just "agency priorities." *Id*. The need for this "clarification"—one that deviates from the actual text of the Clause the President was purporting to interpret—shows that the Clause, as currently written, does not carry the meaning that Defendants advance.

Defendants' reliance on a neighboring subsection, § 200.340(a)(3), is misguided too. That subsection applies when a *recipient* partially terminates an award, allowing the agency to terminate the rest if it "will not accomplish the purposes for which the Federal award was made." 2 C.F.R. § 200.340(a)(3). Defendants argue that if the Clause in subsection (a)(4) were meant to operate retrospectively, it would mirror the language in subsection (a)(3). Doc. No. 89 at 39-40. But those

two subsections differ in scope, and that difference in scope explains why they use different language. Subsection (a)(3) addresses the specific scenario of a partial termination by the *grantee*, inviting an inquiry into the agency's original purposes in making the award in order to determine whether the remaining portion of the award would accomplish those purposes. Subsection (a)(3) therefore sought to make clear that what mattered was not the *grantee*'s purposes in using the remaining funding, but instead the "purposes for which the Federal award was made." Subsection (a)(4), by contrast, governs the *agency's* authority to affirmatively terminate an award based on whether the award continues to advance the agency's program goals or priorities. In that provision, there is no doubt that the focus is on the agency's program goals and priorities, rather than on the grantee's purposes—so it makes sense that subsection (a)(4) did not include a phrase like "purposes for which the Federal award was made." Both (a)(3) and (a)(4) are backward-looking inquiries, and nothing about the regulation's structure suggests that it would make sense only for subsection (a)(3) to focus on the state of play at the time of the grant.

For similar reasons, Defendants' focus on verb tense is also a red herring. Doc No. 89 at 40. The phrase "no longer effectuates the ... agency priorities" in subsection (a)(4) looks backward just as clearly as "purposes for which the Federal award was made" in subsection (a)(3). That is true regardless of whether subsection (a)(4) uses the past tense, as the words "no longer" and "the" in subsection (a)(4) both amply make clear that this inquiry is backward-looking. *See supra* at 22-23. There is no canon or interpretive principle that requires drafters of regulations to use the past tense to convey that they are contemplating a backward-looking inquiry just because a different provision happens to use the past tense. To the contrary, the backward-looking nature of subsection (a)(3) reinforces the backward-looking nature of subsection (a)(4). *See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of

interpreting the other items as possessing that attribute as well."). If anything, therefore, subsection (a)(3) confirms that the Clause can only be invoked when, looking backward, the grant "no longer effectuates the" agency priorities at the time of the award.

**Regulatory History**. Notably, Defendants do not even mention the rulemaking history of the Clause, which strongly supports Plaintiffs' reading. When the Clause was initially added in 2020, OMB explained that the new language was intended "to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals." 85 Fed. Reg. 49,506, 49,507 (Aug. 13, 2020); *see also id.* at 49,508 (in addressing 2020 amendments, describing a "focus on the degree to which grant programs achieve their goals and intended results"). The final guidance identified two situations in which the new clause would permit termination: (1) when "additional evidence reveals that a specific award objective is ineffective at achieving program goals" or (2) when "additional evidence" causes the agency "to significantly question the feasibility of the intended objective of the award." *Id.* at 49,507-08.

Both scenarios relate to new information about the award, thus showing that the Clause is trained on previously established goals rather than any new agency priorities. By way of example, the EPA could use the Clause to terminate an existing grant to clean up groundwater pollution with a particular technology if a new study reveals that this technology does not in fact help clean up groundwater. *See* Doc. No. 67 at 26. But EPA could not stop funding the cleanup project midway because it has lost interest in water quality. To the contrary, OMB reassured commenters that the Clause would *not* allow agencies "to terminate grants arbitrarily," and OMB assuaged any concern that the "language [could] provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause." *Id.* at 49,509. And given the massive significance that a "changed

agency priorities" termination regime would have—as vividly demonstrated by the at-will termination of thousands of grants worth many billions of dollars in recent months, *see supra* at 7-10—it is inconceivable that OMB would have contemplated such terminations without including a single exemplar of that kind.

Defendants' interpretation also undermines the stated regulatory purpose of ensuring transparency. The regulatory history of the OMB guidance is replete with language making clear that agencies should develop and announce their priorities *before* they solicit applications, so that applicants can make informed decisions about whether to apply. *See* Doc. No. 67 at 10-15; 89 Fed. Reg. 30,046, 30,149 (focusing on transparency and clearly articulated priorities in 2024 revision of Guidance); 85 Fed. Reg. 49,506-10 (same in 2020 rulemaking); 78 Fed. Reg. 78,590, 78,621-22 (same in 2013 rulemaking).[14] Defendants' interpretation, which would allow agencies to suddenly change priorities mid-award, is wholly inconsistent with this focus on ensuring consistency, transparency, and public notice in federal grantmaking. It would also open a backdoor for agencies to circumvent the regulatory procedure required by the rest of the regulation. The interpretation should therefore be rejected. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012) (describing presumption against ineffectiveness, and that a "textually permissible interpretation that furthers rather than obstructs a document's purpose should be favored").

**Context**. Finally, the Court should reject Defendants' interpretation of the Clause because it requires concluding that OMB silently adopted essentially an at-will termination regime, and

---

[14] This focus on agencies developing their priorities prior to soliciting applications also demonstrates there is no "severe administrability problem" with Plaintiffs' interpretation. *See* Doc. No. 89 at 44. By statute, agencies must formulate priorities through a reticulated process that provides adequate notice to Congress. *See, e.g.*, 31 U.S.C. § 1120(a)(3); 5 U.S.C. § 306(b). Such priorities will usually be evident on the face of the notice of funding opportunity (which solicits grant applications) or in the grant award itself.

buried it among a series of much narrower provisions. And it requires accepting that, despite the vast authority it confers, the Clause was not invoked as Defendants describe until five years after it was introduced, when it was suddenly invoked thousands of times. To call these conclusions counterintuitive is generous. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover" an "unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism." (citation omitted)). In light of the remarkable about-face in agency practice and the unprecedented wave of Clause-based grant terminations resulting in billions lost for Plaintiffs and their residents, Defendants' insistence that Plaintiffs' surprise "can be explained only by their failure to read the regulations" is misplaced at best and disingenuous at worst. Doc. No. 89 at 45.

Defendants' own conduct demonstrates that they read the Clause to permit agencies to terminate grants at will, based on nothing more than a talismanic invocation of the phrase "agency priorities." In a recent lawsuit against the President and sixteen agencies, "Defendants argue[d] that their reference to 'agency priorities' satisfies their legal obligation." *Thakur v. Trump*, 787 F. Supp. 3d 955, 983 (N.D. Cal. 2025). And when the American Bar Association joined a lawsuit against the federal government, the Department of Justice then cancelled a series of ABA grants with only "a terse statement indicating that the grants 'no longer effectuate[ ] ... [DOJ] priorities.'" *A.B.A. v. Dep't of Justice*, 783 F. Supp. 3d 236, 239 (D.D.C. 2025); *see also* Grantmaking EO (equating terminations "when the award no longer advances agency priorities" with "termination for convenience"). Under Defendants' interpretation, grantees are thus entitled to no substantive explanation for the termination of their grants, leaving agencies free to terminate at will.

That interpretation flies in the face of constitutional principles. Under the Spending Clause, Congress exceeds its power by surprising "States with post acceptance or 'retroactive' conditions."

27

*Pennhurst*, 451 U.S. at 25. "This threshold requirement—that Congress speak clearly as to a condition it imposes—at least provides assurance that, before a state gives up some of its power in exchange for federal grant money, the state's eyes are wide open: it knows what the consequences are." *Kentucky v. Yellen*, 67 F.4th 322, 324 (6th Cir. 2023). Here, Agency Defendants have not cited any such statute that would allow them to terminate grants based on newly identified program goals or agency priorities unknown to Plaintiffs at the time of the award.[15] And if there were such a statute, it would violate the Spending Clause because it would not set forth unambiguously the terms upon which grants may be terminated, making it impossible for States to evaluate the risks and obligations of accepting the funds.[16] *See* Doc. No. 67 at 28-29.

It is entirely predictable that the at-will termination regime Defendants envision would result in chaos for States and other grantees. For that reason, it is implausible that OMB—which is tasked not only with advancing the Administration's priorities, Doc. No. 89 at 40, but also with "ensuring that regulations are based on sound analysis and serve the purposes of the statutes that authorize them and the interests of the public"[17]—had, without comment, adopted a termination provision that could cause such devastating impacts. Or that OMB would have placed such a far-

[15] In that respect, Agency Defendants have failed to identify any basis for concluding that terminating grants based on newly identified program goals or agency priorities is "authorized by law" within the meaning of the Clause. 2 C.F.R. § 200.340(a)(4) (authorizing terminations based on "program goals or agency priorities" only "to the extent authorized by law").

[16] Contrary to Defendants' contention, it does not solve the problem merely to have the Clause unambiguously incorporated into grant terms and conditions. Doc. No. 89 at 45. In that scenario, Defendants' interpretation of the Clause would still allow agencies to cancel grants based on new agency priorities that grantees, by definition, could not have known about at the time of the award. But under Plaintiffs' interpretation—where the Clause is both unambiguously incorporated into the grant award and only allows grant terminations based on program goals and agency priorities at the time of the award—grantees would have all the notice the Spending Clause contemplates.

[17] *The Mission and Structure of the Office of Management and Budget*, The White House: President Barack Obama, https://obamawhitehouse.archives.gov/omb/organization_mission/ (last visited Oct. 16, 2025).

reaching termination provision among a set of much narrower termination provisions—provisions that an agency would never need to invoke since (apparently) Agency Defendants can just incant "new agency priorities" and cancel any grant they want. Thus, notwithstanding their arguments to the contrary, Doc. No. 89 at 43, Defendants' interpretation would plainly require finding that OMB "hid[] elephants in mouseholes." *Ryder*, 945 F.3d at 203. To be sure, even if OMB's sole aim is to advance the Administration's priorities, Doc. No. 89 at 40, its regulations allow Agency Defendants to do that when issuing *new* grants: they can decide—consistent with law—whether to award new grants (and to whom) based on those new priorities. But termination of *existing* grants must still comply with applicable law, including the Clause.

In short, Defendants' reading of the Clause is contrary to its text and structure, its regulatory history, and common sense. That transformative interpretation should be rejected.

## B.    The Clause Cannot Be Used To Terminate Grant Awards Where It Is Not Clearly And Unambiguously Specified In The Award Terms And Conditions.

Defendants concede, as they must, that the Clause cannot be used to terminate grants when contrary to statutes or regulations. *See* Doc. No. 89 at 34-37. And Defendants do not dispute that for grants issued under the current version of the OMB regulations, an agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b); *see* Doc. No. 89 at 36-37. Nonetheless, they suggest that because the 2020 version of 2 C.F.R. § 200.340(b) used the term "should" instead of "must," grant agreements executed under the prior version were not *required* to "clearly and unambiguously" incorporate the Clause into the terms and conditions of the award in order to use it for grant terminations. *See* Doc. No. 89 at 37 n.11. First, this Court should not consider the argument because it is waived. *See, e.g.*, *Soni v. Bos. Med. Ctr. Corp.*, 683 F. Supp. 2d 74, 93 (D. Mass. 2009) ("[A]rguments raised only in a footnote or in a perfunctory manner are waived."). But even if the Court considers

it, that argument is foreclosed by the text, history, and structure of the 2020 regulation.

Put simply, there is no version of the regulation that empowers Agency Defendants to terminate awards based on changed priorities when the Clause appears nowhere in the grant agreement. Grants and "the security of contract they provide, would be rendered virtually illusory if, in the absence of some contractually agreed upon basis for termination, an agency could at any time terminate an award based upon some open-ended and unspecified change in the agency's priorities or its goals." *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 671 (S.D.N.Y. 2025).

This reasoning applies irrespective of the fact that subsection (b) used the term "should" in 2020. 2 C.F.R. § 200.340(b) (2021). The 2020 version of 2 CFR § 200.211(c)—governing information contained in a federal award's terms and conditions—explicitly stated that "Federal awarding agencies must make recipients aware, in a clear and unambiguous manner, of the termination provisions in § 200.340, including the applicable termination provisions in the Federal awarding agency's regulations or in each Federal award." 2 C.F.R. § 200.211(c)(1)(v) (2021). That is why, during the 2020 rulemaking, OMB made clear that "Federal awarding agencies *must* clearly and unambiguously articulate the conditions under which a Federal award may be terminated in their applicable regulations and in the terms and conditions of Federal awards." 85 Fed. Reg. 49,506, 49,507 (Aug. 13, 2020) (emphasis added). That goes for the 2024 version of the regulation too: when the regulations were amended in 2024, OMB explained that "[t]he prior version of section 200.340(b) and the proposed version *both directed* Federal agencies ... to clearly and unambiguously specify all termination provisions in the terms and conditions of the award." 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024) (emphasis added). OMB nonetheless clarified that it was revising the regulation to simply "underscor[e] the need for agencies ... to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id.* The Court should

therefore declare that the 2020 regulation, like the 2024 regulation, bars grant terminations unless the grounds for the termination are clearly stated in the award's terms and conditions.

To conclude otherwise would be to assume that until only recently, even appropriately interpreted OMB regulations permitted agencies to blindside States with "post acceptance or 'retroactive' conditions" that Congress could not, *Pennhurst*, 451 U.S. at 25, and to surprise all grantees with unheralded grant conditions in violation of fundamental contractual principles of fair notice, *see Duffy*, 784 F. Supp. 3d at 671. The Court should reject that reading of the 2020 regulation.

## III.    Plaintiffs Did Not Waive Or Forfeit Their Claim In Count III.

In Count III, Plaintiffs allege that if Defendants' interpretation of the Clause is correct, then the Clause is arbitrary and capricious. Doc. No. 64 at 79-82 (¶¶ 306-19). The crux of the claim is that when the Clause was proposed and adopted, "OMB never once provided an explanation for [the] expansive assertion of authority" Defendants now advance. Doc. No. 64 at 80-81 (¶¶ 314-15). Defendants contend that Plaintiffs somehow failed to exhaust the issues in Count III, or waived or forfeited them, by not submitting comments to OMB in its rulemaking process. Doc. No. 89 at 31-34; *see Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1149 (D.C. Cir. 2005) ("The distinction between 'issue exhaustion' and 'issue waiver' is illusive, to say the least. Indeed, both terms appear in the case law without apparent distinction, and they are sometimes treated as if synonymous."). But that turns the administrative-waiver doctrine on its head, implying that even if OMB never intended for the Clause to be used so broadly, Plaintiffs cannot challenge it because they did not submit comments anticipating an unheralded authority that the agency itself never endorsed. There is no reason for such a counterintuitive holding here.

For one thing, it would be "especially unfair" to hold that Plaintiffs' claim in Count III is barred by waiver, forfeiture, or administrative exhaustion. *See Am. Forest & Paper Ass'n v. EPA*,

31

137 F.3d 291, 295 (5th Cir. 1998) (explaining that it would be "especially unfair" to apply the waiver doctrine where the agency "*modified* its rule"). Plaintiffs could not have anticipated that the language of the Clause would permit Agency Defendants to terminate federal grants on a whim based on newly identified agency priorities. Indeed, Plaintiffs—States with billions of dollars in federal funding at stake—would have had every incentive to comment on a supposedly all-powerful termination clause that could wipe away billions of dollars in federal funding. That Plaintiffs submitted comments on the (dramatically more limited) financial effects of other regulatory provisions[18] but not on a provision that could apparently eliminate all their federal funding says nothing about waiver and everything about Defendants' unprecedented interpretation of the Clause.

In any event, the administrative-waiver doctrine is inapposite in this context. Unlike challenges under other statutes, the APA simply provides that those "suffering legal wrong because of agency action" are "entitled to judicial review thereof." 5 U.S.C. § 702. Nothing in the APA requires those suffering a "legal wrong" to have submitted comments to an agency during a notice-and-comment rulemaking in order to later challenge that rule. *See Vt. Pub. Int. Rsch. Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 516 (D. Vt. 2002) (noting that the APA does not "require[] issue exhaustion" in notice-and-comment rulemaking and finding it inequitable to "judicially-impose[]" such a requirement where agency "did not mention the issue" because plaintiffs had not "been put on notice"); *see also* William Funk, *Exhaustion of Administrative Remedies - New Dimensions Since Darby*, 18 Pace Env't. L. Rev. 1, 17-18 (2000) (explaining that a "faithful application" of the APA and precedent means "there could be no exhaustion required as a precondition of judicial review of rulemaking"). That is why, "[w]here statutes and regulations are silent,"

---

[18] *See, e.g.*, Doc. No. 89 at 32 n.7 (citing to comment made by Massachusetts on proposal to "[i]ncrease the amount of subaward costs that can be counted within the Modified Total Direct Cost (MTDC) base from $25,000 to $50,000").

the Supreme Court has held that courts may only "require issue exhaustion" where administrative proceedings are "adversarial" such that the parties "bear the responsibility to develop issues" for the agency. *Carr v. Saul*, 593 U.S. 83, 88-89 (2021). Unsurprisingly, that happens only in agency adjudications, from which the administrative-waiver doctrine derives. *See, e.g.*, *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36 (1952).

In contrast, it makes little sense to apply the administrative-waiver doctrine to notice-and-comment rulemaking. *See Citizens Coal Council v. EPA*, 447 F.3d 879, 904 n.25 (6th Cir. 2006) (noting "the rulemaking/adjudication dichotomy pervasive in administrative law" and cautioning that "[t]he waiver rule should not be applied freely in both areas, given the fundamental differences between the two endeavors"). Unlike agency adjudications—which necessarily apply to a partic- ular party who may later seek judicial review—agency regulations apply broadly to all regulated parties and could be challenged years or decades later by a plaintiff who is injured by the regulation at that time. *See Corner Post,* 603 U.S. at 813 (explaining that the "statute of limitations begins to run" for an APA claim only when the plaintiff is "injured" by the regulation). And when that plaintiff brings their case years after a regulation was promulgated, apparently Defendants' view is that those claims are barred because the plaintiff did not comment on the proposed rule. *Id.* at 806. But that harsh theory would countermand the Supreme Court's recent holding that plaintiffs— even plaintiffs like organizations that "did not exist" when the agency adopted a rule—could bring such claims. *See id.* at 806, 824 (explaining "that anyone injured by agency action should have access to judicial review"). Beyond that, it would "require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rule- making published each day in the Federal Register" but "a psychic able to predict the possible changes that could be made in the proposal when the rule is finally promulgated." *Am. Forest &*

*Paper*, 137 F.3d at 295. Courts, including the First Circuit, have rightly rejected that bizarre out-come.[19] *See, e.g.*, *id.*; *Massachusetts v. Hayes*, 691 F.2d 57, 60 (1st Cir. 1982) (a party "is not estopped from challenging the validity of an agency standard that it has not objected to at the time of its promulgation"). This Court should too.

At the very least, the administrative-waiver doctrine does not apply where, as here, one of a rule's key assumptions is at issue.[20] "[E]ven if a party may be deemed not to have raised a par-ticular argument before the agency," the agency "'retains a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule'" and "'must justify that assumption even if no one objects to it during the comment period.'" *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014). "[T]he key assumption doctrine applies to aspects of a rule that are foundational to its existence." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 589 (D.C. Cir. 2019). And the scope of an agency's authority to terminate grants under the Clause is precisely the sort of "key assumption" that falls on Defendants to justify. *See Nat. Res. Def. Council*, 755 F.3d at 1023; *Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 589; *Greenwich Terminals LLC v. United States Army Corp of Eng'rs*, Civ. No. 23-4283, 2024 WL 4595590, at *10 (E.D. Pa. Oct. 28, 2024) (key legal issues "are not waivable").

---

[19] Besides, the usual arbitrary-and-capricious review already does the work of the administrative-waiver doctrine in the rulemaking context. An agency must *always* consider major issues—and need not address minor issues—regardless of whether such comments were raised in public comments. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (only "significant" comments must be addressed); *Gulluni v. Levy*, 85 F.4th 76, 82 (1st Cir. 2023) (an agency regulation is arbitrary or capricious if the agency failed to consider "'an important aspect of the problem'").

[20] Courts have also declined to apply the administrative-waiver doctrine to claims that the agency lacks legal authority. *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (explaining that "courts decide legal questions by applying their own judgment"); *Sandoz Inc. v. Becerra*, 57 F.4th 272, 278-79 (D.C. Cir. 2023) ("issue-exhaustion requirement" inapplicable where the plaintiff challenged an agency's statutory interpretation).

The administrative-waiver doctrine simply does not apply here. And if it did, it would be "especially unfair" to hold that Plaintiffs' claim in Count III is barred because Plaintiffs did not submit comments about an interpretation of the Clause that Defendants did not invoke until years later. *See Am. Forest & Paper*, 137 F.3d at 295.

## <u>CONCLUSION</u>

The Court should deny Defendants' motion to dismiss in its entirety, grant summary judgment for Plaintiffs on Count I, and issue the requested declaratory judgment.

Dated: October 17, 2025

Respectfully submitted,

**MATTHEW J. PLATKIN**
  ATTORNEY GENERAL OF NEW JERSEY


*/s/ Jeremy M. Feigenbaum*
Jeremy M. Feigenbaum*
  *Solicitor General*
Sundeep Iyer*
  *Chief Counsel*
Stephen Ehrlich*
  *Deputy Solicitor General*
Bassam F. Gergi*
Jessica L. Palmer†
Amanda I. Morejón
Meghan K. Musso*
Sarah Nealon†
Lauren E. Van Driesen†
  *Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Jeremy.Feigenbaum@njoag.gov
Amanda.Morejon@law.njoag.gov

*Counsel for the State of New Jersey*


**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK


By: */s/ Rabia Muqaddam*
Rabia Muqaddam†
  *Special Counsel for Federal Initiatives*
Jessica Ranucci†
  *Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8883
Rabia.muqaddam@ag.ny.gov
Jessica.Ranucci@ag.ny.gov

*Counsel for the State of New York*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS


By:  */s/ Katherine B. Dirks*
Katherine B. Dirks (BBO No. 673674)
  *Chief State Trial Counsel*
Vanessa A. Arslanian (BBO No. 688099)
James A. Sweeney (BBO No. 543636)
  *State Trial Counsel*
Anna J. Lumelsky (BBO No. 677708)
  *Deputy State Solicitor*
Yael Shavit (BBO No. 695333)
  *Chief, Consumer Protection Division*
Jak Kundl (BBO No. 713951)
  *Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
vanessa.arslanian@mass.gov

*Counsel for the Commonwealth of Massachusetts*


**KRISTIN K. MAYES**
  ATTORNEY GENERAL OF ARIZONA


By: */s/ Hayleigh S. Crawford*
Hayleigh S. Crawford†
  *Deputy Solicitor General*
Syreeta A. Tyrell†
  *Senior Litigation Counsel*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
  ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Shiwon Choe*
Anya M. Binsacca*
  *Supervising Deputy Attorney General*
Shiwon Choe[†]
Zelda Vassar[†]
Harald H. Kirn[†]
  *Deputy Attorneys General*
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-4400
Anya.Binsacca@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Zelda.Vassar@doj.ca.gov
Harald.Kirn@doj.ca.gov

*Counsel for the State of California*


**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Michael K. Skold*
Michael K. Skold[†]
  *Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Counsel for the State of Connecticut*


**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

By: */s/ Andrew C. Mendrala*
Andrew C. Mendrala[†]
  *Assistant Attorney General*
400 Sixth Street, NW
Washington, D.C. 20001

**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO

By: */s/ David Moskowitz*
David Moskowitz[†]
  *Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

*Counsel for the State of Colorado*


**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

By: */s/ Ian R. Liston*
Ian R. Liston[†]
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*


**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day[†]
  *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes[†]
*Solicitor General*
425 Queen Street

37

(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
  ATTORNEY GENERAL OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead[†]
  *Public Interest Counsel*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

*Counsel for the State of Illinois*

**OFFICE OF THE GOVERNOR *ex rel.***
**ANDY BESHEAR**
  IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
  THE COMMONWEALTH OF KENTUCKY

By: */s/ S. Travis Mayo*
S. Travis Mayo[†]
  *General Counsel*
Taylor Payne[†]
  *Chief Deputy General Counsel*
Laura C. Tipton[†]
  *Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**LAURA KELLY**
  IN HER OFFICIAL CAPACITY AS GOVERNOR OF
  THE STATE OF KANSAS

By: */s/ Justin Whitten*
Justin Whitten[†]
  *General Counsel*
Ashley Stites-Hubbard[†]
  *Deputy Chief Counsel*
Office of the Kansas Governor
300 SW 10th Ave, Room 541-E
Topeka, KS 66612
(785) 296-3930
Justin.h.whitten@ks.gov
Ashley.stiteshubbard@ks.gov

*Counsel for Governor Laura Kelly*

**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

By: */s/ Jason Anton*
Jason Anton[†]
  *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
jason.anton@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

By: */s/ Steven J. Goldstein*
Steven J. Goldstein†
  *Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6414
Sgoldstein@oag.state.md.us

*Counsel for the State of Maryland*


**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

By: */s/ Katherine J. Bies*
Katherine J. Bies†
  *Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Counsel for the State of Minnesota*


**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern†
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*


**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti†
  *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorney for the People of the State of Michigan*


**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Amy Senier*
Amy Senier
  *Senior Litigation Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asenier@nmdoj.gov

*Counsel for the State of New Mexico*


**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

By: */s/ Brian Simmonds Marshall*
Coby Howell†
Brian Simmonds Marshall*
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
  IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
THE COMMONWEALTH OF PENNSYLVANIA

Jennifer Selber
*General Counsel*

By:  */s/ Jacob B. Boyer*
Jacob B. Boyer[†]
  *Deputy General Counsel*
Michael J. Fisher[†]
  *Executive Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*


**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND
By: */s/ Leonard Giarrano IV*
Leonard Giarrano IV[†]
  *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2062
lgiarrano@riag.ri.gov

*Counsel for the State of Rhode Island*


**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose[†]
  *Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*


**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Colin T. Roth*
Colin T. Roth[†]
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us

*Counsel for the State of Wisconsin*


*Pro hac vice application forthcoming
[†] Admitted pro hac vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

<u>/s/ Katherine B. Dirks</u>
Katherine B. Dirks

Dated: October 17, 2025