# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, *et al.*,

      Plaintiffs,

          *v.*

U.S. OFFICE OF MANAGEMENT
AND BUDGET, *et al.*,

      Defendants.

Case No. 1:25-cv-11816-IT

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

STEPHEN M. PEZZI
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov
Florida Bar No. 1041279

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION........................................................................................................................1

    I.       PLAINTIFFS LACK ARTICLE III STANDING...................................................2

           a.     Plaintiffs' cognizable injuries are caused by decisions that they do not (and could not) challenge in this suit, and that are not redressable here.................2

           b.     Plaintiffs' allegations of possible future injury relating to possible future grant terminations are too speculative to support standing.......................4

           c.     Plaintiffs seek an impermissible advisory opinion, not a permissible declaratory judgment...............................................................................5

    II.      PLAINTIFFS DO NOT CHALLENGE ANY FINAL AGENCY ACTION IN COUNTS I AND II..................................................................................7

    III.    ALL PLAINTIFFS FORFEITED (AND SOME PLAINTIFFS WAIVED) THEIR CLAIMS IN COUNT III BY FAILING TO RAISE THEIR OBJECTIONS DURING THE RULEMAKING...................................................9

    IV.    PLAINTIFFS' CLAIMS LACK MERIT....................................................13

CONCLUSION....................................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adams v. EPA,*
  38 F.3d 43 (1st Cir. 1994) ...................................................................................................9

*Am. Forest & Paper Ass'n v. EPA,*
  137 F.3d 291 (5th Cir. 1998) .............................................................................................11

*Andresen v. Diorio,*
  349 F.3d 8 (1st Cir. 2003) .................................................................................................19

*Appalachian Power Co. v. EPA,*
  251 F.3d 1026 (D.C. Cir. 2001) ....................................................................................9, 11

*ASARCO Inc. v. Kadish,*
  490 U.S. 605 (1989) .............................................................................................................5

*AT&T Co. v. EEOC,*
  270 F.3d 973 (D.C. Cir. 2001) ............................................................................................8

*Beecham v. United States,*
  511 U.S. 368 (1994) ...........................................................................................................16

*Bennett v. Spear,*
  520 U.S. 154 (1997) .........................................................................................................7, 8

*Biden v. Texas,*
  597 U.S. 785 (2022) .............................................................................................................1

*Bittner v. United States,*
  598 U.S. 85 (2023) .............................................................................................................16

*Buck v. Am. Airlines, Inc.,*
  476 F.3d 29 (1st Cir. 2007) .................................................................................................6

*California v. Texas,*
  593 U.S. 659 (2021) .............................................................................................................6

*Carr v. Saul,*
  593 U.S. 83 (2021) .............................................................................................................11

*Chevron U.S.A. Inc. v. Echazabal,*
  536 U.S. 73 (2002) .............................................................................................................16

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .........................................................................................................4, 5

*Dep't of Educ. v. California,*
  145 S. Ct. 966 (2025) ..................................................................................................1, 2, 5

*Hagan v. Signature Aviation US Holdings, Inc.,*
  2025 WL 1684793 (D. Mass. June 16, 2025) ...................................................................19

*Harper v. Werfel,*
  118 F.4th 100 (1st Cir. 2024) ....................................................................................... 7, 8

*Henson v. Santander Consumer USA Inc.,*
  582 U.S. 79 (2017) ..........................................................................................................16

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ..........................................................................................................5

*Mass. Delivery Ass'n v. Coakley,*
  769 F.3d 11 (1st Cir. 2014) ...............................................................................................5

*Massachusetts v. Hayes,*
  691 F.2d 57 (1st Cir. 1982) ..........................................................................................9, 10

*Massachusetts v. Sec'y of Agric.,*
  984 F.2d 514 (1st Cir. 1993) ...................................................................................9, 10, 11

*Massachusetts v. United States,*
  522 F.3d 115 (1st Cir. 2008) ...........................................................................................10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .............................................................................................................1

*Muirhead v. Mecham,*
  427 F.3d 14 (1st Cir. 2005) ...............................................................................................6

*Mullane v. DOJ,*
  113 F.4th 123 (1st Cir. 2024) ........................................................................................2, 3

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
  538 U.S. 803 (2003) ..........................................................................................................5

*New Hampshire Lottery Commission v. Rosen,*
  986 F.3d 38 (1st Cir. 2021) ...........................................................................................6, 7

*NIH v. Am. Pub. Health Ass'n,*
  145 S. Ct. 2658 (2025) ............................................................................................1, 2, 4, 5

*Ohio Forestry Ass'n v. Sierra Club,*
  523 U.S. 726 (1998) ..........................................................................................................5

*Ortiz v. Jimenez-Sanchez*,
  98 F. Supp. 3d 357 (D.P.R. 2015) ............................................................19

*Progressive Consumers Fed. Credit Union v. United States*,
  79 F.3d 1228 (1st Cir. 1996) ....................................................................6

*Rudisill v. McDonough*,
  601 U.S. 294 (2024) ................................................................................16

*Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. Army Corps of Eng'rs*,
  888 F.3d 906 (8th Cir. 2018) ....................................................................8

*Stinson Canning Co. v. Mosbacher*,
  731 F. Supp. 32 (D. Me. 1990) ................................................................10

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...........................................................................4, 19

*Trump v. Am. Fed'n of Gov't Emps.*,
  145 S. Ct. 2635 (2025) ..............................................................................1

*Tyngsboro Sports II Solar, LLC v. Nat'l Grid USA Serv. Co., Inc.*,
  88 F.4th 58 (1st Cir. 2023) ........................................................................6

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952) ..................................................................................10

*United States v. Texas*,
  599 U.S. 670 (2023) ..................................................................................1

**REGULATIONS**

2 C.F.R. § 200.101(b)(1) (2020) ..................................................................20

2 C.F.R. § 200.340 ......................................................................................15

2 C.F.R. § 200.340(a)(3) .........................................................................15, 16

2 C.F.R. § 200.340(a)(4) .......................................................................*passim*

2 C.F.R. § 200.340(b) .................................................................14, 18, 19, 20

85 Fed. Reg. 49,506 (Aug. 13, 2020) ..........................................................17

**OTHER AUTHORITIES**

Illinois Comment on Proposed Rule for OMB Guidance for Grants and Agreements (Mar. 23, 2020), https://www.regulations.gov/comment/OMB-2019-0005-0192 ...............................................12

*Improving Oversight of Federal Grantmaking*, Exec. Order No. 14,332, 90 Fed. Reg. 38,929 (Aug. 7, 2025) ...........................................................................................................................................................14

Minnesota Comment on Proposed Rule for OMB Guidance for Grants and Agreements (Mar. 23, 2020), https://www.regulations.gov/comment/OMB-2019-0005-0167 ...............................................12

The White House, OMB, https://bidenwhitehouse.archives.gov/omb/ ...............................................18

# INTRODUCTION

Plaintiffs now concede several critical points. They disclaim any challenge to "*past* grant terminations." Pls.' Opp'n & Reply at 7, ECF No. 98. They ignore Defendants' arguments about— and don't even cite—two recent Supreme Court opinions about grant-termination litigation. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (citing *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025)). They offer no substantive response to Defendants' causation or redressability arguments—an extraordinary oversight that is fatal to this suit. And they abandon two of their three merits theories, apparently now recognizing that Defendants do not argue (and never did) that 2 C.F.R. § 200.340(a)(4) authorizes grant terminations that otherwise violate federal statutes or regulations.

All of this validates Defendants' warning that "the States have brought an extraordinarily unusual lawsuit." *United States v. Texas*, 599 U.S. 670, 686 (2023). In response, Plaintiffs now repeatedly characterize their suit as "a textbook pre-enforcement APA challenge." Pls.' Opp'n & Reply at 4. The parties are clearly reading from different textbooks. If Plaintiffs want to bring a "textbook" lawsuit, they should sue in the Court of Federal Claims to challenge any actual grant termination that they believe to be unlawful. But this sprawling and scattershot facial challenge, at this high level of generality, just doesn't work. *Cf. Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) (Sotomayor, J., concurring). And on the merits, Plaintiffs still have little response to Defendants' arguments about the text, structure, and context of 2 C.F.R. § 200.340(a)(4)—which, on its face, allows for consideration of *any* "agency priorities," not just those of the prior President. Plaintiffs' apparent surprise that agencies have now actually *used* their broad grant-termination authority does not change the straightforward meaning of the plain text of the regulation.

It bears repeating that "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part) (cited favorably in *Biden v. Texas*, 597 U.S. 785, 812 (2022)). Some of Plaintiffs' arguments are very hard to square with that important principle of representative democracy. This suit should be dismissed in its entirety.

## I.    PLAINTIFFS LACK ARTICLE III STANDING.

Defendants' opening brief made two different arguments about Article III standing: (1) that there is a mismatch between Plaintiffs' alleged injuries and the target of this suit, which gives rise to causation and redressability problems; and (2) that Plaintiffs' forward-looking theories of injury were also too speculative. Plaintiffs ignore the former, and their responses to the latter are meritless.

### a.    Plaintiffs' cognizable injuries are caused by decisions that they do not (and could not) challenge in this suit, and that are not redressable here.

Defendants' opening brief explained why, at least in this forum, Plaintiffs could not challenge the actual termination of any particular grant, under now-well-settled principles reiterated by the Supreme Court twice this year. *See NIH*, 145 S. Ct. 2658 (citing *California*, 145 S. Ct. 966). But in trying to plead around a Tucker Act problem, Plaintiffs have pleaded themselves into another one: the causation and redressability requirements of Article III standing. As for causation, Defendants explained that "Plaintiffs' injuries are all caused by actual grant terminations—not by the regulations (nor any interpretation of those regulations) that Plaintiffs challenge in this suit." Defs.' Br. at 1, ECF No. 89. And as for redressability, Defendants argued that winning this suit "would not restore a single dollar of lost funding, nor prevent the future termination of any particular grant." *Id.* at 12.

Remarkably, Plaintiffs do not offer any substantive response—even though these arguments are dispositive of the entire case, and even though arguments "in favor of a court's subject-matter jurisdiction," rather than its absence, "can be waived or forfeited." *Mullane v. DOJ*, 113 F.4th 123, 137 (1st Cir. 2024). The Court could thus stop reading here, and dismiss this case on that basis alone.

Plaintiffs' error seems to have been based on a misunderstanding of Defendants' arguments. In Plaintiffs' words: "[W]hile Defendants spill much ink arguing that there is no causation or redressability for *past* grant terminations, Plaintiffs are not seeking relief for any of those." Pls.' Opp'n & Reply at 7. Plaintiffs assert that "they seek *forward*-looking relief to clarify their rights under the Clause for current and future grants that are subject to Agency Defendants' invocation of the Clause." *Id.* And they say that "Defendants do not (and could not) contest that Plaintiffs' harm from future grant terminations is traceable to Defendants and would be redressed by a favorable ruling." *Id.*

In fact, Defendants can—and did—contest exactly that: arguing (1) that "Plaintiffs' injuries are *all* caused by actual grant terminations" that are not challenged here, and (2) that winning this suit "would not restore a single dollar of lost funding, nor prevent the *future* termination of any particular grant." Defs.' Br. at 1, 12 (emphases added). None of those arguments was limited to past grant terminations—as Defendants' use of the words "all" and "future" should have made clear.

Nor would it have made sense for Defendants to limit these arguments in the way that Plaintiffs mistakenly assumed. The fundamental point has always been that there is a "mismatch," *id.* at 1, between Plaintiffs' alleged injuries (all of which stem from grant terminations) and the nature of their claims for relief (about agency regulations or an interpretation of those regulations). That same mismatch is present whether or not the grant terminations in question have already happened or are (as Plaintiffs assert) imminently going to happen in the future. So these arguments apply equally to "the *future* termination of any particular grant." *Id.* at 12 (emphasis added).[1]

To be sure, Defendants *also* argue that Plaintiffs' forward-looking theories of injury "do not even get off the ground" because of an additional standing problem: that "they are far too speculative to provide the basis for any Article III injury." *Id.* at 13. But that was not a concession about past grant terminations—it is just that theories of injury based on past grant terminations (obviously) do not have a speculativeness problem. They do, however, have the same causation and redressability problems described above, and in Defendants' first brief (at 10-12). In other words, Section I(a) of Defendants' opening brief addressed "all of Plaintiffs' Article III injuries," and Section I(b) addressed a subset—that is, allegations about "the risk of future injuries." *Id.* at 12, 13.

In any event, the result is clear: Plaintiffs have not offered any substantive response to the causation and redressability arguments in Section I(a) of Defendants' motion to dismiss. That alone justifies dismissal of this entire suit for lack of subject-matter jurisdiction.

---

[1] This point was also made on several other occasions in Defendants' brief. *See* Defs.' Br. at 12 ("*all* of Plaintiffs' Article III injuries . . .") (emphasis added); *id.* ("*[N]one* of Plaintiffs' alleged injuries . . .") (emphasis added). Regardless, even if Plaintiffs dispute that interpretation, arguments about the lack of subject-matter jurisdiction can never be forfeited or waived. *See, e.g., Mullane*, 113 F.4th at 137.

b.    **Plaintiffs' allegations of possible future injury relating to possible future grant terminations are too speculative to support standing.**

In addition, Plaintiffs' allegations of future injuries are too speculative, both as a matter of standing and ripeness. *Id.* at 13-17. On this point, Plaintiffs responded. Their responses lack merit.

**1.** As for the possible future termination of possible future grants that have not yet been awarded—which comprised a huge part of Plaintiffs' theory of harm, *see id.* at 13 n.3 (citing thirteen different paragraphs of the amended complaint)—Plaintiffs now retreat. Plaintiffs offer no defense of those allegations and instead pivot immediately to a theory of harm based on "*existing* grants that are at risk of termination right now." Pls.' Opp'n & Reply at 9. So, if nothing else, the Court should dismiss any request for relief that would cover future grants that have not yet been awarded. *See TransUnion LLC v. Ramirez,* 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."). Of course, if Plaintiffs are dissatisfied with the terms of the government's *future* offers, they are free to decline—nobody is forced to apply for (or accept) federal grant money.

**2.** As for existing grants, Plaintiffs argue that "any suggestion that Plaintiffs will not experience more Clause-based grant terminations by Agency Defendants blinks reality." Pls.' Opp'n & Reply at 9. But it is not Defendants' burden to prove that no grant will ever again be terminated. To the contrary, Plaintiffs must establish an injury that is "concrete, particularized, and actual or imminent"— it is "not sufficient" to offer mere "allegations of *possible* future injury." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013) (cleaned up). Plaintiffs seem to think it is enough to predict that at least one agency will terminate at least one grant at some point in the next 100 years based on a change in agency priorities. But if that were enough, *Clapper* would have come out the other way. *See* 568 U.S. at 412 ("[B]ecause § 1881a at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural.").

In the grant-termination context specifically, Plaintiffs do not dispute that grant terminations are "highly discretionary decisions over how to allocate limited agency resources." *NIH,* 145 S. Ct. at 2665-66 (Kavanaugh, J., concurring). So when it comes to considering grants on an agency-by-agency,

grant-by-grant basis, "[t]hese policy decisions might be made in different ways by the governing officials, depending on their perceptions of wise . . . policy and myriad other circumstances." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 614-15 (1989).  But standing cannot rest on "guesswork as to how independent decisionmakers will exercise their judgment."  *Clapper*, 568 U.S. at 413.

**3.**  Plaintiffs' ripeness problem is even more straightforward.  They now accept that "in a case seeking relief with respect to agency regulations, a case is 'ordinarily considered' ripe when the 'factual components [are] fleshed out, by some concrete action applying the regulation' in 'a fashion that harms or threatens to harm' to the challenging party."  Pls.' Opp'n & Reply at 10 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)); *see also* Defs.' Br. at 15 (including the full quotation, which is even more damaging to Plaintiffs' position than Plaintiffs' edited version).  But that does not "describe[] this case perfectly," as Plaintiffs' insist without explanation.  Pls.' Opp'n & Reply at 10. What matters for purposes of the ripeness doctrine is that, when actual grants are actually terminated, Plaintiffs will "have ample opportunity later to bring its legal challenge" in the context of those actual grant terminations, "at a time when harm is more imminent and more certain."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998).  So they must.

Plaintiffs say that the Court should "not require Plaintiffs to lose billions more in federal funding to contest Defendants' interpretation of the Clause."  Pls.' Opp'n & Reply at 12.  That argument reflects a material misunderstanding of Defendants' position.  Plaintiffs can sue *today* to challenge actual grant terminations—that is, as long as they do so in compliance with the Tucker Act. *See NIH*, 145 S. Ct. 2658 (citing *California*, 145 S. Ct. at 966).  Plaintiffs may find that "case-by-case approach" to be "frustrating," but it "is the traditional, and remains the normal, mode of operation[s] of the courts."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

**c.**    **Plaintiffs seek an impermissible advisory opinion, not a permissible declaratory judgment.**

**1.**  "The divide between a valid declaratory judgment and an invalid advisory opinion can be narrow."  *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 16 (1st Cir. 2014).  As Defendants explained in their opening brief (at 17-19), this suit falls on the wrong side of that line, because Plaintiffs ultimately

"seek nothing more than 'an opinion advising what the law would be upon a hypothetical state of facts.'" Defs.' Br. at 18-19 (quoting *California v. Texas*, 593 U.S. 659, 672 (2021)).

Plaintiffs' response is two-fold: that (1) "Plaintiffs have had billions in grants already terminated by Agency Defendants, and [2] they have billions in *active* grants with the same Agency Defendants at risk of termination." Pls.' Opp'n & Reply at 17. But mashing those two distinct theories into one sentence does not solve Plaintiffs' advisory-opinion problem. As for "grants already terminated" in the past, Plaintiffs have now conceded explicitly that they "are not seeking relief for any of those." *Id.* at 7. And as for "active grants" that Plaintiffs fear are "at risk of termination" in the future, *id.*, that is exactly the sort of "hypothetical state of facts" that cannot support a declaratory judgment. So, for example, although Plaintiffs insist that "this is a dispute over the legality of concrete agency actions," which "concrete" action do they have in mind? They don't say. That is unsurprising, as the legality of the possible future termination of some as-yet-unidentified grant does not raise any "concrete" dispute at all—even if some of Plaintiffs' predictions turn out to be true, and some of their grants are eventually terminated at some point in the future.

**2.** A declaratory judgment is a form of relief, not a standalone cause of action. *See* Defs.' Br. at 19-20. Plaintiffs now concede that "other courts have held as much," but assert that "the First Circuit has not." Pls.' Opp'n & Reply at 19. But Defendants quoted (at 19) three First Circuit cases for this precise proposition. *See Tyngsboro Sports II Solar, LLC v. Nat'l Grid USA Serv. Co., Inc.*, 88 F.4th 58, 64 (1st Cir. 2023) ("The DJA does not by itself create a federal cause of action."); *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007) ("Although the plaintiffs style 'declaratory judgment' as a cause of action, the provision that they cite, 28 U.S.C. § 2201(a), creates a remedy, not a cause of action."); *Muirhead v. Mecham*, 427 F.3d 14, 17 n.1 (1st Cir. 2005) (similar) (citing *Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228, 1230 (1st Cir. 1996))). None of these cases is acknowledged (let alone refuted) in Plaintiffs' brief. That is dispositive of this issue.[2]

---

[2] Plaintiffs do cite—in a footnote, without any explanation—the First Circuit's decision in *New Hampshire Lottery Commission v. Rosen*, 986 F.3d 38, 62 (1st Cir. 2021), which predates the clear statement in *Tyngsboro Sports* quoted above. Nonetheless, the cited passage addresses "the relief granted by the

## II.    PLAINTIFFS DO NOT CHALLENGE ANY FINAL AGENCY ACTION IN COUNTS I AND II.

Plaintiffs' Count III is an arbitrary-and-capricious challenge (only in the alternative) to 2 C.F.R. § 200.340(a)(4). Counts I and II, by contrast, do not actually challenge the legality of any regulation. Instead, in Counts I and II, Plaintiffs challenge the government's *interpretation* of § 200.340(a)(4). In other words, Plaintiffs argue that the government has interpreted § 200.340(a)(4) in a way that is "contrary to the meaning" of that (itself lawful) regulation. Am. Compl. ¶ 300 (Count II), ECF No. 64; *see also id.* at ¶ 295 (in Count I, seeking "Declaratory relief setting out these limitations on the Clause"). But as Defendants have explained, *see* Defs.' Br. at 20-23, the government's interpretation of its own grant-termination regulations, in the abstract, neither "mark[s] the 'consummation' of the agency's decisionmaking process," nor reflects any decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Accordingly, Counts I and II fail for lack of final agency action. Plaintiffs' (few) responses are heavy on rhetoric and light on substance.[3]

Plaintiffs seem not to dispute "that further agency steps must still occur" before Plaintiffs suffer any injury from the government's interpretation of its grant-termination regulations. Pls.'

---

district court." *Id.* Again, Defendants agree that a declaratory judgment is one possible form of "relief" that could be granted to remedy an APA violation, if a plaintiff prevails on an APA claim. The problem is that—under binding First Circuit precedent that Plaintiffs continue to ignore—there is no such thing as a standalone "Declaratory Judgment" cause of action. And for whatever reason, that is the only cause of action on which Plaintiffs have sought summary judgment.

[3] Plaintiffs' briefing also confuses which theories appear in which parts of the amended complaint. To be clear, all agree that Count III challenges final agency action. And all agree that Count II does not directly challenge any regulation, but instead challenges the government's *interpretation* of its regulations, and thus is (at least potentially) vulnerable to Defendants' final-agency-action argument. Unexpectedly, however, Plaintiffs resist the idea that the same is true of Count I, asserting that Count I (like Count III) "seek[s] relief targeted at agency regulations themselves." *See* Pls.' Opp'n & Reply at 13 n.8. Defendants encourage the Court to read Paragraphs 279-295 of the amended complaint (not just Paragraph 280, which Plaintiffs cite at 13 n.8). As those paragraphs make clear, Count I (like Count II, but unlike Count III) does not reflect any challenge *to* the regulations (*e.g.*, by arguing that the regulations should be declared unlawful), but instead seeks relief relating to how those (concededly lawful) regulations should be interpreted. *See* Pls.' Opp'n & Reply at 13 n.7 (describing Count I in a way that is consistent with Defendants' interpretation, not Plaintiffs'). Accordingly, all of Defendants' arguments about final agency action apply equally to Counts I and II (but not to Count III).

Opp'n & Reply at 16. Nor could they. After all, many thousands of grants are governed by the exact same regulations, interpreted the exact same way, and have *not* been terminated. *See* Defs.' Br. at 21. That alone proves that the interpretation itself is not the action "from which 'legal consequences will flow.'" *Harper*, 118 F.4th at 116 (quoting *Bennett*, 520 U.S. at 178). Instead, it is the (possible, future) termination of a grant that would be final agency action—far downstream of the (alleged) interpretive decision that Plaintiffs try to challenge here.

Plaintiffs respond that "this argument ignores the facts on the ground: Plaintiffs have suddenly experienced billions of dollars in grant terminations—all invoking the newly interpreted Clause—and are vulnerable to billions more." Pls.' Opp'n & Reply at 16. But the fact that many grants have been terminated (or that future grants might also be terminated) has nothing to do with whether Plaintiffs challenge final agency action—after all, Plaintiffs are not challenging the termination of any grant. If Plaintiffs did challenge actual grant terminations, Defendants would have other justiciability arguments—but would not be disputing final agency action. So these "facts on the ground," if anything, prove Defendants' point—it is the actual termination of an actual grant that both "mark[s] the 'consummation' of the agency's decisionmaking process" and is an agency decision "from which 'legal consequences will flow.'" *Harper*, 118 F.4th at 116 (quoting *Bennett*, 520 U.S. at 178).

Plaintiffs also respond that "some federal agencies have now expressly incorporated Defendants' interpretation of the Clause into new grant award terms and conditions, confirming that Defendants intend to continue to use that flawed interpretation to terminate more grants in the future." Pls.' Opp'n & Reply at 15. That argument confuses final agency action with standing and ripeness. Although Plaintiffs' speculation about possible future events is both a standing and a ripeness problem, *see supra* at 4-5, their final-agency-action problem is different—and has little to do with the speculativeness (or lack thereof) of their theories of future injury. In any event, if Plaintiffs are correct that Defendants will "terminate more grants in the future," those grant terminations *would* be final agency action. But an agency does not determine legal rights or obligations "merely by expressing its view of the law." *Sisseton-Wahpeton Oyate of Lake Traverse Rsrv. v. Army Corps of Eng'rs*, 888 F.3d 906, 915 (8th Cir. 2018) (quoting *AT&T Co. v. EEOC*, 270 F.3d 973, 976 (D.C. Cir. 2001)).

III.   **ALL PLAINTIFFS FORFEITED (AND SOME PLAINTIFFS WAIVED) THEIR CLAIMS IN COUNT III BY FAILING TO RAISE THEIR OBJECTIONS DURING THE RULEMAKING.**

**a.**  The core premises of Defendants' waiver-and-forfeiture argument are also now undisputed. Plaintiffs do not dispute that (1) many of the States "did not comment at all" in the 2024 rulemaking at issue in this suit, nor that (2) those States that did comment failed to "raise[] any of the issues that are now the subject of Plaintiffs' lawsuit," nor even that (3) "many" of the States' comments "were broadly *supportive* of OMB's proposed language." Defs.' Br. at 23.  Plaintiffs likewise do not dispute that, at least in the D.C. Circuit, "[i]t is black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue." *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001); *see also* Defs.' Br. at 25 (collecting cases).  Plaintiffs' only real response is to assert (without explanation) that the First Circuit has rejected that well-settled rule, citing only one case: *Massachusetts v. Hayes*, 691 F.2d 57 (1st Cir. 1982).  Plaintiffs are mistaken—which is presumably why Plaintiffs say nothing at all about the several First Circuit cases that Defendants cited for this proposition, all of which come after *Hayes*.

For example, in *Adams v. EPA*, the First Circuit explained that "[i]n reviewing agency action," a court "will not consider issues which a petitioner failed to present during the administrative process in accordance with the relevant procedural requirements." 38 F.3d 43, 50 (1st Cir. 1994).  The First Circuit even explained *why* "[w]e apply the doctrine of procedural default in the administrative context": (1) so that the agency "can apply its expertise" and "create a more finely tuned record for judicial review," (2) "to promote judicial economy," and (3) by giving the agency an "opportunity to monitor its own mistakes" and thus "ensur[e] that regulated parties do not simply turn to the courts as a tribunal of first resort." *Id.* (quoting *Massachusetts v. Sec'y of Agric.*, 984 F.2d 514, 523 (1st Cir. 1993)).  All those considerations apply here.

Similarly, in *Massachusetts v. Secretary of Agriculture*, the First Circuit went on at length about what it described as "the raise-or-waive rule in the administrative law context." 984 F.2d at 524.  In the First Circuit's words, the First Circuit "appl[ies] strict rules of procedural default in the administrative context." *Id.* at 523.  As a result, "[i]n the usual administrative law case, a court ought not to consider

points which were not seasonably raised before the agency." *Id.* (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (citing the "general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice")). Finally, in *Massachusetts v. United States*, the First Circuit called it a "basic prerequisite" for "judicial review of an agency action" that the challenger first satisfy "[t]he administrative exhaustion requirement" by requiring that "litigants use all steps that the agency holds out" before bringing suit. 522 F.3d 115, 132 (1st Cir. 2008).

By contrast, the basis for Plaintiffs' assertion (at 34) that the First Circuit has "rejected" these principles relies entirely on one quote from one half of one sentence in *Massachusetts v. Hayes*, 691 F.2d 57, 60 (1st Cir. 1982) (discussing when a party is "not estopped"). Again, *Hayes* predates all the First Circuit authority just discussed. But even on its own terms, Plaintiffs seem to have found a quote they liked and then stopped reading. After Plaintiffs' quote—and after a "however"—the First Circuit went on to note that "the Commonwealth had actual notice of rulemaking," and that "the Commonwealth did not question the validity of" the agency standard "in administrative hearings on its own application for exemption." *Id.* Then, after citing the canonical source of the original administrative-exhaustion requirement from the Supreme Court—*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)—the First Circuit stated that it "would hesitate, therefore, to declare [the agency rule] invalid even if it were clearly beyond the agency's statutory authority." *Hayes*, 691 F.2d at 60; *see also Stinson Canning Co. v. Mosbacher*, 731 F. Supp. 32, 34 (D. Me. 1990) ("[*Hayes*] qualified its position in certain instances in which the aggrieved party had actual notice of the proposed rule.").

This ambiguous dictum is hardly a "rejection" of what later First Circuit precedent describes definitively as the "the raise-or-waive rule in the administrative law context." *Massachusetts v. USDA*, 984 F.2d at 524. And it is fully consistent with Defendants' position—especially where, as here, Plaintiffs do not even assert that they lacked notice of the rulemaking. Regardless, *Hayes* ultimately declined to issue a holding on this question. *See* 691 F.2d at 60 ("Because we find that the agency was well within its discretion, however, we need not deal with that tension between procedural and

substantive shortcomings."). So *Hayes* offers no basis to depart from the "black-letter administrative law" rule that is fatal to Count III. *Appalachian Power*, 251 F.3d at 1036.[4]

    **b.** Unable to find refuge in precedent, Plaintiffs lean on policy arguments. They argue that "it makes little sense to apply the administrative-waiver doctrine to notice-and-comment rulemaking." Pls.' Opp'n & Reply at 33. Setting aside that neither the Supreme Court, the First Circuit, or the D.C. Circuit has ever limited the doctrine in that way,[5] this very case shows why that is wrong. According to Plaintiffs, "[t]he crux of the claim is that when the Clause was proposed and adopted, 'OMB never once provided an explanation for [the] expansive assertion of authority' Defendants now advance." *Id.* at 31 (quoting Am. Compl. ¶¶ 314-15). But that is exactly the sort of claim that would benefit from "applying strict rules of procedural default in the administrative law context." *Massachusetts v. USDA*, 984 F.2d at 523. After all, had Plaintiffs raised *any* of these issues in *any* of their comments, perhaps OMB would have offered the very sort of explanation that Plaintiffs now claim is missing. Unfortunately, because Plaintiffs never raised these issues during the rulemaking, we'll never know.

    Relying heavily on one Fifth Circuit opinion, Plaintiffs lament that straightforward application of these rules might require litigants to become "faithful reader[s]" of the Federal Register. Pls.' Opp'n & Reply at 33 (quoting *Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 295 (5th Cir. 1998)). It is far from clear why incentivizing States to pay more attention to federal regulatory actions would be a bad thing. Regardless, that policy critique is also inapposite here, where several Plaintiffs *did* comment on

---

    [4] Plaintiffs cite out-of-circuit authority for the idea that sometimes, an agency may have to address certain "key assumption[s]" of a rule, even in the absence of comments. Pls.' Opp'n & Reply at 34. But the age of the "agency priorities" was not a "key assumption" in the 2024 rulemaking, which didn't even make any changes to the regulatory text on that issue. Of course, if this really went to some "key assumption" of that rulemaking, Plaintiffs' failure to comment is even more inexplicable.

    [5] Plaintiffs (at 33) cite *Carr v. Saul*, 593 U.S. 83 (2021), a non-rulemaking case in which the Supreme Court excused administrative forfeiture of an Appointments Clause claim. There, the Court explained that "structural constitutional challenges . . . usually fall outside" an agency's "technical expertise." *Carr*, 593 U.S. at 92. In addition, the Court relied on a "futility exception," on the theory that it "makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested," such as (in *Carr*) asking an Administrative Law Judge at the Social Security Administration to opine on the Appointments Clause. *Id.* at 93. None of those considerations applies here. So, if anything, *Carr* supports Defendants, by accepting the basic administrative-law premise—which Plaintiffs still resist—that this sort of issue exhaustion is (at least) presumptively required.

this very rulemaking. They just didn't notice—or perhaps didn't care, at least during the Biden Administration—that the regulations explicitly provide for termination of a grant that "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

Plaintiffs say that enforcing waiver-and-forfeiture rules here "would be especially unfair" because they "could not have anticipated that the language of the Clause would permit Agency Defendants to terminate federal grants on a whim based on newly identified agency priorities." Pls.' Opp'n & Reply at 32. But even if that were legally relevant to Plaintiffs' (now undisputed) failure to comment, the assertion is refuted by record—as Illinois and Minnesota *did* identify this very possibility in an earlier rulemaking on the same topic. *See* Defs.' Br. at 24 n.9. To be clear, Plaintiffs do not dispute that that 2020 rulemaking "is not before this Court," nor that "commenting on a different, previous rule cannot satisfy Plaintiffs' burden to comment on the one that is before the Court." *Id.* But as for what Plaintiffs could have anticipated, those comments are fatal. In the 2020 rulemaking, Plaintiff Minnesota argued that "[t]he potential for grants to be defunded in the middle would be hugely problematic." *See* Minnesota Comment (Mar. 4, 2020).[6] Plaintiff Illinois was even more direct:

> It concerns us that if there is a change in management for an agency and the new management wants to go in a different direction with the goals, it would allow them to terminate awards that we, as the pass-through agency may already have started the program and obligated grants to our sub-recipients. A federal agency['s] program goals/priorities may change, but the pass-through entities may not. Thus, a grant termination by the federal agency may cause a substantial disruption to the pass-through entity and/or its subrecipients. . . . [W]e are very concerned that with a change of administration there may be a change in the direction of program goals/priorities causing a termination of awards.

Illinois Comment (Mar. 25, 2020).[7] If Plaintiffs Illinois and Minnesota were "very concerned" about this possibility with the 2020 version of the regulations, it is hard to understand why Plaintiffs Illinois

---

[6] https://www.regulations.gov/comment/OMB-2019-0005-0167

[7] https://www.regulations.gov/comment/OMB-2019-0005-0192

and Minnesota—or any of the other Plaintiffs—"could not have anticipated" that the 2024 regulations would be invoked in much the same way that two of them feared in 2020. Pls.' Opp'n & Reply at 32.[8]

## IV.    PLAINTIFFS' CLAIMS LACK MERIT.

Plaintiffs' opening brief attacked a strawman, arguing that the Court should declare that the government must generally comply with federal grant-related statutes and regulations, *see* Pls.' Mot. for Summ. J. at 21-25, ECF No. 67—a point that Defendants never even disputed, at least at the level of generality at which Plaintiffs brought this suit. To their credit, Plaintiffs now abandon those requests for relief. *See* Pls.' Opp'n & Reply at 2. The result is that two of Plaintiffs' original three merits theories can now be disregarded, for lack of any live dispute. Plaintiffs' only remaining merits argument—that when OMB said "agency priorities" in 2 C.F.R. § 200.340(a)(4) it meant only *old* agency priorities—is impossible to square with the text, structure, or context of the regulation.

**a.** Under 2 C.F.R. § 200.340(a)(4), a "Federal award may be terminated in part or its entirety . . . [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." As Defendants have explained, nothing in that language limits "the program goals or agency priorities" to those in effect at the time the grant was made—the text simply asks whether "an award no longer effectuates the program goals or agency priorities," without any textual limitation on *when* those goals or priorities were established. *See* Defs.' Br. at 30-31.

In response, Plaintiffs' primary textual argument continues to be that "[t]he definite article"— that is, the word "the"—"forecloses Defendants' suggestion that there can be many sets of goals and priorities between Time A and Time B." Pls.' Opp'n & Reply at 22. Defendants do not know what else to say about this argument that they haven't already said: "Nothing about the word 'the' tells the

---

[8] Those comments also dispose of Plaintiffs' repeated accusations that Defendants' arguments about "Plaintiffs' surprise" are somehow "disingenuous" or "absurd." Pls.' Opp'n & Reply at 21, 27. At an absolute minimum, Plaintiffs Illinois and Minnesota cannot plausibly level that charge. And none of the other Plaintiff States explains why Illinois and Minnesota were able to anticipate the very possibility that they now suggest was impossible to see coming.

reader whether 'the . . . agency priorities' at issue are 'the' current priorities or 'the' old priorities" or both. Defs.' Br. at 33. "The word 'the' simply doesn't answer (or even address) that question." *Id.*

Undeterred, Plaintiffs now repeat the same argument several more times, insisting that "if the Clause permitted different goals and priorities at Times A and B, as Defendants argue, it would not be possible to speak of 'the program goals or agency priorities.'" Pls.' Opp'n & Reply at 22-23. Respectfully, that is demonstrably wrong as a matter of plain English. Consider the following sentence: "After the new Secretary of Transportation took over, the agency priorities changed." Or try: "The President and his team adjusted the program goals and agency priorities to align more closely with his campaign promises." Or how about: "Everyone expects that the program goals or agency priorities are going to change after the inauguration." It is easy to place the word "the" before "program goals or agency priorities" that have changed (or that can change) over time. So Plaintiffs' core textual argument is based on an obviously mistaken linguistic premise.

Plaintiffs also fault the President for (more recently) directing his subordinates to "take steps to revise the terms and conditions of existing discretionary grants to permit immediate termination for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest." *Improving Oversight of Federal Grantmaking*, Exec. Order 14,332, §6(b), 90 Fed. Reg. 38,929, 38,932 (Aug. 7, 2025). On its face, that language is mostly about an issue that Plaintiffs have abandoned: the separate requirement in 2 C.F.R. § 200.340(b) that an agency "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," which different agencies have handled differently over the years.

In any event, Plaintiffs' focus on the absence of the word "the" before "agency priorities" in one section of that Executive Order is more revealing about Plaintiffs' state of mind than the President's—especially given that "the national interest" appears two words later, introduced by the word "the." If Plaintiffs really believe that the President omitted the word "the" before "agency priorities" and included it before "national interest" in order to covertly make a significant point about changes over time—without saying so expressly, and in an order that otherwise treats "agency priorities" and "national interest" largely as synonyms—they have offered no evidence for that

ambitious assumption. And in any event, even if the omission of the word "the" before "agency priorities" is intentional, that would only mean that the President was prudently seeking to neutralize the same baseless arguments that Plaintiffs raise here, in future litigation. That would at most be sensible, belt-and-suspenders lawyering—not some kind of opaque, implicit concession about the meaning of the word "the" in other regulatory text issued by OMB during the Biden Administration.[9]

**b.** Defendants have also explained why Plaintiffs' interpretation is inconsistent with the structure of 2 C.F.R. § 200.340. In particular, on Plaintiffs' theory, it is very hard to understand why, in the immediately preceding sub-section of OMB's regulations, the agency's termination authority turns explicitly on a conclusion that "the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made." *Id.* § 200.340(a)(3). In other words, in (a)(3), OMB called for the very sort of backward-looking inquiry about the agency's "purposes" at the time "the Federal award was made" that Plaintiffs say is silently and implicitly required by subsection (a)(4)—despite the absence of any remotely similar language in (a)(4). *See* Defs.' Br. at 31-32.

Plaintiffs respond that "those two subsections differ in scope, and that difference in scope explains why they use different language." Pls.' Opp'n & Reply at 23-24. Obviously, the substance of those two subsections "differ in scope"—otherwise there would be only one subsection, not two. The problem for Plaintiffs is that they want to read § 200.340(a)(4) to allow termination only when allowing the award to continue "will not accomplish the purposes for which the Federal award was made." 2 C.F.R. § 200.340(a)(3). But if OMB intended subsection (a)(4) to operate like subsection (a)(3), then why didn't it include the same kind of temporal language? Plaintiffs offer no answer.

---

[9] To that end, Plaintiffs' intense focus on the word "the" is also an awkward fit for the "agency priorities" half of the phrase "the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). OMB only put the word "the" in front of "program goals," not in front of "agency priorities." So even accepting Plaintiffs' premise—that OMB chose the word "the" to dramatically narrow the scope of this regulation—it is not clear why OMB didn't say "the program goals or *the* agency priorities." That internal inconsistency in Plaintiffs' theory is unexplained in their briefs—which repeatedly use an ellipsis to attach the word "the" to the phrase "agency priorities" more closely than in the actual regulation. *See* Pls.' Opp'n & Reply at 21 (discussing "the . . . agency priorities"). At times, Plaintiffs omit the ellipsis entirely. *See id.* at 23 (quoting the regulation, inaccurately, as "*the* agency priorities").

Plaintiffs nonetheless insist that "[t]he phrase 'no longer effectuates the . . . agency priorities' in subsection (a)(4) looks backward just as clearly as 'purposes for which the Federal award was made' in subsection (a)(3)." Pls.' Opp'n & Reply at 24. Respectfully, when it comes to the age of the "agency priorities," that is plainly wrong. To say (as in (a)(4)) that a grant no longer "effectuates" the agency's priorities could be about (and indeed, is more naturally read to be about) the agency priorities in effect *today*—even if the grant previously effectuated agency priorities, in the past. But to ask (as in (a)(3)) whether an award will accomplish "the purposes for which the Federal award *was* made" is to ask *only* about the agency's purposes at the time of the award "was made," in the past. Yes, both provisions acknowledge that time passes—but what matters here is that only one of the two ties the agency's termination authority to "agency priorities" or "purposes" that were in effect at the time that "the Federal award was made." 2 C.F.R. § 200.340(a)(3). And this "focus on verb tense" is not "a red herring," Pls.' Opp'n & Reply at 24, as Plaintiffs say—to the contrary, the Supreme Court "generally 'presume[s] differences in language like this convey differences in meaning.'" *Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017)).

Plaintiffs close this section by asserting, improbably, that "the backward-looking nature of subsection (a)(3) reinforces the backward-looking nature of subsection (a)(4)," Pls.' Opp'n & Reply at 24, citing a case for the proposition that when "several items in a list share an attribute" that "counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994). But again, (a)(3) and (a)(4) do *not* share the relevant attribute: one asks about the agency priorities in effect at the time that "the Federal award was made," 2 C.F.R. § 200.340(a)(3), and one just asks about the "agency priorities," *id.* § 200.340(a)(4). If anything, the more applicable interpretive canon is "*expressio unius est exclusio alterius*," which means that "expressing one item of [an] associated group or series excludes another left unmentioned." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002); *see also, e.g.*, *Bittner v. United States*, 598 U.S. 85, 94 (2023) (same).

**c.** Plaintiffs fault Defendants for failing to engage with "the rulemaking history of the Clause." Pls.' Opp'n & Reply at 25. But nothing in the "rulemaking history"—by which Plaintiffs mostly seem

to mean the preamble to the 2020 version of the regulation—could possibly overcome the regulation's actual text.  Regardless, Plaintiffs' references to the "rulemaking history" also fail on their own terms.

Plaintiffs first point to language suggesting that the termination provisions were intended "to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals."  85 Fed. Reg. 49,506, 49,507 (Aug. 13, 2020).  On its face, that language is fully consistent with all parties' interpretations of the regulation.  It does not address the dispute at issue in this case.

Plaintiffs then offer an example about how the "EPA could use the Clause to terminate an existing grant to clean up groundwater pollution with a particular technology if a new study reveals that this technology does not in fact help clean up groundwater."  Pls.' Opp'n & Reply at 25 (citing only their own brief).  Defendants agree.  But then, Plaintiffs declare that "EPA could not stop funding the cleanup project midway because it has lost interest in water quality."  *Id.*  Of course, that may or may not be correct for reasons having nothing to do with the challenged regulations—the answer might depend, for example, on what the Clean Water Act or other EPA-specific statutes or regulations have to say on the subject.  But as relevant here, Plaintiffs cite nothing at all for that proposition.  So this is not even an argument about "rulemaking history" at all; it is more like fan fiction.

Plaintiffs next point to OMB's statement in the Federal Register that "agencies are not able to terminate grants arbitrarily."  85 Fed. Reg. at 49,509.  Again, that doesn't address (let alone answer) the question at issue in this lawsuit.  Plaintiffs may think that some agencies have "terminate[d] grants arbitrarily"; the relevant agencies presumably disagree.  Regardless, if Plaintiffs think that any particular grant termination was unlawful, they can sue in the Court of Federal Claims.  But none of that says anything about whether the reference to "the program goals or agency priorities" in 2 C.F.R. § 200.340(a)(4) silently excludes any consideration of current agency priorities.

**d.**  Several of Plaintiffs' merits arguments are bound up with their repeated assertion that "the Clause was not invoked as Defendants describe until five years after it was introduced, when it was suddenly invoked thousands of times."  Pls.' Opp'n & Reply at 27.  Plaintiffs cite no factual support for those numbers, but assume (for purposes of argument) that they are accurate.  Plaintiffs err by assuming that the prior Administration's failure to rely upon this regulation says something important

about what the regulation means. It is now obvious that the second Trump Administration is more interested in exercising its full authority to terminate grants than prior Administrations—but the scope of the authority at issue does not wax and wane via the use or disuse of OMB regulations. Plaintiffs are thus mistaken to repeatedly conflate their "surprise" that the regulations were actually *used* with "surprise" that the regulations mean what they say. And respectfully, it is not "simply absurd" to expect recipients of large amounts of taxpayer money to carefully read the regulations governing those grants, *id.* at 21—nor to consider the possibility that those regulations might actually be *used* to their fullest extent one day, perhaps even in ways that they haven't been used in the past. (This regulation has been on the books only under two Presidents.) And as for Plaintiffs' disparagement of 2 C.F.R. § 200.340(a)(4) as an "an obscure regulatory provision," *id.*, that can't change its meaning, even if it were true—which it is not, given its appearance in the aptly-titled "Termination" section.

     **e.** Defendants' opening brief (at 32-33) also explained why Plaintiffs' interpretation was very hard to square with OMB's core mission, which is to "serve[] the President of the United States in overseeing the implementation of his or her vision across the Executive Branch." THE WHITE HOUSE, OMB, *available at* https://bidenwhitehouse.archives.gov/omb/. Plaintiffs' only response is that "[w]hile Defendants may change their priorities (consistent with applicable law) and take new priorities into account when awarding *new* grants, their invocation of those new priorities to terminate *existing* grants is unlawful." Pls.' Opp'n & Reply at 3; *see also id.* at 29. That is a legal conclusion, not a legal argument. So the point remains unanswered: given OMB's role in the Executive Branch, "it is hard to imagine that in explicitly referencing 'agency priorities' in 2 C.F.R. § 200.340(a)(4), OMB intended to foreclose consideration of *new* agency priorities—all without saying so expressly." Defs.' Br. at 33.

     **e.** On the merits, one additional point warrants mention. As discussed above, the parties agree that, under the current version of the regulations, an agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b). So there is no need (and no legal basis) for a declaratory judgment on that point.

     From reading Defendants' brief, however, Plaintiffs now seem to have learned, for the first time, that "previous versions of this regulation" instead use "explicitly precatory terms" on that issue.

Defs.' Br. at 29 n.11 (quoting 2 C.F.R. § 200.340(b) (2020) ("A Federal awarding agency *should* clearly and unambiguously specify termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section." (emphasis added))).  Defendants noted that wrinkle in passing, in a footnote, just to "underscore[] the problematic nature of the broad, across-the-board relief that" Plaintiffs seek in this case—particularly given the (undisputed) fact that "many older grants," including some "referenced in Plaintiffs' complaint" would be governed by the 2020 version of § 200.340(b), *not* the version at issue in this suit.  *Id.*  But because Plaintiffs do not challenge the government's interpretation of the 2020 version of that provision—and because the parties agree about this feature of the 2024 regulations—Defendants did not address the point further.

Now, apparently concerned by that footnote, Plaintiffs added an entirely new request for relief in their latest brief, asking the Court to "declare that the 2020 regulation, like the 2024 regulation, bars grant terminations unless the grounds for the termination are clearly stated in the award's terms and conditions."  Pls.' Opp'n & Reply at 31.  Plaintiffs say that the Court should reach that conclusion "irrespective of the fact that subsection (b) used the term 'should' in 2020."  *Id.* at 30.

That request is improper.  Neither Plaintiffs' complaint, nor their summary-judgment motion sought any such declaration relating to the 2020 version of 2 C.F.R. § 200.340(b).  That is why this issue was flagged only in passing, in a footnote in Defendants' brief.  Plaintiffs' opposition-reply brief is not an appropriate place to raise new claims or make new requests for relief.  *See, e.g.*, *Andresen v. Diorio*, 349 F.3d 8, 13 (1st Cir. 2003) (argument forfeited "because it is presented for the first time in the reply brief"); *Hagan v. Signature Aviation US Holdings, Inc.*, 2025 WL 1684793, at *2 (D. Mass. June 16, 2025) ("[T]he plaintiffs cannot, of course, add allegations or claims by furnishing them for the first time in an opposition to a motion to dismiss." (quoting *Ortiz v. Jimenez-Sanchez*, 98 F. Supp. 3d 357, 365 n.5 (D.P.R. 2015))) (collecting cases).  And Plaintiffs have not even tried to establish standing to challenge the government's interpretation of the 2020 version of 2 C.F.R. § 200.340(b), which is independently fatal to this untimely gambit.  *See, e.g.*, *TransUnion*, 594 U.S. at 431.

Had Plaintiffs ever before sought this sort of declaration about the 2020 version of 2 C.F.R. § 200.340(b), Defendants would have, for example, explained why the operative text of the 2020

regulation—which uses the word "should" instead of "must," unlike the current version—controls over any contrary implications that Plaintiffs may try to read into the preamble published in the Federal Register. *See* Pls.' Opp'n & Reply at 30 (ignoring the regulation's operative text and making arguments only about the preamble). But, because Plaintiffs never sought that relief, Defendants have not developed those (or any other) arguments further. *See also, e.g.*, 2 C.F.R. § 200.101(b)(1) (2020) (explicitly defining "must" and "should" differently "[t]hroughout this part").

Finally, Plaintiffs say that "this Court should not consider the argument because it is waived." Pls.' Opp'n & Reply at 29. That is correct, as a description of *Plaintiffs'* argument. Defendants cannot have waived their response to an argument that Plaintiffs had not even made at the time of Defendants' alleged waiver. Had Defendants said nothing about this nuance, Plaintiffs may still not even know that they had overlooked this feature of OMB's prior regulations. The Court should not punish Defendants' candor by allowing Plaintiffs to expand the scope of their lawsuit at the eleventh hour. If Plaintiffs wanted relief relating to the government's interpretation of the 2020 version of 2 C.F.R. § 200.340(b), they should have included it in their complaint and their motion for summary judgment (or, when they realized their oversight, filed an amended complaint). They did not.

## CONCLUSION

For these reasons, the Court should dismiss this suit, in its entirety, either for lack of subject-matter jurisdiction (under Rule 12(b)(1)) or for failure to state a claim upon which relief can be granted (under Rule 12(b)(6)). Plaintiffs' motion for summary judgment should then be denied as moot.

Date: December 5, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

/s/ Stephen M. Pezzi
STEPHEN M. PEZZI
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 305-8576
Email: stephen.pezzi@usdoj.gov
Florida Bar No. 1041279

*Counsel for Defendants*