UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STATE OF NEW JERSEY, et al., Plaintiffs, v. U.S. OFFICE OF MANAGEMENT AND BUDGET, et al., Defendants. | ) | Civil Action No. 1:25-cv-11816-IT |

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

MOTION HEARING

Wednesday, May 6, 2026
1:06 p.m.

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts

Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

**A P P E A R A N C E S**

On behalf of the Plaintiffs:

NEW JERSEY ATTORNEY GENERAL'S OFFICE
BY: STEPHEN EHRLICH
BASSAM GERGI
PO Box 112
Trenton, NJ 08625
(609) 984-3900
stephen.ehrlich@njoag.gov
bassam.gergi@njoag.gov

OFFICE OF THE ATTORNEY GENERAL
BY: ANNA E. LUMELSKY
VANESSA AZNIV ARSLANIAN
One Ashburton Place
Boston, MA 02108
(617) 963-2334
anna.lumelsky@mass.gov
vanessa.arslanian@mass.gov

On behalf of the Defendants:

UNITED STATES DEPARTMENT OF JUSTICE
BY: STEPHEN MICHAEL PEZZI
1100 L Street NW
Washington, DC 20005
(202) 305-8576
stephen.pezzi@usdoj.gov

# P R O C E E D I N G S

(In open court at 1:06 p.m.)

THE DEPUTY CLERK: United States District Court is now in session, the Honorable Judge Indira Talwani presiding.

This is Case Number 25-cv-11816, State of New Jersey, et al. v. US Office of Management and Budget, et al. Will counsel please identify themselves for the record.

MR. EHRLICH: Good afternoon, Your Honor. Stephen Ehrlich from the New Jersey Attorney General's Office on behalf of plaintiffs; and with me, also from the New Jersey Attorney General's Office, is Bassam Gergi.

THE COURT: Good afternoon.

MS. LUMELSKY: Good afternoon. Anna Lumelsky from the Massachusetts Attorney General's Office for plaintiff states; and with me is Vanessa Arslanian, also from the Massachusetts Attorney General's Office.

THE COURT: Good afternoon.

MR. PEZZI: Good afternoon, Your Honor. Stephen Pezzi from the Department of Justice on behalf of the United States.

THE COURT: Good afternoon.

So I have the plaintiffs' motion for summary judgment on Count 1, and I have the defendants' motion to dismiss. And I wanted to start out by making sure I

understand the posture of this litigation.

As I read the complaint, the plaintiffs are asking for relief on Count 1 and, in the alternative, if Count 1 is not granted, then Counts 2 and 3; is that correct?

MR. EHRLICH: That's correct, Your Honor.

THE COURT: Okay. I'm going to go back and forth for a few minutes, so before you take over the podium, I'm just trying to get the shape of this.

MR. EHRLICH: Okay. Understood.

THE COURT: So -- and you moved for summary judgment on Count 1 and not on the other counts. And in your view, if I were to grant your motion, what happens to Counts 2 and 3?

MR. EHRLICH: I think if you grant our motion, we -- you can enter judgment on Count 1, and we can reserve on Count 2 and 3. I don't think you have to rule on those. You just enter judgment for the plaintiffs, Your Honor.

THE COURT: Well, I can't enter judgment if you have things open.

MR. EHRLICH: Well, I mean, you can -- we can sort of hold those and perhaps --

THE COURT: But I can't enter judgment.

MR. EHRLICH: Well, so I guess we can -- we can confer with the other side about exactly what that looks like. Perhaps we'll just proceed to final judgment because,

I mean, the other two are only in the alternative anyway. So I think if Your Honor enters --

THE COURT: That's my question. Those are the alternative? Okay.

MR. EHRLICH: Yes. If you -- sorry to be clear, if you enter judgment on Count 1, we get all of the relief that we are seeking.

THE COURT: And Counts 2 and 3 I don't have to spend time on?

MR. EHRLICH: Correct.

THE COURT: Okay. For defendant, you're moving to dismiss all of the counts, but you have slightly different arguments on the different counts, correct?

MR. PEZZI: Yes, Your Honor, that's correct.

THE COURT: So what I would like to at least start off with, and maybe we revert later to something else, but what I would like to start off with is Count 1.

And I will start with their motion to dismiss, because at least as to the justiciability issues, if you're not properly here, we can't get there. But I'd like to have you reserve -- right now, just focus -- instead of all counts, if you could focus your argument on Count 1.

And it's my practice to go back and forth, but that's your motion to dismiss, so I'll allow you to start. We'll go back and forth. And then once I understand the

arguments on the justiciability, then I will hear the motion for summary judgment, essentially, on the merits of Count 1; and then depending on our time, we'll see whether we get to two or three. Okay?

So with that, I'll let you start, and I'll probably interrupt you.

MR. PEZZI: Okay. Thank you, Your Honor. Stephen Pezzi from the Department of Justice.

I -- the first thing I would say is I think all of our arguments, other than the waiver and forfeiture argument about failure to participate in the comment process, apply to all three counts of plaintiffs' complaint. So I -- for purposes of the current discussion, respecting Your Honor's directions, we'll not get into the waiver and forfeiture issue, which is not at issue for Count 1.

The remainder of our arguments, I think, do apply to Count 1. We have a series of threshold and justiciability arguments; and then, of course, I'm happy to address the merits. Starting --

THE COURT: And let me just make sure we're all on the same page, because I think we are, but there's a fair bit of ink back and forth. I understand this action to concern only grants that have not yet been terminated, maybe that haven't even been awarded, but certainly we're not addressing grants that have been terminated, correct?

MR. EHRLICH: That's correct, Your Honor.

THE COURT: Okay. So we're in the world of grants that have been awarded but not terminated and maybe grants that might be awarded in the future. But it seems sort of the -- we might as well start with the grants that have been awarded that the plaintiffs are concerned may be terminated.

MR. PEZZI: Yes, Your Honor. And so to start with that, those categories of grants, I think the first argument we raise is a standing argument. And I think the best way to think about that standing argument is about there being, in the government's view, a mismatch between the injury in fact that plaintiffs have identified and the target of this lawsuit, including in Count 1.

So the government, perhaps, unsurprisingly does not dispute that the termination of a grant, whether it's the past termination of a grant or the imminent future termination of a grant, would itself give rise to a concrete Article III injury.

THE COURT: So "imminent future" meaning they've announced that the grant is going to be terminated? What do you mean by that word?

MR. PEZZI: For plaintiffs to carry their burden to show standing, they need to show either an actual injury or an imminent future injury. And so if we're just talking about possible future grant terminations rather than the past

grant terminations --

THE COURT: What about the cases that allow in various contexts consideration of sort of preenforcement questions? Are you saying that those are -- they just don't have standing to raise any preenforcement question?

MR. PEZZI: No, Your Honor. We are not making some sort of, you know, broad attack on the concept of a preenforcement challenge. Preenforcement challenges can and do happen. But in a preenforcement challenge, the plaintiff may often have a harder time, as we think the plaintiffs do here, showing an actual and imminent future injury.

And so our arguments are based on -- I mean, there's -- the causation issue is about the mismatch between the injury and the target of the lawsuit. And so even if we're only talking about possible future grant terminations, the cognizable Article III injury that would give plaintiffs standing to challenge those possible future grant terminations is the termination of that grant.

And we do not dispute --

THE COURT: And is it your view that the threat, the cloud of termination isn't sufficient?

MR. PEZZI: We do not think that, you know, the cloud of termination is sufficient. It's not even clear to me the extent to which plaintiffs seek to rely on that cloud rather than pointing to actual grant terminations, both past

and future.

But even interpreting their complaint that way, I do not think the uncertainty over the possibility of potential future grant terminations is a sufficiently concrete and particularized Article III injury to support standing.

I think the ripeness question --

THE COURT: Before we get to ripeness, let's --

I'm going to bat it back to you on standing: Why do you think you can challenge this regulation where, as to the grants at issue here, which are the ones -- for purposes of this question, let's just say the ones that have been awarded, but nobody is saying it's going to be terminated. Why do you have standing to ask me to interpret whether it could be terminated?

MR. EHRLICH: So I think our theory of standing, Your Honor, is very straightforward. It's we need to show a substantial risk that they're going to be terminated using the clause, and we have that in spades here.

So, first, you have the history of past terminations. There have been hundreds of terminations worth billions of dollars. You have two presidential executive orders directing those terminations to continue. And you have the terminations, indeed, continuing, including through the course of this litigation as recently as just last --

just two months ago in March. DOJ canceled two grants using the clause to the State of Massachusetts.

And then as Your Honor identified, we have both current and future anticipated grants. I know you're focusing on the current one. So I think, under those circumstances, we have shown a substantial risk. I think this goes far beyond the First Circuit case law in this area.

So, usually, one past injury plus a continuing policy or practice is enough. I would point Your Honor to the *Drewniak* case --

THE COURT: So the --

MR. EHRLICH: Oh, sure.

THE COURT: -- continuing policy and practice, you're -- what are you looking -- what are you relying on when you say there's a policy and practice?

MR. EHRLICH: Well, their -- their use of the clause, to terminate grants based on newly identified agency priorities, is their practice. They've done it --

THE COURT: Okay.

MR. EHRLICH: -- hundreds of times.

THE COURT: So what's the policy?

MR. EHRLICH: The policy is -- maybe just the practice is more what I was focused on, was the practice of terminating these grants using the clause. And I think that goes, as I was saying, far beyond what the case law holds.

So you have the *Drewniak* case out of District of New Hampshire. There was prospective relief sought. It was about traffic checkpoints. It's not super important. But there was one traffic checkpoint in the past. They said there was a future policy, even though the defendants said, you know, it's not going to -- "We don't have any plans for it," and the Court found standing.

The First Circuit in *Webb*, which was a data breach case, they said one instance of misuse of the data from the data breach was enough to show standing. And so I think it goes far beyond that.

I think not for nothing, but they haven't disavowed using the clause. As I --

THE COURT: I understand --

MR. EHRLICH: Yeah.

THE COURT: I understand that. They're not --

MR. EHRLICH: They're not saying they're not --

THE COURT: -- one way or another. But you have the burden of showing that there's -- there's this whatever level of imminence of this risk.

MR. EHRLICH: No, absolutely we do, and I think we've done that in spades here. We have 57 unrebutted declarations showing past -- past enforcement, showing their practice of terminating using the clause.

You know, the First Circuit in the *PILF v. Bellows*

case found standing even when the enforcer in that case, the state AG, had disclaimed that they were going to enforce it, and the First Circuit still found standing.

So I think we have plenty to show that the past practice coupled with the presidential executive orders, you know, directing terminations, including terminations throughout the litigation as recently as March, and plus the current and future grants that we have, you know, are plenty.

We have over 1,100 current grants -- and I know Your Honor asked specifically about the current grants -- over 1,100 current grants worth over $5 billion that are at risk today if the agencies decide to change their priorities and terminate them. So we think that's plenty here, Your Honor.

And the last point I'll just make on this is, in the challenges we've seen, especially in the "post-*NIH*, Justice Barrett concurrence" world where people challenge these broad agency policies about grant terminations, we're not aware of a single case holding that there's no standing there. I mean, most of those cases don't even discuss it.

For example, the *Massachusetts v. NIH* case from the First Circuit didn't even discuss it. Obviously, Your Honor found standing on that -- on that theory in the Massachusetts -- in the *American Association of Universities* case. And I would point also to the *Washington v. FEMA* case

that Judge Stearns decided.

So we're not aware of any case that has not found standing based on a future injury for a loss of funds because of grant terminations.

THE COURT: You can respond to that or you can move to ripeness, whichever you want to do. They're somewhat related.

MR. PEZZI: Certainly, Your Honor. Maybe I'll try both.

I mean, in direct response, I think a lot of those arguments would be good arguments that there's a substantial risk of future injury from the termination of a grant. And if this were a lawsuit challenging the termination of a grant or a preenforcement challenge about the termination to a grant, then I think a lot of our arguments would look very different.

This is not a challenge to the termination of any grant, past or future. The plaintiffs have explicitly disavowed that theory, presumably for the very sound, strategic reason that we would have a whole host of other arguments, for example, about why those lawsuits need to be brought --

THE COURT: Well, but Justice Barrett did carve out this area that something is going to be going forward in the District Court, right? So you quote the part that says

everything goes into the Tucker claim part. But she -- the majority, the -- you know, it's one vote, but we have the notion that there is something here.

MR. PEZZI: That's fair, Your Honor. I would say a few things about that. One is -- I mean, the -- actually, the last paragraph of Justice Barrett's concurrence I think raises a real question and says explicitly, you know, we're not deciding today whether there might be other justiciability issues, and she specifically mentions final action agency action.

THE COURT: Correct. And we can talk about whether there's final agency action, but that's a different one. She doesn't say there's a standing problem here. She says these things are appropriate to be in the District Court.

MR. PEZZI: That's certainly a correct assessment of Justice Barrett's opinion. We don't dispute that. I will just, before I move on to ripeness, just make clear that we do not dispute that if someone's grant is terminated, they have Article III standing to terminate that grant, not --

THE COURT: But if they have -- if the grant is terminated, they can't be here. But there's a universe where they can be here, and that's -- I mean, I'm -- as the Supreme Court has made very clear, I need to follow the Supreme Court. And the Supreme Court has said there is something that can be here, right?

So this isn't the world of when they've been terminated. It cannot be the case -- the -- *NIH* case would have come out differently if the rule is that you can't do anything until the grant has been terminated, because if that was the rule, there would be nothing left to be in front of the district courts.

MR. PEZZI: I think, at that level of generality, I'm not sure I have any disagreement with what Your Honor just said. I'll move on to ripeness --

THE COURT: Yeah.

MR. PEZZI: -- and just explain why I think some of the ripeness principles, I think, counsel in favor of a similar conclusion, although, I think, even more straightforwardly in some respects.

The ripeness question here is more about the lack of a concrete dispute between the parties with respect to any particular application of what my friend on the other side calls a practice.

THE COURT: Well, isn't there a dispute as to whether you can terminate the grants based on failure to meet newly announced priorities rather than failure to meet the priorities that were identified at the time that the grant was issued?

MR. PEZZI: There is certainly a legal disagreement about that question of law between the parties and --

THE COURT: Well, and as a practical matter, what the plaintiffs are saying is that the administration has been using that interpretation of the regulation to cancel the grants that have been canceled. So that's why they think this is a dispute that's a real dispute right now. Why do you disagree?

MR. PEZZI: Because, Your Honor, they are not bringing a lawsuit about the use of that interpretation that the parties do disagree on to actually terminate any particular grant. They are just saying that, "This has happened in the past. We are worried it might happen again in the future."

THE COURT: "And so we want a declaration as to what the regulation means." That's what they're saying.

MR. PEZZI: Yes, Your Honor. And we think the Supreme Court's ripeness jurisprudence makes clear that, although it may be more convenient for, in some respects, the parties and the Court to adjudicate a case like this at that level of generality about the abstract legal principle, the ripeness doctrine generally requires parties to litigate these questions in the context of a concrete application of the --

THE COURT: Well --

MR. PEZZI: -- regulation.

THE COURT: What's -- I understand that, and I

understand the reason for that, which is that, in the abstract, you could end up all different ways. But there's nothing -- is there really any -- other than we don't know the particular grant that might be terminated next, is there anything abstract about this dispute itself?

I mean, the dispute is -- it seems to me, the dispute is: Does the government have the authority to do this, or does the government not have the authority to do this? And the "this" is clear. It's not like, well, we don't know what they're going to do in any one case. It's -- the "this" is saying you can use -- measure against new priorities instead of the priorities that were there when the grant was issued.

MR. PEZZI: Again, Your Honor, I -- I don't really dispute that the parties have a clear legal disagreement on the question of what is the best interpretation of this regulation, at least on the narrow question of whether or not old agency priorities rather than new agency priorities can be considered by the government in terminating a grant.

We still think the ripeness doctrine requires that that question be litigated in the context of a concrete application rather than in the abstract.

And so to be clear about what I mean about this, we're not saying that no court could ever opine on the -- on that abstract, on that legal question. We just think a Court

needs to opine on that legal question in an actual case or controversy where that legal question is dispositive of whether an actual grant termination is unlawful or lawful.

And so this is the sort of thing that you could imagine a court opining on in the context of a specific dispute over the termination of a specific grant, and there's been plenty of litigation that looks like that over the last year or two. Sometimes the government wins those cases. Sometimes the government loses.

But that is the right way to litigate this question about the interpretation of the regulations, not this sort of abstract question about, you know, in a vacuum, has the government misread its own regulations?

THE COURT: What's your answer on the ripeness question?

MR. EHRLICH: I think Your Honor has it, basically, the -- exactly right. We have a concrete legal dispute. It's a purely legal question about whether the clause can be used to terminate grants based on newly identified agency priorities or those in place at the time of the grant. It's a concrete legal dispute. There's no facts that are going to help us flesh that out in the actual termination proceeding in the Court of Federal Claims. And then -- so I think that's very clear, that there's a concrete dispute.

In terms of the second prong, the First Circuit has

been over and over clear. We cited the *Verizon New England* case as recently as *Jensen* last year. They say for a declaration action, you look at whether this would be using in setting the controversy to rest.

That's exactly what Your Honor's declaratory judgment would do. It would be a preclusive judgment against the defendants that they can't use the clause to terminate based on newly identified agency priorities. That would extremely -- that's extremely helpful to us.

We have a lot of uncertainty based on grants being pulled out from under us. It makes it hard to plan our state budgets. And this is irreversible damage for us. We have programs that would be shut down and things that you can't get recouped on the back end. You could get damages, but you couldn't stop programs being shut down and things like that.

And then the last thing I'll just say, Your Honor, is similar to what I said in standing. In this post-*NIH* world, we're not aware of any court saying that these types of cases are unripe. You know, there's been many decisions in this front; and most of them, again, do not really even discuss ripeness, and the ones that do do find ripeness. So the *Washington v. FEMA* case I'll reference again, a couple of Illinois versus the federal government cases in the District of Rhode Island.

I think the federal government's view that you have

to wait for the concrete proceeding later and litigate these sort of piecemeal is just not right. I mean, that would be true in every preenforcement standing case, and we know that's not right. *New Hampshire Lottery* from the First Circuit speaks to that as well as many other cases and, again, as I mentioned, it hasn't been true in these funding cases post-*NIH*.

So I think, for those reasons, we think there's ripeness here.

THE COURT: Okay. Do you have a further justiciability argument with causation?

MR. PEZZI: We talked about some features, maybe not every little wrinkle of our standing and ripeness arguments. Those are obviously discussed at some length in the papers. I'm happy to address any questions Your Honor has about those. We certainly do have --

THE COURT: I think I just need to go back and -- oh, you did raise a question about declaratory judgment being untethered to anything. But I think you didn't disagree when they said, well, it's tethered to the APA here as the cause of action is asserted.

MR. PEZZI: All I'll say about that, Your Honor, beyond what's in the papers is, I mean, I think that is easily the most technical of our arguments. I mean, we do think the First Circuit case law is clear that the

Declaratory Judgment Act itself does not create a cause of action.

THE COURT: But nobody is disputing that. They're saying the Declaratory Judgment plus APA.

MR. PEZZI: And we agree that if there is a violation of the APA, a declaratory judgment can sometimes be an appropriate remedy; although, just to be clear, they don't seek relief at this time on Count 2 or Count 3, which are their substantive APA counts. But Your Honor is right at a high level.

THE COURT: But they do mention APA in the complaint under Count 1.

MR. PEZZI: They do cite to the declaratory relief provision of the APA, I believe, yes.

THE COURT: Okay. Let's spend a little bit of time talking about the merits of Count 1, and then if we still have a little bit more time, we can come back to any further justiciability issues on Counts 2 and 3.

MR. EHRLICH: Can I just make one -- it was just on the point Your Honor was making right there, which is we think you can do a standalone declaratory judgment. That's what the First Circuit did in *New Hampshire Lottery*, but you don't have to do that. You can just go under the APA for -- and we can discuss that.

I just wanted to be clear, Your Honor. So we have

the argument that you can enter a declaratory judgment alone, but you can also do it through the APA based on final agency action. We would win on either of those.

THE COURT: Okay. I can tell you I'm much more comfortable with it being tied to the APA and being floating out there. You may have one case that says it. There are many cases that say you can't.

MR. EHRLICH: Yeah, I'm happy to move on if Your Honor isn't -- but I would say the cases don't really say that. I think they're confused. I think the cases stand for the proposition that you need federal jurisdiction, which is both a federal question and standing. And when you have that, you can enter declaratory judgment.

That's what the First Circuit did in *New Hampshire Lottery*. Like, if you look at the underlying complaints in *New Hampshire Lottery*, it's just counts of declaratory judgment. That's all they sought. So I think Your Honor can do that here, but we're -- I'm happy to get more into that, but you can just go through the APA, if you're more comfortable that way.

THE COURT: Let's -- I am more comfortable that way.

MR. EHRLICH: Okay.

THE COURT: Let's --

MR. PEZZI: Your Honor, just briefly, for purposes

of a clean record, if Your Honor wants to move on to the merits, we're, of course, happy to address the merits. I did just want to make clear, distinct from our standing and ripeness arguments, we do have a separate final agency action argument, which is --

THE COURT: Are you raising that as to Count 1 or Count 3 only?

MR. PEZZI: Count 1 and 2, Your Honor.

THE COURT: Okay.

MR. PEZZI: And so --

THE COURT: All right. So let's talk about that then.

MR. PEZZI: Yes, Your Honor.

THE COURT: And I'll let you start on that.

MR. PEZZI: So, I mean, we think even if plaintiffs were able to carry their burden on standing and ripeness, final agency action is a separate doctrinal test and an independent hurdle that they have to clear that requires two things: that the challenged action marked the consummation of the agency's decision-making process, one; and, two, that the action be one by which rights or obligations have been determined or from which legal consequences may flow.

Again, an actual grant termination, past, present, or future, absolutely satisfies that requirement; but they -- and I think everyone is clear about this -- they are not

challenging any actual past, present, or future grant termination. They are challenging the government's interpretation of its own regulations. And so --

THE COURT: Well, so the way I was understanding their argument is they're saying the final agency action is the reg. Is that wrong?

MR. EHRLICH: No, that's right, Your Honor.

THE COURT: So if the final agency action is the regulation, can they proceed that way?

MR. PEZZI: If they are challenging the regulation itself, for example, arguing that the regulation itself is unlawful or violates the APA or violates some statute, that regulation is going to be final agency action. And in Count 3, that's what they do, and so we don't dispute final agency action on Count 3.

Count 1, though, does not argue that the regulation itself is unlawful. It instead argues that the government has misinterpreted or misread its own regulation. They are saying that, you know, maybe in January of 2025, there was a lawyer at OMB who had a light bulb go off in his head and think, "Okay. Here's how I think we should interpret this regulation."

And, I mean, we're willing -- assuming that that's exactly what happened for purposes of today's argument, that light bulb going off in an OMB lawyer's head, where the

government's abstract interpretation of this regulation is not final agency action, the reason we know that is because that interpretation governs the possible termination of many thousands of grants that have not been terminated.

Because what actually results in the consummation of the government's decision-making process or what results in legal consequences for the grantor or the grantee is the decision to terminate or to not terminate a grant. And if the same grants that have been retained are subject to the same interpretation, I think that shows pretty clearly that the relevant final agency action would be the decision to terminate a grant, not the interpretation of the regs in the abstract.

THE COURT: Well, you're not saying that the grants that haven't been canceled won't be canceled.

MR. PEZZI: We're certainly not disavowing the possibility that future grants might be terminated, including --

THE COURT: Including for this reason.

MR. PEZZI: Correct, Your Honor.

THE COURT: Okay. So let me turn to plaintiff here. What is it that you are claiming is the final agency action?

MR. EHRLICH: So we're --

THE COURT: Count 1.

MR. EHRLICH: We would say -- so I'll say two different theories. One is we think we're challenging the regulation. We use the same of paragraph in both Count 1 and Count 3 that the defendants cite to concede final agency action.

THE COURT: Okay. But just -- instead of telling me what their concession was in the brief, which you already said in your brief, tell me what your -- tell me the theory. Tell me the theory of what's the final agency action.

MR. EHRLICH: The final agency action, there's two ways to look at it. One is, as I think the briefing sort of teed up, the final agency action is the regulation. Everybody agrees that that's final agency action. The relief in Count 1 and Count 3 are both targeted at the regulation.

Count 1 is just narrower relief. We want declaratory judgment, and they get to keep their regulation and use it for the narrow slice of things we say they can use it for. Count 3 is more of the nuclear option. It would just wipe the regulation away altogether. So we think it's targeted at the regulation. We think if you -- and we think we're, obviously, on solid footing since everybody agrees that's final agency action.

If you wanted to say the -- we're challenging the interpretation, we think we're more than fine there too. It's not -- I mean, if you look at the two prongs, it's not

tentative or interlocutory in looking at the consummation prong. It's very final. We know it's final. They've used it this way hundreds of times.

THE COURT: Do we -- do you have any examples where you point to -- where -- anyone, a plaintiff, points to something as a final agency action where they don't have a piece of paper that they're pointing to?

MR. EHRLICH: Absolutely, Your Honor. It happens all the time. I can point you to -- Judge Saris said this in the *Presidents' Alliance* case from March. Judge Young said this in the *American Association of University Professors* last year, that it does not have to be in writing. That would incentivize agencies to simply not put things in writing to evade judicial review.

And I'll give you two examples of where this has happened. The -- Judge Stearns' decision in *Washington v. FEMA* talked about -- it was a termination, a possible termination of BRIC grants from FEMA. And, you know, they had put out some press statements. There was no definitive piece of paper. And Judge Stearns said, sub silentio or not, there was final agency action.

And then just one more example, Your Honor, the *Illinois v. Vought* case out of the Northern District of Illinois. They said the case for final agency action was entirely circumstantial, quote/unquote, and then marched

through the sort of circumstances. In that case, it was about whether funding would be cut to four specific states and ended up saying there's enough here to determine that there's final agency action.

So it happens all the time. So sometimes --

THE COURT: What exactly is the final agency action?

MR. EHRLICH: Well, under either theory -- so one theory, which is more straightforward, is we're challenging the regulation. So that's the final agency action. Or under their alternative challenge, it would be we're challenging the interpretation of the regulation.

THE COURT: I'm sorry; I didn't frame that question well.

Is the action, in your view, whether it's the interpretation or the reg itself, is the action the idea that they can choose to terminate grants if they don't meet current priorities? Is that the action or -- I mean --

MR. EHRLICH: I think that's --

THE COURT: Give me the words that you think are there sub silentio.

MR. EHRLICH: Yeah, I think what Your Honor is getting at is sort of the point that this is not the last step in the process, that, like, the reg itself or the interpretation are not doing anything. And I guess I would

say two -- two things about that. Obviously, stop me if I'm going down -- this isn't what you meant.

But I would say two things on that. One, I don't think anyone thinks that's true, even the defendants, because the reason they concede final agency action on Count 3, which they interpret as the reg, is they say that it shapes the contours of the legal and contractual relationship with the grantor and the grantee. That's as true for the regulation as it is for the interpretation. Either way, subsequent grant terminations have to happen. So I think, even under their theory, you would have final agency action.

But then, in terms of the case law, I mean, the courts routinely find final agency action even though there's further things to happen. So the Supreme Court in *Hawkes* did this. There was an agency interpretation about the Clean Water Act, and there was no -- not going to be an enforcement action yet, but they said it doesn't matter. It's still final.

The Ninth Circuit has put this even more bluntly. They said even if the ultimate impact of the action rests on some other concurrence that there is a final agency action. And that has been a kind of through line through the -- these type of grant funding, future termination cases, including the *New York v. Administration for Child and Family Services* case.

So I think it's very clear. Your Honor had the *Association of American Universities* case about the -- the indirect cost cap. You didn't have to tackle final agency action there. It wasn't even challenged.

But Judge Burroughs had a similar case where she talked about final agency action, and she says, you know, it's enough that the parties will already or will soon directly -- that agency action would already or soon directly affect the parties. Of course, as we've talked about, that's what we have here. It has changed the landscape to --

THE COURT: But I think --

MR. EHRLICH: Yeah.

THE COURT: -- I mean, at least -- I don't know about the case in front of Judge Burroughs, but the case in front of me, there was sort of a -- it wasn't all happening sub silentio. It was: "Here's what we're going to do. Remember those negotiated overhead rates? Those are no longer in place," and that was an announcement that was going to happen.

But we don't have -- what we have here is we have, in each individual termination, there's the assertion that they can do it; but there isn't a blanket sort of written statement of how you get from "We want to terminate grants" to "We are terminating grants." You don't have a statement that says, "We can do it because we've changed priorities."

MR. EHRLICH: No, I -- I agree, Your Honor. As I said, I don't think it has to be written. You can -- just to back up for one second, you can bypass all this by saying we're challenging the regulation.

But just on the interpretation point, it doesn't have to be written, as I discussed; and I would say it's anything but silent. I mean, they've done this hundreds of times. They are vigorously defending the interpretation here. They haven't disavowed it. They've started incorporating this interpretation into new grants, and the President, in his executive order, has adopted this interpretation. So it's not of tentative or interlocutory nature. It's very much final. It's consummated.

And I think the real action is, is this -- does this have some sort of legal consequences? And we say yes. They can now change their priorities and terminate our grants on a dime; and that's exactly the sort of legal consequences, you know, as the -- as the defendants say in their words, shapes the contours of the relationship between the grantor and the grantee. And I think that's well within the case law.

THE COURT: Anything you want to say on that before we go to the merits? Because I would like to talk about the merits a little bit.

MR. PEZZI: Just very briefly, Your Honor.

The first thing I will say is I think even plaintiffs' description of their various counts today makes clear that Count 1 can't possibly be a challenge to the regulation itself in the way that Count 3 conceivably is.

I think my friend on the other side described Count 3 as the nuclear option to wipe the reg off the books. That's what it means to challenge a reg. That's usually the result of a successful challenge against a reg under the APA.

Count 1 is something else. It's about, notwithstanding this concededly lawful reg, we think it should be interpreted in one way rather than another way. And so I don't think the final agency action question can possibly be answered by saying the reg itself is final agency action because they're not seeking vacatur or an injunction against the reg. They're seeking --

THE COURT: Well, they're seeking that -- they're essentially saying that the reg has to mean this or it's no good, I suppose.

MR. PEZZI: In Count 3, they are making, in the alternative, a request for relief that would operate against the reg, like, that would wipe the reg off the books. And, again --

THE COURT: But they're not -- in Count 1, they're not asking to wipe the reg off the book. They're asking me to interpret the reg in a way that would avoid it being

written off the books.

MR. PEZZI: Yes, Your Honor. And so what they are challenging, therefore, in Count 1 is the idea that an OMB lawyer allegedly had in his office one day to interpret the reg one way or the other.

THE COURT: Well, it is more than that. I mean, I understand that I don't have a piece of paper, and that does trouble me.

On the other hand, he's correct that you haven't denied this interpretation, and all of these grants keep getting eliminated based on this interpretation.

MR. PEZZI: Yes, Your Honor. And I'm glad you brought that up. I mean, to be clear, we are not suggesting that you can avoid judicial review by, you know, refusing to put a new policy down on a piece of paper. I mean, I think I agree with plaintiffs' counsel that it can't be dispositive whether it's, you know, a written policy or an unwritten policy.

Our argument is, instead, that the test for final agency action requires, first of all, the consummation of -- as in the end of the decision-making process.

THE COURT: So would you disagree that there's a policy?

MR. PEZZI: I would -- so I want to be careful about how I answer this. To be clear, I am not aware of

there ever having been, you know, this -- this light bulb moment that I keep returning to in --

THE COURT: Okay.

MR. PEZZI: -- some of my answers that sort of --

THE COURT: So it happened over a few weeks that they figured it out. There wasn't just a single light bulb, and it wasn't a single DOGE employee. It was figured out over a period of time. But is it currently the policy?

MR. PEZZI: I -- again, to be absolutely clear about this, I do not know one way or the other whether any decision was made on one day or over a period of weeks or whether any formal decision was made at all.

What I do know, though -- and we have not disputed -- I mean, plaintiffs are correct that the government interprets this regulation to allow for termination of a grant based on the grant no longer effectuating program goals or agency priorities, and that includes agency priorities that have changed during the grant-making process. Plaintiffs are correct that that is the government's interpretation of that reg.

To be clear, I'm not even sure that that's a new interpretation of the reg. If you asked an OMB lawyer about that two years ago, you might have gotten the same answer. Plaintiffs are certainly correct that that interpretation has been invoked more frequently in the last year and a half or

so than it had ever been invoked before, but --

THE COURT: Well, why don't we go ahead then and let's talk about the merits of it, because if it has been invoked before, then that presumably makes your argument on the merits easier.

But this is your motion, so I'm going to let you go first on this.

MS. LUMELSKY: Yes. Thank you, Your Honor.

The defendants have focused mainly on procedural issues in their briefing, and I -- and that shouldn't distract from the significance of what's at issue here. They're asserting the right to terminate any grant, essentially, at will simply by saying the words "agency priorities." And that is how they have been using this clause. They've been --

THE COURT: Okay. I understand the magnitude of your problem.

MS. LUMELSKY: Right.

THE COURT: But the question here is now: What does this language say or not say?

MS. LUMELSKY: Right. And their interpretation, it's inconsistent with the text of the clause, especially when considered in the context of the full regulatory system and the regulatory history here.

So when -- when OMB introduced this language into

the clause in 2020, it provided an explanation of what the purpose of the clause was that was fully consistent with the plaintiff states' interpretation and entirely inconsistent with what the defendants are arguing that the clause says now.

They did not say in 2020, when they introduced the language or in 2024 when the language was revised in a minor way that terminations were permitted based on newly developed priorities. And one would have assumed they would have said that given how significant that is and as shown to be in -- has created chaos, as we've all seen.

But if you look at when the language was introduced in 2020, what they said as an explanation for why it was added, they said, "The intent of this change is to ensure that federal awarding agencies prioritize ongoing support to federal awards that meet program goals."

And so, specifically, they're talking about ongoing support, and then they -- so meaning support -- continuing to support grants that were meeting priorities and continue to meet priorities. And then they provided two examples to make that very clear.

Both examples talk about additional evidence that reveals that a specific objective is no longer being achieved. Both of them had to do with kind of a mismatch between the award and the original priorities or original

program goals. They didn't say anything about changes in priorities, which -- and those were all the examples that they provided.

You would think that if what they were talking about was terminations based on changed priorities, that they would have at least mentioned that.

And it's also instructive to look at kind of the full set of revisions that were happening in 2020 because there were a number of revisions that they made at the same time. And there was a strong theme throughout those revisions on the concept of ensuring grantee accountability by making sure that they met the objectives that had been developed at the time or before the notice of funding opportunity was announced.

THE COURT: So let me interrupt you here. I know that I'm not -- as a construction rule, I shouldn't worry too much about headings; but I did note that this termination provision is a subsection under -- and I don't have that title in front of me, but it's basically problems on the part of the grantee for -- that would lead to termination. And you end up with they don't comply with their grant, they don't deliver, et cetera, and it's under this.

Is there a different set of -- is there a different place in the reg that underscores -- instead of the obligations of the grantee, is there a different section that

underscores the rights of the grantor? So, for example, if there's no money anymore, is there a provision that says we don't have to fund this anymore? Or, you know, are there some other --

Because this is a -- this is being interpreted as a right of the grantor to change the terms mid-grant, but I see it under a section of the grantee failing to meet the obligations of the grant. But are you familiar enough with the regulatory scheme? Is there a different place, or is this really the only place where you talk about the responsibilities of --

MS. LUMELSKY: So if I'm understanding Your Honor correctly, there -- so all of the termination provisions, I understand it, are in 200.340.

THE COURT: But if that is a subpart, if you look at the regulatory heading --

MS. LUMELSKY: Right.

THE COURT: Unfortunately, I don't have it --

MS. LUMELSKY: Remedies for Noncompliance.

THE COURT: Remedies for Noncompliance. It's a subheading under Remedies for Noncompliance. In other words, it seems to me -- and, again, I can't go very far with that; but it seems to me that's the section where we're talking about the grant failing, as opposed to a section which would talk about the grantor's rights.

And I'm just wondering if there's a different section of the regs that talks about the -- sort of the other side of it, which isn't the grantee failing, but the grantor retaining certain rights in any event, which I'm sure they do.

MS. LUMELSKY: "The grantor" meaning the federal agency?

THE COURT: Yes.

MS. LUMELSKY: My understanding is that it's all within this provision because it's -- it talks about a variety of reasons that -- for termination and where there's a failure to comply with terms and conditions; but then it also talks about there might be agreement between the agency and the recipient on termination where there's not necessarily noncompliance of any kind, but just an agreement.

And it also talks about the recipient just deciding that they want to terminate and then a decision being made about what to do with the rest of the grant, for example. So my understanding is that this is -- this is the language. This is the relevant portion for the -- that discusses termination.

THE COURT: Are you familiar with any other provision? For example, there's no money anymore, "We're not going to be able to pay your grant because we don't have money." Is there such a provision?

MR. PEZZI: I confess that I do not know the answer to the question of whether there's a specific provision that covers that circumstance. I am quite certain the government would take the position that, if there's no money anymore, it need not pay the grant.

THE COURT: I'm sure they would. And I just would wonder if there's a different section where that would be in.

Okay. I cut you off.

MS. LUMELSKY: No, Your Honor. Just -- just going back to 2020, I think this is very important because that's when they described what the purpose of this language was, and there wasn't anything in what they said about changed priorities.

And just following up on where I was going about the surrounding revisions that were being made at the same time, there was a strong focus on making sure that there was a match between the original -- between the award and the original objectives.

And they specifically say that those objectives are developed during program planning and design and before the notice of funding opportunity is announced. And then they say that it's important to develop a strong plan and design to set the stage for demonstrating program results.

And then there are a number of sections; for example, 200.202 was a new section that was added at the same

time. And it talks about developing strong program goals. And then there's a specific link between the termination provision and another section called Performance Measurement. That's 200.301.

And it says that the agency must measure the recipient's performance to show achievement of program goals and objectives, and it specifically ties those goals and objectives to the original planning and design that -- what was done before the notice of funding opportunity was sent out.

THE COURT: So let me stop you there for a minute and ask the government counsel: The language that these grants are being -- the language that's at issue refers to both program goals and priorities, right?

Would you agree that, at least as to program goals, that's what's been laid out in the earlier documents in the proceeding of getting a grant? The notice for funding, the grant application, the performance measurements -- they all seem to me, as I read these Sections 200, 300, and so on, that the program goals are supposed to be laid out, and then measured against and that those can't be changing.

Would you agree with that?

MR. PEZZI: Respectfully, I don't think I agree with that as an abstract principle, but I don't think the Court needs to decide that here. The program goals, to be

sure, are --

THE COURT: Well, I need to interpret these words. And if I have "program goals" written all the way through the regs, why wouldn't I use how it's used throughout so I don't have a different interpretation here than every other section?

MR. PEZZI: Sure, Your Honor. I'll try to answer it this way: I think program goals is a narrower category than agency priorities on its face and that program goals is about, you know, a specific program, typically.

Program goals, too, I think can change, and I don't think there's anything in the regs that say to the contrary, although I think even if we are wrong about that, I think, if anything, that helps the government's position overall because agency priorities, which I understood plaintiffs' challenge to be almost entirely focused on the agency priorities half of that clause in any event, agency priorities are certainly at a higher level of generality and can change whether or not a program goal stays constant.

So presumably at many agencies, although agency priorities change frequently from administration to administration, many of their program goals would presumably stay the same. So I don't think it is necessarily the case that a program goal could never change. I think that would be too broad and too blanket of a statement. But I think,

ultimately, the -- to the extent there's a difference between those parts of the reg, it ultimately supports the government's interpretation.

THE COURT: So the notice of funding opportunity, that's what goes out before a grant is awarded; is that correct?

MS. LUMELSKY: Yes, Your Honor.

THE COURT: Yes?

MR. PEZZI: Yes, typically, Your Honor, as I understand it.

THE COURT: Okay. And so I'm looking at -- I guess, it's Appendix I, full text of Notice of Funding Opportunity, and it says what the notice of funding opportunity has to include.

And so when you're listing the notice of funding, a brief description, there's an executive summary, the agency contact, who would be eligible. And then program description, you have to contain the full program description of the funding opportunity.

And then under that, the section must include the following: the general purpose of the funding, what it is expected to achieve for the public good, the federal agency's funding priorities or focus area.

So you're putting this notice out, and the notice says, "Here's our priorities, and here's our program goals."

People apply for the grants. They're awarded the grants. But you're saying that, even though you're awarded the grants on a notice of funding opportunity that specifies program goals and agency priorities, those can change after the grant is awarded, as to that grant. Clearly, they can change for the next grant; but for that grant, they can change retroactively.

And if that's the case, why would you have to include them in the notice? Why would it matter? Why would this application go in if the program goals can change all the time during the life of the grant?

MR. PEZZI: I still think it would serve a valuable purpose, and the reg writers are entitled to conclude that setting out that information at the time the grant is awarded is useful to the process of attracting qualified -- sorry, Your Honor.

THE COURT: Why is it useful? If -- let's say you put out a grant; and on day one, you say the purpose of this grant is to eliminate world hunger, and everyone applies. And then on day two, after you've gone through this whole process, you say, well, actually, the purpose of this grant isn't eliminating world hunger; it's, you know, building skyscrapers. I don't know.

I mean, why would you put in a purpose and a priority if the person who applies for the grant and maybe

gets in, gets it and commits to it, all of those things change? And it doesn't say, "Here are the program goals subject to change," or "Here's the funding priorities subject to change," right?

MR. PEZZI: So, I mean, I think, Your Honor, even the language that Your Honor read is about the expectations of the grantor, which, obviously, expectations may change.

I think more relevant to this case, though, I mean, I think even if Your Honor were to conclude that program goals are locked in permanently based on the goals that are set forth or announced or even the program priorities that appear in certain notices of funding opportunities, the question in this case is about agency priorities.

THE COURT: Well, those words are "agency funding priorities." What I'm saying is: Why can't I interpret the words in this reg consistent with the same words showing up elsewhere? And I agree with you it doesn't say "agency priorities." It says "agency funding priorities." But given that we're talking about the funding of a grant, I think you maybe can read those the same, no?

MR. PEZZI: I respectfully don't think I can agree that those are the same. I think agency priorities are at a high level of generality, and they change quite often from administration to administration. And we think that this reg is intended to capture those possible changes in agency

priorities.

And those changes can happen even when program goals are constant or funding priorities are constant. Agency priorities can and do change, and we think the most natural reading of the regulation captures that possibility.

Now, often, of course, they won't change; and in many respects, even after a change of administration, grants are retained, as many have been here.

THE COURT: So if you were applying for a two-year grant, are you saying you better be careful not to do it during an election year because you're going to hire up a team, but then the grant's going to go away? I mean, I sort of envision -- and tell me if I'm wrong, but there's a way that a grant is a contract.

MR. PEZZI: Yes, Your Honor. In many respects, a grant is a contract.

THE COURT: And the United States honors its contracts.

MR. PEZZI: Yes, Your Honor.

THE COURT: And so even though you have an administration saying, "We would never have given this particular grant, and we're not going to renew it" -- and grants are often quite short term because it gives the granting agencies that flexibility to do that, to renew it or not renew it -- to say every political change means all of

our contracts don't apply anymore?

MR. PEZZI: Respectfully, Your Honor, that is not what we are saying. We are saying that a grant may be terminated, quote, "by the federal agency, pursuant to the terms and conditions of the federal award" -- which is one limitation -- "including to the extent authorized by law" -- another limitation -- and then, as relevant here, quote, "if an award no longer effectuates the program goals or agency priorities."

THE COURT: Which have now changed. Why isn't it -- I mean, I don't mean to be overly simplistic, but I'm going to go to Contracts 101. Why isn't it an illusory contract if the government can simply say, "We changed our mind about awarding this type of a contract"?

MR. PEZZI: Respectfully, Your Honor, it is not an illusory contract --

THE COURT: Why?

MR. PEZZI: -- because there's extensive consideration on both sides. The fact that there is discretionary termination authority for one party is actually quite common in binding contracts, including in the private sector, you know, termination without cause provisions of that sort.

THE COURT: Sure. You have contracts that are terminable at will all the time, but this is not being

presented as terminable at will. I mean, then you just wouldn't even need all of these clauses. You would simply say, "Here is the money for as long as we want to give it to you, and then it will stop."

MR. PEZZI: Yes, Your Honor. And so, I mean, I think that proves my point, which is that this is not an illusory contract. It is governed by these regulations and by other legal constraints.

Now, what Your Honor, I think, is getting at is this regulation gives a lot of authority to the grantor to terminate a grant for a wide variety of discretionary reasons.

THE COURT: Well, for any and -- for -- without -- without any reason, really; that it's to say -- if you can say -- an agency priority at that level of abstraction, you can simply say, "We don't want to fund it." That's an agency priority now.

MR. PEZZI: I don't think that is our position here, that it can be terminated for any reason or without any -- I mean, we -- to be clear, we believe that these regs need to be complied with absent some sort of --

THE COURT: But what's the difference? I mean, how -- if I have a grant and I need to decide to hire somebody tomorrow under this grant, do I have any assurance in any way that this grant is going to continue in another

month? Because if, as I understand the government's view here, if you decide you don't want to fund this anymore, it's done.

So I don't understand the hoops you're saying they would have to comply with. I mean, I guess there's notice of how much time and so forth; but you're basically saying we can just change whether we want to fund it anymore mid-contract.

MR. PEZZI: I mean, I -- look, if the bottom line premise that Your Honor is getting at is that the government, under its interpretation, retains a lot of discretionary authority to terminate grants --

THE COURT: Not a lot, all. There is no -- I mean, that's what I'm saying. It's not an illusory contract because you're paying for what services have been performed. But it is an at-will contract. And to suggest that grants are at will, terminable at will by the government, I don't think comports with anybody's understanding of how these work.

MR. PEZZI: So I respectfully disagree with that proposition as well, Your Honor. I think it's actually --

THE COURT: So you would agree that they are terminable at will? That is your view?

MR. PEZZI: No, Your Honor. We -- we -- the regulations that govern the termination process are set forth

in this regulation here that we are talking about. Now, there are other general contract principles, like termination for convenience, that are common in the contracting space, so I --

THE COURT: But here, on a grant, you keep saying, "Well, we're going to comply with this. It's not just terminable at will." But you're not telling me what would be the stopgap, where you couldn't just terminate it, under your -- under your construction.

MR. PEZZI: If the grant continues to effectuate program goals or agency priorities, then this termination would not provide --

THE COURT: But "the agency goals as we state them on any given day." So, yes, as long as we wanted -- that's what I'm saying. That's an at-will contract. That's, like, saying you can keep working here as long as your service is good to me; and if -- and if I don't want you here anymore, you go. I want to hire my sister instead, you go. There's no rules about it.

And here you're saying, as long as it pleases us, we're fine. But if we want to change what it is that we -- if we don't want to do this anymore, we can do it. And that, to me, means terminable at will.

MR. PEZZI: So whether we call it "terminable at will" or whether we call it something else, I think I, again,

agree with Your Honor that the government's interpretation is that it has significant discretionary authority to terminate grants and, as relevant here, when they no longer effectuate program goals or agency priorities.

I don't think it is surprising or legally problematic in any way that, in the government contracting space, the government retains a lot of authority to terminate its contracts, if we're thinking about a grant as a contract. That is common and lawful, in the government's view.

THE COURT: I think my -- the difficulty here for me in the position is the gap between "retains a lot of authority" and "retains all authority." The difference between terminable at will and terminable with some limitations. And I don't hear you giving me any limitations. I hear your interpretation being terminable at will, essentially; "We change our priorities, we cancel the grant."

MR. PEZZI: I have no limitations to offer other than what is in the text of this regulation and the government's interpretations of it, Your Honor.

THE COURT: Okay. I just have a few more minutes, but let's switch back to the challenges to Counts 2 and 3, to the extent that we didn't touch on them. I think you said that there were a few challenges that weren't applicable to Count 1. So if you want to --

MR. PEZZI: Yes, Your Honor. I think everything we

just discussed would also apply to Count 2. Count 2, I think, seeks maybe a slightly different form of relief than Count 1, but all of the justiciability arguments and the merits arguments that we've already addressed I think would be equally applicable to Count 2, the only real difference being, of course, plaintiffs are not seeking relief on Count 2 at this time.

Count 3 is a challenge to the regulation itself on the theory that, if it means what the government says it means, then it violates the APA or is arbitrary and capricious. We, obviously, disagree with that too, including for the merits reasons that we just discussed.

The only additional threshold argument that we have that applies to Count 3 but does not apply to Counts 1 and 2 is we have a waiver and forfeiture argument due to plaintiffs' failure to advance any of these concerns during the rulemaking process.

THE COURT: And what's your answer to their contention of, "Well, we couldn't raise them then because nobody was interpreting it this way"?

MR. PEZZI: So I'd say two things about that: One is they absolutely could have raised it then, even if no one else was thinking of this issue; two, they themselves were thinking of this issue as early as 2020.

And so plaintiffs, you know, their entire merits

presentation was about the preamble to the 2020 rule, which to be clear is not the rule at issue here, but it did announce similar regulatory texts than the texts that Your Honor is ultimately interpreting in this case.

But in that rulemaking, I believe, it was Illinois and Minnesota both raised more or less the same sort of questions here and expressed concerns. We quote the comment from one of the two states in our reply brief.

And so the idea that no one could have possibly contemplated that the reg would have been interpreted this way I think is significantly undermined by the fact that two of the very plaintiffs in this case seemed to contemplate that very sort of thing, at least in the 2020 rulemaking.

And then none of the states, including Illinois and Minnesota, brought any of these concerns to the agency's attention during the rulemaking at issue here during the Biden administration. And so I think especially whereas here their argument on Count 3 is mostly about, you know, a failure to explain or a failure to respond to the concerns that they have raised, we don't know whether they would have explained or responded to these concerns if they had presented them during the rulemaking process.

So that -- I mean, that's the only threshold argument, I think, we have that applies to Count 3 that doesn't apply to Count 1 and 2.

THE COURT: I realize I did have one other set of questions. I couldn't tell to what extent the parties are agreeing and disagreeing here.

Plaintiffs are saying that there are three -- there's sort of preenforcement challenge to the current regs. The one is what we've been talking about the whole time. We were talking about the merits, "may not be used to terminate existing grants based on new agency priorities."

The second was "may not be used where the effect would be defendants withholding of appropriated funding based on priorities contrary to congressional directives." Is that argument still live in front of me?

MR. PEZZI: We don't think so, Your Honor. I mean, to be clear, the government agrees that it has to comply with federal statutes and applicable federal regulations.

MS. LUMELSKY: Yeah, in our view, they've essentially conceded on that point, and it's not at issue.

THE COURT: And then, third, that termination, based on the termination clause, would be improper if the clause essentially wasn't included back in the grant; and is that one still in front of me?

MS. LUMELSKY: So our argument on that point was with respect to both the 2020 and the 2024 regulations, and it sounds like there's a little bit of a dispute with respect to 2020.

THE COURT: Why do I care about 2020?

MS. LUMELSKY: We do have still-existing grants under -- that were granted at that time, so potentially it could be relevant with respect to those grants.

THE COURT: Okay.

MS. LUMELSKY: And we did --

THE COURT: And what -- the issue -- what's the issue with 2020 that's not there with 2024? Because 2024 says it's going to be included, right?

MS. LUMELSKY: Yes. I believe that -- and the government can speak to this. My understanding is that there's -- within the 2020 version, it said "should" as opposed to "must"; although, if you look at the discussion when the rule was introduced, it had the same kind of requirement listed there.

So if you look at the rule with the -- how it was introduced by OMB, it's clear that it was mandatory at that time as well.

THE COURT: Is the government contending otherwise?

MR. PEZZI: Yes, Your Honor. So this is addressed at page 18 to 20 of our reply brief. Plaintiffs, for the first time in their reply brief, raised this question about the 2020 version of the regulation and how it uses "should" instead of "must." And plaintiffs' view is that "should" should be interpreted to mean "must."

That is an argument that we would have addressed at length far earlier if we thought it was a part of the complaint in this case. It also does not appear in plaintiffs' opening brief.

The government brought this wrinkle to the Court and to plaintiffs' attention just in a footnote in its own opening brief in the interest of candor and completeness to show why plaintiffs' sort of high-level challenge might be missing some important distinctions between particular grants subject to particular regulations at particular times.

So, I mean, we absolutely think the fact that the 2020 version of the relevant regulation uses the word "should" and the one that we thought was at issue in this case uses the word "must" reflects a meaningful difference between the 2020 and the 2024 versions of the reg.

But for the reasons we state in our brief, we don't think our reply brief is an appropriate time to raise a new theory of relief, and so our primary submission on that is that the argument is waived.

THE COURT: So -- hold on a minute. The --

MS. LUMELSKY: Can I speak to that waiver point, Your Honor?

THE COURT: Sure.

MS. LUMELSKY: In our complaint, from the beginning, we've defined the clause to mean both the 2024 and

the 2020 version. If you look at footnote 1 of the complaint, it says that when we're talking about the clause, we're referring to both. And that -- and that was true in our briefing as well. We've made very clear throughout that we were talking about both versions.

THE COURT: So --

MS. LUMELSKY: So I guess I'm confused by the waiver argument. We've been clear from the beginning on that point.

THE COURT: So when you're asking -- and I thought I had printed out your -- it's probably left on my desk -- the proposed declaratory judgment that you were looking at, is that asking for declaratory judgment as to both of the regs?

MS. LUMELSKY: Yes, and it does say that in the -- with respect to the requests for relief.

THE COURT: Okay. So two is gone. Three, I have to figure out.

And -- all right. Well, I'll go and read the arguments there. It's page 18 to 20 of the reply. And where in the sur-reply? I think that's what you were giving me with the cites before.

MR. PEZZI: Yeah, it's page 18 to 20 of defendants' reply, is where defendants' argument on this wrinkle is included. And I think plaintiffs' last brief, which is

ECF 98 -- not to speak for plaintiffs --

MS. LUMELSKY: Yes.

MR. PEZZI: -- it's page 29 to 31.

MS. LUMELSKY: Thirty-one.

But we do think it's a fairly simple argument based on just looking at the rule in combination with the OMB's discussion of it, that it's -- that it's required just as it was in 2024.

MR. PEZZI: Unsurprisingly, Your Honor, we very much disagree with that. I'm happy to address it now. I'm happy to let Your Honor review our papers, however the Court wishes to proceed.

THE COURT: I think it's probably more efficient for me to go back and look at your papers and not make you redo it right now.

Oh, here. I have it right in front of me, this proposed order.

So -- so I didn't understand -- I saw the definition of "clause" as being both of those, but I always think of a reg as superseding the prior reg. And so are you saying that termination -- if someone was to terminate a current grant, they would terminate it under the old reg, not the new reg?

MS. LUMELSKY: Well, we -- at least potentially, there could be an issue there.

THE COURT: But is there? I mean, talk about ripe or not ripe. I mean, I just couldn't -- I understand what you're saying now, that when the grant happened, this was the reg in place. And then you're saying to me there are grants which were issued prior to 2024.

But wouldn't the case -- wouldn't it be the case that if the government was going to terminate the grant, they would follow the current reg? Am I wrong about that?

MR. PEZZI: So I think I have a very partial agreement with plaintiffs on this. I mean, I do think it is theoretically possible that there are some older regs, that the termination of those older regs would be governed by the terms and conditions of those older grants, which might incorporate by reference --

THE COURT: Wait. The other way around. The termination of the grants --

MR. PEZZI: Sorry. You're right. Yes.

THE COURT: -- would be based on the regs that were in place at the time the grant was issued?

MR. PEZZI: Is my understanding, that that is typically the case, that when these new regs are issued, they govern the termination of grants issued after those regs.

THE COURT: Okay.

MR. PEZZI: So I think --

THE COURT: So both of you agree on that? So then

it is -- it is a current reg that -- both the 2020 and the 2024 reg you're asking for an interpretation of?

MS. LUMELSKY: I mean, certainly if the government were to say that the 2020 reg doesn't -- isn't -- wouldn't matter, then we wouldn't need any relief on that; but to the extent the government is saying that it potentially could matter, then we do need relief on that.

MR. PEZZI: The last thing I will say about this, other than, you know, referring Your Honor to the materials in our papers which address some of these very nuances, is -- I mean, not to redo all of our standing and ripeness arguments, but we would be talking about a real theoretical possibility now that a grant that has been in effect for many years across multiple administrations that, including in this administration, there was apparently no desire to terminate, might be terminated at some uncertain point in the future in reliance on a reg that is no longer in effect --

THE COURT: Well, I would assume, if we go through the grants that they've already terminated, most of those started before the 2024 reg. I mean, that's -- maybe not. Maybe some of them are just right after '24, but just because of the timing.

MR. PEZZI: I don't know the full universe of numbers there. I mean, I will say it is presumably a -- it is a closed and dwindling set of grants for which this could

possibly theoretically matter. I mean, we're not saying there's, you know, no possibility that that could happen.

I mean, we think, you know, the fact that plaintiffs' merits argument on this point, like their merits argument on the other points, has very little to do with the text of the reg and a lot to do with the preamble we think is telling.

And, also, their -- the idea that it is preserved because it is -- there's, like, a footnote in the complaint that we should have understood that we were talking about multiple regulations, even though plaintiffs never addressed this "should" versus "must" issue in any brief before, I think it's clear that the argument is not preserved and, in any event, is meritless.

But, again, those issues are addressed in the papers; and so unless Your Honor has further questions about that, I'm happy to stand on those.

MS. LUMELSKY: Your Honor, just on the text, if Your Honor would like me to speak to the text, we think that it supports our argument here, and I'd be very happy to talk about that if that would be helpful.

THE COURT: Is it in your brief?

MS. LUMELSKY: It is in our brief.

THE COURT: It is in your brief?

MS. LUMELSKY: Yes. But just to be clear, contrary

to the government's arguing, our argument here is not based solely on the regulatory history. We think that the text here strongly supports our argument here as well.

THE COURT: Okay. I think that's -- the question of the Kansas governor, I was trying to think about, if the attorney general is unhappy about the governor proceeding here, whether the proper way to proceed is some state court action enjoining the governor or something of the sort.

It's a little odd to have that in front of me through -- I don't think it gets to me by an amicus brief. You've dropped a footnote. You've mentioned three states. Two of them gets nowhere because there's no authority there. The one tries to incorporate by reference the amicus brief.

I -- I don't like leaving an issue unresolved, but it does feel like it's not squarely in front of me.

MR. EHRLICH: I'm happy to speak to that. I think -- and the other side, my friend on the other side, can correct me if I'm wrong. I think you don't have to reach that if you find standing for the other plaintiffs.

I will say, to Your Honor's point, that did come up in state court. I can give you the Westlaw citation: 2026 WL 845727, where the Kansas attorney general admitted that the governor -- this is a quote -- "governor is empowered to litigate on behalf of the legal interests of her office and those of the executive agency she oversees."

That includes the department -- that Kansas Department of Agriculture and Department of Health and Environment, which were harmed by the grant terminations here. So I think the AG -- our view is that the AG had basically conceded in that litigation that the governor can represent the agencies that she oversees, so --

THE COURT: Was that related litigation?

MR. EHRLICH: No, no, no. It had -- this issue came up about when the governor can represent the state, versus the attorney general. And so it came up in that context, so that -- that's the only thing I would say there, Your Honor.

THE COURT: If I don't have to reach it, I'd probably rather not.

MR. EHRLICH: I agree.

THE COURT: Okay. I think that's all I have. I will try to get something out soon. And I thank you for your good arguments.

MR. PEZZI: Thank you, Your Honor.

THE DEPUTY CLERK: We are in recess.

(Court in recess at 2:23 p.m.)

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 14th day of May, 2026.

/s/ Robert W. Paschal

______________________________

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter