UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STATE OF NEW JERSEY, et al.,      *

    Plaintiffs,     *

    v.     *      Civil Action No. 1:25-cv-11816-IT

UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET, et al.,     *

    Defendants.     *

MEMORANDUM & ORDER

July 17, 2026

TALWANI, D.J.

Plaintiffs—twenty states,[1] three governors,[2] and the District of Columbia—brought this

action against Defendants U.S. Office of Management and Budget ("OMB"), Russell Vought in

his official capacity as Director of the OMB, and various grant-making Executive Branch

agencies and their heads in their official capacity.[3] This case concerns the "Termination Clause"

---

[1] The twenty states are: New Jersey, Massachusetts, New York, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, Vermont, and Wisconsin.

[2] The three governors bringing suit in their official capacity are Governor Josh Shapiro of Pennsylvania, Governor Laura Kelly of Kansas, and Governor Andy Beshear of Kentucky.

[3] The grant-making agencies and their heads (with substitutions in accordance with Fed. R. Civ. P. 25(d)) are: the U.S. Department of Agriculture ("USDA"), Secretary of the USDA Brooke Rollins, the U.S. Department of Commerce, Secretary of Commerce Howard Lutnick, the U.S. Department of Defense, Secretary of Defense Pete Hegseth, the U.S. Department of Homeland Security, Secretary of Homeland Security Markwayne Mullin (substituted for Kristi Noem), the U.S. Department of Justice, Acting Attorney General Todd Blanche (substituted for Pamela Bondi), the U.S. Department of Labor, Acting Secretary of Labor Keith E. Sonderling (substituted for Lori Chavez-DeRemer), the U.S. Department of State, Secretary of State Marco Rubio, the U.S. Environmental Protection Agency ("EPA"), Administrator of the EPA Lee Zeldin, the U.S. Federal Emergency Management Agency ("FEMA"), Robert J. Fenton Jr. (substituted for David Richardson) in his official capacity as Senior Official Performing the Duties of FEMA Administrator, the National Endowment for the Humanities, Acting Chairman

in 2 C.F.R. § 200.340 (the "Regulation"), which was promulgated by OMB in 2020 and revised in 2024, and in parallel regulations issued by the Defendant grant-making agencies. Am. Compl. ¶ 2 [Doc. No. 64]; 2 C.F.R. § 200.106.[4] In Count I of the Amended Complaint [Doc. No. 64], Plaintiffs seek declaratory relief under the Declaratory Judgment Act and the Administrative Procedure Act ("APA") to clarify the meaning of the Termination Clause and, by extension, the rights and obligations of the parties subject to the grant agreements at issue in this case. Am. Compl. ¶¶ 278–295 [Doc. No. 64]. The parties dispute the basis on which, pursuant to the Termination Clause, Defendant-Agencies may terminate currently awarded grants or grants Defendant-Agencies may later award Plaintiff-States. Plaintiffs do not seek damages or any other relief concerning grants that have already been terminated.

Pending before the court are Defendants' Motion to Dismiss [Doc. No. 88] and Plaintiffs' First Amended Complaint [Doc. No. 64], both on justiciability grounds and on the merits, and Plaintiffs' Motion for Summary Judgment [Doc. No. 65] on Count I of the First Amended Complaint [Doc. No. 64]. For the reasons below, as to Count I only, Defendants' Motion to Dismiss [Doc. No. 88] is DENIED and Plaintiffs' Motion for Summary Judgment [Doc. No. 65] is GRANTED.[5]

---

of the National Endowment for the Humanities William English (substituted for Michael McDonald), the National Science Foundation ("NSF"), and Interim NSF Director Brian Stone.

[4] The term "Termination Clause" as used herein refers both to 2 C.F.R. § 200.340 (as promulgated in 2020 and amended in 2024) and to the agencies' parallel regulations.

[5] Count II and Count III are brought as alternatives to Count I. Where the court is granting summary judgment on Count I, Plaintiffs shall promptly advise the court whether they continue to seek relief under Count II and Count III. Defendants' Motion to Dismiss [Doc. No. 88] as to Counts II and III remains pending and will be addressed as necessary thereafter.

## I.    Background

A. *OMB Adopts the "Termination Clause"*

Title 2 of the Code of Federal Regulations contains OMB "guidance to Federal agencies on government-wide policies for the award and administration of Federal financial assistance" and "Federal agency regulations implementing that OMB guidance." 2 C.F.R. § 1.100.

On August 13, 2020, OMB promulgated "Final Guidance" modifying federal policies governing agency grantmaking, including the standards governing the termination of grant awards. Guidance for Grants and Agreements 85 Fed. Reg. 49506 (Aug. 13, 2020).[6] As discussed further below, the 2020 Final Guidance included the first version of the Termination Clause at issue here.

OMB published its 2024 revision on April 22, 2024, slightly modifying the Termination Clause. The Termination Clause, as modified in 2024, states that a "Federal award may be terminated in part or its entirety . . . [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).

B. *The 2025 Executive Orders*

On January 20, 2025, President Trump issued an Executive Order creating the United States Department of Government Efficiency ("DOGE"). Establishing and Implementing the President's ''Department of Government Efficiency,'' Exec. Order No. 14158, 90 Fed. Reg.

---

[6] The Final Guidance directed federal agencies that make federal awards to "implement the language in subparts C through F of this part in codified regulations unless different provisions are required by Federal statute or are approved by OMB." Guidance for Grants and Agreements 85 Fed. Reg. at 49538; see also 2 C.F.R. § 200.106. Subpart D governs "Post Federal Award Requirements" and includes 2 C.F.R. § 200.340, which governs grant terminations and contains the Termination Clause. See 2 C.F.R. § 200.340(a)(2) (2021).

8441 (Jan. 20, 2025). A month later, the President issued an Executive Order announcing "a transformation in Federal spending on contracts, grants, and loans" and mandating a review of existing contracts and grants issued by federal agencies. Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative, Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025). Specifically, the order mandated that

> Each Agency Head, in consultation with the agency's DOGE Team Lead, shall review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the] Administration.

Id. at 11095–96. The President directed agencies to begin the review process "immediately" and to complete the review within 30 days of order's issuance. Id. at 11096. The Executive Branch has separately issued additional orders further directing agencies to terminate grant awards that do not align with the branch's present policy positions. See Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No. 14151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025) (directing agencies to terminate all "equity-related" grants or contracts); Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14168, 90 Fed. Reg. 8615, 8615–16 (Jan. 20, 2025) (requiring each agency to "ensure grant funds do not promote gender ideology"); Protecting American Communities from Criminal Aliens, Exec. Order No. 14287, 90 Fed. Reg. 18761, 18761–62 (Apr. 28, 2025) (instructing the head of each executive department or agency to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination").

C. *Grant Terminations*

Plaintiffs allege that, since January 2025, federal agencies have terminated billions of dollars in federal grant funding awarded to Plaintiffs. These terminations have affected grants for universities, initiatives to combat violent crime and hate crimes, and school lunch programs, among other programs. Grejner-Brzezinska Decl. (WI) ¶ 4 [Doc. No. 66-51] (describing numerous grant terminations to the University of Wisconsin-Madison); Ottobre Decl. (NJ) ¶ 4a [Doc. No. 66-39] (alleging the Department of Justice terminated "two awards under the Matthew Shepard & James Byrd Hate Crimes Program to combat violent crime and hate crimes"); Sanders Decl. (IL) ¶ 4 [Doc. No. 66-19] (noting USDA terminated an approximately $26 million award to the Illinois State Board of Education for the Local Food for Schools and Child Care Cooperative Agreement program).

Agencies have cited the Termination Clause when issuing these terminations. Often, termination letters to Plaintiffs note only that the funded activity no longer aligns with agency priorities. Diaz de la Rubia Decl. (AZ) Ex. A, at ECF 8 [Doc. No. 66-1] (letter from EPA noting agency "is asserting its right under 2 C.F.R. § 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award."); Thomas Decl. (CA) Ex. A, at ECF 6 [Doc. No. 66-3] (letter from U.S. Dept. of Interior citing 2 C.F.R. § 200.340, and noting "award no longer effectuates the priorities of the United States Fish and Wildlife Service"); Hurlburt Decl. (CT) Ex. A, at ECF 5 [Doc. No. 66-9] (citing 2 C.F.R. § 200.340(a)(4) noting the Agricultural Marketing Service "has determined this agreement no longer effectuates agency priorities and that termination of the award is appropriate"); Scheminske Decl. (CO) Ex. A, ECF 6 [Doc. No. 66-7] (noting "[t]he objectives of the award are no longer consistent with EPA funding priorities"). On occasion, the termination letters refer to rejecting the program goals

5

established at the time the grants were issued. Martinez Decl. (IL) Ex. A, at ECF 6 [Doc. No. 66-17] (noting "previous agency priorities . . . were to provide funding to non-federal entities to provide shelter, food, transportation, acute medical care, and personal hygiene supplies for individuals released from DHS short-term holding facilities" and terminating Plaintiff's award where "support for illegal aliens. . . is not consistent with DHS's current priorities").

In addition to the already terminated grants, Plaintiffs also have current active grants with Defendant-Agencies. See Diaz de la Rubia Decl. (AZ) ¶ 6 [Doc. No. 66-1] (noting the University of Arizona has numerous multi-million-dollar grants with Defendants); Gorzkowicz Decl. (MA) ¶ 5 [Doc. No. 66-28] (noting "Massachusetts state agencies also have active grants with the U.S. Department of Commerce, U.S. Department of Defense, U.S. Environmental Protection Agency, U.S. Department of Homeland Security, U.S. Department of Justice, the U.S. Department of Labor, and the Federal Emergency Management Agency"). Plaintiffs aver the total of these grants exceeds $5,391,125,688 in grant funding and fear that Defendants' policy changes place these grants at risk of termination. Pls.' Reply Mem. ISO of Pls.' Mot. for Summ. J. on Count I 8 [Doc. No. 98] ("Plaintiffs' Reply").

Finally, Plaintiffs note they have pending applications for new grants offered by Defendants and that there are future grants offered by Defendants to which they intend to apply. See Thomas Decl. (CA) ¶ 6 [Doc. No. 66-3]; Barela Decl. (CO) ¶ 8a [Doc. No. 66-5]; Bowen Decl. ¶ 6 [Doc. No. 66-55]; Daniels Decl. ¶ 12 [Doc. No. 66-48]. Plaintiffs allege that they anticipate that many of these applications would be granted but are uncertain as to whether they may rely on this funding, should they receive it, given the risk of unilateral termination based on further policy changes after an award is granted. Pls.' Mem. ISO of Pls.' Mot. for Summ. J. on Count I 11–12 [Doc. No. 67] ("Plaintiffs' Memorandum").

### II.  Motion to Dismiss

Defendants move to dismiss Plaintiffs' Amended Complaint [Doc. No. 64] on justiciability grounds and on the merits. Defs.' Mot. to Dismiss [Doc. No. 88]. This order addresses Defendants' arguments as to Count I of the Amended Complaint.

### A.  *Legal Standard*

Federal Rule of Civil Procedure 12(b)(1) is "[t]he proper vehicle for challenging a court's subject matter jurisdiction[,]" Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362–63 (1st Cir. 2001), and a motion to dismiss for lack of constitutional standing is properly brought as a challenge to the court's subject matter jurisdiction pursuant to Rule 12(b)(1). See Katz v. Pershing, LLC, 672 F.3d 64, 70 (1st Cir. 2012). Federal courts are courts of limited jurisdiction, so federal jurisdiction is never presumed. Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998). The party asserting jurisdiction has the burden of demonstrating the existence of federal jurisdiction. Id. A court should treat all well-pleaded facts as true and provide the plaintiff the benefit of all reasonable inferences. Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). Dismissal is appropriate only when the facts alleged in the complaint, taken as true, do not support a finding of federal subject matter jurisdiction. Id.

A challenge to the court's subject matter jurisdiction must generally be addressed before addressing the merits of a case. See Acosta-Ramirez v. Banco Popular de Puerto Rico, 712 F.3d 14, 18 (1st Cir. 2013) ("Federal courts are obliged to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case.").

To survive dismissal on Rule 12(b)(6) grounds, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to

raise a right to relief above the speculative level. . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

B.   *Discussion*

1.   Standing

Defendants contend Plaintiffs lack Article III standing because the risk of a future termination is not sufficiently imminent to constitute an injury-in-fact, caused by Defendant-Agencies, and redressable by the relief sought in Count I.

The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. art. III, § 2, cl. 1; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (quoting Lujan, 504 U.S. at 560–61). "The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts." Katz, 672 F.3d at 71 (citing Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006)). And where the question of standing is based on the pleadings, "the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016).

a.   **Injury in Fact**

Defendants and Plaintiffs diverge on whether future terminations of awards constitute sufficiently imminent injuries as to confer standing. Defendants focus on future grants not yet

awarded and largely do not address whether Plaintiffs have standing to bring suit for future terminations of already-awarded grants. But both circumstances are at issue here.

To establish injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. A future injury can confer standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Dep't of Com. v. New York, 588 U.S. 752, 767 (2019) (citing Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014)); Murthy v. Missouri, 603 U.S. 43, 58 (2024) (noting plaintiffs "must face a real and immediate threat of repeated injury" (internal quotation omitted)).

The termination of grant funding constitutes an injury for the purposes of Article III standing. See Dep't of Com., 588 U.S. at 767 (Loss in federal funds was "a sufficiently concrete and imminent injury to satisfy Article III[.]").

And as to active grants already awarded to Plaintiffs, Plaintiffs have demonstrated that terminations of at least some grants are certainly impending and "not too speculative for Article III purposes." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013). The Executive Branch has directed Defendant-Agencies to review and terminate existing grants. In accordance with these instructions, Defendants have in the first year of the new administration terminated billions of dollars in grant funding. And these terminations continue: since the filing of this lawsuit, Defendants have continued to terminate grants. See Carlisle Decl. (MA) ¶ 4a [Doc. No. 97-1] (noting Department of Interior's Bureau of Ocean Energy Management terminated grant on September 10, 2025, after Plaintiffs filed this action on June 24, 2025); Second Grejner-Brzezinska Decl. ¶ 4 [Doc. No. 97-2] (noting University of Wisconsin-Madison has had additional grants terminated since June 25, 2025). Moreover, Plaintiffs assert they possess

numerous active awards, at least 1,180 active grants totaling more than $5,391,125,688 in grant funding from Defendant-Agencies, all of which have incorporated the Termination Clause into their regulations. Pls.' Reply 8 [Doc. No. 98]. Based on these circumstances, it is not speculative to conclude that at least some of Plaintiffs' awards are at imminent risk of termination. See Massachusetts v. U.S. Dep't of Health & Hum. Servs., 923 F.3d 209, 222 (1st Cir. 2019); N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 50 (1st Cir. 2021) (noting "history of past enforcement against the same conduct supports a finding of injury in fact for pre-enforcement standing").

Defendants argue it is not possible to predict how individual decisionmakers within the Executive Branch may behave, such that it is not possible to conclude grants would in fact be terminated. Mem. ISO Defs.' Mot. to Dismiss 14 [Doc. No. 89] ("Defendants' Memorandum"). Plaintiffs, however, need not establish that a termination will in fact occur, so long as they can show there is a substantial risk that it will. See Dep't of Com., 588 U.S. at 767. Plaintiffs have done so here. The record shows terminations are continuing and that there are express instructions from the Executive Branch directing Defendant-Agencies to proceed with terminations. Though it is not necessarily possible to identify which of Plaintiffs' numerous grants may be terminated, it is possible to conclude that some grants are substantially likely to be terminated. Such a conclusion is unlike the "guesswork" that the Supreme Court warned against in Clapper. 568 U.S. at 413. There, plaintiffs' argument rested on "a highly attenuated chain of possibilities" that would have required speculation across multiple links in the "chain," including into the actions of independent actors. Id. at 411–14.

Accordingly, Plaintiffs have alleged an injury-in-fact with respect to currently active grants.

### b.   Causation and Redressability

Defendants next contend there is a fundamental mismatch between "Plaintiffs' alleged injuries (all of which stem from grant terminations) and the nature of their claims for relief (about agency regulations or an interpretation of those regulations)." Reply Mem. ISO Defs.' Mot. to Dismiss 3 [Doc. No. 111] ("Defendants' Reply"). This mismatch, Defendants argue, is present regardless of whether a grant has already been terminated or is imminently going to be terminated. Id.

Defendants correctly note that Plaintiffs must bring any challenges to past award terminations to the Court of Federal Claims pursuant to the Tucker Act, and not to this court. Defs.' Reply 2 [Doc. No. 111]; Nat'l Insts. of Health v. Am. Pub. Health Ass'n, 145 S. Ct. 2658, 2661 (2025) (citing Dep't of Educ. v. California, 604 U.S. 650 (2025)). Plaintiffs, however, do not challenge past terminations. Plaintiffs instead challenge future terminations that they believe (based on Defendant-Agencies' actions thus far) are likely to occur.[7] These terminations would be the result of Defendants' alleged improper reliance on the Termination Clause.

With respect to these future terminations, as part of Count I, Plaintiffs seek a preenforcement declaration establishing: first, that the Termination Clause cannot be invoked to terminate awards based on agency priorities newly identified after a grant is awarded, Am. Compl. ¶ 290 [Doc. No. 64]; second, that Defendant-Agencies may not rely on the Termination Clause to terminate an award where Congress has directed that funds be spent on a particular

---

[7] Such a challenge, as the Supreme Court found in National Institutes of Health, is properly before this court. 145 S. Ct. at 2661 n.1. There, the court noted that while the district court could not hear challenges to grant terminations, it could hear challenges to the agency guidance authorizing grant terminations. Id. In the latter case, should the district court find that the guidance violated the APA, it possessed the authority to "vacate the guidance, preventing the agency from using it going forward." Id.

program or has appropriated funds for a specific objective and where an agency would be substituting its own agency priorities for the Congressional objective to effectuate the cancellation, id. ¶ 287; and third, that the Termination Clause cannot be used to terminate an award if an award's terms and conditions do not clearly and unambiguously specify that the award can be terminated pursuant to the language of the Termination Clause, that is, that the grant can be terminated when it "no longer effectuates the program goals or agency priorities," id. ¶ 286 (quoting 2 C.F.R. § 200.340(b)).

The prospective relief sought would redress the injuries alleged by Plaintiffs. The relief sought would not restore lost funding; declaratory relief would clarify the parties' rights and obligations under the current grants, addressing whether the Termination Clause authorizes the termination of grants on the basis of new agency priorities. See Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995) ("The Declaratory Judgment Act serves a valuable purpose. It is designed to enable litigants to clarify legal rights and obligations before acting upon them." (footnote omitted)).

Plaintiffs have therefore alleged an injury-in-fact, caused by Defendants, that would be redressed by the declaratory relief sought by Plaintiffs. Plaintiffs have standing to bring suit.[8]

---

[8] Defendants additionally argue in a footnote that where three Plaintiffs bringing suit are governors rather than the states themselves, those Plaintiffs should be dismissed to the extent that they lack the authority under state law to bring this suit. Defs.' Mem. 10 n.2 [Doc. No. 89]. As to this argument, the Motion to Dismiss [Doc. No. 88] is DENIED where Defendants make no further references to the relevant state laws or to the governors of Pennsylvania and Kentucky, and as to the governor of Kansas, merely seek to incorporate by reference the Brief of Amicus Curiae [Doc. No. 78] filed by the State of Kansas in support of Defendants. Where Defendants have provided no additional argument on the matter, the court declines to address the argument briefed only by amicus.

2. Ripeness

Defendants separately assert that Plaintiffs' suit suffers from a ripeness problem where Defendants have not terminated the grants Plaintiffs warn are at risk of termination.

The doctrines of standing and ripeness are both drawn from Article III of the Constitution, which confines the federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. Art. III, § 2; Reddy v. Foster, 845 F.3d 493, 499 (1st Cir. 2017)

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . .'" Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 807–08 (2003) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148–149 (1967)). "[T]he facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of" the judicial relief sought. Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016) (quoting MedImmune, Inc. v. Genentech, Inc., et al., 549 U.S. 118, 127 (2007)).

To determine whether a controversy is ripe, courts examine "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Mangual v. Rotger-Sabat, 317 F.3d 45, 59 (1st Cir. 2003) (quoting Abbott Labs., 387 U.S. at 149).

In the context of judicial review under the APA,

> a regulation is not ordinarily considered the type of agency action "ripe" for judicial review . . . until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

Nat'l Park Hosp. Ass'n, 538 U.S. at 808 (emphasis added).

The First Circuit has also recognized that "[d]eclaratory actions contemplate an *ex ante* determination of rights that exists in some tension with traditional notions of ripeness." Rhode

13

Island v. Narragansett Indian Tribe, 19 F.3d 685, 692 (1st Cir. 1994) (internal quotations omitted). Still, while declaratory relief should not be granted "in speculative situations," id. at 693 (quoting Pub. Affairs Assocs., Inc. v. Rickover, 369 U.S. 111, 112 (1962)), it is also the case that "a litigant 'does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.'" Id. (quoting Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev't Comm'n, 461 U.S. 190, 201 (1983)).

Here, where Plaintiffs' injury is sufficiently imminent and the scope of the controversy is sufficiently defined, Plaintiffs' claim is fit for judicial resolution. Defendant-Agencies have taken concrete actions and applied the Termination Clause to terminate over a thousand grants held by Plaintiffs. And, as noted, Defendants' actions indicate that additional terminations are certainly impending. See supra Section II.B.1.a. Further, the factual components of the case do not require further fleshing out for the court to resolve this dispute. The parties at this stage disagree on a "purely legal" issue: the exact limits of the Termination Clause. See Rhode Island, 19 F.3d at 694 (quoting W.R. Grace & Co.-Conn. v. EPA, 959 F.2d 360, 364 (1st Cir. 1992)).

Defendants argue that Plaintiffs' claims must wait until "a termination actually happens" to challenge grant terminations. Defs.' Mem. 16 [Doc. No. 89]. The ripeness doctrine imposes no such requirement. It is sufficient that the potential harm be imminent.

Plaintiffs would also experience hardship were the court to find that the controversy is not yet ripe for adjudication. "[H]ardship typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." N.H. Lottery Comm'n, 986 F.3d at 53 (internal quotation omitted). This inquiry focuses on whether a judgment would be useful. Rhode Island, 19 F.3d at 693. That is, "[r]ather than asking . . . whether denying relief would impose hardship," a court must instead assess "whether granting relief would serve a useful purpose, or,

put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest." Id.

Here, requiring Plaintiffs to wait until grants are terminated pursuant to the Termination Clause to bring suit would produce uncertainty while Plaintiffs are attempting to engage in ongoing activities presumably covered by the grants. See Fortman Decl. (ME) ¶ 5a [Doc. No. 66-26] (noting termination of current grant would result in staff layoffs); Cuhel-Schuckers Decl. (NJ) ¶ 7a [Doc. No. 66-36] (noting if current grant is cancelled "[g]raduate assistants, project managers, evaluators, instructional designers, undergraduate students, and staff would lose their jobs or paid work funded by this grant"); Dykes Decl. on Behalf of Connecticut Dep't of Energy and Env'tl Prot. (CT) ¶ 5u [Doc. No. 66-8] (noting if National Park Service grants are terminated "it will leave already under-resourced communities financially responsible for projects already underway" and that these communities "may struggle to pay contractors"). Declaratory judgment would allow Plaintiffs certainty as to whether grants will continue, so long as they perform in accordance with the grant requirements, and avoid uncertainty if the Termination Clause instead authorizes termination of grants based on an administration's new or changing priorities.

3.  Plaintiffs Raise a Case or Controversy Warranting Declaratory Relief

In tandem with their arguments on ripeness and standing, Defendants contend that Plaintiffs seek an impermissible advisory opinion on the meaning of the law rather than a valid declaratory judgment. Defs.' Mem. 17 [Doc. No. 89]. Defendants note they only contest one of three issues Plaintiffs have brought before the court: whether the Termination Clause allows the termination of grants based on new agency priorities developed after an agency awarded the grant. See supra Section II.B.1.b (describing the three components of the declaratory relief sought). As to this issue, Defendants argue that where Plaintiffs are not challenging any specific

15

termination by a particular agency of a particular grant, any dispute as to what the Termination Clause allows is not yet an actual controversy. Defs.' Mem. 18–19 [Doc. No. 89].

The Declaratory Judgment Act, 28 U.S.C. § 2201, establishes that a district court may grant declaratory relief, limited to cases of actual controversy under Article III. 28 U.S.C. § 2201(a) (district courts "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."); Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937). "To determine if the declaratory relief is sought within a case of actual controversy, district courts must examine 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" In re Fin. Oversight & Mgmt. Bd. for P.R., 919 F.3d 638, 645 (1st Cir. 2019) (quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)) (emphasis in original); see also Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 325 (4th Cir. 1937) (holding that a federal court should generally entertain a declaratory judgment action "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.").

Plaintiffs have raised a controversy of sufficient immediacy that could benefit from declaratory relief. Though there is a controversy on only one of the three issues Plaintiffs have raised, as to that, the parties do have adverse legal interests with respect to the meaning and limits of the Termination Clause. And, as described in the court's assessment of standing and ripeness, there is evidence of a real controversy of sufficient immediacy between the parties.

16

As noted, judgment would also help clarify the issue in dispute, and by extension the legal relationship between Plaintiffs and Defendant-Agencies. Finally, declaratory relief would mitigate uncertainty and clarify to Plaintiffs whether their active grants could be at risk of termination pursuant to the Termination Clause.

In reply, Defendants assert that Plaintiffs' fear of grant terminations concerns a "hypothetical state of facts" and that there have been no concrete agency actions with respect to Plaintiffs' active grants. Defs.' Reply 6 [Doc. No. 111]. This argument—and Defendants' arguments as to ripeness and standing—all at their core appear to suggest that there is no room for Plaintiffs to seek prospective relief. And again, this argument, too, is unsupported by the law. A controversy need only be of sufficient immediacy and reality to warrant declaratory relief, it is so here. See Mass. Delivery Ass'n v. Coakley, 769 F.3d 11, 17 (1st Cir. 2014) (Declaratory judgment regarding meaning of state statute would not be an improper advisory opinion where "peril of an enforcement action" was not speculative, as evidenced by plaintiff-organization's members previously being subject to enforcement proceedings for violating the statute.).

4. Cause of Action

Defendants further contend that the court cannot grant Plaintiffs' motion for summary judgment on Count I of Plaintiffs' Amended Complaint because Count I only seeks a remedy and does not assert a cause of action. Specifically, Defendants assert that Count I only requests declaratory relief under the Declaratory Judgment Act, and that the Declaratory Judgment Act provides a remedy but not a cause of action. Defs.' Mem. 19 [Doc. No. 89]; see also Tyngsboro Sports II Solar, LLC v. Nat'l Grid USA Serv. Co., Inc., 88 F.4th 58, 64 (1st Cir. 2023) ("The [Declaratory Judgment Act] does not by itself create a federal cause of action.").

17

In response, Plaintiffs point out that Count I is also brought under the APA (which does provide a cause of action), where the count "alleges an APA violation[.]" Pls.' Reply 19–20 [Doc. No. 98].

Where Defendants do not reply to this argument, and where Count I of Plaintiffs' Amended Complaint explicitly seeks a declaratory judgment under both the APA, 5 U.S.C. § 703, and the Declaratory Judgment Act, 28 U.S.C. § 2201, see Am. Compl., Count I [Doc. No. 64], the court finds Plaintiffs have asserted a claim under the APA.

### 5. Final Agency Action

Defendants also move to dismiss Count I on the grounds that it does not challenge any final agency action, as required by the APA.

The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. An agency action is "final" if: (1) the action marks the "'consummation' of the agency's decision-making process," and (2) the action has determined rights or obligations or will create legal consequences. Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024) (citing Bennett v. Spear, 520 U.S. 154, 177 (1997)).

Defendants contend that Count I does not challenge the OMB regulation that contains the Termination Clause (or Defendant-Agencies' parallel regulations) but instead challenges Defendants' decision to interpret the Termination Clause in a particular way. An agency's interpretation of the meaning of a regulation, Defendants go on to argue, is not a final agency action under the APA. Defs.' Mem. 20–21 [Doc. No. 89].

Plaintiffs maintain that Count I challenges the regulation itself, not an interpretation. The court agrees. Count I asks the court to declare the meaning of the Termination Clause itself. See Am. Compl. ¶ 295 [Doc. No. 64] (noting "[d]eclaratory relief setting out these limitations on the [Termination] Clause and the Agency Defendants' parallel regulations will clarify the rights and

obligations of the parties"). This relief is directed to the regulation, not Defendants' actions implementing the regulation.[9]

### III.   The Merits

Plaintiffs move for summary judgment as to Count I of their Amended Complaint. This count seeks a declaratory judgment establishing three limits to the Termination Clause. The requested judgment would declare that the Termination Clause: (1) does not permit the withholding of congressionally appropriated funds on account of changed agency priorities; (2) cannot be invoked to terminate funding where an award's terms and conditions do not specify that the award can be terminated pursuant to the Termination Clause; and (3) does not allow terminations based on new agency priorities that an agency identifies after granting the award. Pls.' Mem. 12 [Doc. No 67]; Am. Compl. ¶¶ 296, 287, 290 [Doc. No. 64]. Defendants respond that they do not challenge either of the first two requested limits and that they "fully agree that the government must comply with federal statutes and regulations in terminating grants." Defs.' Mem. 26 [Doc. No. 89]. Accordingly, the parties' dispute solely concerns whether the Termination Clause allows terminations based on agency priorities that have changed after the agency has granted an award. Am. Compl. ¶ 290 [Doc. No. 64].

### A.  *Legal Standard*

In the administrative law context, a motion for summary judgment is "simply a vehicle to tee up a case for judicial review." Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016). Therefore, "an inquiring court must review an agency action not to determine

---

[9] In contrast, Count II, Agency Action Contrary to Law, asks the court to find Defendants' interpretation to be contrary to law and vacate any decision by Defendants interpreting the Termination Clause in this manner. Id. ¶¶ 304–05.

whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious" or otherwise unlawful. Id.; see Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997) (explaining court's task on summary judgment in administrative law context "is only to determine" whether agency's action was "consonant with [its] statutory powers, reasoned, and supported by substantial evidence in the record").

B.  *Discussion*

Plaintiffs contend that the Termination Clause does not authorize agencies to terminate awards based on new agency priorities not identified at the time of the award. Plaintiffs maintain that the clause instead only allows for terminations where a grant no longer can achieve the program goals and agency priorities identified when the award was first made. Pls.' Mem. 16–17 [Doc. No. 67]. Defendants disagree.

After review of the plain language, regulatory scheme, regulatory history, the Spending Clause of the U.S. Constitution, and Defendants' argument regarding the implementation of the President's vision, the court agrees with Plaintiffs and finds that the Termination Clause does not permit agencies to terminate grants based on program goals and agency priorities identified after grants were awarded.

1.   The Regulation's Express Language

"Determining a regulation's meaning requires application of the same principles that imbue exercises in statutory construction." Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia, 524 F.3d 54, 57 (1st Cir. 2008). The court accordingly begins with the current text of 2 C.F.R. § 200.340(a), in which the Termination Clause is found at subsection (4).

Section (a) of the Regulation provides:

(a)  The Federal award may be terminated in part or its entirety as follows:

(1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. . . .

(3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates <u>the</u> program goals or agency priorities.

2 C.F.R. § 200.340(a) (emphasis added).

### a.   The Termination Clause

Plaintiffs contend that the use of the word "the" in the last phrase of the Termination Clause to describe program goals or agency priorities is a word of limitation, which "indicates that each noun's identity is discrete and certain." Pls.' Mem. 17 [Doc. No. 67]. They assert that this means that the regulation's reference to program goals or agency priorities refers not to <u>any</u> goals or priorities, but rather a specific set of goals and priorities. Based on this, Plaintiffs contend that the program goals and agency priorities referenced must be the specific ones in place at the time of the initial award. <u>Id.</u> at 18.

Plaintiffs find further support for this interpretation where the Termination Clause establishes that termination is only possible if the award "no longer effectuates" these goals or priorities. <u>Id.</u> Plaintiffs argue that this term suggests that the agency priorities must have existed previously, and that the term cannot be applied to new priorities that did not exist at the time of the award. <u>Id.</u> Under this reading, it is the award's failure to effectuate the goals and priorities for

which it was awarded that warrants termination, rather than a change in an administration's goals and priorities. This reading is also consistent with the syntax, where the word "award," rather than "program goals" or "agency priorities" is the subject of the last clause.

While Plaintiffs offer the more natural reading of the regulation, it is not the only reading. Defendants suggest that if the word "the" adds any limitation, it would only be as to "program goals" and not "agency priorities." Defs.' Reply 15 n.9 [Doc. No. 111]. Under this reading, an agency would be able to terminate a grant if an award "no longer effectuates . . . agency priorities," new and old, because those priorities have changed. 2 C.F.R. § 200.340(a)(4).

Where this alternative construction is plausible, the language of the Termination Clause alone does not fully confirm Plaintiffs' interpretation.

### b.     The Other Termination Provisions in 2 C.F.R. § 200.340

In support of their interpretation, Defendants underscore the differences between the Termination Clause and its preceding provision, 2 C.F.R. § 200.340(a)(3). Defs.' Mem. 31 [Doc. No. 89]. That earlier provision allows a grantee to partially terminate an award. But, upon doing so, an agency may then assess whether "the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made[.]" 2 C.F.R. § 200.340(a)(3). If the remaining portion will not accomplish these "purposes", an agency may terminate the remainder of the award. Id. Defendants contend that this express reference to the "purposes for which the Federal award was made" forecloses the possibility that, without relying on similar language, the Termination Clause also refers to agency priorities when the award was made. Defs.' Mem. 31 [Doc. No. 89].

Though this distinction lends some support to Defendants' interpretation, Defendants' construction faces a broader problem: it would render the other grounds for termination superfluous. According to Defendants, agencies are permitted to terminate grants based on a

22

change in agency priorities. Such a change could be a broad strategic shift by the agency. But an

agency's decision that it no longer wishes to fund a grantee could also be considered a change in

priority. In such cases, an agency need not ascertain whether, after a grantee seeks partial

termination, the remaining portion of the award meets original program goals. 2 C.F.R.

§ 200.340(a)(3). An agency could instead simply decide that the remaining portion of the award

would not meet agency priorities. Likewise, it would not be necessary for an agency to seek

consent from the recipient to terminate an award. See 2 C.F.R. § 200.340(a)(2). Again, the

agency could instead decide that funding that particular recipient no longer was an agency

priority.[10]

> c.      The Broader Regulatory Scheme

---

[10] Defendants' proposed interpretation also is in tension with the requirements the regulatory
scheme sets out for terminations tied to noncompliance. Section 200.340(a)(1) authorizes an
agency to terminate an award "if the recipient or subrecipient fails to comply with the terms and
conditions of the Federal award[.]" Id. And  § 200.339 outlines the remedies available to an
agency when a recipient has failed to comply. The provision begins by noting:

> The Federal agency or pass-through entity may implement specific conditions if the
> recipient or subrecipient fails to comply with the U.S. Constitution, Federal
> statutes, regulations, or terms and conditions of the Federal award. See § 200.208
> for additional information on specific conditions. When the Federal agency or pass-
> through entity determines that noncompliance cannot be remedied by imposing
> specific conditions, the Federal agency or pass-through entity may take one or more
> of the following actions[.]

2 C.F.R. § 200.339 (emphasis added). Accordingly, the agency must consider whether
noncompliance cannot be remedied through additional conditions. Only after making such a
determination may the agency proceed with terminating a grant. Meanwhile, Defendants'
interpretation of the Termination Clause would suggest that agencies could terminate awards
based on new priorities even when a grantee was complying with earlier priorities and goals.
Moreover, where such a grantee would now not be in compliance with the new priorities
(priorities that the agency need not communicate to the grantee), the Termination Clause would
not require that the agency determine whether this "noncompliance" could be remedied by
imposing specific conditions, unlike § 200.339.

The court next turns to the Termination Clause's relationship with the broader regulatory scheme. See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 666 (2007) ("[T]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation modified)).

The broader regulatory scheme dictates that an agency may not terminate grants pursuant to the Termination Clause solely because the agency's priorities have changed.

The 2024 Final Guidance sets forth numerous notice requirements concerning award applicants and award recipients. Pursuant to 2 C.F.R. § 200.202, an agency seeking to issue an award must first "design a program and create an Assistance Listing before announcing the Notice of Funding Opportunity." 2 C.F.R. § 200.202(a). The regulation further requires that a program be designed "[w]ith clear goals and objectives" and "[t]o measure performance based on the goals and objectives developed[.]" 2 C.F.R. § 200.202(a)(1)–(2); see also 2 C.F.R. § 200.301(a) (noting that an agency "must measure the recipient's performance to show achievement of program goals and objectives" and that the "agency should clearly communicate the specific program goals and objectives in the Federal award, including how the Federal agency will measure the achievement of the goals and objectives"). 2 C.F.R. § 200.203, which sets out requirements for providing public notice of federal financial assistance programs, establishes that when an agency creates an assistance listing,[11] the agency must submit

---

[11] "Assistance Listings refer to the publicly available listing of Federal assistance programs managed and administered by the General Services Administration (GSA) at SAM.gov." 2 C.F.R. § 200.1.

information to the General Services Administration ("GSA") regarding the program description, purpose, goals, and measurement. 2 C.F.R. § 200.203(b)(1). "[T]he program description, purpose, goals, and performance measurement[,]" the provision establishes "should align with the strategic goals and objectives within the Federal agency's performance plan[.]" Id.

When an agency decides to announce a notice of funding opportunity,[12] the requirements are largely the same. The agency must display with the notice an executive summary, providing "[a] brief description that is written in plain language and summarizes the goals and objectives of the program[.]" 2 C.F.R. § 200.204(a)(8). The agency must also issue the notice pursuant to Appendix 1 of the final guidance, which governs the contents of the full text of a notice of funding opportunity and articulates numerous requirements concerning the information an agency must include when issuing a notice. 2 C.F.R. § 200.204(c)(1). Among the many requirements, the Appendix mandates that, in the program description of the funding opportunity, the agency list the "agency's funding priorities or focus areas[.]" 2 C.F.R. Pt. 200, App. I (b)(3)(i)(B) (emphasis added).

These requirements prioritize ensuring that grantees are on notice, before applying, as to what the program goals and agency priorities are for any particular award. The statutory scheme also encourages compliance with program goals by requiring that an agency monitor a grantee's progress toward meeting such goals. See 2 C.F.R. § 200.301(a). It would be contrary to this extensive scheme to interpret the Termination Clause to allow the termination of grants based on

---

[12] A "[n]otice of funding opportunity means a formal announcement of the availability of Federal funding through a financial assistance program from a Federal agency. The notice of funding opportunity provides information on the award, such as who is eligible to apply, the evaluation criteria for selecting a recipient or subrecipient, the required components of an application, and how to submit the application." 2 C.F.R. § 200.1.

new priorities, including priorities not disclosed to the grantees. Such an interpretation would obviate any need to notify parties of program goals and priorities, given that agencies could change goals and priorities at any time. Where Defendants' interpretation of the Termination Clause would undermine other requirements set forth by the regulatory scheme, such an interpretation is inconsistent with the regulatory scheme. See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 222 (2008) ("[O]ur construction . . . must, to the extent possible, ensure that the statutory scheme is coherent and consistent.").

Defendants, meanwhile, point to no other text in the regulatory scheme that suggests goals and priorities for existing awards could be adjusted without notice to grantees after grants are issued. Instead, Defendants assert that there would be "severe administrability problem[s]" because identifying when an agency priority came to be is not a straightforward inquiry. Defs.' Mem. 36 [Doc. No. 89]. Plaintiffs' interpretation, Defendants argue, "would seemingly require courts to take on the task of identifying the date on which a new agency priority sprang into existence, to decide whether it was before or after a grant was made." Id.

On the contrary, this argument lends support for Plaintiffs' construction of the provision. The regulatory scheme requires Defendant-Agencies to provide notice of program goals and agency priorities at the time a funding opportunity is announced, and awards are then issued based on those priorities. Accordingly, Plaintiffs' interpretation, which requires consideration of those initial program goals and agency priorities, would not require courts to determine at what point an agency's priorities changed. All that a court would need to do is look to the agency priorities and program goals identified in the notice of funding opportunity when the program was announced.

2. The Rulemaking History

"[B]eyond context and structure," courts may look to "history [and] purpose to divine the meaning of language." Gundy v. United States, 588 U.S. 128, 141 (2019) (alteration in original) (internal quotation omitted). Here, the rulemaking history further supports an interpretation of the Termination Clause that limits termination to instances where a grantee cannot achieve initial program goals or agency priorities.

OMB first adopted the Termination Clause in 2020. Much like the 2024 Termination Clause, the 2020 clause stipulated that an award may be terminated, in whole or in part, "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities[.]" Guidance for Grants and Agreements, 85 Fed. Reg. 49506, 49559 (Aug. 13, 2020); 2 C.F.R. § 200.340(a)(2) (2021).[13] As part of the 2020 revision, OMB also added a notice requirement governing award terminations. The new provision stipulated that federal awarding agencies "should clearly and unambiguously specify termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section." 2 C.F.R. § 200.340(b) (2021).[14]

---

[13] In the 2024 revisions, OMB moved the Termination Clause from subsection (a)(2) to (a)(4) and updated the language to allow for termination "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30169 (Apr. 22, 2024) (emphasis highlighting amendment to provision).

[14] Additionally, 2 C.F.R. § 200.211, which governs the information contained in a federal award and was modified at the same time, noted that "Federal awarding agencies must make recipients aware, in a clear and unambiguous manner, of the termination provisions in § 200.340, including the applicable termination provisions in the Federal awarding agency's regulations or in each Federal award." 2 C.F.R. § 200.211(c)(v) (2021). The 2024 guidance amended the termination section's notice provision, changing "should" specify all termination provisions in the terms and conditions of the award to "must" so specify. Compare 2 C.F.R. § 200.340(b) (2021) with 2 C.F.R. § 200.340(b) (2024).

27

OMB received several comments in 2020 concerning the proposed change to the termination provision. Guidance for Grants and Agreements, 85 Fed. Reg. at 49509. The largest number of these comments expressed concern that the Termination Clause would "provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause." Id. In response, OMB noted it "deliberated upon these requests and decided as written agencies are not able to terminate grants arbitrarily[.]" Id.[15]

OMB additionally presented in the Final Guidance's preamble two instances where the new Termination Clause might apply. In the first instance, termination pursuant to the clause would be appropriate where, after an agency issues an award, "additional evidence reveals that a specific award objective is ineffective at achieving program goals[.]" Id. at 49507. Termination would similarly be apt if "additional evidence . . . cause[d] the Federal awarding agency to significantly question the feasibility of the intended objective of the award[.]" Id. at 49507–08. In such a case, the preamble noted, "it may be in the interest of the government to terminate the Federal award." Id. at 49508. These examples suggest that when OMB promulgated the Termination Clause, it did not contemplate instances where an agency would terminate a grant because its program goals or priorities had changed. Instead, the Final Guidance supports the conclusion that the Termination Clause provides an opportunity to terminate an award in instances where new information establishes that the original goals can no longer be met, either because the specific project cannot achieve those goals or because they are unachievable.

---

[15] The preamble to the Final Guidance also noted that "Federal awarding agencies must clearly and unambiguously articulate the conditions under which a Federal award may be terminated in their applicable regulations and in the terms and conditions of Federal awards." Guidance for Grants and Agreements, 85 Fed. Reg. 49506, 49507 (Aug. 13, 2020) (emphasis added).

In the 2024 revisions, OMB updated the language to allow for termination "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Guidance for Federal Financial Assistance, 89 Fed. Reg. at 30169 (emphasis added to highlight amendment to provision).

Originally, OMB had proposed removing the Termination Clause in their 2024 Final Guidance, noting that agencies would be able to independently incorporate such a clause into their own award terms, but ultimately decided to preserve the clause and further noted that termination could only occur pursuant to the terms and conditions of the final award. Id. at 30089. The Final Guidance's preamble noted that several comments had supported removing the Termination Clause, and that one of these comments asserted that removal would "from terminating high-performing projects based on shifting agency priorities." Id. The Final Guidance did not directly reply to this comment in its preamble, but did note that "[t]he prior version of section 200.340(b) and the proposed version both directed Federal agencies and pass-through entities to clearly and unambiguously specify all termination provisions in the terms and conditions of the award." Id. at 30089. It went on to note that the final version adopted in the guidance "underscore[ed] the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." Id.

In sum, this history, together with the statutory scheme, demonstrates that OMB designed a regulatory scheme that ensured agencies established clear program goals and priorities before they issued awards and ensured grantees were aware of the termination conditions governing grant awards. The scheme additionally required goal setting and performance monitoring by

agencies to ensure grantees met these goals and priorities. However, where these efforts were not successful, and a grantee could not meet such goals, OMB adopted the Termination Clause to provide agencies with the flexibility to terminate those particular grants.

### 3. The Spending Clause

"The Spending Clause grants Congress the power 'to pay the Debts and provide for the . . . general Welfare of the United States.'" Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 576 (2012) (alteration in original) (quoting U.S. Const., Art. I, § 8, cl. 1). Though Congress may rely on the spending power to place conditions on states receiving funding, this power has limits. See Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). Notably, a State must "voluntarily and knowingly accepts the terms of" an agreement between the federal government and the State. Id. Therefore, there can "be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." Id. (emphasis added). "The crucial inquiry," is whether Congress has spoken "so clearly" that a court may conclude "that the State could make an informed choice." Id. at 25.

Plaintiffs argue that no statute authorizes the termination of grants to States based on new agency goals or priorities and, if there was, that such a statute would violate the Spending Clause of the Constitution. Pls.' Mem. 20–21 [Doc. No. 67].

In response, Defendants contend that the Termination Clause imposes no conditions upon Plaintiffs in exchange for accepting federal funds. Defs.' Mem. 36 [Doc. No. 89]. Defendants argue further that if the Termination Clause functions as a condition placed upon the states, that "[n]o [s]tate can reasonably claim to be surprised that a federal agency availed itself of authority that appears expressly in the Code of Federal Regulations." Id. at 37.

Plaintiffs' argument carries more force. Both the first clause of 2 C.F.R. § 200.340(a) and the Termination Clause impose conditions on grants. Under the first clause, the Federal agency or pass-through entity may terminate the grant "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award[,]" 2 C.F.R. § 200.340(a)(1), and under the Termination clause, the Federal agency or pass-through entity may terminate the grant if it "no longer effectuates the program goals or agency priorities[,]" 2 C.F.R. § 200.340(a)(4). If the terms and conditions of the Federal award, and the program goals and agency priorities are known at the time the grant is awarded are known to the State, the State can make an informed choice to accept the grant, as required by Pennhurst. But if the regulation is construed to allow the program goals and agency priorities the grant is being measured against to change, the required notice is lacking. Where the latter interpretation, then, would run contrary to the requirements outlined in Pennhurst, this lends greater support for Plaintiffs' interpretation of the clause.

4.   The Implementation of the President's Vision

As discussed above, Defendants' interpretation of the Termination Clause is not clearly supported by the text of the provision, runs counter to the regulatory scheme, receives no support in the rulemaking history, and would violate the Spending Clause's requirement that conditions be imposed unambiguously. Defendants insist, however, the Plaintiffs' interpretation of the Termination Clause would be contrary to the function of the OMB: supporting each President in implementing "his or her vision across the Executive Branch." Defs.' Reply 18 [Doc. No. 111] (internal quotation omitted). Nothing in this interpretation of the Termination Clause limits the President or Agencies from setting program goals and agency priorities before awarding new grants. The regulation, as declared by this court, demands only that grantees be apprised of those goals and priorities before grants are awarded.

31

Accordingly, the court finds that the Termination Clause does not permit the termination of grants based on their inability to effectuate program goals and agency priorities identified after the award was made.[16]

### IV.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [Doc. No. 65] on Count I of Plaintiffs' Amended Complaint [Doc. No. 64] is GRANTED and Defendants' Motion to Dismiss [Doc. No. 88] as to Count I is denied. Defendants' Motion to Dismiss [Doc. No. 88] as to Counts II and III remains pending.

The court declares that 2 C.F.R. § 200.340(a)(4) (2024) and 2 C.F.R. § 200.340(a)(2) (2021) do not allow terminations of awards based on new program goals or agency priorities that an agency identifies after granting the award.

IT IS SO ORDERED.

July 17, 2026                                      /s/ Indira Talwani
                                                  United States District Judge

---

[16] Plaintiffs separately contend that the Termination Clause cannot be used to terminate awards where the clause was not clearly and unambiguously specified in the award terms and conditions. Defendants do not dispute that the regulations were amended in 2024 to include this requirement. See 2 C.F.R. § 200.340(b) (2024) (noting "[t]he Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award"). Defendants, however, dispute whether the 2020 Final Guidance imposed the same requirements where that version of the regulation notes: "[a] Federal awarding agency should clearly and unambiguously specify termination provisions applicable to each Federal award, in applicable regulations or in the award, consistent with this section." 2 C.F.R. § 200.340(b) (2021) (emphasis added). Where the court finds the Termination Clause does not permit terminations based on new agency priorities identified after an award is made, whether or not the awards were required to include the Termination Clause in their terms and conditions is moot.