**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF NEW JERSEY, *et al.*,

Plaintiffs,

v.

U.S. OFFICE OF MANAGEMENT AND BUDGET, *et al.*,

Defendants.

Civil Action No. 25-11816-IT

---

**PLAINTIFF STATES' OPPOSITION**
**TO DEFENDANTS' MOTION TO STAY PENDING APPEAL**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

ARGUMENT ........ 6

I. Defendants Fail To Demonstrate Irreparable Injury, And The Equities Weigh Decisively Against A Stay. ........ 6

II. Defendants Cannot Succeed On The Merits. ........ 9

A. The Court Correctly Found Final Agency Action. ........ 9

B. The Court Correctly Interpreted The Clause. ........ 13

CONCLUSION ........ 19

# TABLE OF AUTHORITIES

## Cases

*Arevalo v. Ashcroft*, 344 F.3d 1 (1st Cir. 2003) ........ 14

*Badger Cath., Inc. v. Walsh,* 620 F.3d 775 (7th Cir. 2010) ........ 7

*Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45 (D.C. Cir. 2000) ........ 12

*Beame v. Friends of the Earth*, 434 U.S. 1310 (1977) ........ 7

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83 (D.C. Cir. 2020) ........ 13

*California v. U.S. Dep't of Educ.*, 2026 WL 2754968 (D. Mass. Sept. 17, 2026) ........ 13

*City of Salem v. Mullin*, 839 F. Supp. 3d 1320 (D. Or. 2026) ........ 19

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024) ........ 9

*DRG Funding Corporation v. Secretary of HUD*, 76 F.3d 1212 (D.C. Cir. 1996) ........ 11

*Fischer v. United States*, 603 U.S. 480 (2024) ........ 17

*Fla. Agency for Health Care Admin. v. Adm'r for Ctrs. for Medicare & Medicaid Servs.*, 161 F.4th 765 (11th Cir. 2025) ........ 11

*Harper v. Werfel*, 118 F.4th 100 (1st Cir. 2024) ........ 11, 12

*Kentucky v. Yellen*, 67 F.4th 322 (6th Cir. 2023) ........ 18

*N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1 (1st Cir. 2000) ........ 10

*N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38 (1st Cir. 2021) ........ 10, 11, 13

*New Hampshire Youth Movement v. Scanlan*, 191 F.4th 41 (1st Cir. 2026) ........ 7

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) ........ 9

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ........ 11

*Rhode Island v. Trump*, 155 F.4th 35 (1st Cir. 2025) ........ 1, 6, 7

*Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) ........ 6

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ........ 13

*Schoenthal v. Raoul*, 150 F.4th 889 (7th Cir. 2025) .......... 13

*Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016) .......... 11

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) .......... 13

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25 (1st Cir. 2026) .......... 12

**Statutes**

5 U.S.C. § 703 .......... 9

**Other Authorities**

Exec. Order No. 14,332, 90 Fed. Reg. 38,929, 38,932 (Aug. 7, 2025) .......... 12

85 Fed. Reg. 49,506 (Aug. 13, 2020) .......... 3, 16

**Regulations**

2 C.F.R. § 200.100, *et seq.* (2024) .......... 2, 17

2 C.F.R. § 200.202(a) .......... 3

2 C.F.R. § 200.301(a) .......... 3

2 C.F.R. § 200.340 .......... *passim*

2 C.F.R. § 200.340 (2020) .......... 2

2 C.F.R. § 400.1 .......... 2

2 C.F.R. § 600.101(a) .......... 2

2 C.F.R. § 1104.1 .......... 2

2 C.F.R. § 1327.101 .......... 2

2 C.F.R. § 1402.100 .......... 2

2 C.F.R. § 1500.2 .......... 2

2 C.F.R. § 2500.100 .......... 2

2 C.F.R. § 2800.101 .......... 2

2 C.F.R. § 2900.4 .......... 2

2 C.F.R. § 3002.10 .......... 2

2 C.F.R. § 3374.1 .......... 2

## INTRODUCTION

Over three months ago, this Court issued a declaratory judgment holding that the Termination Clause at "2 C.F.R. § 200.340(a)(4) (2024) and 2 C.F.R. § 200.340(a)(2) (2021) do[es] not allow terminations of awards based on new program goals or agency priorities that an agency identifies after granting the award." Memorandum & Order, Doc. No. 122 at 32. Now, after failing to seek any relief for three months following that binding order, and after occasioning months of delay in memorializing a final judgment, Defendants claim that they urgently need a stay pending appeal because they have an interest in "terminating awards that 'no longer effectuate the program goals or agency priorities' of the current Administration." Doc. No. 146 at 14. But Defendants have come nowhere close to carrying their burden of showing that they require the "extraordinary relief" of a stay pending appeal. *Rhode Island v. Trump*, 155 F.4th 35, 41 (1st Cir. 2025) (internal quotation marks and citations omitted).

For one thing, the equities tip sharply against a stay pending appeal. Defendants' months-long delay in consummating final judgment and their lack of any urgency in seeking relief after this Court issued a binding declaratory judgment are reason enough to deny a stay. Defendants' delay undercuts any assertion that they are somehow irreparably harmed by this Court's decision. Nor do the equities otherwise support Defendants' request for extraordinary emergency relief. Defendants continue to press the breathtaking position that a single subclause in federal regulations is essentially an at-will termination provision, allowing federal agencies virtually unfettered authority to terminate grants on a whim. But their filing simply confirms what Plaintiffs have said all along: that "billions of dollars in grants" are "at imminent risk of termination." Doc. No. 67 at 2; *see* Doc. No. 122 at 10 (this Court agreeing that "at least some of Plaintiffs' awards are at imminent risk of termination"). Plaintiff States would suffer devastating harm if Defendants could

unlawfully deprive States of funding that Defendants themselves awarded and that States rely on to combat violent crime, equip law enforcement, educate students, safeguard public health, protect clean drinking water, conduct life-saving research, address food insecurity, and more.

Nor can Defendants succeed on the merits. This Court has already held that Plaintiffs properly challenged final agency action and that the Termination Clause does not mean what Defendants say it means. Defendants offer no reason why this Court should now conclude otherwise. The Court should reaffirm those holdings and reject Defendants' belated motion.

## BACKGROUND

Since its initial notice-and-comment rulemaking in 2013, OMB's Uniform Guidance for federal grantmaking has been expressly incorporated into the grantmaking regulations of most federal agencies that award grants with congressionally appropriated funds, including all the Agency Defendants.[1] *See* 2 C.F.R. § 200.100, *et seq*. This regulation permits the termination of awarded grands only under carefully cabined circumstances. *See* 2 C.F.R. §§ 200.339 to 200.343 (collectively addressing "Remedies for Noncompliance").

As relevant here, the current version of the regulation, promulgated in 2024, allows a federal agency to terminate an award "pursuant to the terms and conditions of the Federal Award, including to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The predecessor regulation similarly allowed federal agencies to terminate awards "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020). This Termination Clause has long been understood to allow agencies to terminate grants if those grants are not

---

[1] *See* 2 C.F.R. § 400.1; 2 C.F.R. § 1327.101; 2 C.F.R. § 1104.1; 2 C.F.R. § 3002.10; 2 C.F.R. § 1402.100; 2 C.F.R. § 2800.101; 2 C.F.R. § 2900.4; 2 C.F.R. § 600.101(a); 2 C.F.R. § 1500.2; 2 C.F.R. § 3374.1; 2 C.F.R. § 2500.100.

meeting agency priorities established at or before the time of the award.[2] Indeed, prior to January 2025, the Clause was never used to terminate grant awards to Plaintiffs based on program goals or agency priorities established after the award was made. Am. Compl., Doc. No. 64 ¶ 6.

Immediately following President Trump's inauguration, the President issued a series of unprecedented Executive Orders directing federal agencies to review and terminate existing grant funding to a range of recipients, including Plaintiffs, based on the Executive Branch's new policy preferences. Pls.' Partial Motion for Summ. Judgment, Doc. No. 67, at 8–9 (describing executive orders). Federal agencies carrying out these terminations—which resulted in the elimination of billions of dollars of funds awarded to and relied upon by Plaintiffs—repeatedly invoked the Termination Clause as the legal basis for their decisions, with boiler-plate termination notices stating that the grants "no longer effectuate[] agency priorities[.]" Doc. No. 67 at 10–11. The coordinated onslaught of terminations by numerous federal agencies not only significantly disrupted Plaintiffs' provision of vital services and programs, but also injected tremendous uncertainty into the broader federal funding landscape, inhibiting Plaintiffs in making short- and long-term budgeting decisions for critical programs that benefit their residents. *See id.*

Plaintiffs filed suit against OMB and the Agency Defendants in June 2025. The Amended Complaint asserted three causes of action. Count I—the only cause of action at issue here—was directed at the regulation and sought a declaratory judgment under the Administrative Procedure

---

[2] *See, e.g.*, *Guidance for Grants and Agreements*, 85 Fed. Reg. 49,506, 49,507–09 (Aug. 13, 2020) (the regulation does not permit "arbitrarily" terminating awards "without sufficient cause"); *see also* 2 C.F.R. § 200.202(a) (requiring programs to be designed with "clear goals and objectives" and directing performance to be measured "based on the goals and objectives developed during program planning and design"); 2 C.F.R. § 200.301(a) (requiring federal agencies to "measure the recipient's performance to show achievement of program goals and objectives" and directing that "[t]he Federal agency should clearly communicate the specific program goals and objectives in the Federal award").

Act (APA) and Declaratory Judgment Act clarifying "the[] limitations on the Clause and the Agency Defendants' parallel regulations[.]" Doc. No. 64 ¶ 295. Specifically, Plaintiffs asked that the Court declare that the Clause "authorizes a grant to be terminated only if the grant no longer effectuates 'agency priorities' that were identified at the time of the federal award" and "does not independently permit or authorize . . . terminations based on changed agency priorities identified after the time of the federal award."[3] *Id.* ¶ 290.

Counts II and III were pled in the alternative. Count II was directed at Defendants' decision to "terminate grants based on new 'agency priorities' identified after the grants have been award" and sought an order vacating and setting aside that decision. *Id.* ¶¶ 296–305. Like Count I, Count III was directed at the regulation. If "the Court disagree[d] with Plaintiffs' interpretation (as set forth in Count I) of the language of the Clause," Count III sought "an order and judgment holding unlawful and setting aside the Clause." *Id.* ¶¶ 306–19. Plaintiffs moved for summary judgment only as to Count I, while Defendants opposed the motion and cross-moved for dismissal of the entire action. Doc. No. 65–67, 89.

On July 17, 2026, this Court granted Plaintiffs' motion for partial summary judgment and denied Defendants' motion to dismiss Count I. Memorandum & Order, Doc. No. 122. "After review of the plain language, regulatory scheme, regulatory history, the Constitution's Spending Clause, and Defendants' arguments," the Court agreed with Plaintiffs that "the Termination Clause

---

[3] Count I also asked for a declaratory judgment clarifying that the Clause could not (1) "be invoked to terminate an award if the award terms and conditions themselves do not 'clearly and unambiguously specify' that the grant can be terminated when it 'no longer effectuates the program goals or agency priorities'" and (2) "be used to terminate an award where Congress has directed funds to be spent on particular grant programs or where Congress has appropriated money for an identified objective and the agency substitutes its own 'agency priorities' for the objective identified by Congress." Doc. No. 64 ¶¶ 286–287. Because Defendants conceded these points, the "dispute solely concern[ed] whether the Termination Clause allows terminations based on agency priorities that have changed after the agency has granted an award." Doc. No. 122 at 19.

does not permit agencies to terminate grants based on program goals and agency priorities identified after grants were awarded." *Id.* at 20. The Court thus issued a declaratory judgment stating that "2 C.F.R. § 200.340(a)(4) (2024) and 2 C.F.R. § 200.340(a)(2) (2021) do not allow terminations of awards based on new program goals or agency priorities that an agency identifies after granting the award." *Id.* at 32. In so ruling, the Court found that Agency Defendants' widespread practice of invoking the Clause as the basis for the terminations created an actual controversy as to the meaning of the Clause that was ripe for adjudication. *Id.* at 5–6, 13–18.

In its Memorandum & Order, the Court requested that Plaintiffs "promptly advise the court whether they continue to seek relief under Count II and Count III," given that these counts were pled in the alternative. *Id.* at 2 n.5. Plaintiffs thus began to confer with Defendants about the appropriate treatment of Counts II and III, with Defendants expressing a desire to obtain "a final judgment that the United States could appeal." *See* Dirks Decl., Doc No. 151 ¶¶ 4–5.

The parties reached an agreement in principle on August 7, 2026, to prepare and file a joint motion for entry of partial final judgment on Count I pursuant to Fed. R. Civ. P. 54(b). Doc No. 151 ¶ 6. On August 12, 2026, Defendants agreed to draft that joint motion. *Id.* ¶ 7. Two weeks later, however, Defendants changed course and requested that Plaintiffs draft the motion instead. *Id.* ¶ 8. Plaintiffs circulated a draft motion for Defendants' review on September 10, 2026. *Id.* ¶ 9. Defendants did not return comments or edits on that draft motion for another three weeks. *Id.* ¶ 10.

In the interim, this Court scheduled a status conference on September 22, 2026. At that status conference, the Court requested an update from the parties on the resolution of Counts II and III. Doc. No. 139. In response, Defendants did not commit that they would be able to finalize the draft motion within two weeks. The Court nonetheless requested that the parties seek to resolve the issue within two weeks and entered an order after the conference requiring counsel to file an

update with the Court by October 6, 2026. *Id.* Nine days after the status conference, on October 1, 2026, Defendants finally returned comments on the draft motion Plaintiffs had circulated to Defendants three weeks earlier. Doc. No. 151 ¶ 10. On October 6, 2026, two months after the parties had reached an agreement in principle regarding a joint Rule 54(b) motion, Plaintiffs filed the parties' joint Rule 54(b) motion, and the Court entered partial final judgment the next day. Doc. Nos. 140–142. More than two weeks after this Court entered partial final judgment, Defendants filed their notice of appeal and a motion for a stay pending appeal with this Court. Doc. Nos. 144, 145.

## ARGUMENT

Because "[a] stay pending appeal is an intrusion into the ordinary processes of administration and judicial review," it is never "granted as a matter of right." *Rhode Island v. Trump*, 155 F.4th 35, 41 (1st Cir. 2025) (internal quotation marks and citations omitted). Defendants "bear the burden of demonstrating that they are entitled to the 'extraordinary' relief they seek." *Id.* To obtain this "extraordinary" relief, Defendants must make a "strong showing" that they are "likely to succeed on the merits," that they will be "irreparably injured absent a stay," and that equities and public interest weigh in their favor. *Id.* The first two factors are the "most critical," *id.*, and "an applicant's likelihood of success on the merits need not be considered" if "the applicant fails to show irreparable injury from the denial of the stay." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, J., in chambers).

### I. Defendants Fail To Demonstrate Irreparable Injury, And The Equities Weigh Decisively Against A Stay.

Defendants have plainly failed to meet their burden of "strong[ly] showing" that they will be irreparably injured absent a stay or that the equitable factors favor a stay.

To start, Defendants' "leisurely pursuit of a stay" in this case, while now belatedly claiming

"reasons for expediency," fatally undermines their claim of imminent, irreparable harm. *See New Hampshire Youth Movement v. Scanlan*, 191 F.4th 41, 43 (1st Cir. 2026) (denying a stay pending appeal "even assuming" appellants were likely to succeed on the merits where they waited several weeks to seek a stay and never "request[ed] expedited briefing" despite "adverse rulings" from the district court). Defendants received the Court's adverse declaratory judgment ruling on July 17, 2026. Doc. No. 122. That order had "the force and effect of a final judgment" upon issuance. 28 U.S.C. § 2201(a); *see also Badger Cath., Inc. v. Walsh,* 620 F.3d 775, 782 (7th Cir. 2010) (Easterbrook, J.) ("[A] declaratory judgment is a real judgment, not just a bit of friendly advice[.]"). Despite the conclusive and binding nature of the Court's declaratory judgment, Defendants took no action to stay that order or to seek any other relief until they filed this motion for a stay pending appeal.

Instead, Defendants lackadaisically proceeded toward a final judgment and appeal over the last three months. *See supra* at 4–5. As detailed above, Defendants repeatedly delayed the filing of the parties' joint Rule 54(b) motion until early October. *See id.* And even after this Court entered final judgment on October 7, 2026, Defendants delayed filing a notice of appeal and seeking a stay from this Court for two *more* weeks. *See id.* These lengthy and unexplained delays "vitiate[] much of the force of their allegations of irreparable harm," *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (Marshall, J., in chambers), and are alone "sufficient grounds to deny a stay," *see Scanlan*, 191 F.4th at 43; *see also* 1st Cir. R. 27.0(b) ("Motions for stay ... may be denied for failure to present promptly.").[4]

---

[4] Puzzlingly, Defendants claim that Plaintiffs' "unexplained delay" in filing this action undermines Plaintiffs' claims of irreparable harm. Doc. No. 146 at 15. But it is *Defendants*, not Plaintiffs, who seek a stay pending appeal. So *Defendants* bear the burden of demonstrating irreparable harm. *See Rhode Island*, 155 F.4th at 41.

Dispositive delay aside, it remains unclear what harm would befall Defendants from this Court's judgment. This Court issued a declaratory judgment that in no way enjoins the Federal Government from terminating funding in a manner consistent with the law. Defendants retain the authority to terminate grants when a recipient "fails to comply with the terms and conditions of the Federal award" or "if an award no longer effectuates the program goals or agency priorities" established at the time of the award. *See* 2 C.F.R. § 200.340(a)(1), (4). And, of course, Defendants may also change their priorities consistent with applicable law and take those new priorities into account when awarding *new* grants. What's more, the Court's declaratory judgment does not of its own force require the Federal Government to reinstate any specific already-terminated grants, and it does not require the Federal Government to continue funding specific grants to Plaintiff States. Instead, the Court's declaratory judgment clarifies that Defendants exceed the scope of their authority when they pull the rug out from under Plaintiff States and terminate grants based on program goals and agency priorities that were unknown at the time of the existing grants and may yet be unknown to Defendants themselves.[5] Defendants can claim little public interest in terminating grants to Plaintiffs under those carefully defined circumstances.

Plaintiffs, by contrast, have diligently sought to clarify their rights with respect to current and future grants—relief they surely have a "cognizable interest in." Doc. No. 146 at 15. As Plaintiffs repeatedly demonstrated, and this Court has recognized, Plaintiffs have an exceedingly strong interest in protecting their residents from the devastation of additional grant terminations, which could eliminate essential funding for programs that combat violent crime, protect public safety,

[5] Defendants do not develop any specific argument about the "severe separation-of-powers harm" they claim they will suffer in the absence of a stay. Doc. No. 146 at 14. They neither suggest any specific policy they have been unable to pursue nor explain how continuing to fund already-awarded grants could implicate a legitimate separation-of-powers concern.

safeguard public health, ensure clean drinking water, and much more. *See* Doc. No. 122 at 9–10. Relatedly, the States and their residents have an overwhelming interest in orderly and reliable federal funding for critical programs, and in knowing the terms on which they are receiving federal funding. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). So the equities, public interest, and lack of irreparable harm weigh decisively in favor of Plaintiffs.

## II. Defendants Cannot Succeed On The Merits.

As this Court has already found in granting summary judgment to Plaintiffs, Defendants also cannot succeed on the merits. Plaintiffs have challenged final agency action: the Clause itself. And as the Court has thoroughly explained, the Clause does not allow Defendants to terminate grant awards based on new agency priorities that were not identified at the time the award was made. For these reasons too, a stay should be denied.

### A. The Court Correctly Found Final Agency Action.

For over half a century, it has been well established that a plaintiff in an APA action may seek a pre-enforcement declaration directed to the meaning or applicability of a regulation. *See* 5 U.S.C. § 703 (authorizing "actions for declaratory judgments" as proper "form[s] of proceeding for judicial review"); H. R. Rep. No. 1980, 79th Cong., 2d Sess., at 276 (1946); S. Rep. No. 752, 79th Cong., 1st Sess., at 212–13 (1945). Unsurprisingly, then, courts have routinely decided APA actions doing exactly that. *See* Doc. No. 98 at 13–14 & n.3 (collecting cases). It is no exaggeration to say that "preenforcement review of agency rules" is "the norm, not the exception." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 840 (2024) (Kavanaugh, J., concurring). So, in resolving the question of whether the Clause "permit[s] Defendants to terminate grants on the grounds that Defendants have identified new 'agency priorities' after the award of the grant," Doc. No. 64 ¶¶ 281, 290–95, this Court properly held that the regulations constitute a final agency action and declared "the meaning of the Termination Clause" under the Declaratory Judgment Act

and the APA. *See* Doc. No. 122 at 18–19.

Everyone agrees that the regulations at issue are final agency action. In Defendants' own words, the regulations "shape the contours of the legal and contractual relationship between grantor and grantee." Doc. No. 89 at 28; *see also* Doc. No. 146 at 6 ("The promulgation of a rule like the Termination Clause is final agency action."). The only question is whether Count I challenged the Clause in those regulations. It plainly did. As the Court correctly held, "Count I asks the court to declare the meaning of the Termination Clause itself," so it is "directed to the regulation, not Defendants' actions implementing the regulation." Doc. No. 122 at 18–19. After all, Plaintiffs expressly identified "OMB's regulations containing the Clause and the Agency Defendants' parallel regulations" incorporating the Clause as the relevant "final agency action." Doc. No. 64 ¶ 280 (citing 5 U.S.C. § 551(13)). And that was as true for Count III—which Defendants agree involves final agency action—as it was for Count I. *See* Doc. No. 98 at 22 n.8.

It does not matter that Count I sought to clarify the limited scope of the Clause rather than vacate "the Termination Clause as unlawful." Doc. No. 146 at 7–8. The APA specifically contemplates "actions for declaratory judgments," 5 U.S.C. § 703, and directs courts to decide "the meaning or applicability" of agency actions like regulations, 5 U.S.C. § 706. And courts routinely issue declaratory judgments determining the meaning of legal provisions. *See, e.g.*, *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 61–62 (1st Cir. 2021) (granting declaratory judgment as to meaning of a phrase in the federal Wire Act); *cf. N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 8 (1st Cir. 2000) (refusing declaratory judgment because it was inconsistent with Court's interpretation of federal criminal statutes). So, where a regulation could have some valid applications if

interpreted correctly, nothing in the APA or the Declaratory Judgment Act forces the drastic remedy of vacatur over the more limited remedy of a declaratory judgment.[6] To the contrary, the First Circuit has acknowledged that a declaration is preferable where, as here, it provides an "adequate [remedy] under the circumstances." *N.H. Lottery*, 986 F.3d at 62.

But even if Defendants were correct that Count I challenges the agencies' interpretation of the Termination Clause, it would make little difference. Doc. No. 146 at 7. There is no categorical bar to APA review of agency legal interpretations.[7] Doc. No. 146 at 7. Where interpretive decisions are sufficiently definitive, courts routinely find that they are final agency action subject to APA review. *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105–06 (2015) (recognizing that "an agency's decision to issue an interpretive rule" is subject to APA review); *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) ("ATF's issuance of a classification letter [was] a 'final agency action[.]'"); *Fla. Agency for Health Care Admin. v. Adm'r for Centers for Medicare & Medicaid Servs.*, 161 F.4th 765, 778 (11th Cir. 2025) (noting that "interpretive rules can be final" and finding that a CMS Bulletin was "final agency action" where it "enforc[ed] CMS's view"). And that is true here. Defendants' interpretation of the Clause is one from which "legal consequences will flow." *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024). Just like the Clause itself, Defendants' interpretation of the Clause also (in Defendants' words) "shape[s] the contours

---

6 Again, both Count I and Count III sought relief targeted at agency regulations themselves. The only difference was that Count I sought a declaratory judgment as to the Termination Clause's meaning, while Count III requested (in the alternative if Defendants' interpretation were accepted) an order enjoining and invalidating the Termination Clause as unlawful. *Compare* Doc. No. 64 ¶¶ 278–95, *with id.* ¶¶ 306–19.

7 Defendants' cited case is fact specific and inapplicable; it merely found that a "determination" by an agency designee that directed an administrative law judge "to proceed with the administrative process in accordance" with agency regulations was not "final" because it was an "intermediate decision" that did "not end the controversy" and was subject to further proceedings. *DRG Funding Corporation v. Secretary of HUD*, 76 F.3d 1212, 1214–15 (D.C. Cir. 1996).

of the legal and contractual relationship between grantor and grantee" by allowing Defendants to terminate grants on a whim based on changing agency priorities. Doc. No. 89 at 28.

Defendants' interpretation of the Clause is also final—that is, not "tentative or interlocutory." *Harper*, 118 F.4th at 116. Defendants have used their interpretation of the Clause to terminate thousands of grants collectively involving billions of dollars in federal funding. *See* Doc. No. 64 ¶¶ 96–266. They have begun expressly incorporating their particular interpretation of the Clause into new grant awards. *See* Doc. No. 98 at 24. The President has directed Defendants to ensure that "the terms and conditions of existing discretionary grants" permit "immediate termination for convenience" based on Defendants' shifting "agency priorities." Exec. Order No. 14,332 § 6(b), 90 Fed. Reg. 38,929, 38,932 (Aug. 7, 2025). And they have vigorously defended that interpretation here. *See* Doc. No. 146 at 8–14. As Defendants stated at oral argument, "the government interprets this regulation to allow for termination of a grant based on the grant no longer effectuating program goals or agency priorities, and that includes agency priorities that have changed during the grant-making process." Doc. No. 117 at 34. "[T]hat is the government's interpretation of th[e] reg[ulation]." *Id.*; *see also Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 47–48 (D.C. Cir. 2000) (EPA guidance was finally agency action where counsel "admitted at oral argument that EPA's position" was "final" because agency position was not "of a merely tentative or interlocutory nature"). Certainly if "a hodgepodge of memos and emails" is enough for final agency action, then there is more than enough to establish final agency action here.[8] *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 42 (1st Cir. 2026) (collecting cases).

---

[8] It is irrelevant that Defendants' interpretive decision is not memorialized in single writing. As Defendants acknowledged at oral argument, it is not "dispositive" whether Plaintiffs challenge "a written policy or an unwritten policy." Doc. No. 117 at 33. The challenged agency action "need not be in writing to be final and judicially reviewable." *R.I.L-R v. Johnson*, 80 F. Supp.

In the end, whether the final agency action is the Clause itself or Defendants' interpretation of the Clause, the Court properly issued a declaratory judgment under both the APA and Declaratory Judgment Act. In fact, the Court could have simply followed the First Circuit's lead and entered a declaratory judgment under the Declaratory Judgment Act alone. *See N.H. Lottery Comm'n*, 986 F.3d at 62; *see also Schoenthal v. Raoul*, 150 F.4th 889, 901 (7th Cir. 2025) ("Nearly a century of case law establishes that Plaintiffs can bring a standalone claim pursuant to the procedures in the Declaratory Judgment Act" when "the claim satisfies Article III's case-or-controversy requirement."); Doc. No. 98 at 19–20 & n.13. Either way, Plaintiffs "need not assume" the risk of billions more in lawless grant terminations "while waiting for [Defendants] to drop the hammer in order to have their day in court." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) (internal quotation marks and citations omitted).

**B. The Court Correctly Interpreted The Clause.**

As to the meaning of the Clause, every tool of statutory interpretation leads to the same conclusion: Defendants cannot terminate grant awards based on new agency priorities that were not identified at the time the award was made. Unable to overcome that straightforward conclusion, Defendants' stay motion rehashes the same arguments this Court carefully considered and cogently rejected in granting summary judgement to Plaintiffs. This Court should reject them again, as another session of this Court has too. *See California v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2026 WL 2754968, at *31 (D. Mass. Sept. 17, 2026) ("The Court agrees with Judge Talwani's interpretation of 2 C.F.R. § 200.340(a)(4) and adopts her reasoning in full by reference here.").

Start with text and structure. The Clause permits an agency to terminate a grant "if an award

---

3d 164, 184 (D.D.C. 2015); *see also Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (same).

no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2024). Read together, two key terms in the Clause—"no longer" (in "no longer effectuates") and "the" (in "the … agency priorities")—show that the only priorities an agency may invoke to terminate a grant are those that existed when the award was made. As Defendants concede, the phrase "no longer effectuates" "makes clear the regulation contemplates a change in circumstances between when the grant was awarded and when the agency decides to terminate the grant." Doc. No. 146 at 8. But the Clause's use of the article "the" preceding "agency priorities" provides the yardstick against which an agency must measure that change: a *specific* set of program goals and agency priorities, namely those that existed when the award was made. If, as Defendants contend, agencies were permitted to terminate based on "shift[ing]" goals or priorities, *id.* at 9, then it would not be possible to speak of "*the* program goals or agency priorities." Because Defendants' interpretation would require this Court to ignore the definite article "the," it is plainly wrong. *See Arevalo v. Ashcroft*, 344 F.3d 1, 7 (1st Cir. 2003) (describing "the venerable rule that statutes should be interpreted, whenever possible, to give every word and phrase some operative effect"); *Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 59 (1st Cir. 2008) (applying the same principle to regulations).

Defendants' invocation of past-tense language used in subsection 200.340(a)(3) does not support its proposition that subsection (a)(4) requires a "here-and-now analysis" of whether the award effectuates "current[]" agency priorities. Doc. No. 146 at 9. Both subsections involve backward-looking inquiries, and the difference in tense is easily explained by the subsections' differing purposes. Subsection (a)(3) applies when a *grant recipient* partially terminates an award and allows the agency to terminate the rest of the award if it "will not accomplish the purposes for which the Federal award was made." 2 C.F.R. § 200.340(a)(3). Subsection (a)(3) thus sought to clarify

that what mattered was not the *recipient*'s purpose in using the remaining funding, but instead the "purposes for which the Federal award was made." Subsection (a)(4), on the other hand, regulates the *agency*'s authority to affirmatively terminate an award based on whether the award continues to "effectuate[] the program goals and agency priorities." The provision's focus is undisputedly on the agency's program goals and priorities—not the recipient's—so there was no need to clarify that the agency's inquiry should focus on *its* goals and priorities when the award was made. And in any event, other textual clues make subsection (a)(3)'s backward-looking approach clear, specifically its use of "no longer effectuates." As Defendants acknowledge, that language requires a historical assessment of the agency's original priorities measured against the award today. Doc. No. 146 at 8. And Defendants still fail to identify any canon or interpretive principle that requires drafters of regulations to use the past tense to convey that a backward-looking assessment is required, just because another subsection happens to use past tense. If anything, the backward-looking nature of subsection (a)(3) reinforces the backward-looking nature of subsection (a)(4). *See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").

The plain text of the Clause thus preserves agencies' flexibility to "support implementation of … Administration priorities" while protecting against arbitrary agency terminations that would disrupt billions of dollars in pre-awarded grant money. Doc. No. 146 at 10 (quoting 85 Fed. Reg.at 49,506). Indeed, if an agency awarded a grant to solve a particular problem, but that issue "has been resolved in some other way," then the Clause would permit termination because the grant would no longer further the agency's original priorities given that the problem the agency identified for resolution is no longer a problem. Doc. No. 146 at 10. And if an agency needed to "reorient its priorities" on an emergent basis, nothing in the Clause prevents the agency from auditing earlier

awards to ensure they still meet original agency priorities, limiting new grants to those that further the agency's revised objectives, or relying on one of the several other subsections of § 220.340 to terminate grants. But the Clause does not permit agencies to engage in sudden, at-will termination of billions of dollars in grants that would destabilize the entire award system and devastate Plaintiffs and other grantees.

The Clause's regulatory backdrop likewise undermines Defendants' claims. When the Clause was adopted in 2020, OMB explained that the new language was included "to ensure that Federal awarding agencies prioritize *ongoing support* to Federal awards *that meet program goals*." 85 Fed. Reg. at 49,507 (emphases added). And the guidance included two scenarios in which the Clause would permit termination, which Defendants concede contemplate termination based only on "additional evidence" concerning the award's ability to achieve its intended objectives—not termination based on a "change in agency priorities." Doc. No. 146 at 13. Yet while Defendants claim the Clause is not "limited to such situations," *id.*, it is unthinkable that OMB would have contemplated at-will terminations based on shifting agency whims without including such an exemplar. To the contrary, OMB reassured commenters that the Clause would not permit agencies "to terminate grants arbitrarily." 85 Fed. Reg. at 49,509. Assuming, as Defendants contend, that those commenters (incorrectly) interpreted the Clause consistent with Defendants' reading, then OMB's definitive rejection of that reading is evidence enough that the Clause can only be utilized to terminate based on original agency priorities.

Other aspects of the regulatory scheme—which all emphasize agency consistency, transparency, and the clear articulation of agency priorities—only further undermine Defendants' position. As this Court recognized, many regulatory provisions make abundantly clear that recipients must be put on notice *before* awards are made as to the goals and priorities with which they are

expected to comply.[9] OMB's exhaustive emphasis on articulating agency goals and priorities prior to awarding grants cannot be squared with Defendants' position that agencies can "later change those goals" if the agency suddenly deems them "no longer appropriate."[10] Doc. No. 146 at 11. Indeed, such extensive disclosures would have no purpose if agencies could reverse course at any point. Nor would there be much incentive for grantees to pursue agency objectives if their efforts could be so swiftly mooted by an agency about-face.

With this regulatory backdrop in mind, Defendants' expansive interpretation of the Clause would "render[] an unnerving amount" of "text mere surplusage." *Fischer v. United States*, 603 U.S. 480, 498 (2024). As this Court correctly explained, it would no longer be necessary for agencies to seek consent from the recipient to terminate an award, *see* 2 C.F.R. § 200.340(a)(2), or, if

---

[9] *See* 2 C.F.R. Part 200, appendix I(b)(3)(i) (requiring notices of funding opportunities to contain "the full program description" that includes the "general purpose of the funding," the "agency's funding priorities or focus areas," "[p]rogram goals and objectives," and a "description of how the award will contribute to achieving the program's goals and objectives"); 2 C.F.R. § 200.202(a)(1) (requiring federal agencies "before announcing the Notice of Funding Opportunity" to "design a program … [w]ith clear goals and objectives that provide meaningful results and [are] consistent with the Federal authorizing legislation of the program"); 2 C.F.R. § 200.204(a)(8) (stating that "notices of funding opportunities" must "summarize[] the goals and objectives of the program"); 2 C.F.R. § 200.211(a) (stating that federal awards, "where applicable," must include "performance goals, indicators, targets, and baseline data"); 2 C.F.R. § 200.301(a) ("The Federal agency must measure the recipient's performance to show achievement of program goals and objectives …. The Federal agency should establish program goals and objectives during program planning and design …. The Federal agency should clearly communicate the specific program goals and objectives in the Federal award[.]").

[10] Defendants try to minimize the significance of OMB's guidance by pointing out insignificant differences in language between the Clause and the guidance. Doc. No. 146 at 11. But Defendants' focus on minutiae obscures the bigger picture: the guidance makes clear that OMB intended agencies to communicate program goals and priorities with applicants and grant recipients at the outset. That effort would be pointless if agencies could simply terminate grants when those priorities change. And Defendants' arguments are beside the point. Whether the guidance requires agencies to disclose "agency funding priorities" instead of just "agency priorities," for example, hardly proves Defendants' point. Doc No. 146 at 11. A "funding priority" is obviously a type of "agency priority," and a particularly important one in the *grant funding* context.

a grantee seeks partial termination, assess whether the remaining portion of the award meets original program goals, *see id.* § 200.340(a)(3). Agencies can simply decide that they "no longer wish to fund a grantee," Doc. No. 122 at 23 & n.10, and rubberstamp that decision by incanting a change in "agency priorities," as agencies did when terminating various grants last year, *see* Doc. No. 98 at 36–37 & n.16.[11] It does not matter whether Defendants' reading is completely or only partially redundant. Doc. No. 146 at 13. Surplusage is "nonetheless disfavored," and a "construction that creates substantially less of it"—as Plaintiffs' construction does—"is better than a construction that creates substantially more." *See Fischer*, 603 U.S. at 496.

This conclusion is reinforced by constitutional principles. Under the Spending Clause, Congress exceeds its power by surprising "States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. "This threshold requirement—that Congress speak clearly as to a condition it imposes"—ensures that States "know[] what the consequences are" before accepting federal funds. *Kentucky v. Yellen*, 67 F.4th 322, 324 (6th Cir. 2023). Here, Defendants do not contend that Congress has authorized at-will grant termination, or that any such statute would comply with the Spending Clause. They instead assert that the Clause "is not a funding condition." Doc. No. 146 at 14. But as this Court rightly recognized, the Clause "impose[s] [funding] conditions on grants" by permitting them to be terminated if they "no longer effectuate[] program goals or agency priorities." Doc. No. 122 at 31 (quoting 2 C.F.R. § 200.340(a)(4)). And if agencies can terminate based on agency priorities unknown to the State upon accepting the grant, the constitutionally required notice to States is lacking. *Id.*; *see also City of Salem v. Mullin*, 839 F. Supp. 3d 1320,

[11] While Defendants assert that terminating a grant based on changed agency priorities is "not necessarily arbitrary," Doc. No. 146 at 13, their recent conduct in terminating grants—without explanation or consideration of the various interests involved—cannot be described as anything but arbitrary.

1339 (D. Or. 2026) (provision permitting DHS to terminate grants based on "changes to agency priorities" violated the Spending Clause because it was "too ambiguous" and could permit the administration to terminate grants for impermissible reasons "while protected by the vagaries of … changing priorities").

This Court rightly declared that the Clause permits termination of existing grants only where the grant no longer effectuates program goals and agency priorities identified at the time of the award. It should reaffirm that holding and deny the motion for a stay.

## **CONCLUSION**

The Court should deny Defendants' motion to stay pending appeal.

Dated: October 29, 2026

Respectfully submitted,

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Charles C. Kelsh*
Katherine B. Dirks (BBO No. 673674)
*Chief State Trial Counsel*
Vanessa A. Arslanian (BBO No. 688099)
Charles C. Kelsh (BBO No. 703558)
*State Trial Counsel*
Anna J. Lumelsky (BBO No. 677708)
*Deputy State Solicitor*
Yael Shavit (BBO No. 695333)
*Chief, Consumer Protection Division*
Jak Kundl (BBO No. 713951)
*Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
vanessa.arslanian@mass.gov
chaz.kelsh@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

*/s/ Sundeep Iyer*
Sundeep Iyer†
*Solicitor General*
Stephen Ehrlich†
*Deputy Solicitor General*
Jessica L. Palmer†
*Assistant Attorney General*
Bassam F. Gergi†
September R. McCarthy
Amanda I. Morejón (BBO No. 696737)
Sarah Nealon†
*Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Sundeep.Iyer@njoag.gov
Amanda.Morejon@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Rabia Muqaddam*
Rabia Muqaddam†
*Special Counsel for Federal Initiatives*
Jessica Ranucci†
*Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8883
Rabia.muqaddam@ag.ny.gov
Jessica.Ranucci@ag.ny.gov

*Counsel for the State of New York*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

By: */s/ Hayleigh S. Crawford*
Hayleigh S. Crawford†
*Deputy Solicitor General*
Syreeta A. Tyrell†
*Senior Litigation Counsel*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

By: */s/ Shiwon Choe*
Shiwon Choe†
Zelda Vassar†
Harald H. Kirn†
*Deputy Attorneys General*
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-4400
Shiwon.Choe@doj.ca.gov
Zelda.Vassar@doj.ca.gov
Harald.Kirn@doj.ca.gov

*Counsel for the State of California*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ David Moskowitz*
David Moskowitz†
*Deputy Solicitor General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

*Counsel for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: /s/ *Michael K. Skold*
Michael K. Skold†
*Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: /s/ *Ian R. Liston*
Ian R. Liston†
*Director of Impact Litigation*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

By: /s/ *Andrew C. Mendrala*
Andrew C. Mendrala†
*Assistant Attorney General*
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.mendrala@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAI‘I

By: /s/ *Kaliko‘onālani D. Fernandes*
Kaliko‘onālani D. Fernandes†
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawai‘i*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Darren Kinkead*
Darren Kinkead†
*Public Interest Counsel*
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

*Counsel for the State of Illinois*

**LAURA KELLY**
IN HER OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF KANSAS

By: */s/ Justin Whitten*
Justin Whitten†
*General Counsel*
Ashley Stites-Hubbard†
*Deputy Chief Counsel*
Office of the Kansas Governor
300 SW 10th Ave, Room 541-E
Topeka, KS 66612
(785) 296-3930
Justin.h.whitten@ks.gov
Ashley.stiteshubbard@ks.gov

*Counsel for Governor Laura Kelly*

**OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY

By: */s/ S. Travis Mayo*
S. Travis Mayo†
*General Counsel*
Taylor Payne†
*Chief Deputy General Counsel*
Laura C. Tipton†
*Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Jason Anton*
Jason Anton†
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145
jason.anton@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: /s/ Steven J. Goldstein
Steven J. Goldstein†
*Assistant Attorney General*
Office of the Attorney General of Maryland
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6414
Sgoldstein@oag.state.md.us

*Counsel for the State of Maryland*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: /s/ Neil Giovanatti
Neil Giovanatti†
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorney for the People of the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: /s/ Katherine J. Bies
Katherine J. Bies†
*Special Counsel, Rule of Law*
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Counsel for the State of Minnesota*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: /s/ Anjana Samant
Anjana Samant†
*Director of Impact Litigation*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4332
asamant@nmdoj.gov

*Counsel for the State of New Mexico*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: /s/ Heidi Parry Stern
Heidi Parry Stern†
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: /s/ Coby Howell
Coby Howell†
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
coby.howell@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

Jennifer Selber
*General Counsel*

By: */s/ Jacob B. Boyer*
Jacob B. Boyer†
*Deputy General Counsel*
Michael J. Fisher†
*Executive Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Leonard Giarrano IV*
Leonard Giarrano IV†
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2062
lgiarrano@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose†
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

*Counsel for the State of Vermont*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Colin T. Roth*
Colin T. Roth†
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us

*Counsel for the State of Wisconsin*

† Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

*/s/ Charles C. Kelsh*
Charles C. Kelsh

Dated: October 29, 2026